**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| GCM PARTNERS, LLC, an Illinois limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:20-cv-06401 |
| HIPAALINE LTD., a limited company of England and Wales, and EMILY ARIDA FISHER, | ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff GCM Partners, LLC ("GCM Partners" or "Plaintiff") states the following as its Complaint for Injunctive and Other Relief against Defendants Hipaaline Ltd. ("Hipaaline" or "Consultant") and Emily Arida Fisher ("Fisher") (collectively, the "Defendants").

**NATURE OF THE ACTION**

1.     GCM Partners is a state-of-the-art company that originally operated brick-and-mortar medical clinics to treat patients via state-sanctioned medical cannabis programs. Effective October 1, 2019, GCM Partners and Defendant Hipaaline entered into an Exclusive Marketing and Consultant Services Agreement, whereby Defendant Hipaaline agreed to provide a software platform to Plaintiff that facilitated virtual physician-patient visits over the internet (i.e., telehealth). In consultation with Defendants, GCM Partners subsequently expanded its business to include the provision of telehealth services through use of Defendant Hipaaline's domain name www.leafwell.co.

2.     On October 23, 2020, Plaintiff learned that Defendants unequivocally intend to completely remove Plaintiff's access to www.leafwell.co on November 1, 2020, without any legal

basis, justification, or authorization in breach of the parties' agreement, in violation of the Computer Fraud and Abuse Act, and in violation of the Defend Trade Secrets Act. Such action by the Defendants would cause catastrophic loss and irreparable harm to GCM Partners and its patients, who would undoubtedly suffer an interruption in service in the midst of a global pandemic when patients are relying more heavily on telehealth medicine than ever before. GCM Partners' patients, partners, and independent contractors (i.e., doctors) rely on the software platform on a near-continuous basis to conduct business, process patient orders, and fulfill patient needs.

3.      Plaintiff has also learned that Defendants have breached the parties' agreement in multiple other ways, including by breaching a restrictive covenant and exclusivity provisions of the parties' agreement, as outlined below.

## THE PARTIES, JURISDICTION, AND VENUE

4.      Plaintiff GCM Partners, LLC is an Illinois limited liability company with its principal place of business in Chicago, Illinois.

5.      Defendant Hipaaline Ltd. is a limited company of England and Wales with its principal place of business in London, England.

6.      Upon information and belief, Defendant Emily Arida Fisher is a resident and citizen of England.

7.      Jurisdiction and venue are proper in this Court.

8.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because it is a civil action where the matter in controversy exceeds the sum or value of $75,000 and is between a citizen of a State and citizens or subjects of a foreign state.

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff raises federal questions under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the Defend Trade Secrets Act, 18 U.S.C. §§ 1836-39, *et seq.*

10.      The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims arise out of the same case or controversy as the federal claims.

11.      This Court has personal jurisdiction over all Defendants because they consented to the jurisdiction of the State of Illinois and waived all objections to venue and jurisdiction in the parties' agreement.

12.      Venue is proper in this District because a substantial part of the events giving rise to the claims occurred within this District.

## FACTUAL BACKGROUND

**Defendant Fisher Approaches GCM Partners**

13.      In September 2017, Dr. George Gavrilos, Pharm.D., M.A. ("Dr. Gavrilos") and Dr. Steven Salzman, D.O. ("Dr. Salzman") founded a brick-and-mortar practice to treat patients via state-sanctioned medical cannabis programs. The practice began first in Illinois only and then expanded into Maryland, Ohio, and Pennsylvania in the fall of 2018. Dr. Gavrilos formed the legal entity GCM Partners, LLC ("GCM Partners") in October 2018 to reorganize and accommodate the out-of-state expansion. *See* **Exhibit 1**, Affidavit of Dr. George Gavrilos, Pharm.D., M.A. ("Gavrilos Aff.") at ¶ 1.

14.      From approximately September 2017 through October 2019, prior to beginning a business relationship with Defendant Hipaaline, Dr. Gavrilos, while working full-time as a critical-care, clinical pharmacist for a large, academic medical center in the Chicago metropolitan area, undertook the following steps toward building an established, successful medical-cannabis

practice: recruited medical providers; searched for and leased brick-and-mortar office spaces; participated in numerous live and recorded educational, topical webinars to drive attention and patient volumes; secured internet, newspaper, magazine, and radio advertising placements; hired clinical staff and patient-support and provider-support personnel; conducted extensive research and created state-specific workflow documentation mapping the medical-cannabis process in each state with a medical-cannabis program; and sponsored charity events for patient referral and relationship-building purposes. (Gavrilos Aff. ¶ 2.)

15.     In or about May 2019, Dr. Gavrilos was approached by Defendant Fisher about an opportunity to expand GCM Partners' brick-and-mortar practice into the telehealth industry. (Gavrilos Aff. ¶ 3.)

16.     Defendant Fisher represented herself as a medical cannabis marketing specialist with significant experience in telehealth services. (Gavrilos Aff. ¶ 4.)

17.     She serves as the Chief Executive Officer of Defendant Hipaaline. (Gavrilos Aff. ¶ 5.)

18.     Defendant Fisher explained that, by using her services via Defendant Hipaaline, GCM Partners could expand into new markets through the provision of telehealth services to patients. (Gavrilos Aff. ¶ 6.)

19.     On May 31, 2019, Defendant Fisher proposed that GCM Partners could find a team of medical providers in states with medical cannabis programs and operate telemedicine clinics while Defendant Hipaaline would provide marketing efforts and the technological infrastructure to achieve the parties' shared goal of becoming the primary national destination for medical cannabis patients to obtain a doctor's certificate. (Gavrilos Aff. ¶ 7.)

20.     Defendant Fisher estimated that it would take approximately six weeks to develop the online software platform, and that the parties would begin to see the impact of their marketing efforts within 3-6 months of the online platform going live and becoming available to potential patients. (Gavrilos Aff. ¶ 8.)

21.     By October 1, 2019, after several discussions and negotiations between the parties, GCM Partners and Defendant Hipaaline began working together. (Gavrilos Aff. ¶ 9.)

22.     GCM Partners made its first payment to Defendant Hipaaline on or about October 14, 2019. (Gavrilos Aff. ¶ 10.)

23.     Over the course of the next eight months, and with the assistance of the marketing and consulting services provided by Defendants, GCM Partners expended an immeasurable amount of resources and money to grow its network of medical providers, substantially increase its customer base, grow and increase the sophistication of its virtual clinic support staff, and expand its practice from being operational in only four states to operating in at least 21 states through telemedicine with medical providers licensed in each jurisdiction. (Gavrilos Aff. ¶ 11.)

24.     GMC Partners' herculean expansion efforts proved fruitful as the number of patients seen by medical providers of GCM Partners increased tenfold in a matter of months. (Gavrilos Aff. ¶ 12.)

25.     In June 2020, GCM Partners hired Jonathan M. Mraunac ("Mr. Mraunac") as the Chief Operating Officer and General Counsel of GCM Partners. (Gavrilos Aff. ¶ 13.)

26.     Mr. Mraunac recommended that GCM Partners and Defendant Hipaaline memorialize their business relationship in writing. (Gavrilos Aff. ¶ 14.)

**The Parties Enter into an Exclusive Marketing and Consultant Services Agreement**

27.     On or about July 7, 2020, GCM Partners entered into an Exclusive Marketing and Consultant Services Agreement (the "Agreement") with Defendant Hipaaline to formally engage Defendant Hipaaline on an exclusive, independent-contractor basis to perform certain marketing and consulting services related to GCM Partners' medical practice in order to facilitate its bricks-and-mortar practice and expand and enhance its telemedicine presence.  (Gavrilos Aff. ¶ 15.)

