UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GCM PARTNERS, LLC, an Illinois limited )
liability company, )
           )
       Plaintiff, )
           )     No. 20 C 6401
   v. )
           )     Judge Sara L. Ellis
HIPAALINE LTD., a limited company of )
England and Wales, and EMILY ARIDA )
FISHER, )
           )
       Defendants. )

## OPINION AND ORDER

Plaintiff GCM Partners, LLC ("GCM") provides telehealth services for medical cannabis patients using Defendant Hipaaline Ltd.'s ("Hipaaline") Leafwell software platform. After Hipaaline indicated its intent to sever the parties' relationship, GCM filed this lawsuit against Hipaaline and its CEO, Emily Arida Fisher on October 28, 2020. GCM brings claims for violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, as well as for Hipaaline's anticipatory and actual breaches of the parties' agreement, Fisher's tortious interference with contract, and tortious interference with prospective economic advantage. In conjunction with the filing of the complaint, GCM filed a motion for a temporary restraining order ("TRO"), asking the Court to (a) enjoin Defendants from disabling, suspending, and otherwise removing GCM's access to the Leafwell platform and its related confidential information and trade secrets, (b) enjoin Defendants from replacing GCM's third-party payment processor, Bluepay, with Hipaaline's own payment processor and collecting patient payments, and (c) require Defendants to comply with the terms of the parties' agreement. The Court received briefing from the parties and held

hearings on the motion on October 30 and November 9, 2020.[1]  GCM and Hipaaline agreed to a standstill arrangement pending the Court's decision, and the Court now construes the TRO motion as a motion for preliminary injunctive relief.  As set forth below, the Court finds that GCM has satisfied the requirements for preliminary injunctive relief and so orders the parties to continue with their standstill arrangement.

BACKGROUND

I.      **Parties' Initial Relationship and the Leafwell Platform**

In 2017, Dr. George Gavrilos, a pharmacist, and Dr. Steven Salzman, a doctor of osteopathy, founded a brick-and-mortar medical clinic to treat medical cannabis patients in Illinois.  By fall 2018, they had expanded to locations in Maryland, Ohio, and Pennsylvania.  Gavrilos formed GCM to accommodate the out-of-state expansion.  To further GCM's business, Gavrilos recruited medical providers, hired clinical and patient- and provider-support staff, participated in webinars to drive attention and patient volumes, and created state-specific workflow documentation for the medical cannabis process in different states.

In May 2019, Fisher, who holds herself out as a medical cannabis marketing specialist, approached Gavrilos about expanding GCM's practice into telehealth.  Fisher proposed that GCM operate telehealth clinics in states with medical cannabis programs, with Hipaaline providing marketing efforts and technological infrastructure.  GCM and Hipaaline began working together, with GCM offering telehealth evaluations for medical cannabis certifications through the Leafwell platform, in October 2019.  The parties did not formalize their relationship

---

[1] Only counsel for Hipaaline has entered an appearance in this case, although Fisher participated in the hearings.

at that time.  Over the next eight months, GCM expanded its telehealth operations to twenty-one states.

To obtain a medical cannabis certification through the Leafwell platform, a patient registers to virtually meet with a GCM medical provider.  Patients submit their medical history, demographic information, identification, relevant medical records, and payment details through the platform.  A GCM medical provider then conducts a virtual appointment with the patient to determine whether the patient qualifies for a medical cannabis card.  If so, the provider approves the patient, and the patient receives state-specific instructions for completing the certification process.  GCM only charges the patient after the medical provider approves the pateint for a medical cannabis certification, using its third-party payment processor, Bluepay, to collect payment.  Although the Leafwell platform does not identify GCM, it features Salzman and Dr. Lewis Jassey as experienced medical marijuana doctors and identifies Gavrilos as the chief pharmacy officer.  Pursuant to Leafwell's terms of service, users agree that any information submitted through the platform "is provided on a non-proprietary and non-confidential basis" and they grant Hipaaline "a non-exclusive, perpetual, irrevocable, royalty-free, fully paid-up, worldwide license . . . to use, reproduce, process, adapt, publicly perform, publicly display, modify, prepare derivative works, publish, transmit, and distribute" any submissions.  Doc. 14-1 at 12.

## II.    The Parties' Agreement

In July 2020, GCM and Hipaaline memorialized their business relationship in the Exclusive Marketing and Consultant Services Agreement (the "Agreement"), which reflected an effective date of October 1, 2019.  The parties agreed to an initial five-year term running from

3

July 6, 2020, with the Agreement set to automatically renew for one-year terms thereafter. The Agreement allows for termination at any time only for "a material breach by the other Party":

> Termination. This Agreement may be terminated by a Party prior to the expiration of the Term only upon the occurrence of a material breach by the other Party. This Agreement may not be terminated for convenience. Unless otherwise specifically stated herein, a material breach is defined by Illinois law.

Doc. 1-1 at 30. The Agreement includes a no-waiver clause, providing that "a Party's failure or refusal to enforce any right under this Agreement shall not operate as a waiver." *Id.* at 31. It also includes an integration clause and requires "mutual, written consent" for any amendments to the Agreement. *Id.* at 32, 33.

The parties focus on several areas of the Agreement, which the Court briefly sets forth below.

### A.     Practice of Medicine

The Agreement's recitals state that GCM "operates bricks-and-mortar medical clinics which treat patients legally via U.S. states' medical-cannabis programs" and that GCM seeks to engage Hipaaline "to perform certain marketing and consulting services related to [GCM]'s medical practice in order to facilitate its bricks-and-mortar presence and expand and enhance its telemedicine presence." *Id.* at 24. GCM also represented that, "[a]s of the Effective date and currently, [GCM] operates its clinics in compliance with all applicable state and federal corporate and health care rules and regulations, including with respect to corporate practice of medicine rules, licensure rules, and telemedicine guidelines." *Id.* at 32.

4

### B.   Exclusivity and Licenses

In § 5.6 of the Agreement, the parties agreed to an exclusive arrangement by which

Hipaaline would be the sole provider of marketing and consulting services to GCM and only

GCM providers would conduct evaluations through the Leafwell platform:

> Exclusivity. [GCM] hereby grants [Hipaaline], during the Term of
> this Agreement, the exclusive right, at all bricks-and-mortar
> locations of [GCM], including at any new locations [GCM] may
> create or acquire during the Term of this Agreement, to provide the
> Marketing and Consultant Services related to [GCM]'s medical
> cannabis practice. To that end, [GCM] (or its employees, officers,
> or owners) shall not engage any other consultant, contractor,
> employee, or other person or entity to perform any service that
> competes, directly or indirectly, with the scope of the Marketing
> and Consultant Services or invest in a business or entity that does
> same. During the Term of this Agreement, [Hipaaline] shall not
> employ or engage any physician or other health care provider or
> practitioner to promote or utilize [Hipaaline]'s telehealth platform
> unless the physician or other health care provider or practitioner is
> an employee or independent contractor of [GCM].

*Id.* at 28. "Marketing and Consultant Services" include online lead acquisition, advertisement

and brand recognition, technology and systems management, lead analytics, a telehealth

connectivity platform, and an electronic health record system. *Id.* at 35–36.

