**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GCM PARTNERS, LLC, an Illinois limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 20 C 6401 |
| HIPAALINE LTD., a limited company of England and Wales, and EMILY ARIDA FISHER, | ) ) ) ) | Judge Sara L. Ellis |
| Defendants. | ) ) | |

## OPINION AND ORDER

Plaintiff GCM Partners, LLC ("GCM") provided telehealth services for medical cannabis

patients using Defendant Hipaaline Ltd.'s ("Hipaaline") Leafwell software platform. After

Hipaaline indicated its intent to sever the parties' relationship, GCM filed this lawsuit against

Hipaaline and its CEO, Emily Arida Fisher, on October 28, 2020. GCM brings claims for

violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and the Defend

Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, as well as for Hipaaline's anticipatory and actual

breaches of the parties' agreement, Fisher's tortious interference with contract, and tortious

interference with prospective economic advantage. In conjunction with the filing of the

complaint, GCM sought preliminary injunctive relief. After receiving briefing and holding

hearings on the request,[1] on November 23, 2020, the Court issued an Opinion and Order, in

which it found that GCM satisfied the requirements for preliminary injunctive relief. Doc. 26.

Pursuant to Federal Rule of Civil Procedure 65, for the duration of the litigation and pending

further order of the Court, the Court enjoined and restrained Hipaaline from (a) disabling,

---

[1] At the time that the Court considered GCM's request for injunctive relief, only counsel for Hipaaline had entered an appearance in this case, although Fisher participated in the hearings.

suspending, or otherwise removing GCM's access to the Leafwell platform; (b) replacing GCM's third-party payment processor, Bluepay, with its own payment processor and collecting patient payments from the Leafwell platform; and (c) violating any other provision of the parties' agreement.[2] *Id.* at 34–35.

On February 24, 2021, Hipaaline entered administration, a formal insolvency procedure, in the United Kingdom. That same day, the administrators sold certain of Hipaaline's assets to Online MD Ltd. ("Online MD"), a company also controlled by Fisher. After GCM discovered that it no longer had access to the Leafwell platform and related software and that Hipaaline had entered into administration, GCM filed an emergency motion for issuance of a rule to show cause and a finding of contempt [57]. GCM also seeks modification of the preliminary injunction to directly prevent Fisher from taking certain actions [63]. The Court held evidentiary hearings on March 19 and April 2, 2021. Given the ongoing insolvency proceedings, the Court finds that it cannot take any action against Hipaaline, Online MD, or Fisher in her official capacities as a former Hipaaline director and officer or a current Online MD director and officer. And while the Court concludes that the preliminary injunction extends to Fisher in her personal capacity for actions taken after Hipaaline entered administration, GCM has not met its burden to show that Fisher acted in contempt of the Court's order.

---

[2] The Court acknowledges that part (c) of the relief it ordered—precluding Hipaaline from violating any other provision of the parties' agreement—violates Rule 65(d)(1)(C) by referring to another document to describe the restrained acts. Nonetheless, the other aspects of the Court's preliminary injunction (parts (a) and (b)) remain valid.

## BACKGROUND[3]

### I. Pre-Suit Facts

In 2017, Dr. George Gavrilos, a pharmacist, and Dr. Steven Salzman, a doctor of osteopathy, founded a brick-and-mortar medical clinic to treat medical cannabis patients in Illinois. Gavrilos formed GCM in the fall of 2018 to accommodate out-of-state expansion. Fisher, who holds herself out as a medical cannabis marketing specialist, approached Gavrilos in May 2019, about expanding GCM's practice into telehealth by working with Hipaaline, of which Fisher was the CEO and majority shareholder. Fisher proposed that GCM operate telehealth clinics in states with medical cannabis programs, with Hipaaline providing marketing and technological infrastructure. GCM agreed, and the parties began working together in October 2019 to offer telehealth evaluations for medical cannabis certifications through the Leafwell platform, expanding to twenty-one states over the next eight months.

In July 2020, GCM and Hipaaline memorialized their business relationship in the Exclusive Marketing and Consultant Services Agreement (the "Agreement"), which reflected an effective date of October 1, 2019. The parties agreed to an initial five-year term running from July 6, 2020, which would automatically renew for one-year terms thereafter. The Agreement allowed for termination at any time only for "a material breach by the other Party" and specified that a party could not terminate the Agreement merely "for convenience." Doc. 1-1 at 30. The Agreement required mutual, written consent for any amendments, as well as written consent from the other party for any assignment or delegation of the Agreement, and provided that it bound the parties' successors and assigns. *Id.* at 30.

---

[3] The Court presumes familiarity with the facts set forth in its November 23, 2020 Opinion and Order, Doc. 26, and only briefly recounts those facts here.

