# EXHIBIT 2

## EXCLUSIVE MARKETING AND CONSULTANT SERVICES AGREEMENT

This Exclusive Marketing and Consultant Services Agreement ("Agreement") is entered into between GCM Partners, LLC, an Illinois limited liability company with its principal office located at 835 N. California Ave. Apt. 3, Chicago, Illinois 60622 ("Company") and HIPAALINE LTD, a limited company of England and Wales, Company Number 12665260, with its principal office located at 20-22 Wenlock Road, London, England N1 7GU ("Consultant"). This Agreement is effective as of October 1, 2019 ("Effective Date"). Company and Consultant may hereinafter be referred to individually as a "Party" or collectively as the "Parties".

WHEREAS, Consultant is in the business of providing marketing and consulting services for medical practices, including providing a software platform which facilitates virtual physician-patient visits over the internet (i.e., telehealth);

WHEREAS, Company operates bricks-and-mortar medical clinics which treat patients legally via U.S. states' medical-cannabis programs; and

WHEREAS, Company is interested in engaging Consultant on an exclusive, independent-contractor basis to perform certain marketing and consulting services related to Company's medical practice in order to facilitate its bricks-and-mortar presence and expand and enhance its telemedicine presence.

NOW THEREFORE, in consideration of the mutual promises herein, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Consultant and Company hereby agree as follows:

### ARTICLE 1 – DEFINITIONS

1.1     Marketing and Consultant Services. "Marketing and Consultant Services" are the Marketing and Consultant Services provided by Consultant to drive traffic to Company as further set forth on Exhibit A.

1.2     Marketing Service Fees. "Marketing Service Fees" are the fees identified in Exhibit C which consist of the total of fees paid to Consultant for the Marketing and Consultant Services.

1.3     Company Duties. Company shall provide Consultant with the materials described Exhibit B to this Agreement in order to facilitate the Marketing and Consultant Services.

1.4     Recitals. The recitals listed above within the "whereas" clause (the "Recitals") are made a part of the terms of this Agreement, incorporated herein by reference.

### ARTICLE 2 – MARKETING AND CONSULTANT SERVICES

Consultant shall be responsible for providing the Marketing and Consultant Services described in Exhibit A. Consultant shall use reasonable commercial efforts in discharging its duty to provide the Marketing and Consulting Services. Consultant's obligation to provide the

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

Marketing and Consultant Services in accordance with the terms of this Agreement is not in any way waived or relieved with respect to any portion of the Marketing and Consultant Services that have been performed prior to Consultant's execution of this Agreement.

## ARTICLE 3 – MARKETING FEES AND REIMBURSEMENTS

3.1     Consultant's sole remuneration under this Agreement is the payment by Company of the Marketing and Consultant Services Fees in connection with Consultant's provision of the Marketing and Consultant Services set forth in Article 2.

3.2     Each Party is responsible for all of its own costs and expenses of any kind or nature whatsoever associated in any way with operating its business and carrying out its obligations under this Agreement.

3.3     <u>Patient Payments and Payment to Consultant</u>.  All patient payments received at Company's bricks-and-mortar clinics shall be solely collected and held by Company.  All patient payments received through Consultant's telehealth platform shall be solely collected and held by Company.  Consultant shall submit a written invoice to Company every fourteen (14) calendar days covering the Marketing and Consultant Services rendered for the fourteen (14) days preceding the date of the invoice.  Unless a valid reason exists under this Agreement for Company to withhold payment, Company shall remit payment to Consultant for a given invoice within fourteen (14) calendar days of Company's receipt of that invoice.  In the event that Company reasonably believes that there is a valid reason to withhold payment, on or before expiration of the 14-day period following Company's receipt of an invoice, Company shall (i) provide to Consultant written notice reasonably describing such basis with respect to any disputed amounts and (ii) remit to Consultant all amounts not in dispute.  Invoices due and unpaid shall bear simple interest at a rate of five percent (5%) per year.  Consultant may terminate this Agreement for cause if an invoice becomes more than sixty (60) calendar days delinquent.

## ARTICLE 4 - INDEMNIFICATION

4.1     <u>Company as Indemnitor</u>.  To the fullest extent permitted by law, Company shall indemnify, defend, and hold harmless Consultant, and its heirs, successors, and assigns, against any and all liability arising from claims, citations, violations, actions, hearings, lawsuits, or other proceedings, for actual damages and reasonable attorneys' fees and consultants' fees (collectively, "Claims"), in the event such Claims are brought by a person or entity not a party to this Agreement, arise from Company's sole negligence, willful and wanton conduct, or intentional conduct, the sole negligence, willful and wanton conduct, or intentional conduct of one or more of Company's independent-contractor physicians, or a combination of the negligence, willful and wanton conduct, or intentional conduct among Company and one or more of its independent-contractor physicians only, and concern: a) medical malpractice; b) a violation of the Health Insurance Portability and Accountability Act (hereinafter, "HIPAA"); c) an incident of bodily injury or death occurring at the physical location of one of Company's bricks-and-mortar clinics; or d) Company's failure to maintain appropriate licensure, registration, certification, and permitting to the extent appropriate for the operation of its clinics.  The indemnification

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

obligations in this Article 4.1 are limited by insurance coverage held by Company. Company shall have the sole authority to direct the defense or settle any Claim indemnified by Company provided, however, that Consultant may monitor such matters through counsel of its choice and at its own cost and provided, further, that Company may not settle any indemnified Claim unless such settlement includes a full and complete release of Consultant, and no such settlement shall be authorized without the prior written consent of Consultant (which consent shall not be unreasonably withheld).