28.     A true and correct copy of the Agreement is attached hereto as **Exhibit 2**. (Gavrilos Aff. ¶ 16.)

29.     The Agreement became effective as of October 1, 2019, and is effective for an initial term of five (5) calendar years beginning on July 6, 2020 (the "Initial Term"). The Agreement is set to automatically renew for successive one-year terms (each a "Renewal Term") unless GCM Partners gives written notice to Defendant Hipaaline of its election not to renew at least sixty (60) calendar days in advance of the expiration of the Initial Term or then-current Renewal Term. The Initial Term and Renewal Term(s) are collectively referred to as the "Term." *See* Exhibit 2, § 6.1.

30.     Given the highly-sensitive nature of the medical, proprietary, and personal information at issue in providing marketing and consultant services to GCM Partners, the Agreement contains intricate terms for the handling of confidential information, trade secrets, and patient data. (Gavrilos Aff. ¶ 17.)

31.     "Confidential Information" is defined under the Agreement as "information of a confidential or proprietary nature relating to the subject matter described in this Agreement which is taken from or disclosed by one Party (the "Disclosing Party") by or to the other Party (the "Receiving Party")." *See* Exhibit 2, Section 5.1. Such information includes, but is not limited to

"trade secrets, methods, compositions, data and knowhow; designs; systems; processes; computer programs; files and documentation; research projects; matters of a business nature such as pricing, marketing, advertising, corporate, and sales methods and strategies; the terms of this Agreement; lists of actual, prospective, or potential clients, customers, or patients; any information derived from the foregoing items; and any other information that either Party may expressly designated as confidential during the course of this Agreement." *Id*.

32.     Under Section 5.2 of the Agreement, the parties are directed as to how they must treat Confidential Information:

> <u>Treatment of Confidential Information</u>. The Receiving Party agrees to hold the Disclosing Party's Confidential Information in strict confidence and to take commercially reasonable precautions to protect such Confidential Information (including, without limitation, using all precautions Receiving Party employs with respect to its own Confidential Information). Commercially reasonable precautions shall include compliance with all applicable local, state, federal, and international data-privacy laws, codes, rules, and regulations. The Receiving Party further agrees not to disclose any Confidential Information to any third party; not to use, analyze, transcribe, transmit, decompile, disassemble, or reverse engineer any Confidential Information unless required in the performance of the Receiving Party's duties under this Agreement; not to use any Confidential Information for its own or any third party's benefit unless authorized by this Agreement or by the Disclosing Party in writing; and not to alter or remove any legend, marking, or notice provided by the Disclosing Party on its Confidential Information regarding the confidential and proprietary nature of such information.
>
> ****
>
> The confidentiality obligations contained in this Article 5 shall survive the termination, for any reason, of this Agreement for a period of two (2) calendar years from the date of termination.
>
> ****

33.     To reiterate, in Section 5.2 of the Agreement, the parties agreed ". . . not to use any Confidential Information for its own or any third party's benefit unless authorized by this Agreement or by the Disclosing Party in writing . . ."

34. The information collected from GCM Partners' patients is confidential, HIPAA-protected data that belongs to GCM Partners. (Gavrilos Aff. ¶ 18.)

35. Indeed, Section 5.7 of the Agreement contains the following provision:

Ownership of Data. During the Term of this Agreement, Consultant will necessarily have access to data, data sets, medical records, charts, metadata, and analytics ("Data") containing personal information and protected health information ("PHI") of patients for collaborative use by the Parties in furtherance of this Agreement. Ownership and use of the Data shall be governed as follows: a) **any and all Data originally collected by Company from Company's patients shall permanently be the sole property of Company;** b) any and all Data originally collected by Consultant shall permanently be the sole property of Consultant; c) during the Term of this Agreement and at any time after any termination of this Agreement, any Data owned by one Party but accessible by and/or shared with the other Party may be sold, transferred, and/or used by the non-owning Party for any legitimate business purpose. [**emphasis added**]

36. The following non-exhaustive list also qualifies as GCM Partners' trade secrets and Confidential Information: (i) pricing structure of payments by GCM Partners to its medical providers, (ii) contact and licensing information of existing and prospective medical providers, (iii) revenue figures, (iv) log of patient activity on the Leafwell platform, including peak traffic hours on the platform, (v) patient data and identifying information, including, but not limited to, qualifying condition, medical records, medication history, procedural/surgical history, demographic information, geographic location, and cannabis-use history, (vi) identity of referral partner or source of lead generation, (vii) medical providers' charts and notes, (viii) medical provider activity on the Leafwell platform, and (ix) marketing and partner strategy and targets. (Gavrilos Aff. ¶ 19.)

37. The foregoing information has economic value to GCM Partners by virtue of not being generally known to its competitors. (Gavrilos Aff. ¶ 20.)

38. GCM Partners maintains the confidentiality of its Confidential Information, trade secrets, and patient data by several means, including but not limited to:

a.  Requiring GCM Partners' independent contractors and medical providers to use computers that are password or biometric face-scan protected;

b.  Maintaining GCM Partners' records on a cloud-based service that is encrypted and password protected;

c.  Requiring GCM Partners' vendors, independent contractors, and medical providers with access to Confidential Information and trade secrets to sign confidentiality agreements; and

d.  Providing access on a tiered basis so that the type and amount of Confidential Information, trade secrets, and other highly-sensitive information is limited to select representatives of GCM Partners based on his or her position and role at GCM Partners.

(Gavrilos Aff. ¶ 21.)

39.  Additionally, the Agreement contains various covenants and restrictions, including a non-solicitation provision, to outline the contours of the parties' distinct, exclusive arrangement.

(Gavrilos Aff. ¶ 22.)

40.  For instance, Section 5.5 of the Agreement provided as follows:

Restrictive Covenant. During the Term of this Agreement and for a one (1) calendar-year period following termination of this Agreement, regardless of the reason for termination, throughout the entire United States, Company agrees that it will not: (a) solicit, hire, or engage any of Consultant's employees or independent contractors who are employed or engaged by Consultant as of the Effective Date and (b) offer telehealth medical-cannabis evaluations using Consultant's software platform. **During the Term of this Agreement and for a one (1) calendar-year period following termination of this Agreement, regardless of the reason for termination, throughout the entire United States, Consultant agrees that it will not: (a) solicit, hire, or engage any of Company's employees or independent contractors who are employed or engaged by Company as of the Effective Date.** [emphasis added]

41.  In addition, Section 5.6 of the Agreement provided as follows:

Exclusivity. Company hereby grants Consultant, during the Term of this Agreement, the exclusive right, at all bricks-and-mortar locations of Company, including at any new locations Company may create or acquire during the Term of this Agreement, to provide the Marketing and Consultant Services related to Company's medical cannabis practice. To that end, Company (or its employees, officers, or owners) shall not engage any other consultant, contractor, employee, or other person or entity to perform any service that competes, directly or indirectly,

with the scope of the Marketing and Consultant Services or invest in a business or entity that does same. **During the Term of this Agreement, Consultant shall not employ or engage any physician or other health care provider or practitioner to promote or utilize Consultant's telehealth platform unless the physician or other health care provider or practitioner is an employee or independent contractor of Company. [emphasis added]**

42.     The Agreement also articulates the importance of Plaintiff's access and license to use Defendant Hipaaline's software platform to carry out its telehealth services. (Gavrilos Aff. ¶ 23.)

43.     In pertinent part, Section 5.8 of the Agreement states as follows:

License to Use Consultant's Intellectual Property.

(a)     During the Term of this Agreement and subject to Company's prompt payment of all applicable Marketing Service Fees, Consultant hereby grants to Company a nontransferable, non-assignable (whether by contract or operation of law), nonexclusive, fully paid-up, and royalty-free right and license to use the "Consultant-Licensed IP" (as described in Exhibit D hereto) solely for Company's internal business purposes and for the purpose of rendering medical care and treatments to patients through the medical practice owned and operated by Company.

44.     Exhibit D, which is a mere one-sentence statement, clarifies that Defendant Hipaaline's Licensed IP is a "propriety software that provides a HIPAA-compliant telehealth environment and EHR with marketing and administrative functions." *See* Exhibit 2, Exhibit D.