To facilitate the parties' arrangement, Hipaaline provided GCM with a license to use the

Leafwell platform:

> License to Use [Hipaaline]'s Intellectual Property.
>
> (a) During the Term of this Agreement and subject to [GCM]'s
> prompt payment of all applicable Marketing Service Fees,
> [Hipaaline] hereby grants to [GCM] a nontransferable, non-
> assignable (whether by contract or operation of law), nonexclusive,
> fully paid-up, and royalty-free right and license to use the
> [Leafwell platform] solely for [GCM]'s internal business purposes
> and for the purpose of rendering medical care and treatments to
> patients through the medical practice owned and operated by
> [GCM].

5

*Id.* at 28, 38.  Although Hipaaline owns and has full rights to the Leafwell platform's domain

name (www.leafwell.co) and the "Leafwell MD" and "Leafwell M.D." trade names, the

Agreement allows GCM and Gavrilos to use the names "Leafwell MD" and "Leafwell M.D." for

any legitimate business purpose during the Agreement's term.  *Id.* at 29.

### C.  Payments

Section 3.3 of the Agreement provides that "[a]ll patient payments received through

[Hipaaline's] telehealth platform shall be solely collected and held by [GCM]."  *Id.* at 25.

Hipaaline and GCM further agreed that GCM would pay Hipaaline $450 per hour worked, which

"represent[ed] the fair market value of the Marketing and Consultant Services" and was "not

based on the value or volume of services generated by [Hipaaline] on behalf of [GCM]."  *Id.* at

38.  The parties further agreed that if a regulatory agency determined that this rate exceeded fair

market value or otherwise violated any applicable rules or regulations, the parties would

"reasonably work together in good faith to adjust the hourly rate term of this Agreement to be in

compliance."  Doc. 1-1 at 38.

### D.  Confidential Information

The Agreement also includes provisions concerning the use of confidential information

and rights to data generated through the Leafwell platform.  It defines "confidential information"

as "information of a confidential or proprietary nature relating to the subject matter described in

this Agreement which is taken from or disclosed by one Party (the 'Disclosing Party') by or to

the other Party (the 'Receiving Party')."  *Id.* at 26.  The Agreement further specifies that

confidential information includes "trade secrets, methods, compositions, data and knowhow;

designs; systems; processes; computer programs; files and documentation; research projects;

matters of a business nature such as pricing, marketing, advertising, corporate, and sales methods

6

and strategies; the terms of this Agreement; lists of actual, prospective, or potential clients,

customers, or patients; any information derived from the foregoing items; and any other

information that either Party may expressly designate as confidential during the course of this

Agreement." *Id.* Section 5.2 provides, in relevant part:

> Treatment of Confidential Information. The Receiving Party agrees to hold the Disclosing Party's Confidential Information in strict confidence and to take commercially reasonable precautions to protect such Confidential Information (including, without limitation, using all precautions Receiving Party employs with respect to its own Confidential Information). Commercially reasonable precautions shall include compliance with all applicable local, state, federal, and international data-privacy laws, codes, rules, and regulations. The Receiving Party further agrees not to disclose any Confidential Information to any third party; not to use, analyze, transcribe, transmit, decompile, disassemble, or reverse engineer any Confidential Information unless required in the performance of the Receiving Party's duties under this Agreement; not to use any Confidential Information for its own or any third party's benefit unless authorized by this Agreement or by the Disclosing Party in writing; and not to alter or remove any legend, marking, or notice provided by the Disclosing Party on its Confidential Information regarding the confidential and proprietary nature of such information.

*Id.* at 26–27. Section 5.7 further provides:

> Ownership of Data. During the Term of this Agreement, [Hipaaline] will necessarily have access to data, data sets, medical records, charts, metadata, and analytics ("Data") containing personal information and protected health information ("PHI") of patients for collaborative use by the Parties in furtherance of this Agreement. Ownership and use of the Data shall be governed as follows: a) any and all Data originally collected by [GCM] from [GCM]'s patients shall permanently be the sole property of [GCM]; b) any and all Data originally collected by [Hipaaline] shall permanently be the sole property of [Hipaaline]; c) during the Term of this Agreement and at any time after any termination of this Agreement, any Data owned by one Party but accessible by and/or shared with the other Party may be sold, transferred, and/or used by the non-owning Party for any legitimate business purpose.

7

*Id.* at 28.  Upon termination of the Agreement, the parties agreed to return or destroy all

confidential information in their possession or control.  *Id.* at 30.

### III.  GCM's Relationship with its Doctors

#### A.  Independent Contractor Agreements

GCM has entered into independent contractor agreements with the physicians who

conduct medical cannabis evaluations through the Leafwell platform.  These agreements

typically provide that GCM will pay the physician compensation for rendering those "Services"

set forth in the independent contractor agreement.[2]  GCM compensates the physicians per patient

visit, paying either a flat amount—the examples before the Court provide for either $30 or $50

per patient visit—or a percentage of what GCM charges the patient—typically 33% of the

consultation fee.  The physicians agree to "use [their] best professional efforts to perform the

Services in accordance with the terms and conditions of this Agreement and with [GCM]'s

policies and procedures, as issued from time to time."  Doc. 14-1 at 8.  Although GCM

"establish[es] the overall parameters and specifications for the work to be performed,"

physicians remain "responsible for determining the methods, details, and means of performing"

the Services and GCM represents that it does not "control the manner or means of accomplishing

the work."  *Id.*  But the physicians "ha[ve] no authority to offer sales or discounts and ha[ve] no

authority to set prices, nor should [they] attempt to do so," and they agree that GCM has sole

ownership of confidential information, including patients' medical information.  *Id.* at 8, 9–10.

---

[2] Although the independent contractor agreements treat Services as a defined term, they do not
specifically identify the services physicians agree to perform.

**B.** **Dr. Lewis Jassey**

Jassey, one of GCM's independent contractor physicians, began providing evaluations through the Leafwell platform in March 2020. In April 2020, Greg Rovner, the CEO of Heally, a Hipaaline competitor, contacted Fisher for help in finding physicians to cover states in which Heally did not have providers. Fisher arranged a meeting with Jassey, Gavrilos, and Rovner that month. They all agreed that Jassey would evaluate patients through both the Heally and Leafwell platforms and that Heally, GCM, and Hipaaline would receive a portion of the fees Jassey generated from the Heally evaluations.[3]

Jassey is the top provider in terms of volume and revenue on both Heally and Leafwell. He receives a flat fee per evaluation, although the fee varies depending on the patient's state and the platform used. According to Gavrilos, for Jassey's work on the Heally platform, Jassey collects the fee, pays Heally certain administrative fees, and then deposits the remaining amount in GCM's bank account. From that amount, Hipaaline receives 40%, Jassey receives 30%, and GCM receives 30%. The parties did not memorialize this arrangement in writing, however. Hipaaline has reportedly received $47,073.09 between April 19, 2020 and September 26, 2020 from Jassey's work with Heally. According to Gavrilos, GCM stopped paying Hipaaline for any amounts related to Jassey's work with Heally after September 26 at Jassey's request.