In the Agreement, Hipaaline represented that it "own[ed] and ha[d] full rights to use for the purposes of this Agreement the domain name www.leafwell.co and subject matter appearing at that web address as of May 1, 2020" and agreed to provide GCM with a license to use the Leafwell platform. *Id.* at 28, 31, 38. Section 3.3 of the Agreement provided that GCM would collect all patient payments. *Id.* at 25. The Agreement further provided that GCM would pay Hipaaline $450 per hour worked, which "represent[ed] the fair market value of the Marketing and Consultant Services" and was "not based on the value or volume of services generated by [Hipaaline] on behalf of [GCM]." *Id.* at 38. In the course of their dealings, however, GCM paid Hipaaline 40% of its net revenues instead of by the hour.

Soon after the parties memorialized the Agreement, their relationship soured as Fisher attempted to assert more control over the Leafwell business. On October 16, 2020, Fisher notified GCM that Hipaaline was terminating the Agreement, effective immediately. She indicated that Hipaaline would honor the parties' financial arrangements through the end of October to allow for a smooth transition. Hipaaline also served GCM with a formal notice of breach of contract and termination that same day, indicating that it had terminated the Agreement for GCM's alleged material breaches in (1) engaging a direct competitor of Hipaaline to provide substantially similar services GCM agreed Hipaaline would provide on an exclusive basis and (2) violating corporate practice of medicine rules by improperly splitting fees with its independent contractor physicians.

After Hipaaline served its notice of termination, Fisher proposed a settlement in which Hipaaline would assume all overhead and engage medical providers directly and Gavrilos, Salzman, and Dr. Lewis Jassey, one of GCM's independent contractors, would collect 15% of revenue derived from marketing partnerships they generated as well as a 6% equity interest in

4

the event of a sale of Hipaaline. Gavrilos rejected the proposal. GCM then formally responded to Hipaaline's notice of termination by declaring that Hipaaline anticipatorily repudiated and breached the Agreement. GCM provided Hipaaline the opportunity to cure its alleged breach, but Hipaaline refused to do so and reaffirmed its intention to disable GCM's access to the Leafwell platform and replace Bluepay, GCM's payment processor, with Hipaaline's own payment processor on November 1.

## II.     The Present Litigation

With the parties at an impasse, GCM filed its complaint against Defendants on October 28. After receiving notice of the complaint and TRO, Hipaaline took several actions, including disabling GCM's access to the Leafwell platform and related accounts, deactivating Salzman in the Leafwell platform, and removing any references to Gavrilos and Salzman from the Leafwell platform. Finding herself locked out of her Leafwell email account on October 29, Leslie Thelen, a GCM staff member, contacted Fisher, who told Thelen that Leafwell no longer worked with GCM and that all of GCM's clinic staff now worked for and would be paid by Leafwell. Fisher promised to provide Thelen with a Hipaaline employment contract. Fisher also relayed similar information to at least one other GCM staff member.

In addition to initiating litigation, GCM held back a payment due to Hipaaline on October 26. Hipaaline had not yet replaced the third-party payment processor on the Leafwell platform, and so GCM continued to receive all funds paid by patients through the Leafwell platform. During the hearing on GCM's request for injunctive relief, GCM and Hipaaline agreed to enter into a standstill agreement while the Court considered GCM's request for injunctive relief. Pursuant to that agreement, Hipaaline restored GCM's access to the Leafwell platform and GCM resumed payments to Hipaaline.

5

After holding hearings, on November 23, the Court granted GCM's request for injunctive relief, finding that GCM was likely to succeed on its breach of contract and CFAA claims, that GCM demonstrated irreparable harm and an inadequate remedy at law, and that the balance of harms and public interest favored injunctive relief. In doing so, the Court rejected Hipaaline's arguments that it was likely to succeed on its defense that GCM materially breached the Agreement, noting that the record instead reflected that, unhappy with the Agreement and desiring to cut out the middleman so as to obtain greater control and profits over a flourishing business, Hipaaline sought in bad faith to find a pretextual basis to terminate the Agreement. Doc. 26 at 24–25.

After the Court issued the preliminary injunction, Fisher filed an appearance in the case and moved to dismiss the claims against her, arguing, among other things, that the Court lacks personal jurisdiction over her. Doc. 38. That motion remains pending. On December 15, Hipaaline filed a notice of appeal with respect to the Court's preliminary injunction order, which also remains pending.[4] The parties engaged in a settlement conference with the magistrate judge on February 8, 2021, as well as a mediation with the Seventh Circuit mediator on February 23, 2021. Neither conference resulted in a settlement of the case.

III. **Post-Preliminary Injunction Developments**

On November 23, 2020, the same day the Court issued the preliminary injunction against Hipaaline, Hipaaline filed a certificate of incorporation on change of name in the U.K., changing its name to OnlineMD Ltd. Fisher testified that she had received notice from TransferWise, the platform Hipaaline used to receive money and make payments, that it had closed Hipaaline's account, causing her to change the name of the entity in the hopes of being able to open another

---

[4] The Seventh Circuit has not yet addressed the effect of Hipaaline's insolvency on the appeal.

account.  When this proved not to be the case, Fisher changed the entity's name back to

Hipaaline on December 8 and proceeded to use her personal TransferWise account to receive

funds and make payments on Hipaaline's behalf.  On December 9, Fisher created a new entity,

Online MD, of which she is the only shareholder and director.