4.2 <u>Consultant as Indemnitor</u>. To the fullest extent permitted by law, Consultant shall indemnify, defend, and hold harmless Company, and its heirs, successors, and assigns, against any and all liability arising from claims, citations, violations, actions, hearings, lawsuits, or other proceedings, for actual damages and reasonable attorneys' fees and consultants' fees (collectively, "Claims"), in the event such Claims are brought by a person or entity not a party to this Agreement, arise from Consultant's negligence, willful and wanton conduct, or intentional conduct and concern: a) violation of any state statute concerning consumer data privacy (including, by way of example, but not limited to, the California Consumer Privacy Act of 2018), whether or not said statute has been enacted as of the Effective Date; b) a violation of the Health Insurance Portability and Accountability Act (hereinafter, "HIPAA"); or c) the EU General Data Protection Regulation. The indemnification obligations in this Article 4.2 are not limited by insurance coverage held by Consultant. Consultant shall have the sole authority to direct the defense or settle any Claim indemnified by Consultant provided, however, that Company may monitor such matters through counsel of its choice and at its own cost and provided, further, that Consultant may not settle any indemnified Claim unless such settlement includes a full and complete release of Company, and no such settlement shall be authorized without the prior written consent of Company (which consent shall not be unreasonably withheld).

## ARTICLE 5 – MUTUAL CONFIDENTIALITY AND NON-SOLICITATION

5.1 <u>Confidential Information</u>. The term "Confidential Information" means information of a confidential or proprietary nature relating to the subject matter described in this Agreement which is taken from or disclosed by one Party (the "Disclosing Party") by or to the other Party (the "Receiving Party"). Confidential Information includes, but is not limited to, matters of a technical nature such as: trade secrets, methods, compositions, data and know-how; designs; systems; processes; computer programs; files and documentation; research projects; matters of a business nature such as pricing, marketing, advertising, corporate, and sales methods and strategies; the terms of this Agreement; lists of actual, prospective, or potential clients, customers, or patients; any information derived from the foregoing items; and any other information that either Party may expressly designated as confidential during the course of this Agreement.

5.2 <u>Treatment of Confidential Information</u>. The Receiving Party agrees to hold the Disclosing Party's Confidential Information in strict confidence and to take commercially reasonable precautions to protect such Confidential Information (including, without limitation, using all precautions Receiving Party employs with respect to its own Confidential Information). Commercially reasonable precautions shall include compliance with all applicable local, state, federal, and international data-privacy laws, codes, rules, and regulations. The

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

Receiving Party further agrees not to disclose any Confidential Information to any third party; not to use, analyze, transcribe, transmit, decompile, disassemble, or reverse engineer any Confidential Information unless required in the performance of the Receiving Party's duties under this Agreement; not to use any Confidential Information for its own or any third party's benefit unless authorized by this Agreement or by the Disclosing Party in writing; and not to alter or remove any legend, marking, or notice provided by the Disclosing Party on its Confidential Information regarding the confidential and proprietary nature of such information. The confidentiality obligations of this Article 5 shall not apply to information which, as evidenced in writing or other documentary form:

(a)     is or becomes publicly known through no breach of this Agreement by the Receiving Party;

(b)     is learned by the Receiving Party from a third party entitled to disclose it; or

(c)     is rightfully obtained by the Receiving Party prior to the Effective Date.

The confidentiality obligations contained in this Article 5 shall survive the termination, for any reason, of this Agreement for a period of two (2) calendar years from the date of termination.  Receiving Party may make disclosures required by law, law enforcement, order of court or other tribunal having jurisdiction.  Prior to any required disclosure occurring, Receiving Party shall give Disclosing Party prompt written notice of any disclosure request so that the Disclosing Party can object or otherwise seek to intervene and provided that the Receiving Party uses diligent, reasonable efforts to limit disclosure and to obtain confidential treatment or a protective order.

5.3     <u>Confidentiality and Handling of Patient Data</u>.  During the Term of this Agreement, and for any period after the expiration or termination of this Agreement as required by law, Consultant warrants that it will comply with all applicable personal, financial, and health-related data-privacy laws, codes, regulations, ordinances, and rules including, but not limited to, HIPAA, GDPR, and the Right to Financial Privacy Act of 1978.  The right and duties concerning the subject matter of this Section 5.3 are supplemented by the terms of <u>Exhibit E</u> attached hereto.

5.4     <u>No Transfer, Right, or Title</u>.  Except as specifically provided herein, Receiving Party acknowledges that it shall not acquire any rights or title to any Confidential Information merely by virtue of its use or access to such Confidential Information hereunder.  Neither the execution of this Agreement nor the furnishing of any Confidential Information hereunder shall be construed as granting the Receiving Party, either expressly, by implication, or otherwise, any license under any invention or patent now or hereafter owned by or controlled by the Disclosing Party.  None of the information that may be submitted or exchanged by the parties shall constitute any representation, warranty, assurance, guarantee, or inducement by a Party to the other Party with respect to the infringement of patents, copyrights, trademarks, trade secrets, or any other rights of third persons.