45.     The HIPAA-compliant telehealth software platform referred to in Section 5.8 and Exhibit D is publicly hosted at www.leafwell.co and accessible to GCM Partners' patients via personal computer, smartphone, and tablet computer.  The platform has separate logins, with tiered access, for medical providers, GCM Partners' staff, and Defendant Hipaaline's staff. (Gavrilos Aff. ¶ 24.)

46.     Subsection (c) of Section 5.8 of the Agreement specifies that:

(c)     Use of Names. During the Term of this Agreement, Company and/or George Gavrilos may use the names "Leafwell MD" and "Leafwell M.D." for any legitimate business purpose, without restriction, including use of Consultant's branding, font, and color scheme in Company's display of the names. During the

Term of this Agreement, Company shall not use the names in violation of Section 5.6 herein. After expiration of the Term of this Agreement or termination of the Agreement for any reason, Company shall immediately cease use of the Consultant-Licensed IP.

47.     Finally, Section 6.2 of the Agreement states as follows:

Termination. This Agreement may be terminated by a Party prior to the expiration of the Term only upon the occurrence of a material breach by the other Party. This Agreement may not be terminated for convenience. Unless otherwise specifically stated herein, a material breach is defined by Illinois law. In the event Company alleges in writing a material breach by Consultant, Company shall be entitled to withhold all or any portion of any payment for services Consultant has performed, whether invoiced or uninvoiced, which Company reasonably believes will sufficiently cover Company's damages. Should the withheld amount be less than Company's damages, Company may apply the withheld amount to any claim and enforce this Agreement for the remainder.

**The Leafwell Online Platform**

48.     The software platform that Defendants constructed for purposes of the Agreement is known as www.leafwell.co. (Gavrilos Aff. ¶ 25.)

49.     Defendant Hipaaline owns and has full rights to use the domain name www.leafwell.co, and the "Leafwell MD" and "Leafwell M.D." trade names. (Gavrilos Aff. ¶ 26.)

50.     However, by entering into the Agreement, Defendant Hipaaline gave GCM Partners nearly unfettered access to the www.leafwell.co platform and the "Leafwell MD" and "Leafwell M.D." names for the purpose of conducting its business and expanding its telehealth services. For example, Jenna Kioussis ("Ms. Kioussis"), a GCM Partners representative who is in charge of overall clinic operations, has super-administrative access and super-clinician access to the Leafwell platform. (Gavrilos Aff. ¶ 27.)

51.     Dr. Gavrilos and Mr. Mraunac have even had leafwell.co email addresses. (Gavrilos Aff. ¶ 28.)

52.     The Leafwell platform has become an integral part of GCM Partners' business. (Gavrilos Aff. ¶ 29.)

53.     Under the Agreement, all patients who use the Leafwell platform are customers of GCM Partners.  GCM Partners processes all patient credit card payments and handles all patient customer-service issues.  (Gavrilos Aff. ¶ 30.)

54.     Potential customers of GCM Partners who have a qualifying medical condition may visit the www.leafwell.co online platform to apply for a medical cannabis card. (Gavrilos Aff. ¶ 31.)

55.     Among other things, qualifying conditions may include autism, cancer, glaucoma, Hepatitis C, lupus, multiple sclerosis, Parkinson's Disease, post-traumatic stress disorder, rheumatoid arthritis, traumatic brain injury, and certain terminal illnesses. (Gavrilos Aff. ¶ 32.)

56.     The application process for obtaining a medical marijuana card on the Leafwell platform has three general steps. An image of a portion of the Leafwell homepage is provided below. (Gavrilos Aff. ¶ 33.)



57.     To begin, potential customers of GCM Partners are required to register in order to virtually meet with a GCM Partners medical provider on the Leafwell platform. (Gavrilos Aff. ¶ 34.)

58.     During the registration process, patients submit their medical history, demographic information, identification, relevant medical records, payment details,[1] and related information. (Gavrilos Aff. ¶ 35.)

59.     If the GCM Partners medical provider that conducts a virtual meeting with the patient determines that he or she has a qualifying condition for which a medical cannabis card is appropriate, the provider will approve the patient, and the Leafwell platform automatically emails the patient with further, state-specific instructions for completing the process. (Gavrilos Aff. ¶ 36.)

60.     Once approved, patients are charged a fee for a doctor's certificate through GCM Partners' third-party payment processor, Bluepay. (Gavrilos Aff. ¶ 37.)

61.     In many states, patients must then complete an official state application to become approved for a medical cannabis card. (Gavrilos Aff. ¶ 38.)

62.     For example, in Illinois, patients wishing to obtain a medical cannabis card must apply online via the State of Illinois Medical Cannabis Patient Registry Program located online at https://medicalcannabispatients.illinois.gov/. (Gavrilos Aff. ¶ 39.)

63.     In Illinois, patients are required to submit their doctor's certificates with their state applications for a medical cannabis card. (Gavrilos Aff. ¶ 40.)

64.     Lastly, if approved by the State of Illinois, patients will receive a medical cannabis card and become eligible to purchase medical cannabis in any registered Illinois medical-cannabis dispensary. (Gavrilos Aff. ¶ 41.)

---

[1] No funds are charged until a GCM Partners medical provider approves the patient for a medical cannabis certification.

65.     Although the licensed medical providers are retained by GCM Partners and the patients are customers of GCM Partners, the name "GCM Partners, LLC" is not identified on the Leafwell software platform in any capacity. (Gavrilos Aff. ¶ 42.)

66.     However, the founders of GCM Partners – Dr. Salzman and Dr. Gavrilos – are identified as two of the featured doctors on the www.leafwell.co homepage. An image of a portion of the homepage is below. (Gavrilos Aff. ¶ 43.)



67.     Dr. Salzman and Dr. Gavrilos act, without pay or legal obligation, as Leafwell ambassadors, participating in topical webinars and marketing pitch meetings with potential dispensary partners in order to grow the Leafwell patient base. (Gavrilos Aff. ¶ 44.)

68.     Dr. Lewis Jassey is the third doctor featured on the www.leafwell.co homepage. Dr. Jassey is an independent contractor of GCM Partners, and he evaluates patients on the Leafwell platform. Dr. Jassey also evaluates medical-cannabis patients for Heally, a competitor of Leafwell offering a somewhat similar telemedicine platform. Dr. Jassey has seen patients on the Heally

14

platform since approximately April 2020 with the full knowledge and consent of Defendants Fisher and Hipaaline.  (Gavrilos Aff. ¶ 45.)

69.     From approximately June 19, 2020, through October 23, 2020, Dr. Gavrilos, Dr. Salzman, Ms. Kioussis, and (after June 1, 2020) Mr. Mraunac, without pay or legal obligation, and in the spirit of cooperation between the parties, attended weekly web-development meetings (via video call) with Defendant Hipaaline's web-development team who maintain and improve the Leafwell platform. (Gavrilos Aff. ¶ 46.)

70.     During the web-development meetings, GCM Partners' personnel shared detailed feedback regarding technical problems with the Leafwell platform and suggestions for design and feature improvements for the platform. GCM Partners' feedback and suggestions led directly to permanent improvements in the efficiency, look, and operation of the Leafwell platform, ultimately improving the patient experience and the ease of clinic operations. (Gavrilos Aff. ¶ 47.)

71.     Along with new patients, the existing customers of GCM Partners may use the Leafwell platform to see a medical provider to renew their medical cannabis certification. Depending on state-specific rules, certifications are valid for a specific duration – ranging from 90 days to three years. (Gavrilos Aff. ¶ 48.)

72.     Medical providers of GCM Partners have access to data on the Leafwell platform which includes a record of every patient visit, the amount charged for each visit, patient-supplied medical records, and the providers' notes/charts for each patient visit.  All of this data, for learning and auditing purposes, is invaluable to GCM Partners' medical providers. (Gavrilos Aff. ¶ 49.)