**IV.** **Friction Between the Parties**

On October 11, 2020, Salzman and Gavrilos met with Fisher. During this meeting, Fisher sought to terminate the Agreement, claiming that GCM communicated in an unproductive fashion, that Hipaaline preferred to contract with Gavrilos and Salzman individually as opposed

---

[3] GCM points out that Jassey is not the only physician providing services on more than one medical cannabis telehealth platform. Because Hipaaline only focuses on Jassey, the Court does the same.

to through GCM, that the Agreement had no real effect, and that Leafwell was solely her company. She also represented that, going forward, Hipaaline would directly collect all revenue generated through Leafwell. The following day, Fisher sent Salzman and Gavrilos a proposal to have all operations and hiring moved to Leafwell, with Salzman, Gavrilos, and Jassey serving on Leafwell's executive team and receiving 15% of any revenue from the partnership. Gavrilos rejected Fisher's proposal on October 13 and maintained that Hipaaline did not have a basis to terminate the Agreement.

Undeterred, on October 16, Fisher notified GCM that Hipaaline was terminating the Agreement, effective immediately. She indicated that Hipaaline would honor the parties' financial arrangements through the end of October to allow for a smooth transition. Hipaaline also served GCM with a formal notice of breach of contract and termination that same day, indicating that it had terminated the Agreement for GCM's alleged material breaches: (1) engaging a direct competitor of Hipaaline to provide substantially similar services GCM agreed Hipaaline would provide on an exclusive basis, and (2) violating corporate practice of medicine rules by improperly splitting fees with its independent contractor physicians.

Gavrilos and Salzman met with Fisher again on October 18 to discuss the parties' relationship. Fisher proposed a settlement in which Hipaaline would assume all overhead and engage medical providers directly, with Gavrilos, Salzman, and Jassey becoming directors of Leafwell and collecting 15% of revenue derived from marketing partnerships they generated as well as a 6% equity interest in the event of a sale of Hipaaline. Gavrilos rejected the proposal. The following day, GCM formally responded to Hipaaline's notice of termination, disagreeing that it had breached the Agreement and declaring that Hipaaline anticipatorily repudiated the Agreement. GCM sent a second letter to Hipaaline on October 22, claiming that Hipaaline had

violated the Agreement's exclusivity provision by directly engaging two providers, Dr. Walter

Nyabere and Dr. Takayoshi Kakiuchi, to evaluate patients on the Leafwell platform in Minnesota

and Pennsylvania.  GCM provided Hipaaline the opportunity to cure the breach by cancelling its

agreements with those two doctors and having them instead enter independent contractor

agreements with GCM by October 26.  Hipaaline refused to do so, claiming that it only contacted

the doctors after it terminated the Agreement on October 16.  Additionally, Hipaaline reaffirmed

its intention to disable GCM's access to the Leafwell platform and replace Bluepay with

Hipaaline's own payment processor on November 1.

   With the parties at an impasse, GCM filed the present complaint against Defendants on

October 28.  After receiving notice of the complaint and TRO, Hipaaline took several actions,

including disabling GCM's access to the Leafwell platform and related accounts, deactivating

Salzman, the only clinician in Illinois, in the Leafwell platform, and removing any references to

Gavrilos and Salzman from the Leafwell platform.  On October 29, finding herself locked out of

her Leafwell email account, Leslie Thelen, a GCM staff member, contacted Fisher thinking it

was a technical glitch.  Fisher informed Thelen that Leafwell no longer worked with GCM and

that all of GCM's clinic staff now worked for and would be paid by Leafwell.  Fisher promised

to provide Thelen with a Hipaaline employment contract.  Fisher also relayed similar information

to at least one other GCM staff member, Shannon Michel.

   In addition to initiating litigation, GCM held back a payment due to Hipaaline on October

26.[4]  According to Hipaaline, as of October 30, GCM owed Hipaaline $45,896.  Hipaaline had

---

[4] The Agreement provides as follows with respect to payments:

    Unless a valid reason exists under this Agreement for [GCM] to withhold
    payment, [GCM] shall remit payment to Consultant for a given invoice

not yet replaced the third-party payment processor on the Leafwell platform, and so GCM continued to receive all funds paid by patients through the Leafwell platform. During the hearing on GCM's request for injunctive relief, GCM and Hipaaline agreed to enter into a standstill agreement while the Court considered GCM's request for injunctive relief. Pursuant to that agreement, Hipaaline has restored GCM's access to the Leafwell platform and GCM has resumed payments to Hipaaline.

## LEGAL STANDARD

TROs and preliminary injunctions are extraordinary and drastic remedies that "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). The party seeking such relief must satisfy three threshold requirements: it must show (1) some likelihood of success on the merits; (2) an inadequate remedy at law; and (3) that it will likely suffer irreparable harm if the Court does not grant relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020).[5] If the moving party fails to satisfy any one of these threshold requirements, the Court must deny the preliminary relief. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If the

---

within fourteen (14) calendar days of [GCM]'s receipt of that invoice. In the event that [GCM] reasonably believes that there is a valid reason to withhold payment, on or before expiration of the 14-day period following [GCM]'s receipt of an invoice, [GCM] shall (i) provide to [Hipaaline] written notice reasonably describing such basis with respect to any disputed amounts and (ii) remit to [Hipaaline] all amounts not in dispute.

Doc. 1-1 at 25.

[5] Although *Winter* and *Mays* involved preliminary injunctions, "[t]he standards for granting a temporary restraining order and preliminary injunction are the same." *USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019) (citing cases).

moving party makes the threshold showing, however, the Court "proceeds to a balancing analysis, where the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Mays*, 974 F.3d at 818. "This balancing process involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Id.* Finally, the Court considers whether the injunction is in the public interest, which includes taking into account any effects on non-parties. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018).

## ANALYSIS

### I.  Likelihood of Success on the Merits

The Court begins by considering whether GCM is likely to succeed on its breach of contract, CFAA, and DTSA claims. To meet this requirement, the "plaintiff must demonstrate that 'its claim has some likelihood of success on the merits.'" *Mays*, 974 F.3d at 822 (citation omitted). "What amounts to 'some' depends on the facts of the case at hand because of [the Seventh Circuit's] sliding scale approach," *id.*, but it at least requires a "strong" showing that "normally includes a demonstration of how the applicant proposes to prove the key elements of its case," *see Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020). A "mere possibility of success" does not meet this standard. *Id.* at 762.

#### A.  Breach of Contract

Under Illinois law, a breach of contract claim consists of four elements: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) injury to the

plaintiff.[6] *Gallagher Corp. v. Russ*, 309 Ill. App. 3d 192, 199 (1999). To prevail on an anticipatory repudiation claim, a plaintiff must prove (1) the defendant repudiated the contract; (2) the conditions of the contract could be fulfilled had the defendant not repudiated the contract; and (3) damages resulted from the repudiation. *Pope ex rel. Pope v. Econ. Fire & Cas. Co.*, 335 Ill. App. 3d 41, 46 (2002). The repudiation must "clearly and unequivocally" indicate that the party "will not render the promised performance when it becomes due." *Id.* (citing *In re Marriage of Olsen*, 124 Ill. 2d 19, 24 (1988)); *Draper v. Frontier Ins. Co.*, 265 Ill. App. 3d 739, 745 (1994) ("There is no anticipatory repudiation if a party does no more than make doubtful or indefinite statements that it will not perform or that it will perform only within its interpretation of the contract.").