Fisher claims that at some point over the past year, Hipaaline's expenses in maintaining

the Leafwell platform and marketing its services far exceeded the amounts it received from

GCM.  Consequently, after the entry of the preliminary injunction in this case, Hipaaline began

demanding that GCM pay Hipaaline's invoices per the original terms of the Agreement.  Fisher

claims that GCM refused to pay the invoices and at times paid Hipaaline even less than the

customary 40% of its revenue.[5]

Hipaaline's declining financial situation ultimately led it to explore insolvency options in

the U.K., where it is incorporated.  Fisher met with Nicholas Simmonds of Quantuma Advisory

Limited ("Quantuma") to discuss insolvency options in December 2020.  Fisher provided

Quantuma with notice of the present litigation, the preliminary injunction, and the Agreement, as

well as information about Hipaaline's and her personal finances.  Quantuma engaged two

independent professional appraisers to assist him in valuing Hipaaline's business and assets.  The

appraisers valued Hipaaline's business at £100,000.  After determining that it met the criteria for

both actual and textbook insolvency under U.K. law, Hipaaline decided to pursue administration,

an insolvency procedure in the U.K. with the primary objective of rescuing the company as a

going concern.  Totty, Moss & Segal: Insolvency Vol. 1, C2-02.  Hipaaline put together a pre-

packaged administration, proposing that Online MD purchase Hipaaline's assets as part of a sale

---

[5] The parties have not presented the Court with the invoices or detailed statements of Hipaaline's
expenses compared to GCM's payments, although GCM represents that its payments to Hipaaline
exceeded $150,000 in January 2021.

negotiated in principle before Hipaaline was subject to an insolvency proceeding, with the sale completed immediately after Hipaaline entered into administration. *See id.* at C2-16. Hipaaline then applied to the Pre-Pack Pool ("PPP"), an independent body that offers opinions on the purchase of a business and its assets by connected parties in relation to pre-packaged administrations. A PPP member, Colin Coghlan, reviewed and approved the application, which consisted of a summary of events, evidence of IP ownership, and an original receipt of URL purchase.

On February 24, 2021, Hipaaline entered administration, with Simmonds and Chris Newell, also of Quantuma, appointed as the joint administrators (the "Administrators"). Online MD then purchased certain of Hipaaline's assets out of administration for £100,000 (approximately $140,000) on the same day. Online MD used Fisher's personal money to pay the Administrators the first £20,000 installment. Online MD intends to pay the remaining installments of £8,000 every month until it pays the purchase price in full and also to repay Fisher for the initial payment she made with her personal funds.

Although the Agreement indicates that Hipaaline owns and has full rights to use the Leafwell platform and domain name, Fisher now represents that she has always personally owned the domain name, she personally paid to build the telemedicine platform in 2017, and she retains ownership of the platform. Hipaaline did, however, have full rights to use the Leafwell platform and domain name at the time of the Agreement. Hipaaline's main assets, as determined for the insolvency proceedings, consisted of the goodwill, intellectual property, and content it generated for the Leafwell name. Online MD purchased Hipaaline's goodwill and intellectual property out of administration, with Fisher personally retaining ownership of the Leafwell platform and domain name. The sale from the Administrators to Online MD did not transfer any

8

of Hipaaline's liabilities, including the Agreement, to Online MD. Online MD does not directly have a licensing agreement for use of the Leafwell platform with Fisher but is operating under the understanding that it purchased Hipaaline's prior license for use of that platform and domain name as part of the sale.

After the sale, Online MD operated on the understanding that it need not work with GCM going forward, as it did not purchase the Agreement or any of Hipaaline's liabilities. Therefore, on February 24, after completion of the sale of assets, Fisher, in her capacity as Online MD's CEO, directed Miguel Marinhas to disable all of GCM's access to the Leafwell platform, email accounts, and other software that supported the Leafwell platform, as well as to disable the connection between the Leafwell platform and Bluepay and replace it with Maverick and several other payment processors.[6] That same day, Fisher informed one of GCM's employees that Hipaaline had severed all ties with GCM effective immediately and offered her employment directly with Hipaaline. Similarly, Fisher began contacting GCM's independent contractor physicians to have them join the Leafwell team and sign direct agreements with Hipaaline LLC, a Delaware limited liability corporation.[7] GCM discovered that it and its independent contractor physicians lost all access around 11:30 a.m. CST that day.[8] After contacting Hipaaline's counsel about these apparent violations of the preliminary injunction order, GCM learned for the first time that Hipaaline had entered administration.

---

[6] OnlineMD Corp., a Delaware corporation that Fisher does not control, holds the merchant accounts used on the Leafwell platform, serving as the collections agency for Online MD.

[7] Fisher incorporated Hipaaline, LLC in October 2018 and is its sole owner.