5.5     <u>Restrictive Covenant</u>.  During the Term of this Agreement and for a one (1) calendar-year period following termination of this Agreement, regardless of the reason for termination,

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

throughout the entire United States, Company agrees that it will not: (a) solicit, hire, or engage any of Consultant's employees or independent contractors who are employed or engaged by Consultant as of the Effective Date and (b) offer telehealth medical-cannabis evaluations using Consultant's software platform.  During the Term of this Agreement and for a one (1) calendar-year period following termination of this Agreement, regardless of the reason for termination, throughout the entire United States, Consultant agrees that it will not: (a) solicit, hire, or engage any of Company's employees or independent contractors who are employed or engaged by Company as of the Effective Date.

5.6     <u>Exclusivity.</u>  Company hereby grants Consultant, during the Term of this Agreement, the exclusive right, at all bricks-and-mortar locations of Company, including at any new locations Company may create or acquire during the Term of this Agreement, to provide the Marketing and Consultant Services related to Company's medical cannabis practice.  To that end, Company (or its employees, officers, or owners) shall not engage any other consultant, contractor, employee, or other person or entity to perform any service that competes, directly or indirectly, with the scope of the Marketing and Consultant Services or invest in a business or entity that does same.  During the Term of this Agreement, Consultant shall not employ or engage any physician or other health care provider or practitioner to promote or utilize Consultant's telehealth platform unless the physician or other health care provider or practitioner is an employee or independent contractor of Company.

5.7     <u>Ownership of Data.</u>  During the Term of this Agreement, Consultant will necessarily have access to data, data sets, medical records, charts, metadata, and analytics ("Data") containing personal information and protected health information ("PHI") of patients for collaborative use by the Parties in furtherance of this Agreement.  Ownership and use of the Data shall be governed as follows: a) any and all Data originally collected by Company from Company's patients shall permanently be the sole property of Company; b) any and all Data originally collected by Consultant shall permanently be the sole property of Consultant; c) during the Term of this Agreement and at any time after any termination of this Agreement, any Data owned by one Party but accessible by and/or shared with the other Party may be sold, transferred, and/or used by the non-owning Party for any legitimate business purpose.

5.8     <u>License to Use Consultant's Intellectual Property.</u>

(a)     During the Term of this Agreement and subject to Company's prompt payment of all applicable Marketing Service Fees, Consultant hereby grants to Company a non-transferable, non-assignable (whether by contract or operation of law), non-exclusive, fully paid-up, and royalty-free right and license to use the "Consultant-Licensed IP" (as described in <u>Exhibit D</u> hereto) solely for Company's internal business purposes and for the purpose of rendering medical care and treatments to patients through the medical practice owned and operated by Company.  This license shall immediately terminate upon expiration or termination of this Agreement.  Upon any expiration or termination of this Agreement for any reason, Company shall: (a) at Consultant's option, immediately destroy or return to Consultant all tangible forms of the Consultant-Licensed IP in the possession or

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

reasonable control of Company or any of its shareholders, directors, officers, employees, independent contractors, or agents (collectively "Company Agents"); (b) immediately cease, and cause Company Agents to immediately cease, using the Consultant-Licensed IP; and (c) thereafter not make any reference, and cause Company Agents to not make any reference, to the Company's affiliation with Consultant.

(b)    <u>Restrictions</u>.  The license set forth in Section 5.8 does not include the right to, and Company shall not, and shall cause Company Agents not to, directly or indirectly: (a) grant any sublicense with respect to any Consultant-Licensed IP; (b) reverse engineer, disassemble, or decompile any Consultant-Licensed IP; (c) remove, obscure, or alter any trademark or other notice on or related to the Consultant-Licensed IP; or (d) engage in or permit any use, possession, knowledge, viewing, inspection, examination, copying, licensing or sublicensing, distribution, disclosure, or other activity that is not expressly authorized by Consultant.

(c)    <u>Use of Names</u>.  During the Term of this Agreement, Company and/or George Gavrilos may use the names "Leafwell MD" and "Leafwell M.D." for any legitimate business purpose, without restriction, including use of Consultant's branding, font, and color scheme in Company's display of the names.  During the Term of this Agreement, Company shall not use the names in violation of Section 5.6 herein.  After expiration of the Term of this Agreement or termination of the Agreement for any reason, Company shall immediately cease use of the Consultant-Licensed IP.

5.9    License to Use Company's Intellectual Property and Principal's Likeness.

(a)    As part of Consultant's provision of the Marketing and Consultant Services, Consultant shall have access to intellectual property owned by Company and Company's principals including, but not limited to, Company's marketing and advertising materials, service mark, logo, and assumed business name, as well as access to images and audio/video recordings of George Gavrilos ("Company-Licensed IP").  Company grants Consultant a non-transferable, non-assignable (whether by contract or operation of law) non-exclusive, fully paid-up, and royalty-free right and license to use the Company-Licensed IP to the same extent, and under the same restrictions, as those set forth in Article 5.8.  Company warrants and represents that it has the authority to grant licensure to Consultant with respect to the likeness of Mr. Gavrilos.