**Communications Break Down Between the Parties**

73.     Beginning in approximately June 2020, communications between the parties began to break down as Defendant Fisher attempted to exert a level of control and management over

GCM Partners that is not permitted by the Agreement, which limited her role to the provision of marketing and consultant services. (Gavrilos Aff. ¶ 50.)

74. For example, Defendant Fisher routinely micromanaged GCM Partners' clinic operations (despite having no contractual duty or other legal right to do so). This micromanagement included, but was not limited to: incessantly calling and sending instant messages to Ms. Kioussis regarding patient waiting room times and contact correspondence practices; demanding compliance with unrealistic deadlines to complete research-heavy, complicated, state-specific workflows; and calling and instant messaging Ms. Kioussis during non-business hours, including at times when the virtual clinic was closed. This micromanagement interfered materially with GCM Partners' clinic operations. (Gavrilos Aff. ¶ 51.)

75. Such complaints and requests also greatly exceeded the scope of Defendant Hipaaline's marketing and consultant services in the Agreement. *See* Exhibit A of Exhibit 2. (Gavrilos Aff. ¶ 52.)

76. For further example, Ms. Fisher routinely demanded constant, detailed status updates regarding GCM Partners' preparation of workflow documents as the parties expanded into new medical-cannabis state markets. Conversely, when GCM Partners requested updates from Ms. Fisher regarding the status of dispensary partnerships or website platform bug fixes or new-feature implementations, she always became opaque, refused to share details and acted as if GCM Partners' requests for updates were an imposition to her. Ms. Fisher's communication style materially impacted interpersonal relations and overall operation of the business arrangement. (Gavrilos Aff. ¶ 53.)

77. In hopes of maintaining a mutually-beneficial relationship, GCM Partners nonetheless addressed Defendant Fisher's complaints and requests, but Defendant Fisher became

increasingly emboldened and demanding in ways that exceeded the scope of her authority as a principal of Defendant Hipaaline under the Agreement, and she rarely provided details regarding the statuses of her business undertakings. (Gavrilos Aff. ¶ 54.)

**GCM Partners Learns About Federal Complaint Against Defendant Fisher**

78.     On July 8, 2020, Defendant Fisher misdirected a file attachment to Mr. Mraunac via email. (Gavrilos Aff. ¶ 55.)

79.     The attachment contained a filing[2] from a federal legal action pending in the United States District Court for the Central District of California entitled, *Frank D'Ambrosio, M.D. v. Emily Fisher; and Does 1 through 10*, Case No. 2:19-cv-552.  (Gavrilos Aff. ¶ 56.)

80.     From this pleading, GCM Partners learned for the first time that Defendant Fisher had been previously sued for "wholesale theft of Plaintiff Frank D'Ambrosio's lucrative on-line medical marijuana card referral business by Defendant Emily Fisher, a person he hired – and paid handsomely – to develop the web portal through which D'Ambrosio was offering his services." (Gavrilos Aff. ¶ 58.)

81.     On August 13, 2019, the judge in the *D'Ambrosio* action entered a permanent injunction against Defendant Fisher permanently enjoining her from:

> (i) using, registering or seeking to register the DOCTOR FRANK trademark or any mark confusingly similar thereto, (ii) using, registering or seeking to register the *doctorfrank.com* domain name; (iii) using the Doctor Frank website; (iv) using, registering or seeking to register any social media accounts under the name Doctor Frank Live; (v) using the content of the publication *Cannabis is Medicine*; (vi) promoting, selling, offering for sale, distributing or otherwise exploiting the publication *Cannabis is Medicine;* and (vii) using, reproducing, or otherwise exploiting the dataset resulting from D'Ambrosio's patient research and survey entitled "Can Cannabis Be Used To Replace Addictive Pharmaceuticals".

(Gavrilos Aff. ¶ 59.)

---

[2] Report on the Filing or Determination of an Action Regarding a Patent or Trademark. Dkt. 21.

82.     Thus, it appears that immediately after Dr. D'Ambrosio uncovered Defendant Fisher's unlawful scheme, she targeted a new victim – GCM Partners. (Gavrilos Aff. ¶ 60.)

**Defendants Falsely and Pretextually Claim GCM Partners Breached the Agreement and Attempt to Wrongfully Terminate the Agreement**

83.     On October 11, 2020, Dr. Salzman and Dr. Gavrilos met with Defendant Fisher via a Zoom virtual meeting to confront Defendant Fisher about her recent demanding behavior and the scope of the Agreement. (Gavrilos Aff. ¶ 61.)

84.     During the virtual meeting, Defendant Fisher delivered a presentation that concluded the Agreement must be terminated for the following reasons: that GCM Partners communicated in an unproductive fashion; that Defendant Hipaaline preferred to contract with Dr. Gavrilos and Dr. Salzman individually (as opposed to with a legal entity); that she felt the Agreement was merely a "formality" and that it had no real effect; that Leafwell, despite the efforts of GCM Partners in growing Leafwell, was "her company" only; and because Dr. Gavrilos and Dr. Salzman were not "founders" of Leafwell. (Gavrilos Aff. ¶ 62.)

85.     Further, during this virtual meeting, Defendant Fisher said that all revenue would be redirected to be collected by Defendant Hipaaline. (Gavrilos Aff. ¶ 63.)

86.     During the virtual meeting, GCM Partners first learned of Defendant Hipaaline's desire to terminate the Agreement. Dr. Gavrilos and Dr. Salzman were shocked at this news. (Gavrilos Aff. ¶ 64.)

87.     Defendant Hipaaline has no legal basis to terminate the Agreement. (Gavrilos Aff. ¶ 65.)

88.     On October 12, 2020, Defendant Fisher sent an email to Dr. Salzman and Dr. Gavrilos with a proposal stating, in part, that "[a]ll operations and hiring will come under Leafwell," and Defendant Fisher "would like George, Steven, and Lewis to join our [Leafwell]

18

executive team as Medical Directors/Advisors." She also suggested that Dr. Salzman and Dr. Gavrilos would receive "15% of any revenue from partnerships." At the end of the email, Defendant Fisher vaguely noted, "Although we must push forward with the transition, we will allow till 10/31 for a smooth transition." (Gavrilos Aff. ¶ 66.)

89.     On October 13, 2020, Dr. Gavrilos notified Defendant Fisher via email that her proposal was rejected. In his email, Dr. Gavrilos explained: "From GCM's perspective, HIPAALINE has no legal basis upon which to avoid the continued, binding effect of the current agreement between the parties (hereafter, "Agreement"). Accordingly, HIPAALINE's proposal and, more generally, its forecasted intent to avoid the Agreement are viewed as a plea for relief from what HIPAALINE considers to be a bad deal for itself (despite it being negotiated at arm's length by sophisticated business entities, each with their own legal counsel)." (Gavrilos Aff. ¶ 67.)

90.     On October 16, 2020, Defendant Fisher responded to Dr. Gavrilos by stating, in pertinent part, "Today we terminate our contract with GCM with immediate effect. We will honor any financial agreement of our previous contract till the end of the month to allow for a smooth transition, however, should any employees or contractors wish to continue to work with us, they will need to sign a new agreement with HIPAALINE by Monday and they should email me directly." (Gavrilos Aff. ¶ 68.)

91.     Also, on October 16, 2020, counsel for Defendant Hipaaline served a "Notice of Breach of Contract and Termination" to Dr. Gavrilos and Mr. Mraunac ("Purported Termination Notice"). (Gavrilos Aff. ¶ 69.)

92.     The Purported Termination Notice began by stating: "Our firm represents Hipaaline, LLC. This letter shall constitute notice that GCM Partners, LLC is in material breach of the Exclusive Marketing and Consulting Services Agreement between Hipaaline and GCM

Partners, LLC, effective October 1, 2019 (the "Agreement"). Consequently, Hipaaline hereby terminates the Agreement effective immediately." (Gavrilos Aff. ¶ 70.)