GCM claims that Hipaaline has anticipatorily breached (1) the license provision, § 5.8 of the Agreement, by professing an intention to disable, suspend, or otherwise remove GCM's access to the Leafwell platform on November 1 (Count II); and (2) the patient payments provision, § 3.3 of the Agreement, by indicating that it intends to change the third-party payment processor for the Leafwell platform and directly collect payments from GCM's patients (Count III). GCM also contends that Hipaaline has breached (1) the termination clause, § 6.2 of the Agreement, by serving a termination notice based on false, unsupported, and immaterial grounds (Count IV); and (2) the exclusivity clause, § 5.6 of the Agreement, by directly engaging Dr. Nyabere and Dr. Kakiuchi, to use the Leafwell platform (Count V). Hipaaline responds by arguing that GCM cannot prevail on any of its breach of contract claims because GCM itself has materially breached the Agreement by engaging the services of a competitor and violating

---

[6] The Agreement specifies that Illinois law applies to disputes arising out of the Agreement. Doc. 1-1 at 31.

corporate practice of medicine rules. The Court first considers Hipaaline's claims of breach, which, if proven, would suggest that GCM does not have a reasonable likelihood of success on the merits of its contractual claims.

### 1. Hipaaline's Asserted Bases for Terminating the Agreement

The Agreement provides that a party may terminate the Agreement only upon the occurrence of a material breach by the other party and not for convenience. Under Illinois law, whether a breach is material depends on "whether it is 'so substantial and fundamental as to defeat the objects of the parties in making the agreement,' or whether the failure to perform renders performance of the rest of the contract different in substance from the original agreement.'" *InsureOne Indep. Ins. Agency, LLC v. Hallberg*, 2012 IL App (1st) 092385, ¶ 43 (citation omitted). "The breach must be so material and important to justify the injured party in regarding the whole transaction at an end." *Id.* (citation omitted).

### a. Jassey's Work with Healy

Hipaaline first claims that GCM has materially breached the Agreement's exclusivity provision. Specifically, it argues that because Jassey evaluates medical cannabis patients on both the Healy and Leafwell platforms, GCM has violated its undertaking not to "engage any other consultant, contractor, employee, or other person or entity to perform any service that competes, directly or indirectly, with the scope of the Marketing and Consultant Services or invest in a business or entity that does same." Doc. 1-1 at 28. Hipaaline reads the exclusivity provision too broadly, however. The Agreement defines "Marketing and Consultant Services" as "the Marketing and Consultant Services provided by Consultant to drive traffic to Company," specifically, online lead acquisition, advertisement and brand recognition, technology and systems management, lead analytics, a telehealth connectivity platform, and an electronic health

15

record system. *Id.* at 24, 35–36. These services do not include the evaluation of patients, which the Agreement leaves to GCM's medical providers. Although Healy provides competing marketing and consultant services, Jassey, a physician evaluating patients for medical cannabis certifications, does not. And GCM only has a contract with Jassey, not Healy. Because the plain language of the exclusivity provision does not support Hipaaline's broad interpretation that GCM cannot engage any physician to provide services on the Leafwell platform who also provides services through other telehealth platforms, the Court cannot find on the record before it that Hipaaline has made a strong showing of a breach of the exclusivity provision.

Further, even if Jassey's work for both Leafwell and Healy amounts to GCM indirectly competing with the services Hipaaline provides, Hipaaline would be hard-pressed to demonstrate that such a breach is material and supports termination. At the time the parties entered into the Agreement, Fisher knew of Jassey's work for Healy—she facilitated the arrangement—and received payments derived from Jassey's Healy work. Consequently, it would be difficult for Hipaaline to establish that Jassey's continued work with Healy could be considered "so substantial and fundamental" of a breach that it "defeat[s] the objects of the parties in making the agreement."[7] *InsureOne*, 2012 IL App (1st) 092385, ¶ 43.

### b. Corporate Practice of Medicine and Fee-Splitting

Hipaaline also argues that GCM has violated its representation that, "[a]s of the Effective Date and currently, [GCM] operates its clinics in compliance with all applicable state and federal corporate and health care rules and regulations, including with respect to corporate practice of

---

[7] Hipaaline argues that Fisher's knowledge and apparent acquiescence to the arrangement are of no import because of the Agreement's no-waiver and integration provisions. But Hipaaline has not pointed to anything to suggest that these clauses negate the required materiality inquiry.

medicine rules, licensure rules, and telemedicine guidelines."[8] Doc. 1-1 at 32. According to Hipaaline, GCM's violations of the corporate practice of medicine rules and fee-splitting prohibitions amount to a material breach because continuing to comply with the Agreement would put Hipaaline in the untenable situation of supporting the unlawful practice of medicine. Although the parties discuss several states' laws, the Court focuses on Illinois for purposes of resolving the present motion.[9]

### i.    Corporate Practice of Medicine

According to the corporate practice of medicine doctrine, with limited exceptions, corporations cannot provide professional medical services because only human beings can obtain the licenses required to render medical care. *Berlin v. Sarah Bush Lincoln Health Ctr.*, 179 Ill. 2d 1, 10 (1997). The prohibition stems from public policy concerns with "the dangers of lay control over professional judgment, the division of the physician's loyalty between his patient and his profitmaking employer, and the commercialization of the profession." *Id.*; *see also Carter-Shields, M.D. v. Alton Health Inst.*, 201 Ill. 2d 441, 458 (2002) ("[T]he proscription against the corporate practice of medicine is, at root, animated by the public policy purpose of safeguarding the public health and welfare by protecting the physician-patient relationship from lay interference with the physician's professional judgment.").

Under Illinois law, the practice of medicine includes, among other things (1) appearing to the public as being engaged in the diagnosis or treatment of physical or mental ailments or

---

[8] Although GCM's representation only applied to two specific dates in October 2019 and July 2020, GCM has not pointed to any differences in its operations between these dates and now that would affect the Court's consideration of the validity of the representation.

[9] The Court acknowledges that not every state in which GCM operates prohibits the corporate practice of medicine nor does so in the same way. But because GCM represented that it complied with all relevant state laws, the fact that its operation may not be prohibited in one state would not excuse its failure to comply with other states' laws.

conditions, (2) suggesting, recommending, or prescribing any form of treatment for the palliation, relief, or cure of any physical or mental ailments or condition with the intention of receiving a fee, and (3) diagnosing or attempting to diagnose, prescribing for, or otherwise treating any ailment or condition. 225 Ill. Comp. Stat. 60/49, 60/50. Only licensed individuals may practice medicine, and corporations may not obtain medical licenses. 225 Ill. Comp. Stat. 60/3; *TLC Laser Ctr., Inc. v. Midwest Eye Inst. II, Ltd.*, 306 Ill. App. 3d 411, 422 (1999). The Illinois Limited Liability Company Act also requires "[e]ach organizer of a limited liability company organized to engage in the practice of medicine [to] be a licensed physician of this State or an attorney licensed to practice law in this State." 805 Ill. Comp. Stat. 180/5-1. Similarly, the Illinois Medical Corporation Act provides that "[a]ll of the officers, directors and shareholders of a corporation subject to this Act shall at all times be persons licensed pursuant to the Medical Practice Act of 1987." 805 Ill. Comp. Stat. 15/13.