[8] At the time it disabled GCM's access, Online MD ensured that it had at least one doctor available to see patients in each state in which Leafwell operated.

Prior to February 24, Gavrilos testified that GCM's independent contractor physicians saw approximately 100 patients per day on the Leafwell platform. In January, GCM generated $392,000 in revenue through the Leafwell platform. Since February 24, GCM has let several staff members go. Providers who lost access to the Leafwell platform do not have access to their patient records. But from a user's perspective, Leafwell's operations have continued unchanged and no interruption in services occurred. Hipaaline's staff have continued to work for Online MD, using the same email addresses as before.

## ANALYSIS

After Online MD terminated GCM's access to the Leafwell platform, GCM returned to this Court to seek enforcement of the preliminary injunction. Its requests for relief have varied but include: (1) a rule to show cause against Hipaaline, Fisher, and Online MD and a finding of civil or criminal contempt against them; (2) an order requiring Hipaaline, Fisher, Online MD, and any other entity owned or controlled by Fisher to comply with the Court's November 23, 2020 Opinion and Order and restore GCM's and its physicians' access to the Leafwell platform and associated accounts and the platform's connection to Bluepay; (3) an order requiring Hipaaline and Fisher to cease all conduct aimed at effectuating the creation of a successor business to Hipaaline via Online MD or, alternatively, allowing GCM to conduct discovery related to successor liability; (4) modification and clarification of the November 23, 2020 Opinion and Order to enjoin Fisher directly or indirectly, individually and by operation of any corporate entity she owns or controls from taking the actions prohibited by the preliminary injunction and working as an officer, agent, servant, employee, or affiliate of any entity that provides medical marijuana services in the United States; (5) an accounting of all of Fisher and Online MD's financial activity after February 24, 2021; (6) the entry of sanctions against

10

Hipaaline, Fisher, and Online MD in the amount of $10,000 per day for each day that they fail to come into compliance with the November 23, 2020 Opinion and Order; and (7) an award of attorney's fees and costs. Before addressing the substance of GCM's requests, the Court must resolve several preliminary issues.

## I.   Effect of Hipaaline's Appeal of the Preliminary Injunction Order on the Court's Jurisdiction

First, the Court must consider how Hipaaline's appeal of the November 23 Opinion and Order affects its jurisdiction to address GCM's requests for relief. Although the filing of an appeal typically divests the district court of jurisdiction over the substance of the appealed order, *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982), Federal Rule of Civil Procedure 62(d) provides that "[w]hile an appeal is pending from an interlocutory order . . . that grants . . . an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." In other words, Rule 62(d) "allow[s] the district court to modify an injunction to maintain the status quo pending appeal." *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 384 (7th Cir. 2018); *see also Duthie v. Matria Healthcare, Inc.*, 543 F. Supp. 2d 958, 960 (N.D. Ill. 2008) ("[T]he district court should only take action pursuant to the Rule in an effort to maintain the *status quo* of the parties pending the outcome of the appeal."). Rule 62(d) does not provide the district court with "a blanket grant of permission to impose new obligations, and substantially alter the issues." *MillerCoors LLC v. Anheuser-Busch Cos.*, 940 F.3d 922, 923 (7th Cir. 2019). Thus, although Hipaaline's appeal remains pending in the Seventh Circuit, the Court does not find that the appeal affects the Court's ability to enforce the injunction, particularly given that prosecution of the appeal is currently in doubt.

11

## II.    Effect of Hipaaline's Insolvency Proceeding

Next, the Court must consider the effect of Hipaaline's insolvency proceeding on its ability to order any relief against Hipaaline and Fisher.  The Administrators filed a suggestion of administration on the record on March 1, 2021, suggesting that all actions relating to, impacting, and affecting Hipaaline have been stayed by operation of Paragraph 43(6) of Schedule B1 of the U.K. Insolvency Act 1986.  Doc. 64.  After GCM filed its request for a show cause order and entry of contempt, the Administrators took the added step of applying for recognition of the administration proceeding under Chapter 15.  *See Reserve Int'l Liquidity Fund, Ltd. v. Caxton Int'l Ltd.*, No. 09 Civ. 9021(PGG), 2010 WL 1779282, at *5 (S.D.N.Y. Apr. 29, 2010) ("There is little case law addressing the issue of whether a 'foreign representative' may request a stay of U.S. court proceedings involving the entity subject to liquidation in the foreign proceeding. What case law there is, however, makes clear that foreign representatives must be recognized under Chapter 15 in order to seek a stay from a federal court.").

Chapter 15 intends "to provide effective mechanisms for dealing with cases of cross-border insolvency."  11 U.S.C. § 1501.  The commencement of a Chapter 15 case does not trigger an automatic stay.  Instead, the automatic stay provisions in § 362 apply within the U.S. upon the bankruptcy court's recognition of the foreign proceeding as a foreign main proceeding. 11 U.S.C. § 1520(a)(l).  Here, the bankruptcy court granted the Administrators' petition and recognized the U.K. insolvency proceeding as a foreign main proceeding on April 5, 2021, thus staying this case against Hipaaline.  *See In re Hipaaline Ltd.*, No. 21 B 2837, Doc. 16 (Bankr. N.D. Ill. Apr. 5, 2021).