5.10    <u>Savings Clause</u>. To the extent any covenant, provision, clause, or portion of Article 5 is determined to be unenforceable or invalid for any reason, including, without limitation, because the time period, geographical area, and/or scope of activity covered by any restrictive covenant, provision, or clause is determined to be too broad, the parties acknowledge and agree that:

(a)    Such unenforceability or invalidity shall not affect the enforceability or validity of the remainder of Article 5;

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

(b)     Such unenforceable covenant, provision, clause, or portion shall automatically be deemed reformed such that the contested covenant, provision, clause, or portion will have the closest effect permitted by applicable law to the original form and shall be given effect and enforced as so reformed to whatever extent would be reasonable and enforceable under applicable law; and

(c)     Any court interpreting any covenant, provision, clause, or portion of Article 5 shall have the authority, if necessary, to reform any such provision to make it enforceable under applicable law.

## ARTICLE 6 – TERM AND TERMINATION

6.1     <u>Term</u>. This Agreement shall become effective on the Effective Date and shall be effective for an initial term of five (5) calendar years beginning on the date on which Consultant executes this Agreement (the "Initial Term"). This Agreement shall renew automatically for successive one-year terms (each a "Renewal Term") unless Company gives written notice to Consultant of Company's election not to renew at least sixty (60) calendar days in advance of the expiration of the Initial Term or then-current Renewal Term as the case may be. The Initial Term, together with any Renewal Term(s), of this Agreement shall be referred to herein as the "Term".

6.2     <u>Termination</u>. This Agreement may be terminated by a Party prior to the expiration of the Term only upon the occurrence of a material breach by the other Party. This Agreement may not be terminated for convenience. Unless otherwise specifically stated herein, a material breach is defined by Illinois law. In the event Company alleges in writing a material breach by Consultant, Company shall be entitled to withhold all or any portion of any payment for services Consultant has performed, whether invoiced or uninvoiced, which Company reasonably believes will sufficiently cover Company's damages. Should the withheld amount be less than Company's damages, Company may apply the withheld amount to any claim and enforce this Agreement for the remainder.

6.3     <u>Post-Termination</u>. Upon termination or expiration of this Agreement: (a) Consultant shall cease all Marketing and Consultant Services immediately; (b) each Party shall either return or destroy all Confidential Information of the other Party in its possession or control and so certify in writing to the Disclosing Party; and (c) Consultant shall, within thirty (30) calendar days of the termination date, submit to Company a final, written invoice for all services it claims it has performed but for which it is unpaid.

## ARTICLE 7 – GENERAL PROVISIONS

7.1     <u>Successors and Assigns</u>. Except as specifically provided herein, Company and Consultant shall not fully or partially assign or delegate this Agreement, or any of the rights, interests, or obligations hereunder (whether by operation of law or otherwise), without the prior, written consent of the other Party. This Agreement shall be binding upon, inure to the benefit of, and be enforceable by the Parties and their permitted successors and assigns. Company may assign this Agreement at its sole and absolute discretion in the event that Company has a change in control or the sale of a majority of the assets of Company.

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

7.2     Severability. In the event that any provision of this Agreement shall be determined by a court, tribunal, legislature, council, agency, or other authority having jurisdiction to be invalid, unlawful, void, or unenforceable to any extent, the remainder of this Agreement shall not be impaired or otherwise affected, will be construed to preserve the intent and purpose of this Agreement, and shall continue to be valid and enforceable to the fullest extent permitted by law. The Parties shall negotiate in good faith to modify any invalidated provisions to preserve each Party's anticipated benefits under this Agreement provided, however, that if the Parties are unable to reach agreement, the Agreement shall stand as impacted by the authoritative act or acts.

7.3     Choice of Laws, Jurisdiction, and Venue. This Agreement, and all disputes arising out of, in connection with, or in any way related to this Agreement, shall be governed by and construed in accordance with the laws of the State of Illinois without giving effect to the body of laws pertaining to conflict of laws. All disputes shall be brought solely and exclusively in the Circuit Court of Cook County, Illinois, or in the U.S. District Court for the Northern District of Illinois (Eastern Division). The Parties consent to the jurisdiction of the State of Illinois and waive all objections to venue and jurisdiction. As Consultant is a foreign entity, in the event of any litigation or any dispute-resolution proceeding, Consultant agrees to accept service of process, of a complaint and summons and any other litigation or other dispute-resolution filing, by any of the following methods at any of the following addresses and waives the right to require personal service:

        Via U.S. Certified Mail:                    Via U.S. International Mail:

        HIPPALINE LTD                               HIPAALINE LTD.
        c/o Emily Fisher                            c/o Emily Fisher
        3680 Wilshire Blvd., Suite 1164             20-22 Wenlock Road
        Los Angeles, CA 90100                       London, England N1 7GU

        Service shall be deemed effected upon delivery or refusal.

7.4     Remedies. The Parties' rights and remedies under this Agreement are cumulative. Except as specifically stated herein, a Party's failure or refusal to enforce any right under this Agreement shall not operative as a waiver. The Parties mutually waive the right to claim the following types of damages: except as specifically set forth in Article 4 herein, attorneys' fees and consultants' fees; and casualty resulting from war, terrorist activity, civil unrest, or rioting.