93.     The Notice indicated that there were two bases for termination of the Agreement. (Gavrilos Aff. ¶ 71.)

94.     First, Defendant Hipaaline supposedly "bec[a]me aware that GCM Partners engaged a direct competitor of Hipaaline to provide services that are substantially similar, if not identical, to those for which GCM Partners contract[ed] Hipaaline to provide on an exclusive basis. Such conduct is a material breach of the Agreement under Illinois law." (Gavrilos Aff. ¶ 72.)

95.     Second, Defendant Hipaaline purportedly "bec[a]me aware that GCM Partners contracts with providers where it is billing for and receiving payments for services in multiple states in apparent violation of state corporate practice of medicine rules." (Gavrilos Aff. ¶ 73.)

96.     Both of the allegations made by Defendant Hipaaline's counsel in the Purported Termination Letter are false. (Gavrilos Aff. ¶ 74.)

97.     In closing, Defendant Hipaaline demanded that "GCM Partners (i) immediately cease to use Hipaaline's intellectual property, including but not limited to marketing and advertising materials, name, tradenames, trademarks, service marks, logos, and, specifically, the "Leafwell MD" or "Leafwell M.D." names; [and] (ii) immediately return or destroy all Confidential Information of Hipaaline in its possession and provide written certification to Hipaaline of such return and/or destruction." (Gavrilos Aff. ¶ 75.)

98.     Defendant Hipaaline orchestrated the preparation and service of the Purported Termination Notice for the sole purpose of pretextually terminating the Agreement for convenience as a means to take control of GCM Partners' Confidential Information, patient data, and medical providers. (Gavrilos Aff. ¶ 76.)

99.     Contrary to Defendants' allegation in the Purported Termination Letter, GCM Partners has not engaged a direct competitor of Defendant Hipaaline or any other person or entity to provide marketing and consultant services on behalf of GCM Partners. (Gavrilos Aff. ¶ 77.)

100.    Furthermore, GCM Partners has not violated any state corporate practice medicine rules, as suggested in the Purported Termination Notice. (Gavrilos Aff. ¶ 78.)

101.    Moreover, the Purported Termination Notice was based on an unsigned, outdated draft of the Agreement that was provided to Defendant Hipaaline's counsel by Defendant Fisher. (Gavrilos Aff. ¶ 79.)

102.    Defendant Hipaaline's counsel mistakenly referred to "Hipaaline, LLC" in the Purported Termination Notice although the correct party to the Agreement is "Hipaaline Ltd." (Gavrilos Aff. ¶ 80.)

103.    In addition, the Exclusivity clause quoted in the Purported Termination Notice was inaccurate and incomplete.  (Gavrilos Aff. ¶ 81.)

104.    As a professional courtesy, Mr. Mraunac sent the operative Agreement to Defendant Hipaaline's counsel on October 22, 2020. Defendant Hipaaline's counsel acknowledged he had not seen the operative Agreement before he received it from Mr. Mraunac. (Gavrilos Aff. ¶ 82.)

105.    Defendants' attempt to terminate the Agreement was ineffective, and presently GCM Partners is still able to access the Leafwell online platform. (Gavrilos Aff. ¶ 83.)

106.    However, Defendants have threatened and confirmed multiple times that they will (1) disable GCM Partners' access to the Leafwell platform on November 1, 2020, and (2) replace Bluepay with Defendant Hipaaline's own payment processor on November 1, 2020, thereby

rerouting all Leafwell revenues to Defendant Hipaaline. Both actions would violate the Agreement and cause irreparable, incalculable loss to GCM Partners. (Gavrilos Aff. ¶ 84.)

**GCM Partners Responds to the Purported Termination Letter and Points Out That Defendant Hipaaline Has Breached Multiple Provisions of the Agreement**

107. On October 19, 2020, Mr. Mraunac sent a response to the Purported Termination Notice (the "First Letter"). (Gavrilos Aff. ¶ 85.)

108. In the First Letter, Mr. Mraunac noted that "GCM disagrees that it has breached the Agreement in any manner whatsoever. GCM considers the Agreement to be in full force and effect, as it has been since its execution, and expects HIPAALINE to fully abide by its terms." (Gavrilos Aff. ¶ 86.)

109. He also declared that "HIPAALINE has anticipatorily repudiated the Agreement by: vetting payment processors to replace Bluepay (GCM's current processor); Emily Fisher's statement to Lewis Jassey on October 18 that she intends to replace Bluepay on October 19; Ms. Fisher's admission to Dr. Jassey on October 18 that she had communicated with GCM providers to solicit them to sign new independent-contractor agreements with HIPAALINE to see patients on Leafwell's platform; and wrongfully terminating the Agreement via your Notice." (Gavrilos Aff. ¶ 87.)

110. On October 22, 2020, after acquiring further details regarding the extent of Defendants' misconduct, Mr. Mraunac sent a follow-up letter to Defendant Hipaaline's counsel entitled, "Notice of HIPAALINE's Material Breach of Contact" (the "Second Letter"). (Gavrilos Aff. ¶ 88.)

111. In the Second Letter, Mr. Mraunac stated as follows:

GCM Partners, LLC ("GCM") has learned that HIPAALINE has engaged two providers, Drs. Walter Nyabere and Takayoshi Kakiuchi, who have evaluated patients on the Leafwell platform in Minnesota and Pennsylvania, respectively.

> HIPAALINE's direct engagement of these providers violates Section 5.6 of the Agreement. As exclusivity is fundamental to the spirit of the Agreement, this violation constitutes a material breach of the Agreement.

(Gavrilos Aff. ¶ 89.)

112.    Mr. Mraunac graciously provided Defendant Hipaaline an "opportunity to cure this material breach by cancelling any agreements, written or oral, with Drs. Nyabere and Kakiuchi and referring them to Dr. Gavrilos so they can enter independent-contractor agreements with GCM in accordance with the Agreement" no later than October 26, 2020 at 5:00 p.m. (Gavrilos Aff. ¶ 90.)

113.    Defendants have no authority under the Agreement or otherwise to vet or replace GCM Partners' third-party payment processor, Bluepay, and directly collect payments from GCM Partners' patients. (Gavrilos Aff. ¶ 91.)

114.    Section 3.3 of the Agreement states, "[a]ll patient payments received through [Defendant Hipaaline's] telehealth platform shall be solely collected and held by [GCM Partners]." (Gavrilos Aff. ¶ 92.)

115.    Any act by Defendants to change the payment processor may result in an interruption of service to GCM Partners' patients, a complete loss of revenue to GCM Partners, and would constitute a material breach of Section 3.3 of the Agreement. (Gavrilos Aff. ¶ 93.)

116.    In addition, Section 5.6 of the Agreement prohibits Defendant Hipaaline from employing or engaging any physician or other health care provider or practitioner to promote or utilize the Leafwell telehealth platform unless the physician or other health care provider or practitioner is an employee or independent contractor of GCM Partners. (Gavrilos Aff. ¶ 94.)

117.    Defendant Hipaaline directly engaged Dr. Nyabere and Dr. Kakiuchi to promote or utilize the Leafwell telehealth platform, even though neither physician is an employee or

independent contractor of GCM Partners, in direct contravention of Section 5.6 of the Agreement. (Gavrilos Aff. ¶ 95.)

118.    Therefore, Defendant Hipaaline's solicitation of both medical providers is in direct contravention of the terms of the Agreement.  (Gavrilos Aff. ¶ 96.)

119.    Finally, the Termination provision of the Agreement provides that the Agreement may be terminated only upon the occurrence of a material breach, not for convenience. *See* Exhibit 2, Section 6.2.  (Gavrilos Aff. ¶ 97.)

120.    By concocting false, unsupported, and immaterial grounds for attempting to terminate the Agreement in a sheer maneuver to terminate the Agreement for convenience and selfish gain, Defendant Hipaaline violated Section 6.2 of the Agreement.  (Gavrilos Aff. ¶ 98.)