At this stage, there appears to be no question that the physicians evaluating patients on the Leafwell platform engage in the practice of medicine. For medical cannabis certifications, Illinois requires the certifying health care professional to have an ongoing bona fide physician-patient relationship that is not limited to issuing the written certification or a consultation solely for that purpose and to perform a comprehensive examination of the patient and make or confirm a diagnosis of a debilitating medical condition.[10] 410 Ill. Comp. Stat. 130/10(y), (z); 410 Ill. Comp. Stat. 130/36(a)(4); Ill. Admin. Code tit. 77, § 946.300.

Although the physicians with whom GCM contracts engage in the practice of medicine, it does not necessarily follow that GCM does as well. *See Corporate practice of medicine doctrine*

---

[10] The Court does not address whether the physicians with whom GCM contracts to provide medical cannabis evaluations actually comply with the requirements under Illinois and other states' laws for providing medical cannabis certifications.

*and fee splitting prohibition*, 21 Ill. Prac., The Law of Medical Practice in Illinois § 16:9 (3d ed.)
("[A] physician may be employed as an independent contractor subject to the terms of a contract,
but not the overall control of an employer.").  Admittedly, GCM has made contradictory
statements as to its role in providing medical cannabis certifications in the parties' Agreement
and this litigation.  GCM now represents that the Court should treat it as a management services
organization ("MSO") that provides administrative services to physicians engaged in the practice
of medicine.  An MSO is typically an entity "that provides management services and
administrative systems to one or more medical practices." *E.E.O.C. v. Midwest Emergency
Assocs., Ltd.*, No. 04 C 4353, 2006 WL 495971, at *2 n.3 (N.D. Ill. Feb. 27, 2006); *see also*
Gregory D. Anderson & Emily B. Grey, *The MSO's Prognosis after the ACA: A Viable
Integration Tool?*, 20130211 AHLA Seminar Papers 2 (2013) (providing examples of MSO
services).  To avoid violating the corporate practice of medicine doctrine, physicians typically
bill patients for their professional services and then pay the MSO a management fee tied to the
fair market value of the MSO's services.  Melesa Freerks et al., *Corporate Practice of Medicine-
"A Bad Penny Always Turns Up,"* 20 J. Health Care Compliance 17, 18 (2018).  "If an MSO is
too involved in the operations of a medical practice, a state's corporate practice of medicine
prohibitions may be implicated." *The MSO's Prognosis*, *supra*; *see also* Freerks, *supra*, at 19
("Although the combination of the MSO's authority over the nonprofessional aspects of the
physician practice while allowing the licensed professionals the sole ability to treat patients in his
or her professional judgment does not seem to violate the corporate practice of medicine
doctrine, risk always exists that such an arrangement may be found to violate a particular state's
restriction on corporate practice of medicine.").

GCM maintains that it qualifies as an MSO because it provides non-clinical administrative services to independent contractor physicians, including customer service and technical support assistance on the Leafwell platform, billing and collection services through BluePay, management of electronic health information, and communication with states' medical cannabis programs.  *See TLC Laser Ctr.*, 306 Ill. App. 3d at 424 ("We see no basis to conclude that a company which solely provides administrative services to a physician or group of physicians is thereby engaging in the corporate practice of medicine.").  But Hipaaline responds that the MSO label does not match reality or GCM's prior representations.  Hipaaline highlights that the Agreement is framed as if GCM itself owns and operates a medical practice.  *See, e.g.*, Doc. 1-1 at 24, 28 (providing GCM with a license to use the Leafwell platform "for the purpose of rendering medical care and treatments to patients through the medical practice owned and operated by [GCM]").  GCM argues that while this may indicate "less than perfect contract drafting," it is not a reason to find GCM does not actually operate as an MSO.[11]  Doc. 25 at 2.

GCM's independent contractor agreements are also not models of clarity on the issue. They do draw some delineation between the roles of the physicians and GCM, specifying that the physicians are "responsible for determining the methods, details, and means of performing" their services and that GCM agrees not to "control the manner or means of accomplishing the work."

---

[11] In an additional argument developed in its supplemental briefing, Hipaaline argues that, to the extent GCM is an MSO, it has violated § 5.8(a) of the Agreement because the Agreement provides that GCM may use the Leafwell platform "solely for [GCM's] internal business purposes and for the purpose of rendering medical care and treatments to patients through the medical practice owned and operated by [GCM]."  Doc. 1-1 at 28.  The evidence before the Court suggests that Hipaaline understood that physicians with whom GCM contracted would use the Leafwell platform to provide medical care and that Hipaaline provided access to the Leafwell platform to those physicians.  Further, Hipaaline provided GCM with a license to use the Leafwell platform for GCM's "internal business purposes," which presumably includes the services GCM renders to physicians and patients.  *Id.*  The Court therefore questions whether treating GCM as an MSO would cause a breach of the Agreement's licensing provision and whether any such breach would be material.

Doc. 14-1 at 8. At the same time, however, GCM states that it "establish[es] the overall parameters and specifications for the work to be performed," with the physicians agreeing to perform services "in accordance with . . . the Company's policies and procedures." *Id.* Additionally, GCM, and not the physicians, determines the pricing structure and collects patient payments. Instead of the physicians paying GCM a management fee, GCM compensates the physicians for their services. And GCM represents that it only charges patients if they qualify for a medical cannabis certification, which may incentivize the physicians to certify more patients than are eligible. Most importantly, the independent contractor agreements do not specify what, if any, services GCM provides to the physicians. In light of this contractual arrangement and GCM's representations, as well as a lack of clarity as to how GCM actually operates in practice, the Court finds that Hipaaline has sufficiently set forth how it intends to demonstrate that GCM is engaged in the corporate practice of medicine.

### ii.      Fee-Splitting

Hipaaline also argues that GCM engages in improper fee splitting with its independent contractors. Illinois law provides that "[a] licensee under [the Illinois Medical Practice Act] may not directly or indirectly divide, share or split any professional fee or other form of compensation for professional services with anyone in exchange for a referral or otherwise," subject to certain exceptions. 225 Ill. Comp. Stat. 60/22.2(a). Licensees also "may not divide, share or split a professional service fee with, or otherwise directly or indirectly pay a percentage of the licensee's professional service fees, revenues or profits to anyone for: (i) the marketing or management of the licensee's practice, . . . [or] (iv) negotiating fees, charges or terms of service or payment on behalf of the licensee." 225 Ill. Comp. Stat. 60/22.2(f). But licensees may:

        pay[ ] a fair market value fee to any person or entity whose
        purpose is to perform billing, administrative preparation, or
        collection services based upon a percentage of professional service
        fees billed or collected, a flat fee, or any other arrangement that
        directly or indirectly divides professional fees, for the
        administrative preparation of the licensee's claims or the collection
        of the licensee's charges for professional services, provided that:

        (i) the licensee or the licensee's practice under subsection (c) of
        this Section at all times controls the amount of fees charged and
        collected; and

        (ii) all charges collected are paid directly to the licensee or the
        licensee's practice or are deposited directly into an account in the
        name of and under the sole control of the licensee or the licensee's
        practice or deposited into a "Trust Account" by a licensed
        collection agency in accordance with the requirements of Section
        8(c) of the Illinois Collection Agency Act.