Fisher sought to extend this stay to GCM's claims against her, claiming that she acted in her capacity as Hipaaline's director when placing Hipaaline into administration.  "It is well

established that, absent extraordinary circumstances, the stay afforded a corporate debtor does

not extend to afford protection as well to the debtor's stockholders, principals, officers, directors,

and employees." *In re Suburban W. Props., LLC*, 504 B.R. 477, 488–89 (Bankr. N.D. Ill. 2013).

In determining whether extraordinary circumstances exist, courts have considered whether:

> 1) the debtor is contractually obligated to indemnify the principal
> for the costs and liabilities incurred in connection with the suit to
> be enjoined, 2) the issues involved in the suit against the nondebtor
> are so entwined with potential issues in a suit against the debtor
> that the debtor may have concerns that it might face issue
> preclusion if it does not participate in the suit against the
> nondebtor, 3) the suit against the nondebtor includes such onerous
> discovery that the suit will impose substantial time burdens on the
> nondebtor, and the nondebtor's efforts are essential to the
> reorganization of the debtor, and 4) the reorganization plan
> requires capital infusions by the nondebtor, and the suit will
> severely impair the nondebtor's ability to raise such funds.

*In re Green Scene, Inc.*, No. 10-B-72521, 2010 WL 2465399, at *3 (Bankr. N.D. Ill. June 16,

2010). Courts have also found an exception to the general rule where "there is such identity

between the debtor and the third-party defendant that the debtor may be said to be the real party

defendant and that a judgment against the third-party defendant will in effect be a judgment or

finding against the debtor." *Okla. Federated Gold & Numismatics, Inc. v. Blodgett*, 24 F.3d 136,

141 (10th Cir. 1994) (citation omitted). Because Fisher essentially acted as the sole officer and

director of Hipaaline, her actions prior to the insolvency appear so intertwined with those of

Hipaaline that allowing this case to proceed against her in her capacity as the officer and director

of Hipaaline could potentially impact Hipaaline's insolvency proceedings. *See Raudonis v.

RealtyShares, Inc.*, --- F. Supp. 3d ----, 2020 WL 7405734, at *3–4 (D. Mass. 2020) (extending

stay against individual defendants where the only alleged misrepresentations they made were tied

to their roles as directors of the debtor and the pleadings "make it difficult to disentangle the

13

liability" of the debtor and the individual defendants); *In re SN Liquidation, Inc.*, 388 B.R. 579, 585 (Bankr. D. Del. 2008) ("[C]ourts have often extended protection to non-debtor defendants who were officers or directors.  The rationale for such decisions is that a finding of liability against management defendants could have a preclusive effect, as collateral estoppel, against the debtors.").  But to the extent that GCM seeks relief against Fisher with respect to actions she has taken subsequent to the initiation of the insolvency proceeding, at which point her affiliation with Hipaaline ceased, the Court finds that allowing GCM to pursue such relief would not interfere with the insolvency proceedings in the U.K.

### III.    Jurisdiction over Fisher and Online MD

Next, the Court addresses its jurisdiction over Fisher and Online MD.  Although Fisher challenges personal jurisdiction in this Court for purposes of the case and the contempt proceedings, "a person who knowingly circumvents a [court] order is subject to a show cause order and contempt and thereby submits to the jurisdiction of the court for contempt proceedings." *S.E.C. v. Homa*, 514 F.3d 661, 674 (7th Cir. 2008).  "Jurisdiction over persons who knowingly violate a court's injunctive order, even those without any other contact with the forum, is 'necessary to the proper enforcement and supervision of a court's injunctive authority and offends no precept of due process.'" *Id.* (citation omitted).  Fisher admits she knew of the preliminary injunction, knowledge that the Court can also impute to Online MD.  Thus, even assuming for purposes of this motion that GCM has not established that the Court has personal jurisdiction over Fisher or Online MD for general purposes of the case, the Court may nonetheless consider whether to hold them in contempt of court for knowingly violating the Court's preliminary injunction order.  *See Empire Indus., Inc. v. Winslyn Indus., LLC*, No. 18 C 698, 2019 WL 339544, at *4 (N.D. Ill. Jan. 28, 2019) (court had jurisdiction over non-resident

defendant to consider whether that defendant aided the violation of a preliminary injunction); *BioConvergence LLC v. Attariwala*, No. 1:19-cv-01745-SEB-TAB, 2020 WL 1333201, at *9 (S.D. Ind. Mar. 23, 2020) (lack of personal jurisdiction over claim against a defendant did not limit the court's authority to enforce a preliminary injunction against him if he was found to be in active concert and participation with his wife in any current or future attempts to evade compliance with the injunction). Having resolved these preliminary issues, the Court proceeds to consider the substantive question of contempt.