7.5     Representations.

        (a)     Consultant makes the following representations:

                1.      Consultant owns and has full rights to use for the purposes of this Agreement the domain name www.leafwell.co and subject matter appearing at that web address as of May 1, 2020; Consultant's principal office in the United States is located at 3680 Wilshire Blvd, Suite 1164, Los Angeles, 90100 as of May 1, 2020; all Consultant-Licensed IP referenced in this

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

Agreement; and Consultant is not insolvent, is not at risk of insolvency or of filing for bankruptcy, and has no plans of filing for bankruptcy; as of the Effective Date, Consultant has in place a commercially reasonable web-hosting agreement on which its telehealth platform will run that contains one or more provisions addressing the remediation of service outages, a copy of which has been provided to and approved by Company; as of the Effective Date, Consultant has employees that possess sufficient knowledge, skill, and experience to meet completely the obligations associated with the Marketing and Consultant Services; Consultant is not, and has not been within the past five years of the Effective Date, subject to a criminal investigation for any purpose; Consultant is not, and has not been within the past five years from the Effective Date, a party to any lawsuit; and Consultant is registered with the Secretary of State in each state in which Company has or will have a bricks-and-mortar clinic and/or a telehealth presence.

(b)     Company makes the following representations:

1.      As of the Effective Date and currently, Company operates its clinics in compliance with all applicable state and federal corporate and health care rules and regulations, including with respect to corporate practice of medicine rules, licensure rules, and telemedicine guidelines.

7.6     <u>Entire Agreement</u>. This Agreement, including the exhibits (all of which are incorporated herein): (i) constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof; and (ii) is intended solely for the benefit of each party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third party beneficiary rights, and this Agreement does not confer any such rights, upon any other third party.

7.7     <u>Use of Name</u>. To the extent required to provide the Marketing and Consultant Services Consultant may use Company's name, tradenames, trademarks, service marks, logos, or the name of any affiliated company in any advertising or promotional material, presently existing or hereafter established.

7.8     <u>Notice</u>. Except as stated in Article 7.3, any notice required or permitted by this Agreement, including the transmission of invoicing, unless otherwise specifically stated herein, shall be in writing via e-mail and shall be deemed given upon the date of transmission of the e-mail.  Notwithstanding the foregoing, in the event a Party accuses the other Party of a material breach of this Agreement, notice shall be given by U.S. Certified Mail, return receipt requested, or nationally recognized overnight carrier (with delivery confirmation capabilities).  Any notice required or permitted shall be given to the following individuals:

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

To Consultant:     Emily Fisher (efisher@leafwell.co)

HIPAALINE LTD
20-22 Wenlock Road
London, England N1 7GU


To Company:       George Gavrilos (ggavrilos@gcmp.us)

GCM Partners, LLC
c/o George Gavrilos
835 N. California Ave, Apt. 3
Chicago, IL 60622


Either Party may at any time change the above notice information by providing written notice delivered in conformity with the requirements of this Section 7.8 stating the change and setting forth the new address. Each Party shall ensure that its respective e-mail address listed above remains valid, functional, and able to receive incoming messages at all times.

7.9    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Parties. Both Parties need not sign the same counterpart. A PDF copy shall have the same force and effect as an ink-signed original.

7.10    <u>Independent-Contractor Relationship</u>.  Consultant and Company are independent entities, and nothing in this Agreement shall be construed or be deemed to create a relationship of employer/employee, principal/agent, partnership, joint-venture, or any relationship, fiduciary or otherwise, other than that of independent parties contracting with each other solely for the purpose of carrying out the provisions of this Agreement.  Each Party shall have the entire responsibility to discharge all of its own obligations under federal, state or local laws, regulations, or orders now or hereafter in effect relating to taxes, unemployment compensation or insurance, Social Security, Workers' Compensation, disability pensions, tax withholdings, and any other tax-related obligations.

7.11    <u>Amendment</u>.  Except as otherwise provided in this Agreement, this Agreement or any part of it may be amended at any time only by the mutual, written consent of duly authorized representatives of Company and Consultant.

7.12    <u>Insurance</u>. Company shall cause the appropriate persons or entities to secure and maintain at Company's and/or their expense during the Term of this Agreement and for a period of one (1) calendar year after any termination, insurance policies in accordance with the following types: a) commercial general liability and b) medical malpractice held by each of Company's independent-contractor physicians.  Company represents that coverages are

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

in place, and Company shall make certificates of insurance available upon Consultant's request. Consultant shall secure and maintain at Consultant's sole expense during the Term of this Agreement and for a period of one (1) calendar year after any termination, insurance policies in accordance with the following types and minimum coverage limits: commercial general liability with cybersecurity, data-breach, and power-failure coverage ($1,000,000 per occurrence / $2,000,000 aggregate). Consultant represents coverages which conform to the requirements of this Section 7.12 are in place, and a copy of the policy and a certificate of insurance shall be made available upon Company's request prior to execution of this Agreement.

7.13 <u>Authorization</u>. Each Party hereby represents and warrants to the other party to this Agreement that the execution, delivery and performance by such party of this Agreement, and the consummation of the transactions contemplated hereby (a) have been duly and validly authorized by all necessary and appropriate proceedings, (b) does not violate or conflict with such Party's organizational documents or any material agreement or instrument which is binding upon such Party or its respective assets, and (c) does not constitute grounds for acceleration of any material indebtedness or obligation.