**Defendants Threaten to Shut Down GCM Partners' Access to Leafwell, Seize Its Confidential Data, and Upend It Business**

121.    On October 18, 2020, Dr. Gavrilos and Dr. Salzman attended a virtual Zoom meeting with Defendant Fisher to discuss various letters and email correspondence exchanged between the parties.  (Gavrilos Aff. ¶ 99.)

122.    During that same meeting, Defendant Fisher again proposed that the parties settle their dispute on the following terms: (i) Defendant Hipaaline would assume all overhead and engage all medical providers and staff of GCM Partners directly, (ii) Dr. Salzman, Dr. Gavrilos, and Dr. Jassey would become directors of Leafwell and collect 15% of revenues derived only from marketing partnerships that Dr. Salzman, Dr. Gavrilos, and Dr. Jassey generated, and (iii) the three doctors would receive, collectively, 6% equity interest in the event of a sale of Defendant Hipaaline. (Gavrilos Aff. ¶ 100.)

123.    Dr. Gavrilos again rejected this proposal from Defendant Fisher. (Gavrilos Aff. ¶ 101.)

124.    GCM Partners has not violated the Agreement, and there is no justifiable explanation as to why GCM Partners would accept an offer to receive 15% of ill-defined, self-generated partnership revenue when GCM Partners currently receives 60% of all revenues derived from Leafwell. (Gavrilos Aff. ¶ 102.)

125.    After Dr. Gavrilos rejected her proposal for a second time during the virtual meeting, Defendant Fisher notified Dr. Gavrilos that Defendant Hipaaline would be disabling Bluepay and collecting all revenue directly, and removing GCM Partners' access to the Leafwell platform on November 1, 2020. At that time, Dr. Gavrilos was not certain that Defendants would actually disable GCM Partners' access to its payment processor and the Leafwell platform. (Gavrilos Aff. ¶ 103.)

126.    However, on October 23, 2020, Defendant Hipaaline's counsel clearly and positively confirmed in a telephone conference with Mr. Mraunac that his client does indeed intend to eliminate GCM Partners' access to the Leafwell platform and disable GCM Partners' payment processor, Bluepay, beginning on November 1, 2020. *See* **Exhibit 3**, Affidavit of Jonathan M. Mraunac ("Mraunac Aff.") at ¶ 6.

127.    Shutting down GCM Partners' access to the Leafwell platform would result in a catastrophic, immeasurable loss to GCM Partners.  (Gavrilos Aff. ¶ 104.)

128.    Without access to Leafwell, GCM Partners would be unable to contact its existing and prospective patients.  (Gavrilos Aff. ¶ 105.)

129.    GCM Partners would be unable to access its Confidential Information and patient data stored on the Leafwell platform. (Gavrilos Aff. ¶ 106.)

130.    GCM Partners would be left without an online platform by which to conduct telehealth services for any existing or prospective patients. (Gavrilos Aff. ¶ 107.)

25

131. The medical providers of GCM Partners would be unable to conduct consultations or otherwise communicate with existing and prospective patients. (Gavrilos Aff. ¶ 108.)

132. In essence, GCM Partners' twelve months of effort to grow and expand in the telehealth industry would be completely destroyed if Defendants elected to disable GCM Partners' access to the Leafwell platform and replace Bluepay. (Gavrilos Aff. ¶ 109.)

133. GCM Partners would then be forced to either construct an entirely new online platform or join a different online medical cannabis platform. (Gavrilos Aff. ¶ 110.)

134. Both options would result in a tremendous loss of revenue as it would take, at a minimum, several months and hundreds of thousands of dollars to customize a platform to align with GCM Partners' business model. (Gavrilos Aff. ¶ 111.)

135. The Leafwell platform is, objectively, well-designed and patient-friendly. Further, since October 1, 2019, the "Leafwell" brand name has gained notoriety as a trusted, reliable source for medical-cannabis certifications. If Defendants elect to disable GCM Partners' access to the Leafwell platform and replace Bluepay, GCM Partners will immediately lose the value of that brand cache and be forced to directly compete with it, fundamentally undermining the intent of exclusivity in the Agreement. (Gavrilos Aff. ¶ 112.)

136. There is also no guarantee that any of GCM Partners' existing patients and/or medical providers would agree to join GCM Partners' new platform. (Gavrilos Aff. ¶ 113.)

137. To the contrary, Defendant Hipaaline would be uniquely poised to contact and usurp GCM Partners' existing patients and medical providers, if given the opportunity to do so, as the patients and providers are already familiar with the Leafwell brand and platform, but unaware of GCM Partners. (Gavrilos Aff. ¶ 114.)

**COUNT I**
**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT**
**AGAINST ALL DEFENDANTS**

138.    GCM Partners incorporates all prior paragraphs and factual allegations by reference.

139.    18 U.S.C. § 1030(a)(7) of the Computer Fraud and Abuse Act provides as follows:

(a) Whoever –

****

(7) with intent to extort from any person any money or other thing of value, transmits in interstate or foreign commerce any communication containing any—

(A) threat to cause damage to a protected computer;

(B) threat to obtain information from a protected computer without authorization or in excess of authorization or to impair the confidentiality of information obtained from a protected computer without authorization or by exceeding authorized access; or

(C) demand or request for money or other thing of value in relation to damage to a protected computer, where such damage was caused to facilitate the extortion;

shall be punished as provided in subsection (c) of this section.

140.    In addition to criminal penalties, "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

141.    GCM Partners is engaging in the provision of telehealth services in 21 states across the United States of America, such that the computers used by GCM Partners are protected computers used in interstate commerce. (Gavrilos Aff. ¶ 11.)

142.    Upon information and belief, Defendants are residents of a foreign state providing internet-based marketing and consulting services to GCM Partners, which provides telehealth services across the country. Accordingly, the computers used by Defendants are protected computers used in interstate and foreign commerce.

143. In the present case, with the intent of extorting GCM Partners, Defendant Fisher transmitted a communication from a protected computer containing a threat to damage GCM Partners' protected computers by removing its access to the Leafwell platform, by threatening to seize GCM Partners' Confidential Information and patient data, and by disabling GCM Partners' access to such information.

144. Defendants are not authorized to disable GCM Partners' access to the Leafwell platform.

145. Defendants are not authorized to seize GCM Partners' Confidential Information and patient data, and are not authorized to simultaneously disable GCM Partners' access to such vital information.

146. Nevertheless, Defendants have threatened to knowingly exceed their authorized access to GCM Partners' Confidential Information and patient data, and disable GCM Partners' access to its own Confidential Information and patient data stored on the Leafwell platform.

147. Defendants have violated Section 1030(a)(7) of the Computer Fraud and Abuse Act by transmitting a communication with a daunting ultimatum that GCM Partners either agree to terminate the Agreement and settle this dispute on grossly unfavorable terms for Defendants' selfish gain, or Defendants will single-handedly destroy GCM Partners' telehealth business by (1) disabling its access to Leafwell and any Confidential Information and patient data stored on the Leafwell platform, and (2) interrupting service for all of GCM Partners' patients.

148. Defendants' demand constitutes extortion under the Computer Fraud and Abuse Act.

149. GCM Partners will be irreparably harmed by Defendants' actions as it will be temporarily unable to market to new prospective clients, permanently unable to retrieve order

28

history, address unique patient needs, and access other patient data from the Leafwell platform after its service is disabled, thereby resulting in lost revenues, costs incurred due to an interruption in service, and costs associated with restoring or rebuilding the lost data. (Gavrilos Aff. ¶¶ 105-108.)

150.    GCM Partners' twelve months of effort to grow and expand in the telehealth industry would be completely destroyed if Defendants elected to disable GCM Partners' access to the Leafwell platform. (Gavrilos Aff. ¶ 109.)

151.    GCM Partners would then be forced to either construct an entirely new online platform or join a different online medical cannabis platform. (Gavrilos Aff. ¶ 110.)

152.    Both options would result in a tremendous loss of revenue as it would take, at minimum, several months and hundreds of thousands of dollars to customize a platform to align with GCM Partners' business model. (Gavrilos Aff. ¶ 111.)