225 Ill. Comp. Stat. 60/22.2(d).

        Hipaaline appears to have a good argument that GCM and the independent contractor physicians are engaged in an improper fee split. Indeed, GCM has not even attempted to show that its payment structure fits into an exception to the Illinois fee-splitting prohibition.[12] To fall into the exception allowing physicians to pay a fair market value for billing, administrative preparation, or collection services, the physicians must control the amount of fees charged and collected, and those fees must be paid directly to the physicians or deposited directly into an account in their name and sole control. 225 Ill. Comp. Stat. 60/22.2(d). But the independent contractor agreements indicate that the physician "has no authority to set prices, nor should he or she attempt to do so," Doc. 14-1 at 8, and GCM collects all patient fees through a third-party payment processor and then pays the physicians as set forth in the independent contractor

---

[12] GCM does maintain that Hipaaline's arguments as to improper fee splitting "are baseless" and that it "is not engaging in improper fee-splitting." Doc. 25 at 3. But, despite having multiple opportunities to rebut Hipaaline's argument, GCM provides no explanation to support these conclusory statements.

agreements.  Nor do the independent contractor agreements describe the services that GCM provides for the physicians, making it unclear what the portion of the patient fee that GCM retains covers and whether that amount aligns with a fair market value.[13]  At this stage, Hipaaline has made a strong showing that GCM and its independent contractor physicians are engaged in improper fee-splitting.[14]

### iii.    Materiality

Although Hipaaline has made a strong showing that GCM does not comply with the corporate practice of medicine and fee-splitting rules in Illinois, the evidence at this time does not lend itself to a finding that these violations provide Hipaaline with a basis to terminate the Agreement.[15]  The determination of a material breach is fact-specific, with the Court to consider factors such as "(1) the extent to which the injured party will be deprived of the benefit that he or she reasonably expected; (2) the extent to which the injured party can be adequately compensated for the part of that benefit of which he or she will be deprived; (3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (4) the likelihood that the party failing to perform or to offer to perform will cure his or her failure, taking account of all the circumstances, including any reasonable assurances; and (5) the extent to which the

---

[13] In contrast to the arrangement GCM has with its physicians, the agreement Hipaaline directly proposed to Jassey provides that the physician pays Hipaaline an hourly flat fee representing the fair market value of Hipaaline's services, with patient payments collected by Hipaaline solely for the physician's benefit. The Court expresses no pinion on the propriety of Hipaaline's proposal.

[14] Although not addressed by the parties, because Hipaaline accepts 40% of GCM's net revenue, Hipaaline may also be implicated in any improper fee-splitting.

[15] Hipaaline argues that agreements that violate Illinois' fee-splitting prohibition are void, citing to *TLC Laser Center*, 306 Ill. App. 3d at 428–29.  But Hipaaline does not explain how the potential invalidity of GCM's contracts with its independent contractor physicians requires finding GCM and Hipaaline's Agreement void, and *TLC Laser Center* does not speak to this issue.  Further, the parties themselves specified that any issues with respect to their payment arrangements would not void the entire Agreement and that they would instead work together to cure those issues, undermining Hipaaline's current argument for termination.

behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." *Commonwealth Edison Co. v. Elston Ave. Props., LLC*, 2017 IL App (1st) 153228, ¶ 19. Although Hipaaline now asserts that it would not have entered into the Agreement if it had known of these violations, the record developed by the parties suggests that Hipaaline entered into the Agreement with eyes wide open, aware of and indeed instrumental in developing GCM's operational model. Hipaaline knew that Gavrilos was not a licensed physician and that he held a stake in GCM. And Hipaaline proposed and facilitated some of the arrangements and fee splits it now claims are impermissible, even accepting payments from GCM that allegedly arise out of these improper fee splits. To the extent that Hipaaline had concerns about GCM's business practices, it had ample opportunities to raise them when negotiating the Agreement; the parties have not identified any changes to GCM's business practices over the past several months that defeat Hipaaline's bargained-for expectations. On the other hand, GCM appears to have substantially relied on expectations of a continued business relationship, having bargained for an initial five-year term to the Agreement that the parties could shorten only in the case of a material breach. Nor does the record suggest that GCM made its representations of compliance with federal and state laws in bad faith. The concerns Hipaaline has identified appear curable, and GCM has expressed an openness to reformation of its agreements with Hipaaline and its independent contractor physicians to conform them to GCM's operations and the complex web of state corporate practice of medicine rules and medical cannabis regulations.

Hipaaline only raised these alleged material breaches—which have existed since the time the parties signed the Agreement—after failing to convince Gavrilos, Salzman, and Jassey to enter into a new partnership with Hipaaline. Instead of suggesting a material breach, the current

record reflects that, unhappy with the Agreement and desiring to cut out the middleman so as to

obtain greater control and profits over a flourishing business, Hipaaline has sought in bad faith to

find a pretextual basis for terminating the Agreement.  In other words, the Court does not find it

likely that Hipaaline will succeed on its defense that GCM has materially breached the

Agreement.  Instead, the Court concludes that GCM has made a strong showing that Hipaaline

breached the termination provision by seeking to terminate the Agreement solely as a matter of

convenience.

### 2.      GCM's Claims of Breach

Hipaaline does not meaningfully contest that, if it did not effectively terminate the

Agreement, GCM has some likelihood of success on its breach of contract claims.  The Court has

addressed GCM's claimed breach of the termination clause above and need not repeat that

analysis here.  As for the other contract claims, by representing that it would disable GCM's

access to the Leafwell platform on November 1, demanding that GCM stop using Leafwell trade

names, and indeed taking steps to restrict GCM's access to the Leafwell platform even after the

filing of the complaint, Hipaaline appears to have demonstrated a clear intent to breach § 5.8(a)

and (c), the license provisions of the Agreement.  And while exploring other payment processors

may not be enough to show an anticipatory breach of § 3.3, the patient payments clause,

Hipaaline reiterated that it definitively planned to change payment processors on November 1 in

violation of that clause's allowance for GCM to solely collect and hold patient payments.

Hipaaline also admits that it directly engaged two physicians to provide telehealth services in

Minnesota and Pennsylvania through the Leafwell platform.  Although Hipaaline maintains that

it did so after it terminated the Agreement, to the extent that termination was ineffective, its

direct engagement with these physicians violates Hipaaline's agreement that all physicians using

the Leafwell platform contract through GCM.  Therefore, the Court finds that GCM has made a

strong showing that it is likely to succeed on its breach of contract claims, notwithstanding

Hipaaline's defense that GCM materially breached the Agreement.

### B.    The CFAA

Although the parties focus mainly on the contract claims, GCM also argues that its

CFAA claim supports injunctive relief.  To state a claim under the CFAA, a plaintiff must allege

(1) damage or loss (2) caused by (3) a violation of one of the substantive provisions set forth in

§ 1030(a), and (4) conduct involving one of the factors of harm set forth in § 1030(c)(4)(A)(i)(I)-

(V), which includes $5,000 in losses over a one-year period.  18 U.S.C. § 1030(g); *Segerdahl*

*Corp. v. Ferruzza*, No. 17-cv-3015, 2019 WL 77426, at *4 (N.D. Ill. Jan. 2, 2019).