## IV.    Substance of GCM's Contempt Request

The standards for civil and criminal contempt differ. Civil contempt may be coercive or remedial, "designed either to compel the contemnor into compliance with an existing court order or to compensate the complainant for losses sustained as a result of the contumacy." *Lightspeed Media Corp. v. Smith*, 830 F.3d 500, 508 (7th Cir. 2016) (quoting *United States v. Dowell*, 257 F.3d 694, 699 (7th Cir. 2001)). Although civil contempt does not require full criminal procedural process, a person facing a civil contempt sanction must receive adequate notice of the contempt proceedings and a fair opportunity to be heard. *S.E.C. v. Hyatt*, 621 F.3d 687, 694 (7th Cir. 2010). Criminal contempt, on the other hand, is punitive, intended to punish the violation, vindicate the Court's authority, and deter future violations. *Id.* Although GCM has referred to both civil and criminal contempt, the Court construes its requests as ones for civil contempt as they are meant to compel action and compensate for the harm GCM has suffered, not to punish the alleged violation. *Id.*

The Court may hold a party not named in a preliminary injunction in contempt for failing to comply with that order as long as the party has notice and an opportunity to contest the issue. See *Nat'l Spiritual Assembly of Baha'is of the U.S.A. under the Hereditary Guardianship, Inc. v.*

15

*Nat'l Spiritual Assembly of the Baha'is of the U.S.A., Inc.* ("*Baha'is*"), 628 F.3d 837, 853 (7th Cir. 2010) (a nonparty can "properly be held in contempt for violating an injunction *if* the court acquires jurisdiction over the nonparty and gives the nonparty an opportunity to contest whether he is bound by the injunction and is in fact in contempt").  Both Fisher and Online MD received proper notice of the contempt request and an opportunity to contest the issue,[9] allowing the Court to proceed to consider whether a contempt finding against either is appropriate.

The Supreme Court has recognized that civil contempt is a "severe remedy" that "should not be resorted to where there is [a] *fair ground of doubt* as to the wrongfulness of the defendant's conduct."  *Taggart v. Lorenzen*, --- U.S. ----, 139 S. Ct. 1795, 1801–02 (2019) (alteration in original) (citation omitted).  "[C]ivil contempt sanctions may be warranted when a party acts in bad faith."  *Id.* at 1802.  To obtain a civil contempt finding, GCM must present clear and convincing evidence that "(1) a court order sets forth an unambiguous command; (2) the alleged contemnor violated that command; (3) the violation was significant, meaning the alleged contemnor did not substantially comply with the order; and (4) the alleged contemnor failed to make a reasonable and diligent effort to comply."  *Hyatt*, 621 F.3d at 692.

GCM argues that, after February 24, Fisher and Online MD violated the preliminary injunction order by terminating GCM's access to the Leafwell platform and replacing Bluepay as the payment processor on the platform.  Fisher responds that the preliminary injunction does not extend to her personally nor to Online MD and her actions as its CEO.  Further, she contends that because Online MD acquired Hipaaline's assets free and clear of any of Hipaaline's liabilities,

---

[9] GCM effectuated service on Online MD and provided it with notice of the evidentiary hearing on GCM's contempt requests.  Fisher's counsel also later acknowledged that he would enter a limited appearance on Online MD's behalf for purposes of the hearings.

the insolvency proceeding extinguished GCM's right to specific performance of the Agreement and the preliminary injunction.

### A.  The Injunction's Reach

The Court's preliminary injunction only specifically enjoined Hipaaline, meaning Fisher and Online MD are nonparties to that order.  But this does not automatically place them beyond the injunction's reach.  Rule 65(d)(2)(B) extends the injunction to Hipaaline's officers, employees, and agents "when they act in their official capacities."  *Baha'is*, 628 F.3d at 848.  Rule 65(d)(2)(C) "prevent[s] defendants from rendering injunctions void by carrying out prohibited acts through third parties who were not parties to the original proceeding." *Blockowicz v. Williams*, 630 F.3d 563, 568 (7th Cir. 2010).  Rule 65(d)(2)(C) binds nonparties that (1) act in concert with a bound party or aid or abet an enjoined party in violating an injunction, or (2) are in privity with an enjoined party.  *Baha'is*, 628 F.3d at 848–49.  "When privity is invoked as a basis for binding a nonparty to an injunction, it is 'restricted to persons so identified in interest with those named in the decree that it would be reasonable to conclude that their rights and interests have been represented and adjudicated in the original injunction proceeding.'"  *Id.* at 849 (quoting 11A Charles Alan Wright, Federal Practice & Procedure 2956, at 340–41 (2d ed. 1995)).  This includes (1) nonparties that are "legally identified" with the enjoined party and (2) nonparty successors in interest to an enjoined party.  *Id.*  GCM has the burden to show that the injunction binds Fisher and Online MD.  *Blockowicz*, 630 F.3d at 567.