7.14 <u>Miscellaneous</u>. The Parties each represent that have had their respective legal counsel review, revise, and advise upon this Agreement and that, consequently, any rule of construction to the effect that any ambiguities are to be resolved against the drafting party is not applicable in the interpretation of this Agreement or any amendments or exhibits hereto. The Parties further represent that they have read in whole and fully understand each and every part of this Agreement. Each Party hereby represents and warrants that (a) such Party is not a party to or otherwise subject to any agreements or restrictions that would prohibit such Party from entering into this Agreement and carrying out the transactions contemplated by this Agreement in accordance with the terms hereof, and (b) this Agreement and the transactions contemplated hereby, to their knowledge, will not infringe or conflict with, and are not inconsistent with, the contractual rights of any other person or entity. The headings of Articles, Sections, and Exhibits contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed by its duly authorized officer or agent as of the date below each signature.

**Consultant**                                              **Company**

_Emily Fisher_                                    _George Gavrilos_
Emily Fisher                          Date        George Gavrilos                     Date
Managing Partner          07 / 06 / 2020         Chief Executive Officer
HIPAALINE LTD                                     GCM Partners, LLC        07 / 07 / 2020

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

# EXHIBIT A

## MARKETING AND CONSULTANT SERVICES

Marketing and Consultant Services include, without limitation, the following services:

1.      Online Lead Acquisition

Provide front-end data acquisition including, without limitation:

- Manage third party relationships with media buyers
- Manage internal lead generation and spending
- Manage internal media spending
- Optimize third-party content and lead-generation paths through search-engine optimization (with major search engines and platforms such as Google, Facebook, Instagram, and Yahoo) and through direct media buying

2.      Advertisement & Brand Recognition

Provide advertisement and brand recognition services including, without limitation:

- Creation, design, implementation, and management of creative resources
- Website design and development
- Online health surveys
- Display advertisement
- Online content and information
- Email templates and design
- Patient drives
- Dispensary and manufacturer partnerships
- Brand development and strategic messaging
- Campaign management and platform optimization

3.      Technology & Systems Management

Provide technology and systems needed to manage the services provided including, without limitation:

- Technology platform and all analytic software
- Analytics on implementing technology to improve business and stream line services, information, and processes
- Develop and manage technology across entire patient engagement platform
- Integrate all data into centralized data warehouse

4.      Lead Analytics

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

Provide analytics on all key performance indicators related to obtaining a lead in order to optimize performance and quality including, without limitation:

- Reporting on performance and quality
- Strategic analysis of continued performance and quality
- Implementation of intelligence tool for continued optimum performance and quality
- Analysis and continued implementation of data warehouse performance, quality and security

5. Telehealth connectivity platform and electronic health record (EHR) system

- Provide HIPAA-compliant telehealth platform publicly hosted at www.leafwell.co and accessible to patients via personal computer, smartphone, and tablet computer
- Telehealth platform shall deliver expected service at commercially reasonable speeds including uploads, downloads, and page-load times
- Provide continual software updates and improvements at commercially reasonable intervals and as necessary to address functionality and security issues
- Respond to and address in reasonable timeframes platform outages and functionality issues
- Provide EHR system which integrates with telehealth platform
- Host Data on Consultant's web-based servers
- Allow physicians and patients to communicate via telehealth platform
- Provide technical support to Company, patients, and physicians
- Upon written notice to Consultant, Company shall have the immediate right to view, review, and audit the platform's full backend code, including by way of a third-party consultant, at Company's expense

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

## EXHIBIT B

## COMPANY DUTIES

Company shall provide Consultant with:

(a)     Written and/or electronic copies of Company's literature, brochures, and advertising materials regarding Company's services in such quantities as the Parties may mutually agree, and

(b)     Sales support and assistance on a reasonable, as-needed basis.

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

**EXHIBIT C**

**MARKETING AND CONSULTANT SERVICES FEES**

For each calendar month during the Term, the Company shall pay to Consultant a fee in the amount of $450.00 USD per hour worked on Company's account.

The foregoing hourly flat fee represents the fair market value of the Marketing and Consultant Services and is not based on the value or volume of services generated by Consultant on behalf of Company. If at any time during the Term of this Agreement this hourly rate is reasonably determined to be in excess of fair market value by a valuation professional or regulatory agency, or otherwise in violation of an applicable rule or regulation, the Parties agree to reasonably work together in good faith to adjust the hourly rate term of this Agreement to be in compliance.

**EXHIBIT D**

**LICENSED IP**

A propriety software that provides a HIPAA-compliant telehealth environment and EHR with marketing and administrative functions.