**WHEREFORE**, Plaintiff GCM Partners LLC respectfully requests (1) that this Court enter Judgment in favor of GCM Partners and against Defendant Hipaaline and Defendant Fisher as to Count I, (2) that compensatory damages be awarded in an amount to be determined at trial in excess of $75,000, and (3) that this Court grant any such other and further relief, including injunctive relief, that it deems proper and just.

## COUNT II
## ANTICIPATORY BREACH OF LICENSE PROVISION
## AGAINST DEFENDANT HIPAALINE

153.    GCM Partners incorporates all prior paragraphs and factual allegations by reference.

154.    The Agreement is a valid and enforceable contract.

155.    GCM Partners has complied with the terms of the Agreement.

156.    In pertinent part, Subsection (a) of Section 5.8 of the Agreement states as follows:

License to Use Consultant's Intellectual Property.

(a)     During the Term of this Agreement and subject to Company's prompt payment of all applicable Marketing Service Fees, Consultant hereby grants to Company a nontransferable, non-assignable (whether by contract or operation of law), nonexclusive, fully paid-up, and royalty-free right and license to use the "Consultant-Licensed IP" (as described in Exhibit D hereto) solely for Company's internal business purposes and for the purpose of rendering medical care and treatments to patients through the medical practice owned and operated by Company.

157.    Subsection (c) of Section 5.8 of the Agreement specifies that:

(c)     Use of Names. During the Term of this Agreement, Company and/or George Gavrilos may use the names "Leafwell MD" and "Leafwell M.D." for any legitimate business purpose, without restriction, including use of Consultant's branding, font, and color scheme in Company's display of the names. During the Term of this Agreement, Company shall not use the names in violation of Section 5.6 herein. After expiration of the Term of this Agreement or termination of the Agreement for any reason, Company shall immediately cease use of the Consultant-Licensed IP.

158.    On October 23, 2020, Defendant Hipaaline clearly and positively indicated that it would breach Section 5.8(a) and 5.8(c) of the Agreement by prematurely disabling, suspending, or otherwise removing GCM Partners' access to the Leafwell platform without any legal basis, justification, or authorization on November 1, 2020.

159.    Defendant Hipaaline's Purported Termination Letter and subsequent communications and actions constitute an anticipatory breach of the Agreement.

160.    As a result of Defendant Hipaaline's anticipatory breaches, GCM Partners has suffered and will continue to suffer irreparable harm and immeasurable damages, which cannot be adequately remedied at law, as well as compensatory and consequential damages.

**WHEREFORE**, Plaintiff GCM Partners LLC respectfully requests (1) that a temporary restraining order be entered (i) enjoining Defendant Hipaaline from disabling, suspending, or otherwise removing GCM Partners' access to the Leafwell platform, and (ii) requiring Defendants to comply with the terms of the Agreement, pending a preliminary injunction hearing; (2) that

preliminary and permanent injunctions be entered prohibiting Defendant Hipaaline from disabling, suspending or otherwise removing GCM Partners' access to the Leafwell platform for the duration of the Term of the Agreement; (3) that this Court enter Judgment in favor of GCM Partners and against Defendant Hipaaline as to Count II; (4) that damages be awarded in an amount to be determined at trial in excess of $75,000; and (5) that this Court grant any such other and further relief that it deems proper and just.

**COUNT III**
**ANTICIPATORY BREACH OF PATIENT PAYMENTS CLAUSE**
**AGAINST DEFENDANT HIPAALINE**

161.    GCM Partners incorporates all prior paragraphs and factual allegations by reference.

162.    The Agreement is a valid and enforceable contract.

163.    GCM Partners has complied with the terms of the Agreement.

164.    Section 3.3 of the Agreement states, "[a]ll patient payments received through [Defendant Hipaaline's] telehealth platform shall be solely collected and held by [GCM Partners]."

165.    Defendant Fisher, in her capacity as CEO of Defendant Hipaaline, has clearly and positively indicated to a third-party that she has vetted new third-party payment processors and will change the current third-party payment processor from which GCM Partners collects and holds payments from patients via the Leafwell telehealth platform.

166.    Any act by Defendant Hipaaline to change the payment processor may result in an interruption of service to GCM Partners' patients, a complete loss of revenue to GCM Partners, and would constitute a material breach of Section 3.3 of the Agreement. (Gavrilos Aff. ¶ 93.)

167.    Defendant Hipaaline has no authority under the Agreement or otherwise to vet or replace GCM Partners' third-party payment processor, Bluepay, and collect payments from GCM Partners' patients. (Gavrilos Aff. ¶ 91.)

168.     Defendant Hipaaline's communications and actions constitute an anticipatory breach of the Agreement.

169.     GCM Partners will be damaged by Defendant Hipaaline's breach of Section 3.3 of the Agreement.

**WHEREFORE**, Plaintiff GCM Partners LLC respectfully requests (1) that a temporary restraining order be entered prohibiting Defendant Hipaaline from changing GCM Partners' payment processor and collecting patient payments, pending a preliminary injunction hearing; (2) that preliminary and permanent injunctions be entered prohibiting Defendant Hipaaline from changing GCM Partners' payment processor and collecting patient payments for the duration of the Term of the Agreement; (3) that this Court enter Judgment in favor of GCM Partners and against Defendant Hipaaline as to Count III; (4) that damages be awarded in an amount to be determined at trial in excess of $75,000; and (5) that this Court grant any such other and further relief that it deems proper and just.

**COUNT IV**
**BREACH OF TERMINATION CLAUSE**
**AGAINST DEFENDANT HIPAALINE**

170.     GCM Partners incorporates all prior paragraphs and factual allegations by reference.

171.     The Agreement is a valid and enforceable contract.

172.     GCM Partners has complied with the terms of the Agreement.

173.     The Termination provision states that the Agreement may be terminated only upon the occurrence of a material breach, not for convenience. *See* Exhibit 1, Section 6.2.

174.     Defendant Hipaaline directed its counsel to prepare and serve a Purported Termination Notice that was based on false, unsupported, and immaterial grounds. (Gavrilos Aff. ¶ 98.)

175.     The Purported Termination Notice was Defendant Hipaaline's attempt to terminate the Agreement for convenience and selfish gain, in violation of Section 6.2 of the Agreement. *Id*.

**WHEREFORE**, GCM Partners LLC respectfully requests (1) that this Court enter Judgment in favor of GCM Partners and against Defendant Hipaaline as to Count IV; (2) that damages be awarded in an amount to be determined at trial in excess of $75,000; and (3) that this Court grant any such other and further relief that it deems proper and just.

## COUNT V
## BREACH OF EXCLUSIVITY CLAUSE
## AGAINST DEFENDANT HIPAALINE

176.     GCM Partners incorporates all prior paragraphs and factual allegations by reference.

177.     The Agreement is a valid and enforceable contract.

178.     GCM Partners has complied with the terms of the Agreement.

179.     In pertinent part, Section 5.6 of the Agreement provides that Defendant Hipaaline "shall not employ or engage any physician or other health care provider or practitioner to promote or utilize [its] telehealth platform unless the physician or other health care provider or practitioner is an employee or independent contractor of [GCM Partners]," during the Term of the Agreement.

180.     However, Defendant Hipaaline has directly engaged Dr. Nyabere and Dr. Kakiuchi to promote or utilize the Leafwell telehealth platform. (Gavrilos Aff. ¶ 95.)

181.     Neither Dr. Nyabere nor Dr. Kakiuchi is an employee or independent contractor of GCM Partners. *Id*.

182. Therefore, Defendant Hipaaline's solicitation of both medical providers is in direct contravention of Section 5.6 of the Agreement.