Section 1030(a)(7) provides for liability against anyone who:

> with intent to extort from any person any money or other thing of
> value, transmits in interstate or foreign commerce any
> communication containing any--(A) threat to cause damage to a
> protected computer; (B) threat to obtain information from a
> protected computer without authorization or in excess of
> authorization or to impair the confidentiality of information
> obtained from a protected computer without authorization or by
> exceeding authorized access; or (C) demand or request for money
> or other thing of value in relation to damage to a protected
> computer, where such damage was caused to facilitate the
> extortion.

18 U.S.C. § 1030(a)(7).  GCM contends that Hipaaline engaged in extortion in violation of

§ 1030(a)(7) by sending email demands to GCM to renegotiate the parties' arrangement,

threatening that, if GCM did not agree to terminate the Agreement and renegotiate an

arrangement for GCM to continue using the Leafwell platform on unfavorable terms, GCM

would lose access to the Leafwell platform and its telehealth business.[16]  When Hipaaline did not receive the desired response, Hipaaline took steps to cut off GCM's access to the Leafwell platform, which could support a violation under § 1030(a)(7)(C).  *See Eclipse Gaming Sys., LLC v. Antonucci*, No. 17 C 196, 2017 WL 3071258, at *3 (N.D. Ill. July 18, 2017) (plaintiff stated claim under § 1030(a)(7) where it alleged that "Defendant, with the intent to extort money from Plaintiff, sent messages in interstate commerce to Plaintiff's counsel threatening to damage the gaming machines"); *Inplant Enviro-Sys. 2000 Atlanta, Inc. v. Lee*, No. 1:15-CV-0394-LMM, 2015 WL 13297963, at *4 (N.D. Ga. June 9, 2015) (plaintiff pleaded § 1030(a)(7) violation where it alleged that defendants sent an email demanding payment from plaintiff and indicating that plaintiff's email flow and website would be unaffected if it made the payment).

As for the remaining elements of a CFAA claim, both GCM and Hipaaline appear to use protected computers, an element Hipaaline does not meaningfully dispute.  *See* 18 U.S.C. § 1030(e)(2)(B) (defining protected computer to include a computer "used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States"); *Patrick Patterson Custom Homes, Inc. v. Bach*, 586 F. Supp. 2d 1026, 1032 (N.D. Ill. 2008) (finding sufficient an allegation that the "computer was used for business and the business operated in two different states").  As for loss, GCM alleges that any interruption in its access to the Leafwell platform will cause it to lose revenue and incur costs in having to customize a new platform to provide its services and rebuild its lost data, in an amount exceeding the $5,000 loss threshold.  *See* 18 U.S.C. § 1030(e)(11) ("loss" includes "any

---

[16] Although Fisher sent the emails, GCM may seek to hold Hipaaline liable on a theory of vicarious liability.  *See Svanaco, Inc. v. Brand*, 417 F. Supp. 3d 1042, 1060 (N.D. Ill. 2019).

revenue lost, cost incurred, or other consequential damages incurred because of interruption of service").  While Hipaaline maintains that GCM "stretches liability under the CFAA to the point of absurdity" in an attempt to turn its contractual claims into a federal statutory violation, Doc. 14 at 12–13, at this stage, the Court finds that GCM has provided a plausible roadmap as to how it can meet the elements of its CFAA claim.

Alternatively, Hipaaline contends that GCM is unlikely to succeed on the CFAA claim because its allegations trigger immunity under the Good Samaritan provision of the Communications Decency Act, 47 U.S.C. § 230(c)(2).  The Good Samaritan provision states:

> No provider or user of an interactive computer service shall be
> held liable on account of--(A) any action voluntarily taken in good
> faith to restrict access to or availability of material that the
> provider or user considers to be obscene, lewd, lascivious, filthy,
> excessively violent, harassing, or otherwise objectionable, whether
> or not such material is constitutionally protected.

47 U.S.C. § 230(c)(2).  "[A] mistaken choice to block, if made in good faith, cannot be the basis for liability under federal or state law."  *e360Insight, LLC v. Comcast Corp.*, 546 F. Supp. 2d 605, 609 (N.D. Ill. 2008).  Hipaaline represents that it concluded in good faith that GCM's access to the Leafwell platform constitutes and furthers the unlawful practice of medicine.  Even assuming that the Good Samaritan provision would apply to Hipaaline's actions in restricting GCM's access to the Leafwell platform, the evidence before the Court at this time does not suggest that Hipaaline took these actions in good faith but rather acted out of a desire to pretextually terminate the Agreement.  Therefore, the Court finds that GCM has made a strong showing that it is likely to succeed on the CFAA claim.

### C.     The DTSA

Finally, the Court considers GCM's claim that Hipaaline has threatened to misappropriate GCM's trade secrets in violation of the DTSA.  The DTSA, 18 U.S.C. § 1836, creates a private cause of action for "an owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).  The DTSA defines a trade secret as business-related information that the owner has taken reasonable measures to keep secret and from which the owner derives economic value from the information not being generally known or readily ascertainable by others who could gain an economic advantage from the information.  18 U.S.C. § 1839(3). Misappropriation under the DTSA includes the "acquisition of a trade secret of another . . . by improper means" and "disclosure or use of a trade secret of another without express or implied consent" under certain conditions. 18 U.S.C. § 1839(5).

GCM alleges that its trade secrets include "(i) pricing structure of payments by GCM Partners to its medical providers, (ii) contact and licensing information of existing and prospective medical providers, (iii) revenue figures, (iv) log of patient activity on the Leafwell platform, including peak traffic hours on the platform, (v) patient data and identifying information, including, but not limited to, qualifying condition, medical records, medication history, procedural/surgical history, demographic information, geographic location, and cannabis-use history, (vi) identity of referral partner or source of lead generation, (vii) medical providers' charts and notes, (viii) medical provider activity on the Leafwell platform, and (ix) marketing and partner strategy and targets."  Doc. 1 ¶ 196.  The Agreement's terms and the Leafwell platform's terms of use call into question whether all of these categories of information deserve trade secret protection.  *See, e.g.*, Doc. 1-1 at 28 (providing that Hipaaline may use data

29

owned by GCM but accessible to it "for any legitimate business purpose"); Doc. 14-1 at 12 (stating that users of the Leafwell platform provide information on a non-confidential basis).

Even assuming that GCM could establish that its allegedly confidential information merits trade secret protection, GCM appears unlikely to establish misappropriation or threatened misappropriation. *See Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1069 & n.7 (N.D. Ill. 2020) (a court may grant an injunction for threatened misappropriation where a plaintiff demonstrates the "inevitability of trade secret disclosure"). GCM agreed to share its alleged trade secrets with Hipaaline, and there is no indication that Hipaaline acquired access by improper means. *See id.* at 1066 (N.D. Ill. 2020) (no misappropriation where a party acquired alleged trade secrets "through the normal course of his employment"). Further, the Agreement provides that, upon termination, Hipaaline must destroy or return GCM's confidential information. The failure to do so alone does not constitute misappropriation, however. *Id.* ("[T]he failure to return lawfully acquired information does not constitute 'misappropriation' of that information under the DTSA."). And GCM has not sufficiently shown how it could prove that Hipaaline's disclosure or use of its trade secrets is inevitable so as to warrant an injunction. Therefore, GCM has not made the strong showing required to establish it has some likelihood of success on its DTSA claim.