Under Rule 65(d)(2)(B), the Court's preliminary injunction bound Fisher when she acted in her official capacity as a director and officer of Hipaaline.  *Baha'is*, 628 F.3d at 849.  But because the Administrators removed Fisher from these positions, Rule 65(d)(2)(B), which only extends the injunction to Hipaaline's officers when acting in their official capacities, *id.* at 848,

cannot provide a basis for binding Fisher to the preliminary injunction for any actions she has taken after Hipaaline entered administration. Nonetheless, "a key employee, officer, director, shareholder, or other central figure in an enjoined corporation can be personally bound by the injunction even after the company has dissolved, *provided* he had a controlling role in the injunction proceedings and is otherwise so 'closely identified' with the enjoined corporation that it may reasonably be said that he had his day in court when the injunction was issued." *Id.* at 852. Fisher served as Hipaaline's CEO and had a controlling role not only in the company but also in the injunction proceedings. And she currently is the sole shareholder and CEO of Online MD, which bought the Leafwell intellectual property and goodwill from Hipaaline and conducts essentially the same business as Hipaaline. Moreover, testimony during the hearings revealed that Fisher personally owns the Leafwell domain name and telehealth platform. This evidence supports finding that the preliminary injunction binds Fisher personally despite Hipaaline's insolvency proceedings. *Id.* at 854 (legal identification test satisfied "only when the nonparty 'key employee' against whom contempt sanctions are sought had substantial discretion, control, and influence over the enjoined organization—both in general and with respect to its participation in the underlying litigation—*and* there is a high degree of similarity between the activities of the old organization and the new.").

As for Online MD, GCM argues that Online MD is bound as Hipaaline's successor in interest.[10] Federal common law principles, not Illinois or U.K. law, control the question of whether a nonparty qualifies as a successor in interest for purposes of Rule 65(d). *See ADT LLC*

---

[10] GCM also argues that Online MD has acted in concert with Hipaaline to violate the injunction. One court in this district found that it could not hold a nonparty in contempt for acting in concert with a bound party absent an underlying finding that the bound party violated the court's order. *Empire Indus., Inc. v. Winslyn Indus., LLC*, No. 18 C 698, 2019 WL 2743470, at *5 (N.D. Ill. June 30, 2019). Because GCM focuses mainly on whether Online MD is a successor to Hipaaline, the Court does the same.

*v. NorthStar Alarm Servs., LLC*, 853 F.3d 1348, 1354 (11th Cir. 2017) ("[T]hat NorthStar is a successor to Vision Security under state law does not mean that NorthStar is bound by a federal injunction issued against Vision Security."); *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 154 F.3d 1345, 1355 (Fed. Cir. 1998) (courts look to federal, not state, law to determine Rule 65(d)'s reach. Federal law considers whether a "substantial continuity of identity" exists between the two corporations such that "no major changes are made in that operation," as well as whether the successor corporation had notice of the claim before the acquisition. *E.E.O.C. v. G-K-G, Inc.*, 39 F.3d 740, 747–48 (7th Cir. 1994). "Successor liability is an equitable doctrine, not an inflexible command," and requires careful consideration of the factual circumstances and legal context in which it arises. *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995). In the context of federal employment law, the Seventh Circuit has looked to the following factors to determine whether to impose successor liability:

> (1) whether the successor had notice of the pending lawsuit;
> (2) whether the predecessor could have provided the relief sought before the sale or dissolution; (3) whether the predecessor could have provided relief after the sale or dissolution; (4) whether the successor can provide the relief sought; and (5) whether there is continuity between the operations and work force of the predecessor and successor.

*E.E.O.C. v. N. Star Hosp., Inc.*, 777 F.3d 898, 902 (7th Cir. 2015). A bankruptcy proceeding does not "absolutely preclude[ ]" a finding of successor liability, particularly where the bankruptcy proceeding has concluded and a finding of successor liability would have no effect on the bankruptcy estate. *Tasemkin*, 59 F.3d at 51. But where a finding of successor liability would "upend the priorities of competing creditors" after an insolvent debtor's default, good cause exists not to impose successor liability. *See Teed v. Thomas & Betts Power Sols.*, 711 F.3d

19

763, 766, 768 (7th Cir. 2013) (sale of insolvent debtor's assets is "an example of a good reason not mentioned in conventional formulations of the federal standard for not imposing successor liability"); *In re Trans World Airlines, Inc.*, 322 F.3d 283, 292–93 (3d Cir. 2003) (imposing successor liability on purchaser of debtor's assets would upset the Congressional policy on distribution to creditors in a bankruptcy proceeding).