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

**EXHIBIT E**

**ADDITIONAL TERMS REGARDING HIPAA COMPLIANCE**

**Recitals**

**WHEREAS**, HIPAALINE LTD (hereafter, "Business Associate") provides Marketing and Consultant Services (hereinafter, the "Services") to GCM Partners, LLC (hereinafter, "Company" or "Covered Entity"). In the course of obtaining the Services from Business Associate, it is necessary for Covered Entity, from time to time, to provide Protected Health Information (hereinafter, "PHI"), as such term is subsequently further defined herein, to Business Associate;

**WHEREAS**, Company is a Covered Entity as such term is defined in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 (the "HITECH Act"), and their associated regulations, specifically, 45 CFR §§ 160, 162, and 164, *Standards for Privacy of Individually Identifiable Health Information, Final Rule* (the "Final Privacy Rule") and *Health Insurance Reform: Security Standards, Final Rule* (the "Final Security Rule"). Because Company is a Covered Entity, it is required under HIPAA and the HITECH Act to ensure that Business Associate will appropriately safeguard PHI and use, and, if necessary, disclose PHI only as necessary to provide the Services for Covered Entity consistent with its engagement by Covered Entity, applicable law, and ethical principles; and

**WHEREAS**, Business Associate, which is directly subject to the Final Security Rule to the same extent as Covered Entity, may use and disclose PHI only in compliance with the terms of this Agreement and is subject to the privacy subtitle of the HITECH Act to the same extent as Covered Entity by operation of this Agreement.

1.     **Definitions for this Exhibit E**.

For the purposes of this Exhibit E:

    A.     All capitalized terms not defined herein shall have the meanings defined in the Final Privacy Rule and Final Security Rule, as may be amended from time to time.

    B.     "Breach" shall mean the unauthorized acquisition, access, use, or disclosure of Unsecured PHI that compromises the security or privacy of such information. A Breach shall not include: (1) any unintentional acquisition, access, or use of PHI by a Workforce member or person acting under the authority of Covered Entity or Business Associate, if such acquisition, access, or use was made in good faith and within the scope of authority, and the PHI was not further acquired, accessed, used, or disclosed; (2) any inadvertent disclosure by a person who is authorized to access PHI at Covered Entity or Business Associate to another person authorized to access PHI at the same entity, or at an organized health care arrangement in which Covered Entity participates, and the information received as a result of such disclosure is not further acquired, accessed, used, or disclosed; or (3) a disclosure of PHI where Covered Entity or Business Associate has a good faith belief that an unauthorized

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

person to whom the disclosure was made would not reasonably have been able to retain such information.

C.    "Electronic Protected Health Information" ("EPHI") shall mean PHI that is maintained in electronic media or transmitted by electronic media. EPHI is a subset of PHI.

D.    "Information System" shall mean an interconnected set of information resources under the same direct management control that shares common functionality. A system normally includes hardware, software, information, data, applications, communications, and people.

E.    "Protected Health Information" ("PHI") shall mean information provided to Business Associate by Covered Entity, or provided to or created by Business Associate on behalf of Covered Entity, including demographic information, which is (1) created or received by Covered Entity; and (2) relates to the past, present, or future physical or mental health or condition of an Individual; the provision of health care to an Individual; or the past, present, or future payment for the provision of health care to an Individual; and (i) that identifies the Individual; or (ii) with respect to which there is a reasonable basis to believe the information can be used to identify the Individual.

F.    "Security Incident" shall mean the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.

G.    "Unsecured PHI" shall mean PHI that is not encrypted or destroyed in accordance with standards set by the United States Department of Health and Human Services.

H.    "Workforce" shall mean employees, volunteers, trainees, and other persons whose conduct, in the performance of work for Covered Entity or Business Associate, is under the direct control of such entity, whether or not they are paid by Covered Entity or Business Associate.

All other definitions not specifically set forth in Section 1 of this Exhibit E shall have the same meanings as they are defined in this Agreement.

2.    **Term and Termination.**

A.    Upon knowledge by a Party of a material breach of the terms of this Exhibit E by the other Party, the non-breaching Party may either:

1.    Provide a fifteen (15) business-day opportunity for the breaching Party to cure the breach or end the violation and, if the breaching Party does not cure the breach or end the violation within the 15-business-day period, the non-breaching Party may terminate this Agreement;

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

2. If neither termination nor cure are, in the non-breaching party's sole determination, feasible, the non-breaching party shall report the violation to the Secretary of the U.S. Department of Health and Human Services ('Secretary').

B. Except as provided in paragraph 2.B.1 below of this Section, upon termination of this Agreement for any reason, Business Associate shall return or destroy all PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall also apply to PHI that is in the possession of subcontractors or agents of Business Associate. Neither Business Associate nor any subcontractor or agent of Business Associate shall retain copies of the PHI.

1. If Business Associate reasonably determines that returning or destroying the PHI is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible. Upon Covered Entity's written consent, which shall not be unreasonably withheld, that return or destruction of PHI is infeasible, Business Associate may retain the PHI that is not feasible to return, for so long as it remains infeasible to return such PHI. In such event, Business Associate shall extend the protections of this Agreement to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

2. The provisions of this Section shall survive termination of this Agreement.

3. **Obligations of Business Associate**.

A. Business Associate shall comply with the use and disclosure provisions of the Final Privacy Rule in performing its obligations under any agreement for services with Covered Entity and shall not use or disclose PHI other than as permitted or required under this Agreement or as Required by Law.

B. Business Associate shall implement and use commercially reasonable safeguards to prevent use or disclosure of PHI other than as provided for by this Agreement.