**WHEREFORE**, GCM Partners LLC respectfully requests (1) that a temporary restraining order be entered prohibiting Defendant Hipaaline from violating Section 5.6 of the Agreement, pending a preliminary injunction hearing; (2) that preliminary and permanent injunctions be entered prohibiting Defendant Hipaaline from violating Section 5.6 of the Agreement for the duration of the Term of the Agreement; (3) that this Court enter Judgment in favor of GCM Partners and against Defendant Hipaaline as to Count V; (3) that damages be awarded in an amount to be determined at trial in excess of $75,000; and (5) that this Court grant any such other and further relief that it deems proper and just.

### COUNT VI
### TORTIOUS INTERFERENCE WITH CONTRACT
### AGAINST DEFENDANT FISHER

183. GCM Partners incorporates all prior paragraphs and factual allegations by reference.

184. The Agreement between GCM Partners and Defendant Hipaaline is a valid and enforceable contract.

185. Defendant Fisher was aware of the Agreement as she signed it on behalf of Defendant Hipaaline.

186. Defendant Fisher has intentionally interfered with Defendant Hipaaline's duties and obligations and GCM Partners' rights under the Agreement by attempting to force Defendant Hipaaline to terminate the Agreement and disable GCM Partners' access to the Leafwell platform.

187. As a proximate result of Defendant Fisher's misconduct, GCM Partners has been harmed by Defendant Fisher's misconduct.

34

WHEREFORE, GCM Partners LLC respectfully requests (1) that this Court enter Judgment in favor of GCM Partners and against Defendant Fisher as to Count VI; (2) that damages be awarded in an amount to be determined at trial in excess of $75,000; and (3) that this Court grant any such other and further relief that it deems proper and just.

## COUNT VII
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST ALL DEFENDANTS

188.    GCM Partners incorporates all prior paragraphs and factual allegations by reference.

189.    GCM Partners had a reasonable expectation that it would enter into valid business relationships with prospective patients in need of medical cannabis to treat qualifying conditions.

190.    Defendants were aware of GCM Partners' reasonable expectations.

191.    Defendants clearly and positively indicated that they would purposely interfere and prevent GCM Partners' expectancies from being fulfilled by (i) disabling GCM Partners' access to the Leafwell online platform and (ii) usurping GCM Partners' customer base for their own personal benefit without any compensation to GCM Partners. (Gavrilos Aff. ¶¶ 84, 103.)

192.    As a direct and proximate result of Defendants' tortious conduct, GCM Partners will suffer damages in an amount to be determined at trial.

193.    Defendants' conduct was willful and malicious.

WHEREFORE, GCM Partners LLC respectfully requests (1) that this Court enter Judgment in favor of GCM Partners and against Defendants as to Count VII; (2) that damages be awarded in an amount to be determined at trial in excess of $75,000; and (3) that this Court grant any such other and further relief that it deems proper and just.

**COUNT VIII**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT**
**AGAINST ALL DEFENDANTS**

194.     GCM Partners incorporates all prior paragraphs and factual allegations by reference.

195.     The Defend Trade Secrets Act, 18 U.S.C. §§ 1836-39 *et seq*., provides a remedy against the Defendants for their actual and threatened improper use and misappropriation of GCM Partners' trade secrets.

196.     GCM Partners' trade secrets at issue are related to products and services used in, or intended for use in, interstate commerce. Those trade secrets include, among other things: (i) pricing structure of payments by GCM Partners to its medical providers, (ii) contact and licensing information of existing and prospective medical providers, (iii) revenue figures, (iv) log of patient activity on the Leafwell platform, including peak traffic hours on the platform, (v) patient data and identifying information, including, but not limited to, qualifying condition, medical records, medication history, procedural/surgical history, demographic information, geographic location, and cannabis-use history, (vi) identity of referral partner or source of lead generation, (vii) medical providers' charts and notes, (viii) medical provider activity on the Leafwell platform, and (ix) marketing and partner strategy and targets. (Gavrilos Aff. ¶ 19.)

197.     GCM Partners has taken measures to protect its Confidential Information, trade secrets and patient data from disclosure in several ways, including but not limited to:

    a.   Requiring GCM Partners' independent contractors and medical providers to use computers that are password or biometric face-scan protected;

    b.   Maintaining GCM Partners' records on a cloud based service that is encrypted and password protected;

     c.   Requiring GCM Partners' vendors, independent contractors, and medical providers with access to Confidential Information to sign confidentiality agreements; and

     d.   Providing access on a tiered basis so that the type and amount of Confidential Information, trade secrets, and other highly-sensitive information is limited to select representatives of GCM Partners based on his or her position and role at GCM Partners. (Gavrilos Aff. ¶ 21.)

198.    This information has value by virtue of its secrecy, and through it, GCM Partners is able to maintain and grow customer relationships in an efficient, cost-effective, and successful fashion that its competitors cannot duplicate. (Gavrilos Aff. ¶ 20.)

199.    Compiling and maintaining such information provides GCM Partners with a strong competitive advantage that allows it to better serve its patients in the medical cannabis market.

200.    The information is not generally known outside of GCM Partners and is valuable as a result, and would give any competitors of GCM Partners an unfair competitive advantage. (Gavrilos Aff. ¶ 20.)

201.    Because of the value of the information, which GCM Partners has spent a significant amount of time and invested substantial resources developing, GCM Partners restricts access to such information and requires that it be kept confidential.

202.    Defendants are now threatening to take complete control over and use GCM Partners' trade secret information, and suspend GCM Partners' access to such information as well.

203.    Defendants' decision to engage two physicians to promote or utilize the Leafwell telehealth platform, even though neither physician is an employee or independent contractor of GCM Partners, necessarily indicates that Defendants are now engaging in direct competition with GCM Partners in violation of the Agreement, and suggests that Defendants will improperly use GCM Partners' trade secrets to gain an unfair advantage over GCM Partners in the marketplace.

Further, neither physician is subject to a confidentiality agreement with GCM Partners. (Gavrilos Aff. ¶ 95.)

204.     Misappropriation and use of GCM Partners' trade secret information will provide Defendants with an unfair advantage, and cause significant harm to GCM Partners, including, among other things, the loss of the value of that trade secret information as well as a loss in profits and revenues.

WHEREFORE, GCM Partners LLC respectfully requests (1) that a temporary restraining order be entered prohibiting Defendants from misappropriating GCM Partners' trade secrets, pending a preliminary injunction hearing; (2) that preliminary and permanent injunctions be entered prohibiting Defendants Hipaaline from misappropriating GCM Partners' trade secrets for the duration of the Term of the Agreement; (3) that this Court enter Judgment in favor of GCM Partners and against Defendants as to Count VIII; (4) that damages be awarded in an amount to be determined at trial in excess of $75,000; and (5) that this Court grant any such other and further relief that it deems proper and just.

**JURY DEMAND**

Plaintiff demands a jury on all issues so triable.

Respectfully submitted,

**GCM PARTNERS, LLC**

By:_____s/____*Trisha M. Rich*_____
One of Its Attorneys

Trisha M. Rich
Lisa M. Kpor
Holland & Knight LLP
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
312-263-3600
Trisha.Rich@hklaw.com
Lisa.Kpor@hklaw.com

## **CERTIFICATE OF SERVICE**

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that on this 28th day of October, 2020, the foregoing **Complaint for Injunctive and Other Relief** was served via electronic mail upon the following counsel:

Martin B. Carroll
Fox, Swibel, Levin & Carroll, LLP
200 W. Madison Street, Suite 3000
Chicago, IL 60606
mcarroll@foxswibel.com
*Counsel for Defendant Hipaaline*

Pursuant to Section 7.3 of the Agreement, **Complaint for Injunctive and Other Relief** was also served via U.S. Certified Mail to the Los Angeles, California address below and via U.S. International Mail to the London, England address below on the 29th day of October, 2020:

HIPAALINE LTD                          HIPAALINE LTD
c/o Emily Fisher                       c/o Emily Fisher
3680 Wilshire Blvd., Suite 1164        20-22 Wenlock Road
Los Angeles, CA 90100                  London, England N1 7GU


                    */s/ Trisha M. Rich*