## II.     Inadequate Remedy and Irreparable Harm

The Court next considers whether GCM has demonstrated irreparable harm and whether it has an inadequate remedy at law with respect to its breach of contract and CFAA claims. GCM argues that if Hipaaline cuts GCM out of the Leafwell platform, GCM will lose its relationship with its patients and medical providers, as well as the goodwill it has developed under the Leafwell brand name. GCM also maintains that it will lose its extensive efforts to

grow and expand in the telehealth industry and be forced to construct or join another online platform, which will require a significant amount of time, effort, and money. The loss of customers and sales and the continuing threat of further loss can constitute irreparable harm. *Mintel Int'l Grp., Ltd. v. Neergheen*, No. 08-CV-3939, 2008 WL 2782818, at *5 (N.D. Ill. July 16, 2008); *see also Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002) (injury to consumer goodwill constitutes irreparable harm); *Am. Food & Vending Corp. v. United Parcel Serv. Oasis Supply Corp.*, No. 02 C 9439, 2003 WL 256865, at *2 (N.D. Ill. Jan. 31, 2003) (same). The potential for irreparable harm is especially clear in this case given that GCM has operated solely under Leafwell's branding, meaning that GCM would essentially have to start from scratch to introduce itself to the market if it loses access to the Leafwell platform. At the same time, Hipaaline could take advantage of the work GCM has done to make the Leafwell platform a profitable business. Hipaaline responds that GCM accepted the risk of an interruption of business because Hipaaline could terminate the Agreement upon a material breach. But GCM did not accept a risk of interruption during the duration of the Agreement for Hipaaline's convenience only.

As for an inadequate remedy at law, Hipaaline points out that the traditional remedy for a breach of contract is monetary damages. While "[i]nadequate remedy at law does not mean wholly ineffectual . . . the remedy must be seriously deficient as compared to the harm suffered." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003); *see also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (damages are inadequate when (1) "[t]he damage award may come too late to save the plaintiff's business"; (2) "[t]he plaintiff may not be able to finance his lawsuit against the defendant without the revenues from his business that the defendant is threatening to destroy"; (3) "[d]amages may be unobtainable from the defendant

31

because he may become insolvent before a final judgment can be entered and collected"; or (4) "[t]he nature of the plaintiff's loss may make damages very difficult to calculate"). GCM maintains that a monetary remedy at the conclusion of the case could cause it to go out of business while awaiting that award. Indeed, harm such as loss of goodwill, competitive position, and continuity of business relationships "is oftentimes fatal to businesses, and cannot be readily calculated and cured by an award of monetary damages." *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d 866, 872 (N.D. Ill. Feb. 24, 2006); *see also Promatek*, 300 F.3d at 813 (difficulty in assessing damages related to loss of goodwill shows inadequate remedy at law); *Mazak Optonics Corp. v. Marlette*, No. 17 C 1023, 2017 WL 3394727, at *2 (N.D. Ill. Aug. 8, 2017) ("It would also be extremely difficult to quantify the precise monetary losses that might continue to be suffered by [the plaintiff] due to loss of goodwill."). Hipaaline maintains that any damages calculation can take into account growth in the market and increased competition, meaning it is not "virtually impossible to ascertain the precise economic consequences" of Hipaaline's conduct. *EnVerve, Inc. v. Unger Meat Co.*, 779 F. Supp. 2d 840, 845 (N.D. Ill. 2011). Although a close question, the Court agrees with GCM that because the telehealth space for medical cannabis services is new and highly competitive and GCM's business model depends significantly on the continued use of a telehealth platform, any disruption to its business could prove devastating and difficult to quantify and supports injunctive relief. *See Mickey's Linen v. Fischer*, No. 17 C 2154, 2017 WL 3970593, at *18 (N.D. Ill. 2017) (collecting cases finding that the loss of business can be unquantifiable and supports injunctive relief).

32

### III.    Balance of Harms and the Public Interest

Having found GCM has sufficiently established a likelihood of success, irreparable harm, and an inadequate remedy at law, the Court must "weigh[ ] the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Girl Scouts*, 549 F.3d at 1086. The Court must also take into consideration the public's interest in the controversy. *Courthouse News Serv.*, 908 F.3d at 1068.

GCM argues that Hipaaline will not face any harm because injunctive relief would merely require Hipaaline to comply with the Agreement's terms, with GCM agreeing to continue to pay Hipaaline for its services over the term of the injunction. And while Hipaaline argues that continuing to provide GCM with access to the Leafwell platform would mean it supports the unlawful practice of medicine, the parties can take steps to address this newfound concern that stop short of wholesale termination of the Agreement. On the other hand, if Hipaaline proceeds to revoke GCM's access to the Leafwell platform without cause, GCM will suffer irreparable harm. *See Reliable Prop. Servs., LLC v. Capital Growth Partners, LLC*, 1 F. Supp. 3d 961, 965 (D. Minn. 2014) ("George used information to which he had no right to attempt to force Reliable to agree to some kind of concession or settlement in connection with the parties' ongoing copyright dispute. Enjoining such conduct would not cause George any harm that can legitimately outweigh the harm that George is causing Reliable."). The public interest also supports "enforcing valid contracts," which would include ensuring that, in this case, Hipaaline does not pretextually terminate the Agreement. *Optionmonster Holdings, Inc. v. Tavant Techs., Inc.*, No. 10 C 2792, 2010 WL 2639809, at *10 (N.D. Ill. June 29, 2010).

33

Therefore, the Court finds it appropriate to grant GCM injunctive relief and preliminarily enjoins Hipaaline from taking any steps in contravention of the parties' Agreement, including disabling, suspending, or otherwise removing GCM's access to the Leafwell platform as well as replacing the third-party payment processor on the Leafwell platform.

## IV.    Security

Rule 65 requires that GCM give security in an amount that the Court concludes is proper to pay the costs and damages sustained by Hipaaline if Hipaaline was wrongfully enjoined. "The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him[.]" *Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 516 (7th Cir. 2002). The Court may find that a bond is not required where "there's no danger that the opposing party will incur any damages from the injunction." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010). The Court may also balance the need for an injunction against the movant's ability to pay. *Id.* Although GCM has agreed to make payments due under the Agreement as it had before filing the complaint while a preliminary injunction remains in effect, the Court also finds it appropriate for GCM to post a $10,000 bond to compensate Hipaaline for any harm it may suffer if ultimately the Court wrongfully enjoined Hipaaline.

## CONCLUSION

For the foregoing reasons, the Court grants GCM's motion for a temporary restraining order [4], which the Court construes as a motion for a preliminary injunction. Pursuant to Federal Rule of Civil Procedure 65, for the duration of this litigation and pending further order of this Court, the Court immediately enjoins and restrains Hipaaline from (a) disabling, suspending, or otherwise removing GCM's access to the Leafwell platform; (b) replacing GCM's third-party

payment processor, Bluepay, with its own payment processor and collecting patient payments from the Leafwell platform; and (c) violating any other provision of the Agreement. GCM shall post a bond in the amount of $10,000 with the Clerk of the Court as security.


Dated: November 23, 2020

_____
SARA L. ELLIS
United States District Judge

35