Had Hipaaline transferred its assets to Online MD outside of the U.K. insolvency proceedings, the Court would have no difficulty imposing successor liability on Online MD. As GCM demonstrated, Online MD has continued Hipaaline's operations almost without interruption, with the only real changes being to the name of the corporation—though not of the brand—and the removal of GCM as the entity through whom the medical providers contract. Fisher remains in control of the Leafwell operations as Online MD's CEO, Hipaaline's staff now works for Online MD, and the user experience has not changed. As even Fisher must acknowledge, under ordinary circumstances, Online MD's continued operation of the Leafwell business presents a strong case for binding Online MD to the injunction. *See Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 14 (1945) (injunctions are binding on those "who operate merely [as] a disguised continuance of the old employer" (citation omitted) (internal quotation marks omitted)); *Tasemkin*, 59 F.3d at 49 ("[Alleged successor's] assumption of [alleged predecessor's] corporate identity makes a strong case for substantial continuity.").

But this case does not involve ordinary circumstances and instead presents a good reason not to impose successor liability on Online MD. *See Teed*, 711 F.3d at 766, 768. Online MD purchased certain of Hipaaline's assets—its goodwill and intellectual property—through the insolvency proceeding. The sale did not include assumption of the Agreement or, more generally, Hipaaline's liabilities. Although GCM takes issue with the validity of the insolvency

proceeding and Fisher's continued operation of the Leafwell business through a different entity while shedding Hipaaline's liabilities, this Court is not the appropriate venue for such challenges.

Although not determinative, "a creditor's ability to recover against the predecessor is a factor of significant weight in deciding whether to allow successor liability." *Tasemkin*, 59 F.3d at 51. Here, GCM remains an unsecured creditor of Hipaaline with the ability to challenge the sale and file a claim in the U.K. insolvency proceeding concerning any violations of the Agreement and the preliminary injunction, steps GCM has indicated it intends to take. *See United States v. Apex Oil Co.*, 579 F.3d 734, 736 (7th Cir. 2009) ("If for example you have a decree of specific performance (a type of injunction and therefore an equitable remedy) that you can't enforce because the property that the decree ordered the defendant to sell you was sold to someone else (from whom, for whatever reason, you cannot recover it), you are entitled to a money judgment for the value of the property—and your claim to that value is a claim to a right to receive payment and is dischargeable in the seller's bankruptcy." (citations omitted)). Further, unlike in *Tasemkin*, where the bankruptcy proceedings had concluded, meaning that the priorities for creditors set forth in the Bankruptcy Code had lost their force, 59 F.3d at 51, GCM's attempt to impose successor liability and require Online MD to comply with the Court's preliminary injunction order could disrupt the orderly administration of Hipaaline's ongoing insolvency proceedings, *see Teed*, 711 F.3d at 768; *Trans World Airlines*, 322 F.3d at 292–93. And because the U.K. insolvency proceedings have not yet concluded, the Court remains wary of interfering with those proceedings. *See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005) ("U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding."); *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir. 1985) ("The granting of comity to a foreign

21

bankruptcy proceeding enables the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner, rather than in a haphazard, erratic or piecemeal fashion. Consequently, American courts have consistently recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities."); *Dieker Holding, B.V. v. Am. SIP Corp.*, No. 2007-01(WOB), 2008 WL 4808850, at *3 (E.D. Ky. Nov. 3, 2008) ("Mr. Dieker's attempt to assert[ ] claims of successor liability and voidable transfer against Starrag-Heckert also run[s] afoul of the principles of comity to international bankruptcy proceedings."). Therefore, at this stage, the Court concludes that good reason exists not to extend the Court's preliminary injunction order to Online MD or to Fisher in her official capacity as Online MD's sole shareholder and CEO.

B.  **Fisher's Post-Administration Actions in Her Personal Capacity**

Having found that the preliminary injunction binds only Fisher in her personal capacity after Hipaaline entered administration, the Court must consider whether GCM has presented clear and convincing evidence that Fisher personally violated the preliminary injunction after February 24. Although at times difficult to separate Fisher's actions in her personal and official capacities, the evidence of allegedly wrongful conduct all relates to actions Fisher took as Hipaaline's CEO prior to February 24 and as Online MD's CEO after February 24. And while Fisher personally owns the Leafwell domain name and the telehealth platform, Online MD controls the Leafwell intellectual property and goodwill, and has use of the domain name and telehealth platform. Further, the evidence established that Online MD, not Fisher personally, disabled GCM's access to the Leafwell platform and disconnected Bluepay as the payment processor. Without evidence demonstrating any wrongful actions Fisher took in her personal capacity and in light of the presumed legality of the insolvency proceedings and the limited

22

scope of the contempt inquiry, the Court cannot say that Fisher clearly violated the preliminary injunction. *See Taggart*, 139 S. Ct. at 1801 (civil contempt not appropriate where a "*fair ground of doubt*" exists "as to the wrongfulness of the defendant's conduct" (citation omitted)). While the Court recognizes that GCM's expectations have been frustrated, given the insolvency proceedings, the Court cannot find that GCM has carried its burden to impose a finding of civil contempt on Fisher in her personal capacity.

## CONCLUSION

For the foregoing reasons, the Court denies GCM's emergency motion for issuance of rule to show cause and a finding of contempt [57] and emergency motion to modify the preliminary injunction [63].

Dated: April 19, 2021

_____

SARA L. ELLIS
United States District Judge