C. Business Associate shall implement administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of EPHI that it creates, receives, maintains, or transmits on behalf of Covered Entity, and to otherwise comply with the Final Security Rule in performing Business Associate's obligations under this Agreement.

D. Business Associate shall use best efforts to secure PHI to make it unusable, unreadable, or indecipherable to unauthorized individuals through the use of a technology or methodology specified by the Secretary in its annual guidance issued under section 13402(h) of the HITECH Act, codified at 42 U.S.C. § 17932(h).

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

E.    Business Associate shall mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate in violation of the requirements of this Agreement.

F.    Business Associate shall, as soon as reasonably practicable and in no event later than two (2) business days of discovery of the same, report to Covered Entity any use or disclosure of PHI not provided for by this Agreement of which it becomes aware, including, but not limited to, any Security Incident and any unauthorized acquisition, access, use, or disclosure of PHI.

G.    Business Associate shall develop policies and procedures to both detect and report Breaches of PHI to Covered Entity. Copies of such policies and procedures shall be made available to Covered Entity upon Covered Entity's Request.

H.    Business Associate shall, following the discovery of a Breach of PHI, notify Covered Entity of such Breach.

    1.    Business Associate shall provide in written form initial notice of the Breach as soon as reasonably practicable and in no event later than two (2) business days after the discovery of the Breach. A Breach shall be treated as discovered as of the first day on which the Breach is known to the Business Associate or, by exercising reasonable diligence, would have been known to the Business Associate. Business Associate shall be deemed to have knowledge of a Breach if the Breach is known, or by exercising reasonable diligence, would have been known, to any person, other than the person committing the Breach, who is an employee, officer, or other agent of Business Associate.

    2.    The initial notice shall include, to the extent possible, the identification of each individual whose PHI has been, or is reasonably believed by the Business Associate to have been, accessed, acquired, or disclosed during such Breach. Business Associate shall make best efforts to collect and provide to Covered Entity as soon as possible any such information that Business Associate is unable to provide in the initial notice.

I.    Business Associate shall, following notification to Covered Entity of a Breach of PHI, cooperate with Covered Entity in providing any and all information required for Covered Entity to comply with the breach notification provisions of section 13402 of the HITECH Act and the implementing regulations set forth in Subpart D of the Final Privacy Rule (45 C.F.R. § 164.400 *et seq.*) and any other applicable breach notification laws and regulations.

J.    At the request of Covered Entity, Business Associate shall provide prompt access to PHI to Covered Entity or, as directed by Covered Entity, to an Individual, in order to meet the Individual's right of access requirements under HIPAA.

K.    Business Associate shall enter into legally binding agreements with each of its subcontractors and agents to ensure that any subcontractor agent to whom Business

Page 19 of 20

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

Associate provides PHI received from, or created or received by, Business Associate on behalf of Covered Entity agrees to the same restrictions and conditions that apply through this Agreement to Business Associate with respect to such information.

L.      Business Associate shall make any amendment to PHI that Covered Entity directs, or to which Covered Entity agrees pursuant to an Individual's right to request amendment to his or her PHI under HIPAA.

M.      For purposes of the Secretary determining Covered Entity's compliance with the Final Privacy Rule and Final Security Rule, Business Associate shall make available to the Secretary, in a time and manner designated by the Secretary, its internal practices, books, and records (including policies and procedures), relating to the use and disclosure of PHI received from, or created or received by, Business Associate on behalf of Covered Entity.

N.      Business Associate shall document such disclosures of PHI and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with the Individual's right to receive such accounting under HIPAA.

O.      Business Associate shall provide to Covered Entity or an Individual, information collected in accordance with Section 3.N of this Agreement, to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with the Individual's right to receive such accounting under HIPAA.

4.      **Specific Use and Disclosure Provisions**.

A.      Except as otherwise limited by this Agreement, Business Associate may use PHI for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

B.      Except as otherwise limited by this Agreement, Business Associate may disclose PHI for the proper management and administration of the Business Associate, provided that disclosures are Required By Law, or Business Associate obtains reasonable assurances in writing from the person to whom the information is disclosed that it will remain confidential and be used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

C.      Except as otherwise limited by this Agreement, Business Associate may use PHI to provide Data Aggregation services to Covered Entity as permitted by 45 C.F.R. § 164.504(e)(2)(i)(B).

D.      Business Associate may use PHI to report violations of law to appropriate Federal and State authorities, consistent with 45 C.F.R. § 164.502(j)(l).

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Signed contract |
| **FILE NAME** | GCM-HIPAALine IC Agreement (v2).pdf |
| **DOCUMENT ID** | c8d341443d6672ab299794f0b8e8eb77cca0abca |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

**SENT**
**07 / 06 / 2020**
20:49:22 UTC

Sent for signature to GCM Partners LLC (jmraunac@gcmp.us)
from efisher@leafwell.co
IP: 78.145.70.93

**VIEWED**
**07 / 07 / 2020**
14:26:26 UTC

Viewed by GCM Partners LLC (jmraunac@gcmp.us)
IP: 24.1.71.186

**SIGNED**
**07 / 07 / 2020**
14:57:18 UTC

Signed by GCM Partners LLC (jmraunac@gcmp.us)
IP: 168.235.1.4

**COMPLETED**
**07 / 07 / 2020**
14:57:18 UTC

The document has been completed.