# EXHIBIT 1

to Revised First Amended Complaint
-- Gavrilos Declaration

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| GCM PARTNERS, LLC, an Illinois limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Civil Action No. 1:20-cv-06401 |
| v. | ) ) | Hon. Lindsay C. Jenkins |
| ONLINE MD LTD., a limited company of England and Wales; and EMILY ARIDA FISHER, | ) ) ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

## <u>DECLARATION OF DR. GEORGE GAVRILOS, PHARM.D., M.A.</u>

I, Dr. George Gavrilos, Pharm.D., M.A., state that I am competent to testify to the matters in this declaration, and that I have based my representations in this declaration upon my personal knowledge, and if called to testify, I would state voluntarily as follows:

**Defendant Fisher Approaches GCM Partners**

1.     In September 2017, I founded, with Dr. Steven Salzman, D.O. ("Dr. Salzman"), a brick-and-mortar medical practice to treat patients via state-sanctioned medical cannabis programs.  The practice began first in Illinois only and then expanded into Maryland, Ohio, and Pennsylvania in the fall of 2018. I formed the legal entity GCM Partners, LLC ("GCM Partners") in October 2018 to reorganize and accommodate the out-of-state expansion.

2.     From approximately September 2017 through October 2019, prior to beginning a business relationship with Defendant Fisher, and later Hipaaline, I, while working full-time as a critical-care, clinical pharmacist for a large, academic medical center in the Chicago metropolitan area, undertook the following steps toward building an established, successful medical-cannabis practice: recruited medical providers; searched for and leased brick-and-mortar office spaces;

DocuSign Envelope ID: 19A6B5FC-288F-424B-BB9D-C41E80D36053

participated in numerous live and recorded educational, topical webinars to drive attention and patient volumes; secured internet, newspaper, magazine, and radio advertising placements; hired clinical staff and patient-support and provider-support personnel; conducted extensive research and created state-specific workflow documentation mapping the medical-cannabis process in each state with a medical-cannabis program; and sponsored charity events for patient referral and relationship-building purposes.

3.      In or about May 2019, I was approached by Defendant Fisher about an opportunity to expand GCM Partners' brick-and-mortar practice into the telehealth industry.

4.      Defendant Fisher represented herself as a medical cannabis marketing specialist with significant experience in telehealth services.

5.      Fisher became the Chief Executive Officer of Hipaaline when she formed Hipaaline on June 12, 2020.

6.      Prior to June 12, 2020, Defendant Fisher explained that, by using her services, GCM Partners could expand into new markets through the provision of telehealth services to patients.

7.      On May 31, 2019, Defendant Fisher proposed that GCM Partners could find a team of medical providers in states with medical cannabis programs and operate telemedicine clinics while Defendant Fisher would provide marketing efforts and the technological infrastructure to achieve the parties' shared goal of becoming the primary national destination for medical cannabis patients to obtain a doctor's certificate.

8.      Defendant Fisher estimated that it would take approximately six weeks to develop the online software platform, and that the parties would begin to see the impact of their marketing

efforts within 3-6 months of the online platform going live and becoming available to potential patients.

9.      By October 1, 2019, after several discussions and negotiations between the parties, GCM Partners and Defendant Fisher began working together.

10.     GCM Partners made its first payment to Defendant Fisher on or about October 14, 2019.

11.     Over the course of the next eight months, and with the assistance of the marketing and consulting services provided by Fisher, GCM Partners expended an immeasurable amount of resources and money to grow its network of medical providers, substantially increase its customer base, grow and increase the sophistication of its virtual clinic support staff, and expand its practice from being operational in only four states to operating in at least 21 states through telemedicine with medical providers licensed in each jurisdiction.

12.     GCM Partners' herculean expansion efforts proved fruitful as the number of patients seen by medical providers of GCM Partners increased tenfold in a matter of months.

13.     In June 2020, GCM Partners hired Jonathan M. Mraunac ("Mr. Mraunac") as the Chief Operating Officer and General Counsel of GCM Partners.

14.     Mr. Mraunac recommended that GCM Partners and Defendant Fisher memorialize their business relationship in writing.

**The Parties Enter into an Exclusive Marketing and Consultant Services Agreement**

15.     On or about July 7, 2020, GCM Partners entered into an Exclusive Marketing and Consultant Services Agreement (the "Agreement") with Hipaaline to formally engage Hipaaline on an exclusive, independent-contractor basis to perform certain marketing and consulting services

related to GCM Partners' medical practice in order to facilitate its bricks-and-mortar practice and expand and enhance its telemedicine presence.

16.     A true and correct copy of the Agreement is attached hereto as **Exhibit A**.

17.     Given the highly-sensitive nature of the medical, proprietary, and personal information at issue in providing marketing and consultant services to GCM Partners, the Agreement contains intricate terms for the handling of confidential information, trade secrets, and patient data.

18.     The information collected from GCM Partners' patients is confidential, HIPAA-protected data that belongs to GCM Partners.

19.     The following non-exhaustive list qualifies as GCM Partners' trade secrets and Confidential Information: (i) pricing structure of payments by GCM Partners to its medical providers, (ii) contact and licensing information of existing and prospective medical providers, (iii) revenue figures, (iv) log of patient activity on the Leafwell platform, including peak traffic hours on the platform, (v) patient data and identifying information, including, but not limited to, qualifying condition, medical records, medication history, procedural/surgical history, demographic information, geographic location, and cannabis-use history, (vi) identity of referral partner or source of lead generation, (vii) medical providers' charts and notes, (viii) medical provider activity on the Leafwell platform, and (ix) marketing and partner strategy and targets.

20.     The foregoing information has economic value to GCM Partners by virtue of not being generally known to its competitors.

21.     GCM Partners maintains the confidentiality of its Confidential Information, trade secrets, and patient data by several means, including but not limited to:

> a.   Requiring GCM Partners' independent contractors and medical providers to use computers that are password or biometric face-scan protected;

DocuSign Envelope ID: 19A6B5FC-288F-424B-BB9D-C41E80D36053

    b.   Maintaining GCM Partners' records on a cloud-based service that is encrypted and password protected;

    c.   Requiring GCM Partners' vendors, independent contractors, and medical providers with access to Confidential Information and trade secrets to sign confidentiality agreements; and

    d.   Providing access on a tiered basis so that the type and amount of Confidential Information, trade secrets, and other highly-sensitive information is limited to select representatives of GCM Partners based on his or her position and role at GCM Partners.

22.    Additionally, the Agreement contains various covenants and restrictions, including a non-solicitation provision, to outline the contours of the parties' distinct, exclusive arrangement.

23.    The Agreement also articulates the importance of Plaintiff's access and license to use Hipaaline's software platform to carry out its telehealth services.

24.    The HIPAA-compliant telehealth software platform referred to in Section 5.8 and Exhibit D of the Agreement is publicly hosted at www.leafwell.co and accessible to GCM Partners' patients via personal computer, smartphone, and tablet computer. The platform has separate logins, with tiered access, for medical providers, GCM Partners' staff and Hipaaline's staff.

**The Leafwell Online Platform**

25.    The software platform that Defendants constructed for purposes of the Agreement is known as www.leafwell.co.

26.    At the time the parties entered the Agreement, Fisher and Hipaaline had represented to GCM Partners that Hipaaline owned and had full rights to use the domain name www.leafwell.co, and the "Leafwell MD" and "Leafwell M.D." trade names.

27.    However, by entering into the Agreement, Hipaaline gave GCM Partners nearly unfettered access to the www.leafwell.co platform and the "Leafwell MD" and "Leafwell M.D."

names for the purpose of conducting its business and expanding its telehealth services. For example, Jenna Kioussis ("Ms. Kioussis"), a GCM Partners representative who is in charge of overall clinic operations, has super-administrative access and super-clinician access to the Leafwell platform.

28.     Mr. Mraunac and I have even had leafwell.co email addresses.

29.     The Leafwell platform has become an integral part of GCM Partners' business.

30.     Under the Agreement, all patients who use the Leafwell platform are customers of GCM Partners. GCM Partners processes all patient credit card payments and handles all patient customer-service issues.

31.     Potential customers of GCM Partners who have a qualifying medical condition may visit the www.leafwell.co online platform to apply for a medical cannabis card.

32.     Among other things, qualifying conditions may include autism, cancer, glaucoma, Hepatitis C, lupus, multiple sclerosis, Parkinson's Disease, post-traumatic stress disorder, rheumatoid arthritis, traumatic brain injury, and certain terminal illnesses.

33.     The application process for obtaining a medical marijuana card on the Leafwell platform has three general steps. An image of a portion of the Leafwell site is provided below.

6

DocuSign Envelope ID: 19A6B5FC-288F-424B-BB9D-C41E80D36053



34.     To begin, potential customers of GCM Partners are required to register in order to virtually meet with a GCM Partners medical provider on the Leafwell platform.

35.     During the registration process, patients submit their medical history, demographic information, identification, relevant medical records, payment details,[1] and related information.

36.     If the GCM Partners medical provider that conducts a virtual meeting with the patient determines that he or she has a qualifying condition for which a medical cannabis card is appropriate, the provider will approve the patient, and the Leafwell platform automatically emails the patient with further, state-specific instructions for completing the process.

37.     Once approved, patients are charged a fee for a doctor's certificate through GCM Partners' third-party payment processor, Bluepay.

38.     In many states, patients must then complete an official state application to become approved for a medical cannabis card.

---

[1] No funds are charged until a GCM Partners medical provider approves the patient for a medical cannabis certification.

DocuSign Envelope ID: 19A6B5FC-288F-424B-BB9D-C41E80D36053

39.     For example, in Illinois, patients wishing to obtain a medical cannabis card must apply online via the State of Illinois Medical Cannabis Patient Registry Program located online at https://medicalcannabispatients.illinois.gov/.

40.     In Illinois, patients are required to submit their doctor's certificates with their state applications for a medical cannabis card.

41.     Lastly, if approved by the State of Illinois, patients will receive a medical cannabis card and become eligible to purchase medical cannabis in any registered Illinois medical-cannabis dispensary.

42.     Although the licensed medical providers are retained by GCM Partners and the patients are customers of GCM Partners, the name "GCM Partners, LLC" is not identified on the Leafwell software platform in any capacity.

43.     However, the founders of GCM Partners – Dr. Salzman and myself – are identified as two of the featured doctors on the www.leafwell.co homepage. An image of a portion of the homepage is below.



44.     Dr. Salzman and I act, without pay or legal obligation, as Leafwell ambassadors, participating in topical webinars and marketing pitch meetings with potential dispensary partners in order to grow the Leafwell patient base.

45.     Dr. Lewis Jassey is the third doctor featured on the www.leafwell.co homepage. Dr. Jassey is an independent contractor of GCM Partners, and he evaluates patients on the Leafwell platform.  Dr. Jassey also evaluates medical-cannabis patients for Heally, a competitor of Leafwell offering a somewhat similar telemedicine platform.  Dr. Jassey has seen patients on the Heally platform since approximately April 2020 with the full knowledge and consent of Fisher and Hipaaline.

46.     From approximately June 19, 2020, through October 23, 2020, Dr. Salzman, Ms. Kioussis, myself and (after June 1, 2020) Mr. Mraunac, without pay or legal obligation, and in the spirit of cooperation between the parties, attended weekly web-development meetings (via video call) with Hipaaline's web-development team who maintain and improve the Leafwell platform.

DocuSign Envelope ID: 19A6B5FC-289F-424D-BB0D-C41E80D36053

47.     During the web-development meetings, GCM Partners' personnel shared detailed feedback regarding technical problems with the Leafwell platform and suggestions for design and feature improvements for the platform. GCM Partners' feedback and suggestions led directly to permanent improvements in the efficiency, look, and operation of the Leafwell platform, ultimately improving the patient experience and the ease of clinic operations.

48.     Along with new patients, the existing customers of GCM Partners may use the Leafwell platform to see a medical provider to renew their medical cannabis certification. Depending on state-specific rules, certifications are valid for a specific duration – ranging from 90 days to three years.

49.     Medical providers of GCM Partners have access to data on the Leafwell platform which includes a record of every patient visit, the amount charged for each visit, patient-supplied medical records, and the providers' notes/charts for each patient visit.  All of this data, for learning and auditing purposes, is invaluable to GCM Partners' medical providers.

**Communications Break Down Between the Parties**

50.     Beginning in approximately June 2020, communications between the parties began to break down as Defendant Fisher attempted to exert a level of control and management over GCM Partners that is not permitted by the Agreement, which limited her role to the provision of marketing and consultant services.

51.     For example, Defendant Fisher routinely micromanaged GCM Partners' clinic operations (despite having no contractual duty or other legal right to do so). This micromanagement included, but was not limited to: incessantly calling and sending instant messages to Ms. Kioussis regarding patient waiting room times and contact correspondence practices; demanding compliance with unrealistic deadlines to complete research-heavy,

complicated, state-specific workflows; and calling and instant messaging Ms. Kioussis during non-business hours, including at times when the virtual clinic was closed. This micromanagement interfered materially with GCM Partners' clinic operations.

52. Such complaints and requests also greatly exceeded the scope of Hipaaline's marketing and consultant services in the Agreement. *See* Exhibit A.

53. For further example, Ms. Fisher routinely demanded constant, detailed status updates regarding GCM Partners' preparation of workflow documents as the parties expanded into new medical-cannabis state markets. Conversely, when GCM Partners requested updates from Ms. Fisher regarding the status of dispensary partnerships or website platform bug fixes or new-feature implementations, she always became opaque, refused to share details and acted as if GCM Partners' requests for updates were an imposition to her. Ms. Fisher's communication style materially impacted interpersonal relations and overall operation of the business arrangement.

54. In hopes of maintaining a mutually-beneficial relationship, GCM Partners nonetheless addressed Defendant Fisher's complaints and requests, but Defendant Fisher became increasingly emboldened and demanding in ways that exceeded the scope of her authority as a principal of Hipaaline under the Agreement, and she rarely provided details regarding the statuses of her business undertakings.

**GCM Partners Learns About Federal Complaint Against Defendant Fisher**

55. On July 8, 2020, Defendant Fisher misdirected a file attachment to Mr. Mraunac via email.

56.     The attachment contained a filing[2] from a federal legal action pending in the United States District Court for the Central District of California entitled, *Frank D'Ambrosio, M.D. v. Emily Fisher; and Does 1 through 10*, Case No. 2:19-cv-552.

57.     True and correct copies of the filing and complaint from the *D'Ambrosio* action are attached hereto as **Exhibit B**.

58.     From this pleading, GCM Partners learned for the first time that Defendant Fisher had been previously sued for "wholesale theft of Plaintiff Frank D'Ambrosio's lucrative on-line medical marijuana card referral business by Defendant Emily Fisher, a person he hired – and paid handsomely – to develop the web portal through which D'Ambrosio was offering his services."

59.     On August 13, 2019, the judge in the *D'Ambrosio* action entered a permanent injunction against Defendant Fisher. A true and correct copy of the permanent injunction is attached hereto as **Exhibit C.**

60.     Thus, it appears that immediately after Dr. D'Ambrosio uncovered Defendant Fisher's unlawful scheme, she targeted a new victim – GCM Partners.

---

[2] Report on the Filing or Determination of an Action Regarding a Patent or Trademark. Dkt. 21.

DocuSign Envelope ID: 19A6B5EC-289F-424D-BB0D-C41E80D36053

**Defendants Falsely and Pretextually Claim GCM Partners Breached the Agreement and Attempt to Wrongfully Terminate the Agreement**

61.     On October 11, 2020, Dr. Salzman and I met with Defendant Fisher via a Zoom virtual meeting to confront Defendant Fisher about her recent demanding behavior and the scope of the Agreement.

62.     During the virtual meeting, Defendant Fisher delivered a presentation that concluded the Agreement must be terminated for the following reasons: that GCM Partners communicated in an unproductive fashion; that Hipaaline preferred to contract with me and Dr. Salzman individually (as opposed to with a legal entity); that she felt the Agreement was merely a "formality" and that it had no real effect; that Leafwell, despite the efforts of GCM Partners in growing Leafwell, was "her company" only; and because Dr. Salzman and I were not "founders" of Leafwell.

63.     Further, during this virtual meeting, Defendant Fisher said that all revenue would be redirected to be collected by Hipaaline.

64.     During the virtual meeting, GCM Partners first learned of Hipaaline's desire to terminate the Agreement.  Dr. Salzman and I were shocked at this news.

65.     Hipaaline had no legal basis to terminate the Agreement.

66.     On October 12, 2020, Defendant Fisher sent an email to Dr. Salzman and me with a proposal stating, in part, that "[a]ll operations and hiring will come under Leafwell," and Defendant Fisher "would like George, Steven, and Lewis to join our [Leafwell] executive team as Medical Directors/Advisors."  She also suggested that Dr. Salzman and me would receive "15% of any revenue from partnerships." At the end of the email, Defendant Fisher vaguely noted, "Although we must push forward with the transition, we will allow till 10/31 for a smooth transition."

DocuSign Envelope ID: 19A6B5EC-289F-424D-BB0D-C41E80D36053

67.     On October 13, 2020, I notified Defendant Fisher via email that her proposal was rejected. In his email, I explained as follows: "From GCM's perspective, HIPAALINE has no legal basis upon which to avoid the continued, binding effect of the current agreement between the parties (hereafter, "Agreement").  Accordingly, HIPAALINE's proposal and, more generally, its forecasted intent to avoid the Agreement are viewed as a plea for relief from what HIPAALINE considers to be a bad deal for itself (despite it being negotiated at arm's length by sophisticated business entities, each with their own legal counsel)."

68.     On October 16, 2020, Defendant Fisher responded to my October 13th email by stating, in pertinent part, "Today we terminate our contract with GCM with immediate effect. We will honor any financial agreement of our previous contract till the end of the month to allow for a smooth transition, however, should any employees or contractors wish to continue to work with us, they will need to sign a new agreement with HIPAALINE by Monday and they should email me directly."

69.     Also, on October 16, 2020, counsel for Hipaaline served a "Notice of Breach of Contract and Termination" to me and Mr. Mraunac ("Purported Termination Notice"). A true and correct copy of the Purported Termination Notice is attached hereto as **Exhibit D.**

70.     The Purported Termination Notice began by stating: "Our firm represents Hipaaline, LLC. This letter shall constitute notice that GCM Partners, LLC is in material breach of the Exclusive Marketing and Consulting Services Agreement between Hipaaline and GCM Partners, LLC, effective October 1, 2019 (the "Agreement"). Consequently, Hipaaline hereby terminates the Agreement effective immediately."

71.     The Notice indicated that there were two bases for termination of the Agreement.

72.     First, Hipaaline supposedly "bec[a]me aware that GCM Partners engaged a direct competitor of Hipaaline to provide services that are substantially similar, if not identical, to those for which GCM Partners contract[ed] Hipaaline to provide on an exclusive basis. Such conduct is a material breach of the Agreement under Illinois law."

73.     Second, Hipaaline purportedly "bec[a]me aware that GCM Partners contracts with providers where it is billing for and receiving payments for services in multiple states in apparent violation of state corporate practice of medicine rules."

74.     Both of the allegations made by Hipaaline's counsel in the Purported Termination Letter are false.

75.     In closing, Hipaaline demanded that "GCM Partners (i) immediately cease to use Hipaaline's intellectual property, including but not limited to marketing and advertising materials, name, tradenames, trademarks, service marks, logos, and, specifically, the "Leafwell MD" or "Leafwell M.D." names; [and] (ii) immediately return or destroy all Confidential Information of Hipaaline in its possession and provide written certification to Hipaaline of such return and/or destruction."

76.     Hipaaline orchestrated the preparation and service of the Purported Termination Notice for the sole purpose of pretextually terminating the Agreement for convenience as a means to take control of GCM Partners' Confidential Information, patient data, and medical providers.

77.     Contrary to Defendants' allegation in the Purported Termination Letter, GCM Partners has not engaged a direct competitor of Hipaaline or any other person or entity to provide marketing and consultant services on behalf of GCM Partners.

78.     Furthermore, GCM Partners has not violated any state corporate practice medicine rules, as suggested in the Purported Termination Notice.

79.     Moreover, the Purported Termination Notice was based on an unsigned, outdated draft of the Agreement that was provided to Hipaaline's counsel by Defendant Fisher.

80.     Hipaaline's counsel mistakenly referred to "Hipaaline, LLC" in the Purported Termination Notice although the correct party to the Agreement is "Hipaaline Ltd."

81.     In addition, the Exclusivity clause quoted in the Purported Termination Notice was inaccurate and incomplete.

82.     As a professional courtesy, Mr. Mraunac sent the operative Agreement to Hipaaline's counsel on October 22, 2020. Hipaaline's counsel acknowledged he had not seen the operative Agreement before he received it from Mr. Mraunac.

83.     Defendants' attempt to terminate the Agreement was ineffective, and presently GCM Partners is still able to access the Leafwell online platform.

84.     However, Defendants have threatened and confirmed multiple times that they will (1) disable GCM Partners' access to the Leafwell platform on November 1, 2020, and (2) replace Bluepay with Hipaaline's own payment processor on November 1, 2020, thereby rerouting all Leafwell revenues to Hipaaline. Both actions would violate the Agreement and cause irreparable, incalculable loss to GCM Partners.

**GCM Partners Responds to the Purported Termination Letter and Points Out That Hipaaline Has Breached Multiple Provisions of the Agreement**

85.     On October 19, 2020, Mr. Mraunac sent a response to the Purported Termination Notice (the "First Letter"). A true and correct copy of the First Letter is attached hereto as **Exhibit E.**

86.     In the First Letter, Mr. Mraunac noted that "GCM disagrees that it has breached the Agreement in any manner whatsoever. GCM considers the Agreement to be in full force and effect, as it has been since its execution, and expects HIPAALINE to fully abide by its terms."

DocuSign Envelope ID: 19A6B5EC-288F-424D-BB0D-C41E80D36053

87. He also declared that "HIPAALINE has anticipatorily repudiated the Agreement by: vetting payment processors to replace Bluepay (GCM's current processor); Emily Fisher's statement to Lewis Jassey on October 18 that she intends to replace Bluepay on October 19; Ms. Fisher's admission to Dr. Jassey on October 18 that she had communicated with GCM providers to solicit them to sign new independent-contractor agreements with HIPAALINE to see patients on Leafwell's platform; and wrongfully terminating the Agreement via your Notice."

88. On October 22, 2020, after acquiring further details regarding the extent of Defendants' misconduct, Mr. Mraunac sent a follow-up letter to Hipaaline's counsel entitled, "Notice of HIPAALINE's Material Breach of Contact" (the "Second Letter"). A true and correct copy of the Second Letter is attached hereto as **Exhibit F.**

89. In the Second Letter, Mr. Mraunac stated as follows:

> GCM Partners, LLC ("GCM") has learned that HIPAALINE has engaged two providers, Drs. Walter Nyabere and Takayoshi Kakiuchi, who have evaluated patients on the Leafwell platform in Minnesota and Pennsylvania, respectively. HIPAALINE's direct engagement of these providers violates Section 5.6 of the Agreement. As exclusivity is fundamental to the spirit of the Agreement, this violation constitutes a material breach of the Agreement.

90. Mr. Mraunac graciously provided Hipaaline an "opportunity to cure this material breach by cancelling any agreements, written or oral, with Drs. Nyabere and Kakiuchi and referring them to Dr. Gavrilos so they can enter independent-contractor agreements with GCM in accordance with the Agreement" no later than October 26, 2020 at 5:00 p.m.

91. Defendants have no authority under the Agreement or otherwise to vet or replace GCM Partners' third-party payment processor, Bluepay, and directly collect payments from GCM Partners' patients.

92. Section 3.3 of the Agreement states, "[a]ll patient payments received through [Hipaaline's] telehealth platform shall be solely collected and held by [GCM Partners]."

93.     Any act by Defendants to change the payment processor may result in an interruption of service to GCM Partners' patients, a complete loss of revenue to GCM Partners, and would constitute a material breach of Section 3.3 of the Agreement.

94.     In addition, Section 5.6 of the Agreement prohibits Hipaaline from employing or engaging any physician or other health care provider or practitioner to promote or utilize the Leafwell telehealth platform unless the physician or other health care provider or practitioner is an employee or independent contractor of GCM Partners.

95.     Hipaaline directly engaged Dr. Nyabere and Dr. Kakiuchi to promote or utilize the Leafwell telehealth platform, even though neither physician is an employee or independent contractor of GCM Partners, in direct contravention of Section 5.6 of the Agreement.

96.     Therefore, Hipaaline's solicitation of both medical providers is in direct contravention of the terms of the Agreement.

97.     Finally, the Termination provision of the Agreement provides that the Agreement may be terminated only upon the occurrence of a material breach, not for convenience. *See* Exhibit A, Section 6.2.

98.     By concocting false, unsupported, and immaterial grounds for attempting to terminate the Agreement in a sheer maneuver to terminate the Agreement for convenience and selfish gain, Hipaaline violated Section 6.2 of the Agreement.

**Fisher Threatens to Shut Down GCM Partners' Access to Leafwell, Seize Its Confidential Data, and Upend It Business**

99.     On October 18, 2020, Dr. Salzman and I attended a virtual Zoom meeting with Defendant Fisher to discuss various letters and email correspondence exchanged between the parties.

100.    During that same meeting, Defendant Fisher proposed that the parties settle their dispute on the following terms: (i) Hipaaline would assume all overhead and engage all medical providers and staff of GCM Partners directly, (ii) Dr. Salzman, Dr. Jassey, and I would become directors of Leafwell and collect 15% of revenues derived only from marketing partnerships that Dr. Salzman, Dr. Jassey, and I generated, and (iii) we three doctors would receive, collectively, 6% equity interest in the event of a sale of Hipaaline.

101.    I again rejected this proposal from Defendant Fisher.

102.    GCM Partners has not violated the Agreement, and there is no justifiable explanation as to why GCM Partners would accept an offer to receive 15% of ill-defined, self-generated partnership revenue when GCM Partners currently receives 60% of all revenues derived from Leafwell.

103.    After I rejected her proposal for a second time during the virtual meeting, Defendant Fisher notified me that Hipaaline would be disabling Bluepay and collecting all revenue directly, and removing GCM Partners' access to the Leafwell platform on November 1, 2020. At that time, I was not certain that Defendants would actually disable GCM Partners' access to its payment processor and the Leafwell platform.

104.    Shutting down GCM Partners' access to the Leafwell platform would result in a catastrophic, immeasurable loss to GCM Partners.

105.    Without access to Leafwell, GCM Partners would be unable to contact its existing and prospective patients.

106.    GCM Partners would be unable to access its Confidential Information and patient data stored on the Leafwell platform.

107. GCM Partners would be left without an online platform by which to conduct telehealth services for any existing or prospective patients.

108. The medical providers of GCM Partners would be unable to conduct consultations or otherwise communicate with existing and prospective patients.

109. In essence, GCM Partners' twelve months of effort to grow and expand in the telehealth industry would be completely destroyed if Defendants elected to disable GCM Partners' access to the Leafwell platform and replace Bluepay.

110. GCM Partners would then be forced to either construct an entirely new online platform or join a different online medical cannabis platform.

111. Both options would result in a tremendous loss of revenue as it would take, at a minimum, several months and hundreds of thousands of dollars to customize a platform to align with GCM Partners' business model.

112. The Leafwell platform is, objectively, well-designed and patient-friendly. Further, since October 1, 2019, the "Leafwell" brand name has gained notoriety as a trusted, reliable source for medical-cannabis certifications. If Defendants elect to disable GCM Partners' access to the Leafwell platform and replace Bluepay, GCM Partners will immediately lose the value of that brand cache and be forced to directly compete with it, fundamentally undermining the intent of exclusivity in the Agreement.

113. There is also no guarantee that any of GCM Partners' existing patients and/or medical providers would agree to join GCM Partners' new platform.

114. To the contrary, Hipaaline would be uniquely poised to contact and usurp GCM Partners' existing patients and medical providers, if given the opportunity to do so, as the patients

and providers are already familiar with the Leafwell brand and platform, but unaware of GCM Partners.

115.     I declare under penalty of perjury that the foregoing statements are true and correct.

**FURTHER DECLARANT SAYETH NOT.**

*Dr. George Gavrilos*                                    3/20/2024
_____
Dr. George Gavrilos, Pharm.D., M.A.          Date

# EXHIBIT A

to Gavrilos Declaration
-- the Agreement

## EXCLUSIVE MARKETING AND CONSULTANT SERVICES AGREEMENT

This Exclusive Marketing and Consultant Services Agreement ("Agreement") is entered into between GCM Partners, LLC, an Illinois limited liability company with its principal office located at 835 N. California Ave. Apt. 3, Chicago, Illinois 60622 ("Company") and HIPAALINE LTD, a limited company of England and Wales, Company Number 12665260, with its principal office located at 20-22 Wenlock Road, London, England N1 7GU ("Consultant"). This Agreement is effective as of October 1, 2019 ("Effective Date"). Company and Consultant may hereinafter be referred to individually as a "Party" or collectively as the "Parties".

**WHEREAS**, Consultant is in the business of providing marketing and consulting services for medical practices, including providing a software platform which facilitates virtual physician-patient visits over the internet (i.e., telehealth);

**WHEREAS**, Company operates bricks-and-mortar medical clinics which treat patients legally via U.S. states' medical-cannabis programs; and

**WHEREAS**, Company is interested in engaging Consultant on an exclusive, independent-contractor basis to perform certain marketing and consulting services related to Company's medical practice in order to facilitate its bricks-and-mortar presence and expand and enhance its telemedicine presence.

**NOW THEREFORE**, in consideration of the mutual promises herein, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Consultant and Company hereby agree as follows:

## ARTICLE 1 – DEFINITIONS

1.1 <u>Marketing and Consultant Services</u>. "Marketing and Consultant Services" are the Marketing and Consultant Services provided by Consultant to drive traffic to Company as further set forth on <u>Exhibit A</u>.

1.2 <u>Marketing Service Fees</u>. "Marketing Service Fees" are the fees identified in <u>Exhibit C</u> which consist of the total of fees paid to Consultant for the Marketing and Consultant Services.

1.3 <u>Company Duties</u>. Company shall provide Consultant with the materials described <u>Exhibit B</u> to this Agreement in order to facilitate the Marketing and Consultant Services.

1.4 <u>Recitals</u>. The recitals listed above within the "whereas" clause (the "Recitals") are made a part of the terms of this Agreement, incorporated herein by reference.

## ARTICLE 2 – MARKETING AND CONSULTANT SERVICES

Consultant shall be responsible for providing the Marketing and Consultant Services described in <u>Exhibit A</u>. Consultant shall use reasonable commercial efforts in discharging its duty to provide the Marketing and Consulting Services. Consultant's obligation to provide the

Marketing and Consultant Services in accordance with the terms of this Agreement is not in any way waived or relieved with respect to any portion of the Marketing and Consultant Services that have been performed prior to Consultant's execution of this Agreement.

## ARTICLE 3 – MARKETING FEES AND REIMBURSEMENTS

3.1     Consultant's sole remuneration under this Agreement is the payment by Company of the Marketing and Consultant Services Fees in connection with Consultant's provision of the Marketing and Consultant Services set forth in Article 2.

3.2     Each Party is responsible for all of its own costs and expenses of any kind or nature whatsoever associated in any way with operating its business and carrying out its obligations under this Agreement.

3.3     <u>Patient Payments and Payment to Consultant</u>.  All patient payments received at Company's bricks-and-mortar clinics shall be solely collected and held by Company.  All patient payments received through Consultant's telehealth platform shall be solely collected and held by Company.  Consultant shall submit a written invoice to Company every fourteen (14) calendar days covering the Marketing and Consultant Services rendered for the fourteen (14) days preceding the date of the invoice.  Unless a valid reason exists under this Agreement for Company to withhold payment, Company shall remit payment to Consultant for a given invoice within fourteen (14) calendar days of Company's receipt of that invoice.  In the event that Company reasonably believes that there is a valid reason to withhold payment, on or before expiration of the 14-day period following Company's receipt of an invoice, Company shall (i) provide to Consultant written notice reasonably describing such basis with respect to any disputed amounts and (ii) remit to Consultant all amounts not in dispute.  Invoices due and unpaid shall bear simple interest at a rate of five percent (5%) per year.  Consultant may terminate this Agreement for cause if an invoice becomes more than sixty (60) calendar days delinquent.

## ARTICLE 4 - INDEMNIFICATION

4.1     <u>Company as Indemnitor</u>.  To the fullest extent permitted by law, Company shall indemnify, defend, and hold harmless Consultant, and its heirs, successors, and assigns, against any and all liability arising from claims, citations, violations, actions, hearings, lawsuits, or other proceedings, for actual damages and reasonable attorneys' fees and consultants' fees (collectively, "Claims"), in the event such Claims are brought by a person or entity not a party to this Agreement, arise from Company's sole negligence, willful and wanton conduct, or intentional conduct, the sole negligence, willful and wanton conduct, or intentional conduct of one or more of Company's independent-contractor physicians, or a combination of the negligence, willful and wanton conduct, or intentional conduct among Company and one or more of its independent-contractor physicians only, and concern: a) medical malpractice; b) a violation of the Health Insurance Portability and Accountability Act (hereinafter, "HIPAA"); c) an incident of bodily injury or death occurring at the physical location of one of Company's bricks-and-mortar clinics; or d) Company's failure to maintain appropriate licensure, registration, certification, and permitting to the extent appropriate for the operation of its clinics.  The indemnification

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

obligations in this Article 4.1 are limited by insurance coverage held by Company. Company shall have the sole authority to direct the defense or settle any Claim indemnified by Company provided, however, that Consultant may monitor such matters through counsel of its choice and at its own cost and provided, further, that Company may not settle any indemnified Claim unless such settlement includes a full and complete release of Consultant, and no such settlement shall be authorized without the prior written consent of Consultant (which consent shall not be unreasonably withheld).

4.2    <u>Consultant as Indemnitor</u>.  To the fullest extent permitted by law, Consultant shall indemnify, defend, and hold harmless Company, and its heirs, successors, and assigns, against any and all liability arising from claims, citations, violations, actions, hearings, lawsuits, or other proceedings, for actual damages and reasonable attorneys' fees and consultants' fees (collectively, "Claims"), in the event such Claims are brought by a person or entity not a party to this Agreement, arise from Consultant's negligence, willful and wanton conduct, or intentional conduct and concern: a) violation of any state statute concerning consumer data privacy (including, by way of example, but not limited to, the California Consumer Privacy Act of 2018), whether or not said statute has been enacted as of the Effective Date; b) a violation of the Health Insurance Portability and Accountability Act (hereinafter, "HIPAA"); or c) the EU General Data Protection Regulation.  The indemnification obligations in this Article 4.2 are not limited by insurance coverage held by Consultant.  Consultant shall have the sole authority to direct the defense or settle any Claim indemnified by Consultant provided, however, that Company may monitor such matters through counsel of its choice and at its own cost and provided, further, that Consultant may not settle any indemnified Claim unless such settlement includes a full and complete release of Company, and no such settlement shall be authorized without the prior written consent of Company (which consent shall not be unreasonably withheld).

## ARTICLE 5 – MUTUAL CONFIDENTIALITY AND NON-SOLICITATION

5.1    <u>Confidential Information</u>. The term "Confidential Information" means information of a confidential or proprietary nature relating to the subject matter described in this Agreement which is taken from or disclosed by one Party (the "Disclosing Party") by or to the other Party (the "Receiving Party").  Confidential Information includes, but is not limited to, matters of a technical nature such as: trade secrets, methods, compositions, data and know-how; designs; systems; processes; computer programs; files and documentation; research projects; matters of a business nature such as pricing, marketing, advertising, corporate, and sales methods and strategies; the terms of this Agreement; lists of actual, prospective, or potential clients, customers, or patients; any information derived from the foregoing items;  and any other information that either Party may expressly designated as confidential during the course of this Agreement.

5.2    <u>Treatment of Confidential Information</u>. The Receiving Party agrees to hold the Disclosing Party's Confidential Information in strict confidence and to take commercially reasonable precautions to protect such Confidential Information (including, without limitation, using all precautions Receiving Party employs with respect to its own Confidential Information). Commercially reasonable precautions shall include compliance with all applicable local, state, federal, and international data-privacy laws, codes, rules, and regulations.  The

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

DocuSign Envelope ID: 19A6B5EC-288F-424D-BB0D-C41E80D36053

Receiving Party further agrees not to disclose any Confidential Information to any third party; not to use, analyze, transcribe, transmit, decompile, disassemble, or reverse engineer any Confidential Information unless required in the performance of the Receiving Party's duties under this Agreement; not to use any Confidential Information for its own or any third party's benefit unless authorized by this Agreement or by the Disclosing Party in writing; and not to alter or remove any legend, marking, or notice provided by the Disclosing Party on its Confidential Information regarding the confidential and proprietary nature of such information. The confidentiality obligations of this Article 5 shall not apply to information which, as evidenced in writing or other documentary form:

(a)     is or becomes publicly known through no breach of this Agreement by the Receiving Party;

(b)     is learned by the Receiving Party from a third party entitled to disclose it; or

(c)     is rightfully obtained by the Receiving Party prior to the Effective Date.

The confidentiality obligations contained in this Article 5 shall survive the termination, for any reason, of this Agreement for a period of two (2) calendar years from the date of termination.  Receiving Party may make disclosures required by law, law enforcement, order of court or other tribunal having jurisdiction.  Prior to any required disclosure occurring, Receiving Party shall give Disclosing Party prompt written notice of any disclosure request so that the Disclosing Party can object or otherwise seek to intervene and provided that the Receiving Party uses diligent, reasonable efforts to limit disclosure and to obtain confidential treatment or a protective order.

5.3     <u>Confidentiality and Handling of Patient Data</u>.  During the Term of this Agreement, and for any period after the expiration or termination of this Agreement as required by law, Consultant warrants that it will comply with all applicable personal, financial, and health-related data-privacy laws, codes, regulations, ordinances, and rules including, but not limited to, HIPAA, GDPR, and the Right to Financial Privacy Act of 1978.  The right and duties concerning the subject matter of this Section 5.3 are supplemented by the terms of <u>Exhibit E</u> attached hereto.

5.4     <u>No Transfer, Right, or Title</u>.  Except as specifically provided herein, Receiving Party acknowledges that it shall not acquire any rights or title to any Confidential Information merely by virtue of its use or access to such Confidential Information hereunder.  Neither the execution of this Agreement nor the furnishing of any Confidential Information hereunder shall be construed as granting the Receiving Party, either expressly, by implication, or otherwise, any license under any invention or patent now or hereafter owned by or controlled by the Disclosing Party.  None of the information that may be submitted or exchanged by the parties shall constitute any representation, warranty, assurance, guarantee, or inducement by a Party to the other Party with respect to the infringement of patents, copyrights, trademarks, trade secrets, or any other rights of third persons.

5.5     <u>Restrictive Covenant</u>.  During the Term of this Agreement and for a one (1) calendar-year period following termination of this Agreement, regardless of the reason for termination,

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

DocuSign Envelope ID: 19A6B5EC-288E-424D-BB0D-C41E80D36053

throughout the entire United States, Company agrees that it will not: (a) solicit, hire, or engage any of Consultant's employees or independent contractors who are employed or engaged by Consultant as of the Effective Date and (b) offer telehealth medical-cannabis evaluations using Consultant's software platform. During the Term of this Agreement and for a one (1) calendar-year period following termination of this Agreement, regardless of the reason for termination, throughout the entire United States, Consultant agrees that it will not: (a) solicit, hire, or engage any of Company's employees or independent contractors who are employed or engaged by Company as of the Effective Date.

5.6     <u>Exclusivity.</u>  Company hereby grants Consultant, during the Term of this Agreement, the exclusive right, at all bricks-and-mortar locations of Company, including at any new locations Company may create or acquire during the Term of this Agreement, to provide the Marketing and Consultant Services related to Company's medical cannabis practice. To that end, Company (or its employees, officers, or owners) shall not engage any other consultant, contractor, employee, or other person or entity to perform any service that competes, directly or indirectly, with the scope of the Marketing and Consultant Services or invest in a business or entity that does same. During the Term of this Agreement, Consultant shall not employ or engage any physician or other health care provider or practitioner to promote or utilize Consultant's telehealth platform unless the physician or other health care provider or practitioner is an employee or independent contractor of Company.

5.7     <u>Ownership of Data.</u>  During the Term of this Agreement, Consultant will necessarily have access to data, data sets, medical records, charts, metadata, and analytics ("Data") containing personal information and protected health information ("PHI") of patients for collaborative use by the Parties in furtherance of this Agreement. Ownership and use of the Data shall be governed as follows: a) any and all Data originally collected by Company from Company's patients shall permanently be the sole property of Company; b) any and all Data originally collected by Consultant shall permanently be the sole property of Consultant; c) during the Term of this Agreement and at any time after any termination of this Agreement, any Data owned by one Party but accessible by and/or shared with the other Party may be sold, transferred, and/or used by the non-owning Party for any legitimate business purpose.

5.8     <u>License to Use Consultant's Intellectual Property.</u>

(a)     During the Term of this Agreement and subject to Company's prompt payment of all applicable Marketing Service Fees, Consultant hereby grants to Company a non-transferable, non-assignable (whether by contract or operation of law), non-exclusive, fully paid-up, and royalty-free right and license to use the "Consultant-Licensed IP" (as described in <u>Exhibit D</u> hereto) solely for Company's internal business purposes and for the purpose of rendering medical care and treatments to patients through the medical practice owned and operated by Company. This license shall immediately terminate upon expiration or termination of this Agreement. Upon any expiration or termination of this Agreement for any reason, Company shall: (a) at Consultant's option, immediately destroy or return to Consultant all tangible forms of the Consultant-Licensed IP in the possession or

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

reasonable control of Company or any of its shareholders, directors, officers, employees, independent contractors, or agents (collectively "Company Agents"); (b) immediately cease, and cause Company Agents to immediately cease, using the Consultant-Licensed IP; and (c) thereafter not make any reference, and cause Company Agents to not make any reference, to the Company's affiliation with Consultant.

(b)     <u>Restrictions</u>.  The license set forth in Section 5.8 does not include the right to, and Company shall not, and shall cause Company Agents not to, directly or indirectly: (a) grant any sublicense with respect to any Consultant-Licensed IP; (b) reverse engineer, disassemble, or decompile any Consultant-Licensed IP; (c) remove, obscure, or alter any trademark or other notice on or related to the Consultant-Licensed IP; or (d) engage in or permit any use, possession, knowledge, viewing, inspection, examination, copying, licensing or sublicensing, distribution, disclosure, or other activity that is not expressly authorized by Consultant.

(c)     <u>Use of Names</u>.  During the Term of this Agreement, Company and/or George Gavrilos may use the names "Leafwell MD" and "Leafwell M.D." for any legitimate business purpose, without restriction, including use of Consultant's branding, font, and color scheme in Company's display of the names.  During the Term of this Agreement, Company shall not use the names in violation of Section 5.6 herein.  After expiration of the Term of this Agreement or termination of the Agreement for any reason, Company shall immediately cease use of the Consultant-Licensed IP.

5.9     License to Use Company's Intellectual Property and Principal's Likeness.

(a)     As part of Consultant's provision of the Marketing and Consultant Services, Consultant shall have access to intellectual property owned by Company and Company's principals including, but not limited to, Company's marketing and advertising materials, service mark, logo, and assumed business name, as well as access to images and audio/video recordings of George Gavrilos ("Company-Licensed IP").  Company grants Consultant a non-transferable, non-assignable (whether by contract or operation of law) non-exclusive, fully paid-up, and royalty-free right and license to use the Company-Licensed IP to the same extent, and under the same restrictions, as those set forth in Article 5.8.  Company warrants and represents that it has the authority to grant licensure to Consultant with respect to the likeness of Mr. Gavrilos.

5.10    <u>Savings Clause</u>. To the extent any covenant, provision, clause, or portion of Article 5 is determined to be unenforceable or invalid for any reason, including, without limitation, because the time period, geographical area, and/or scope of activity covered by any restrictive covenant, provision, or clause is determined to be too broad, the parties acknowledge and agree that:

(a)     Such unenforceability or invalidity shall not affect the enforceability or validity of the remainder of Article 5;

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

(b)     Such unenforceable covenant, provision, clause, or portion shall automatically be deemed reformed such that the contested covenant, provision, clause, or portion will have the closest effect permitted by applicable law to the original form and shall be given effect and enforced as so reformed to whatever extent would be reasonable and enforceable under applicable law; and

(c)     Any court interpreting any covenant, provision, clause, or portion of Article 5 shall have the authority, if necessary, to reform any such provision to make it enforceable under applicable law.

## ARTICLE 6 – TERM AND TERMINATION

6.1     <u>Term</u>. This Agreement shall become effective on the Effective Date and shall be effective for an initial term of five (5) calendar years beginning on the date on which Consultant executes this Agreement (the "Initial Term"). This Agreement shall renew automatically for successive one-year terms (each a "Renewal Term") unless Company gives written notice to Consultant of Company's election not to renew at least sixty (60) calendar days in advance of the expiration of the Initial Term or then-current Renewal Term as the case may be. The Initial Term, together with any Renewal Term(s), of this Agreement shall be referred to herein as the "Term".

6.2     <u>Termination</u>. This Agreement may be terminated by a Party prior to the expiration of the Term only upon the occurrence of a material breach by the other Party. This Agreement may not be terminated for convenience. Unless otherwise specifically stated herein, a material breach is defined by Illinois law. In the event Company alleges in writing a material breach by Consultant, Company shall be entitled to withhold all or any portion of any payment for services Consultant has performed, whether invoiced or uninvoiced, which Company reasonably believes will sufficiently cover Company's damages. Should the withheld amount be less than Company's damages, Company may apply the withheld amount to any claim and enforce this Agreement for the remainder.

6.3     <u>Post-Termination</u>. Upon termination or expiration of this Agreement: (a) Consultant shall cease all Marketing and Consultant Services immediately; (b) each Party shall either return or destroy all Confidential Information of the other Party in its possession or control and so certify in writing to the Disclosing Party; and (c) Consultant shall, within thirty (30) calendar days of the termination date, submit to Company a final, written invoice for all services it claims it has performed but for which it is unpaid.

## ARTICLE 7 – GENERAL PROVISIONS

7.1     <u>Successors and Assigns</u>. Except as specifically provided herein, Company and Consultant shall not fully or partially assign or delegate this Agreement, or any of the rights, interests, or obligations hereunder (whether by operation of law or otherwise), without the prior, written consent of the other Party. This Agreement shall be binding upon, inure to the benefit of, and be enforceable by the Parties and their permitted successors and assigns. Company may assign this Agreement at its sole and absolute discretion in the event that Company has a change in control or the sale of a majority of the assets of Company.

7.2     Severability. In the event that any provision of this Agreement shall be determined by a court, tribunal, legislature, council, agency, or other authority having jurisdiction to be invalid, unlawful, void, or unenforceable to any extent, the remainder of this Agreement shall not be impaired or otherwise affected, will be construed to preserve the intent and purpose of this Agreement, and shall continue to be valid and enforceable to the fullest extent permitted by law. The Parties shall negotiate in good faith to modify any invalidated provisions to preserve each Party's anticipated benefits under this Agreement provided, however, that if the Parties are unable to reach agreement, the Agreement shall stand as impacted by the authoritative act or acts.

7.3     Choice of Laws, Jurisdiction, and Venue.  This Agreement, and all disputes arising out of, in connection with, or in any way related to this Agreement, shall be governed by and construed in accordance with the laws of the State of Illinois without giving effect to the body of laws pertaining to conflict of laws.  All disputes shall be brought solely and exclusively in the Circuit Court of Cook County, Illinois, or in the U.S. District Court for the Northern District of Illinois (Eastern Division). The Parties consent to the jurisdiction of the State of Illinois and waive all objections to venue and jurisdiction.  As Consultant is a foreign entity, in the event of any litigation or any dispute-resolution proceeding, Consultant agrees to accept service of process, of a complaint and summons and any other litigation or other dispute-resolution filing, by any of the following methods at any of the following addresses and waives the right to require personal service:

|  |  |
|---|---|
| Via U.S. Certified Mail: | Via U.S. International Mail: |
| HIPPALINE LTD | HIPAALINE LTD. |
| c/o Emily Fisher | c/o Emily Fisher |
| 3680 Wilshire Blvd., Suite 1164 | 20-22 Wenlock Road |
| Los Angeles, CA 90100 | London, England N1 7GU |

Service shall be deemed effected upon delivery or refusal.

7.4     Remedies.  The Parties' rights and remedies under this Agreement are cumulative.  Except as specifically stated herein, a Party's failure or refusal to enforce any right under this Agreement shall not operative as a waiver.  The Parties mutually waive the right to claim the following types of damages: except as specifically set forth in Article 4 herein, attorneys' fees and consultants' fees; and casualty resulting from war, terrorist activity, civil unrest, or rioting.

7.5     Representations.

        (a)     Consultant makes the following representations:

                1.     Consultant owns and has full rights to use for the purposes of this Agreement the domain name www.leafwell.co and subject matter appearing at that web address as of May 1, 2020; Consultant's principal office in the United States is located at 3680 Wilshire Blvd, Suite 1164, Los Angeles, 90100 as of May 1, 2020; all Consultant-Licensed IP referenced in this

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

Agreement; and Consultant is not insolvent, is not at risk of insolvency or of filing for bankruptcy, and has no plans of filing for bankruptcy; as of the Effective Date, Consultant has in place a commercially reasonable web-hosting agreement on which its telehealth platform will run that contains one or more provisions addressing the remediation of service outages, a copy of which has been provided to and approved by Company; as of the Effective Date, Consultant has employees that possess sufficient knowledge, skill, and experience to meet completely the obligations associated with the Marketing and Consultant Services; Consultant is not, and has not been within the past five years of the Effective Date, subject to a criminal investigation for any purpose; Consultant is not, and has not been within the past five years from the Effective Date, a party to any lawsuit; and Consultant is registered with the Secretary of State in each state in which Company has or will have a bricks-and-mortar clinic and/or a telehealth presence.

(b)     Company makes the following representations:

1.      As of the Effective Date and currently, Company operates its clinics in compliance with all applicable state and federal corporate and health care rules and regulations, including with respect to corporate practice of medicine rules, licensure rules, and telemedicine guidelines.

7.6     <u>Entire Agreement</u>. This Agreement, including the exhibits (all of which are incorporated herein): (i) constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof; and (ii) is intended solely for the benefit of each party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third party beneficiary rights, and this Agreement does not confer any such rights, upon any other third party.

7.7     <u>Use of Name</u>. To the extent required to provide the Marketing and Consultant Services Consultant may use Company's name, tradenames, trademarks, service marks, logos, or the name of any affiliated company in any advertising or promotional material, presently existing or hereafter established.

7.8     <u>Notice</u>. Except as stated in Article 7.3, any notice required or permitted by this Agreement, including the transmission of invoicing, unless otherwise specifically stated herein, shall be in writing via e-mail and shall be deemed given upon the date of transmission of the e-mail.  Notwithstanding the foregoing, in the event a Party accuses the other Party of a material breach of this Agreement, notice shall be given by U.S. Certified Mail, return receipt requested, or nationally recognized overnight carrier (with delivery confirmation capabilities).  Any notice required or permitted shall be given to the following individuals:

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

To Consultant:    Emily Fisher (efisher@leafwell.co)

                    HIPAALINE LTD
                    20-22 Wenlock Road
                    London, England N1 7GU

To Company:    George Gavrilos (ggavrilos@gcmp.us)

                    GCM Partners, LLC
                    c/o George Gavrilos
                    835 N. California Ave, Apt. 3
                    Chicago, IL 60622

Either Party may at any time change the above notice information by providing written notice delivered in conformity with the requirements of this Section 7.8 stating the change and setting forth the new address. Each Party shall ensure that its respective e-mail address listed above remains valid, functional, and able to receive incoming messages at all times.

7.9    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Parties. Both Parties need not sign the same counterpart. A PDF copy shall have the same force and effect as an ink-signed original.

7.10    <u>Independent-Contractor Relationship</u>. Consultant and Company are independent entities, and nothing in this Agreement shall be construed or be deemed to create a relationship of employer/employee, principal/agent, partnership, joint-venture, or any relationship, fiduciary or otherwise, other than that of independent parties contracting with each other solely for the purpose of carrying out the provisions of this Agreement. Each Party shall have the entire responsibility to discharge all of its own obligations under federal, state or local laws, regulations, or orders now or hereafter in effect relating to taxes, unemployment compensation or insurance, Social Security, Workers' Compensation, disability pensions, tax withholdings, and any other tax-related obligations.

7.11    <u>Amendment</u>. Except as otherwise provided in this Agreement, this Agreement or any part of it may be amended at any time only by the mutual, written consent of duly authorized representatives of Company and Consultant.

7.12    <u>Insurance</u>. Company shall cause the appropriate persons or entities to secure and maintain at Company's and/or their expense during the Term of this Agreement and for a period of one (1) calendar year after any termination, insurance policies in accordance with the following types: a) commercial general liability and b) medical malpractice held by each of Company's independent-contractor physicians. Company represents that coverages are

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

in place, and Company shall make certificates of insurance available upon Consultant's request. Consultant shall secure and maintain at Consultant's sole expense during the Term of this Agreement and for a period of one (1) calendar year after any termination, insurance policies in accordance with the following types and minimum coverage limits: commercial general liability with cybersecurity, data-breach, and power-failure coverage ($1,000,000 per occurrence / $2,000,000 aggregate). Consultant represents coverages which conform to the requirements of this Section 7.12 are in place, and a copy of the policy and a certificate of insurance shall be made available upon Company's request prior to execution of this Agreement.

7.13   Authorization. Each Party hereby represents and warrants to the other party to this Agreement that the execution, delivery and performance by such party of this Agreement, and the consummation of the transactions contemplated hereby (a) have been duly and validly authorized by all necessary and appropriate proceedings, (b) does not violate or conflict with such Party's organizational documents or any material agreement or instrument which is binding upon such Party or its respective assets, and (c) does not constitute grounds for acceleration of any material indebtedness or obligation.

7.14   Miscellaneous. The Parties each represent that have had their respective legal counsel review, revise, and advise upon this Agreement and that, consequently, any rule of construction to the effect that any ambiguities are to be resolved against the drafting party is not applicable in the interpretation of this Agreement or any amendments or exhibits hereto. The Parties further represent that they have read in whole and fully understand each and every part of this Agreement. Each Party hereby represents and warrants that (a) such Party is not a party to or otherwise subject to any agreements or restrictions that would prohibit such Party from entering into this Agreement and carrying out the transactions contemplated by this Agreement in accordance with the terms hereof, and (b) this Agreement and the transactions contemplated hereby, to their knowledge, will not infringe or conflict with, and are not inconsistent with, the contractual rights of any other person or entity. The headings of Articles, Sections, and Exhibits contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed by its duly authorized officer or agent as of the date below each signature.

**Consultant**                                                    **Company**

_Emily Fisher_                                        _George Gavrilos_
Emily Fisher                          Date          George Gavrilos                       Date
Managing Partner          07 / 06 / 2020     Chief Executive Officer
HIPAALINE LTD                                      GCM Partners, LLC     07 / 07 / 2020

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

# EXHIBIT A

## MARKETING AND CONSULTANT SERVICES

Marketing and Consultant Services include, without limitation, the following services:

1.      Online Lead Acquisition

Provide front-end data acquisition including, without limitation:

- Manage third party relationships with media buyers
- Manage internal lead generation and spending
- Manage internal media spending
- Optimize third-party content and lead-generation paths through search-engine optimization (with major search engines and platforms such as Google, Facebook, Instagram, and Yahoo) and through direct media buying

2.      Advertisement & Brand Recognition

Provide advertisement and brand recognition services including, without limitation:

- Creation, design, implementation, and management of creative resources
- Website design and development
- Online health surveys
- Display advertisement
- Online content and information
- Email templates and design
- Patient drives
- Dispensary and manufacturer partnerships
- Brand development and strategic messaging
- Campaign management and platform optimization

3.      Technology & Systems Management

Provide technology and systems needed to manage the services provided including, without limitation:

- Technology platform and all analytic software
- Analytics on implementing technology to improve business and stream line services, information, and processes
- Develop and manage technology across entire patient engagement platform
- Integrate all data into centralized data warehouse

4.      Lead Analytics

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

DocuSign Envelope ID: 19A6B5FC-289F-424D-BB0D-C41F80D36053

Provide analytics on all key performance indicators related to obtaining a lead in order to optimize performance and quality including, without limitation:

- Reporting on performance and quality
- Strategic analysis of continued performance and quality
- Implementation of intelligence tool for continued optimum performance and quality
- Analysis and continued implementation of data warehouse performance, quality and security

5. Telehealth connectivity platform and electronic health record (EHR) system

- Provide HIPAA-compliant telehealth platform publicly hosted at www.leafwell.co and accessible to patients via personal computer, smartphone, and tablet computer
- Telehealth platform shall deliver expected service at commercially reasonable speeds including uploads, downloads, and page-load times
- Provide continual software updates and improvements at commercially reasonable intervals and as necessary to address functionality and security issues
- Respond to and address in reasonable timeframes platform outages and functionality issues
- Provide EHR system which integrates with telehealth platform
- Host Data on Consultant's web-based servers
- Allow physicians and patients to communicate via telehealth platform
- Provide technical support to Company, patients, and physicians
- Upon written notice to Consultant, Company shall have the immediate right to view, review, and audit the platform's full backend code, including by way of a third-party consultant, at Company's expense

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

# EXHIBIT B

## COMPANY DUTIES

Company shall provide Consultant with:

(a)    Written and/or electronic copies of Company's literature, brochures, and advertising materials regarding Company's services in such quantities as the Parties may mutually agree, and

(b)    Sales support and assistance on a reasonable, as-needed basis.

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

## EXHIBIT C

### MARKETING AND CONSULTANT SERVICES FEES

For each calendar month during the Term, the Company shall pay to Consultant a fee in the amount of $450.00 USD per hour worked on Company's account.

The foregoing hourly flat fee represents the fair market value of the Marketing and Consultant Services and is not based on the value or volume of services generated by Consultant on behalf of Company. If at any time during the Term of this Agreement this hourly rate is reasonably determined to be in excess of fair market value by a valuation professional or regulatory agency, or otherwise in violation of an applicable rule or regulation, the Parties agree to reasonably work together in good faith to adjust the hourly rate term of this Agreement to be in compliance.

## EXHIBIT D

### LICENSED IP

A propriety software that provides a HIPAA-compliant telehealth environment and EHR with marketing and administrative functions.

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

## EXHIBIT E

## ADDITIONAL TERMS REGARDING HIPAA COMPLIANCE

### Recitals

**WHEREAS**, HIPAALINE LTD (hereafter, "Business Associate") provides Marketing and Consultant Services (hereinafter, the "Services") to GCM Partners, LLC (hereinafter, "Company" or "Covered Entity").  In the course of obtaining the Services from Business Associate, it is necessary for Covered Entity, from time to time, to provide Protected Health Information (hereinafter, "PHI"), as such term is subsequently further defined herein, to Business Associate;

**WHEREAS**, Company is a Covered Entity as such term is defined in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 (the "HITECH Act"), and their associated regulations, specifically, 45 CFR §§ 160, 162, and 164, *Standards for Privacy of Individually Identifiable Health Information, Final Rule* (the "Final Privacy Rule") and *Health Insurance Reform: Security Standards, Final Rule* (the "Final Security Rule").  Because Company is a Covered Entity, it is required under HIPAA and the HITECH Act to ensure that Business Associate will appropriately safeguard PHI and use, and, if necessary, disclose PHI only as necessary to provide the Services for Covered Entity consistent with its engagement by Covered Entity, applicable law, and ethical principles; and

**WHEREAS**, Business Associate, which is directly subject to the Final Security Rule to the same extent as Covered Entity, may use and disclose PHI only in compliance with the terms of this Agreement and is subject to the privacy subtitle of the HITECH Act to the same extent as Covered Entity by operation of this Agreement.

1.  **Definitions for this Exhibit E**.

    For the purposes of this Exhibit E:

    A.  All capitalized terms not defined herein shall have the meanings defined in the Final Privacy Rule and Final Security Rule, as may be amended from time to time.

    B.  "Breach" shall mean the unauthorized acquisition, access, use, or disclosure of Unsecured PHI that compromises the security or privacy of such information.  A Breach shall not include: (1) any unintentional acquisition, access, or use of PHI by a Workforce member or person acting under the authority of Covered Entity or Business Associate, if such acquisition, access, or use was made in good faith and within the scope of authority, and the PHI was not further acquired, accessed, used, or disclosed; (2) any inadvertent disclosure by a person who is authorized to access PHI at Covered Entity or Business Associate to another person authorized to access PHI at the same entity, or at an organized health care arrangement in which Covered Entity participates, and the information received as a result of such disclosure is not further acquired, accessed, used, or disclosed; or (3) a disclosure of PHI where Covered Entity or Business Associate has a good faith belief that an unauthorized

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

person to whom the disclosure was made would not reasonably have been able to retain such information.

C. "Electronic Protected Health Information" ("EPHI") shall mean PHI that is maintained in electronic media or transmitted by electronic media. EPHI is a subset of PHI.

D. "Information System" shall mean an interconnected set of information resources under the same direct management control that shares common functionality. A system normally includes hardware, software, information, data, applications, communications, and people.

E. "Protected Health Information" ("PHI") shall mean information provided to Business Associate by Covered Entity, or provided to or created by Business Associate on behalf of Covered Entity, including demographic information, which is (1) created or received by Covered Entity; and (2) relates to the past, present, or future physical or mental health or condition of an Individual; the provision of health care to an Individual; or the past, present, or future payment for the provision of health care to an Individual; and (i) that identifies the Individual; or (ii) with respect to which there is a reasonable basis to believe the information can be used to identify the Individual.

F. "Security Incident" shall mean the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.

G. "Unsecured PHI" shall mean PHI that is not encrypted or destroyed in accordance with standards set by the United States Department of Health and Human Services.

H. "Workforce" shall mean employees, volunteers, trainees, and other persons whose conduct, in the performance of work for Covered Entity or Business Associate, is under the direct control of such entity, whether or not they are paid by Covered Entity or Business Associate.

All other definitions not specifically set forth in Section 1 of this Exhibit E shall have the same meanings as they are defined in this Agreement.

2. **Term and Termination.**

A. Upon knowledge by a Party of a material breach of the terms of this Exhibit E by the other Party, the non-breaching Party may either:

1. Provide a fifteen (15) business-day opportunity for the breaching Party to cure the breach or end the violation and, if the breaching Party does not cure the breach or end the violation within the 15-business-day period, the non-breaching Party may terminate this Agreement;

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

2. If neither termination nor cure are, in the non-breaching party's sole determination, feasible, the non-breaching party shall report the violation to the Secretary of the U.S. Department of Health and Human Services ('Secretary').

B. Except as provided in paragraph 2.B.1 below of this Section, upon termination of this Agreement for any reason, Business Associate shall return or destroy all PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall also apply to PHI that is in the possession of subcontractors or agents of Business Associate. Neither Business Associate nor any subcontractor or agent of Business Associate shall retain copies of the PHI.

1. If Business Associate reasonably determines that returning or destroying the PHI is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible. Upon Covered Entity's written consent, which shall not be unreasonably withheld, that return or destruction of PHI is infeasible, Business Associate may retain the PHI that is not feasible to return, for so long as it remains infeasible to return such PHI. In such event, Business Associate shall extend the protections of this Agreement to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

2. The provisions of this Section shall survive termination of this Agreement.

3. **Obligations of Business Associate**.

A. Business Associate shall comply with the use and disclosure provisions of the Final Privacy Rule in performing its obligations under any agreement for services with Covered Entity and shall not use or disclose PHI other than as permitted or required under this Agreement or as Required by Law.

B. Business Associate shall implement and use commercially reasonable safeguards to prevent use or disclosure of PHI other than as provided for by this Agreement.

C. Business Associate shall implement administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of EPHI that it creates, receives, maintains, or transmits on behalf of Covered Entity, and to otherwise comply with the Final Security Rule in performing Business Associate's obligations under this Agreement.

D. Business Associate shall use best efforts to secure PHI to make it unusable, unreadable, or indecipherable to unauthorized individuals through the use of a technology or methodology specified by the Secretary in its annual guidance issued under section 13402(h) of the HITECH Act, codified at 42 U.S.C. § 17932(h).

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

E.      Business Associate shall mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate in violation of the requirements of this Agreement.

F.      Business Associate shall, as soon as reasonably practicable and in no event later than two (2) business days of discovery of the same, report to Covered Entity any use or disclosure of PHI not provided for by this Agreement of which it becomes aware, including, but not limited to, any Security Incident and any unauthorized acquisition, access, use, or disclosure of PHI.

G.      Business Associate shall develop policies and procedures to both detect and report Breaches of PHI to Covered Entity. Copies of such policies and procedures shall be made available to Covered Entity upon Covered Entity's Request.

H.      Business Associate shall, following the discovery of a Breach of PHI, notify Covered Entity of such Breach.

   1.   Business Associate shall provide in written form initial notice of the Breach as soon as reasonably practicable and in no event later than two (2) business days after the discovery of the Breach. A Breach shall be treated as discovered as of the first day on which the Breach is known to the Business Associate or, by exercising reasonable diligence, would have been known to the Business Associate. Business Associate shall be deemed to have knowledge of a Breach if the Breach is known, or by exercising reasonable diligence, would have been known, to any person, other than the person committing the Breach, who is an employee, officer, or other agent of Business Associate.

   2.   The initial notice shall include, to the extent possible, the identification of each individual whose PHI has been, or is reasonably believed by the Business Associate to have been, accessed, acquired, or disclosed during such Breach. Business Associate shall make best efforts to collect and provide to Covered Entity as soon as possible any such information that Business Associate is unable to provide in the initial notice.

I.      Business Associate shall, following notification to Covered Entity of a Breach of PHI, cooperate with Covered Entity in providing any and all information required for Covered Entity to comply with the breach notification provisions of section 13402 of the HITECH Act and the implementing regulations set forth in Subpart D of the Final Privacy Rule (45 C.F.R. § 164.400 *et seq*.) and any other applicable breach notification laws and regulations.

J.      At the request of Covered Entity, Business Associate shall provide prompt access to PHI to Covered Entity or, as directed by Covered Entity, to an Individual, in order to meet the Individual's right of access requirements under HIPAA.

K.      Business Associate shall enter into legally binding agreements with each of its subcontractors and agents to ensure that any subcontractor agent to whom Business

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

Associate provides PHI received from, or created or received by, Business Associate on behalf of Covered Entity agrees to the same restrictions and conditions that apply through this Agreement to Business Associate with respect to such information.

L.     Business Associate shall make any amendment to PHI that Covered Entity directs, or to which Covered Entity agrees pursuant to an Individual's right to request amendment to his or her PHI under HIPAA.

M.     For purposes of the Secretary determining Covered Entity's compliance with the Final Privacy Rule and Final Security Rule, Business Associate shall make available to the Secretary, in a time and manner designated by the Secretary, its internal practices, books, and records (including policies and procedures), relating to the use and disclosure of PHI received from, or created or received by, Business Associate on behalf of Covered Entity.

N.     Business Associate shall document such disclosures of PHI and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with the Individual's right to receive such accounting under HIPAA.

O.     Business Associate shall provide to Covered Entity or an Individual, information collected in accordance with Section 3.N of this Agreement, to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with the Individual's right to receive such accounting under HIPAA.

4.     **Specific Use and Disclosure Provisions**.

A.     Except as otherwise limited by this Agreement, Business Associate may use PHI for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

B.     Except as otherwise limited by this Agreement, Business Associate may disclose PHI for the proper management and administration of the Business Associate, provided that disclosures are Required By Law, or Business Associate obtains reasonable assurances in writing from the person to whom the information is disclosed that it will remain confidential and be used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

C.     Except as otherwise limited by this Agreement, Business Associate may use PHI to provide Data Aggregation services to Covered Entity as permitted by 45 C.F.R. § 164.504(e)(2)(i)(B).

D.     Business Associate may use PHI to report violations of law to appropriate Federal and State authorities, consistent with 45 C.F.R. § 164.502(j)(l).

Doc ID: c8d341443d6672ab299794f0b8e8eb77cca0abca

DocuSign Envelope ID: 19A6B5FC-289F-424D-BB0D-C41E80D36053

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Signed contract |
| **FILE NAME** | GCM-HIPAALine IC Agreement (v2).pdf |
| **DOCUMENT ID** | c8d341443d6672ab299794f0b8e8eb77cca0abca |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| SENT | **07 / 06 / 2020**<br>20:49:22 UTC | Sent for signature to GCM Partners LLC (jmraunac@gcmp.us)<br>from efisher@leafwell.co<br>IP: 78.145.70.93 |
| VIEWED | **07 / 07 / 2020**<br>14:26:26 UTC | Viewed by GCM Partners LLC (jmraunac@gcmp.us)<br>IP: 24.1.71.186 |
| SIGNED | **07 / 07 / 2020**<br>14:57:18 UTC | Signed by GCM Partners LLC (jmraunac@gcmp.us)<br>IP: 168.235.1.4 |
| COMPLETED | **07 / 07 / 2020**<br>14:57:18 UTC | The document has been completed. |

# EXHIBIT B

to Gavrilos Declaration
-- Filing and D'Ambrosio Complaint

DocuSign Envelope ID: 19A6B5FC-2885-424D-BB0D-C41E80D36053

Case 2:19-cv-00552-GBM-OO Document 156-1 Filed 08/20/20 Page 46 of 78 PageID #:8092
Case 2:19-cv-00552-GBM-OO Document 21 Filed 07/08/20 Page 1 of 1 Page ID #:198

AO 120 (Rev. 08/10)

| TO: | Mail Stop 8<br>Director of the U.S. Patent and Trademark Office<br>P.O. Box 1450<br>Alexandria, VA 22313-1450 | REPORT ON THE<br>FILING OR DETERMINATION OF AN<br>ACTION REGARDING A PATENT OR<br>TRADEMARK |
|---|---|---|

In Compliance with 35 U.S.C. § 290 and/or 15 U.S.C. § 1116 you are hereby advised that a court action has been filed in the U.S. District Court _____Central District of California_____ on the following

☑ Trademarks or  ☐ Patents.  ( ☐ the patent action involves 35 U.S.C. § 292.);

| DOCKET NO.<br>1 | DATE FILED<br>1/24/2019 | U.S. DISTRICT COURT<br>Central District of California |
|---|---|---|
| PLAINTIFF<br><br>Frank D'Ambrosio, M.D. | | DEFENDANT<br><br>Emily Fisher |

| PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
|---|---|---|
| 1  Common Law | | Frank D'Ambrosio |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |

In the above—entitled case, the following patent(s)/ trademark(s) have been included:

| DATE INCLUDED | INCLUDED BY | | | |
|---|---|---|---|---|
| | ☐ Amendment  ☐ Answer  ☐ Cross Bill  ☐ Other Pleading | | | |
| PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK | | |
| 1  Common Law | | Frank D'Ambrosio | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |

In the above—entitled case, the following decision has been rendered or judgement issued:

| DECISION/JUDGEMENT<br><br>11/08/2019 - Stipulation to Dismiss Case |
|---|

| CLERK<br><br>KIRY K. GRAY | (BY) DEPUTY CLERK<br><br>S. Hall-Brown | DATE<br><br>7/8/2020 |
|---|---|---|

Copy 1—Upon initiation of action, mail this copy to Director    Copy 3—Upon termination of action, mail this copy to Director
Copy 2—Upon filing document adding patent(s), mail this copy to Director    Copy 4—Case file copy

DocuSign Envelope ID: 19A6B5FC-289F-424D-BB0D-C41E80D36053
Case 2:19-cv-00552-SBW-JW Document 156-1 Filed 08/20/20 Page 47 of 78 PageID #:8793
Case 2:19-cv-00552-JWM-JEM Document 1 Filed 01/24/19 Page 1 of 22 Page ID #:1

1    Diana Hughes Leiden (SBN: 267606)
     dhleiden@winston.com
2    **WINSTON & STRAWN LLP**
     333 South Grand Avenue, 38th Floor
3    Los Angeles, CA 90071-1543
     Telephone: 213-615-1700
4    Facsimile: 213-615-1750

5    Laura M. Franco (SBN: 186765)
     lfranco@winston.com
6    **WINSTON & STRAWN LLP**
     101 California Street
7    San Francisco, CA 94111-5802
     Telephone: 415-591-1000
8    Facsimile: 415-591-1400

9    Attorneys for Plaintiff
     FRANK D'AMBROSIO, M.D.
10

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13

14   FRANK D'AMBROSIO, M.D.              **Case No.** 2:19-cv-552

15              Plaintiff,

16        v.                            **COMPLAINT FOR BREACH OF
                                        CONTRACT; VIOLATION OF THE
17   EMILY FISHER; and DOES 1 through   ANTICYBERSQUATTING
     10,                                CONSUMER PROTECTION ACT;
18                                      FALSE DESIGNATION OF ORIGIN;
              Defendants.               UNFAIR COMPETITION; AND
19                                      CONVERSION**

20                                      **DEMAND FOR JURY TRIAL**

21

22

23

24

25

26

27

28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

**COMPLAINT**

Plaintiff Frank D'Ambrosio, M.D., by his undersigned counsel alleges, upon knowledge as to himself and his own acts and on information and belief as to all other matters, against Defendant Emily Fisher, and Does 1 through 10:

## INTRODUCTION

1.     This dispute arises out of the wholesale theft of Plaintiff Frank D'Ambrosio's lucrative on-line medical marijuana card referral business by Defendant Emily Fisher, a person he hired–and paid handsomely–to develop the web portal through which D'Ambrosio was offering his services.  Even worse, Fisher accomplished this theft through the unauthorized use of D'Ambrosio's name and trademark to divert clients to Fisher's website that directly competes with D'Ambrosio, and is now profiting from the expertise, credentials, and goodwill built by D'Ambrosio over decades of work.

2.     D'Ambrosio, known widely as "Doctor Frank," hired Fisher to create and run a website, *doctorfrank.com*, and market Doctor Frank's services, including through a "telehealth" portal through which patients could obtain recommendations for a medical marijuana card in certain jurisdictions.  Despite agreeing to obtain the *doctorfrank.com* domain, develop the website and telehealth portal, and perform other marketing services on Doctor Frank's behalf, Fisher made sure that the domain name and website were hosted on her own servers so that she could control access.  As if testing the proof of concept, once the *doctorfrank.com* website started to take off, Fisher surreptitiously re-directed the *doctorfrank.com* domain name away from the website developed for Doctor Frank and to her own website, Leafwell.co, another medical cannabis website that offers the same content and services as the *doctorfrank.com* website and directly competes with Doctor Frank.  Like *doctorfrank.com* did, Leafwell.co links to the telehealth portal that was created on Doctor Frank's behalf.  In fact, Leafwell.co is the *doctorfrank.com*, just re-packaged under a different name.

DocuSign Envelope ID: 19A6B5FC-289E-424D-BB0D-C41E80D36053

Case 2:19-cv-00932-JBW-WEB Document 156-1 Filed 06/29/20 Page 49 of 78 PageID #: 8995
Case 2:19-cv-00932-JBW-WEB Document 1 Filed 02/24/19 Page 3 of 22 Page ID #:3

3.      On information and belief, Defendants are diverting patients away from Doctor Frank via operation of Leafwell.co and the associated telehealth portal and causing Doctor Frank financial and reputational harm.

4.      As set forth below, Fisher breached her contract with Doctor Frank by refusing to turn over the *doctorfrank.com* domain and by failing to fulfill her duties to create and operate Doctor Frank's website and telehealth portal and market his services.  Defendants' conduct also constitutes a violation of the Anticybersquatting Consumer Protection Act ("ACPA"), false designations of origin under the Lanham Act, and unfair competition and conversion under California law.

## PARTIES

5.      Plaintiff Frank D'Ambrosio, M.D. is an individual residing in Los Angeles County, California.

6.      On information and belief, Defendant Emily Fisher is an individual residing in London, United Kingdom.

7.      Plaintiff does not know the true names or capacities of Defendants sued herein as Does 1 through 10.  Plaintiff alleges that Defendants Does 1 through 10 are responsible for the acts alleged in this complaint and sues them on that basis.  Plaintiff will amend this complaint to state the Doe Defendants' true names and capacities within a reasonable time after discovering them.

8.      Plaintiff believes and therefore alleges that Defendants Does 1 through 10 are the agents, servants, employers, employees, partners, joint venturers, and/or co-conspirators of each of the other Defendants, and in doing the acts alleged herein were acting on behalf of each other in one or more of those capacities.

## JURISDICTION AND VENUE

9.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338 because it arises in part under the federal Lanham Act, 15 U.S.C. § 1125. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

10. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff is a citizen of California, on information and belief Defendant Fisher is a citizen of the United Kingdom, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

11. The Court has personal jurisdiction over Defendant Fisher because she has transacted significant business in this District, including but not limited to entering into the contract at issue with Plaintiff, who resides in this District, and performing services within this District for Plaintiff and, on information and belief, for other individuals and entities in California.

12. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1400(a) because a substantial portion of the events giving rise to the claims for relief stated in this Complaint occurred in this District, because a substantial part of the property that is the subject of this action is located in this District, and because Defendant Fisher is subject to personal jurisdiction in this District. Furthermore, Plaintiff has suffered harm in this District.

## INTRADISTRICT ASSIGNMENT

13. This action is not subject to divisional assignment because the case arises under intellectual property laws.

## FACTUAL ALLEGATIONS

**A.      Doctor Frank D'Ambrosio and the DOCTOR FRANK Mark**

14. Plaintiff Frank D'Ambrosio, M.D. is an orthopedic surgeon and advocate for medical marijuana. Widely known by the name "Doctor Frank," he is one of the world's leading campaigners for policy reform on the use of medical cannabis.

15. Doctor Frank has been a surgeon for over 30 years, and during that time, he witnessed patient after patient suffering from chronic pain, often resulting in the patient's long-term dependency on prescription medicines. In searching for alternative forms of pain relief, Doctor Frank became fascinated by the science behind

DocuSign Envelope ID: 19A6B5FC-2885-424D-BB0D-C41E80D36053

Case 2:19-cv-00932-GBW-WGC Document 156-1 Filed 06/24/19 Page 3 of 22 Page ID #:5
Case 2:19-cv-00932-GBW-WGC Document 156-1 Filed 08/28/20 Page 51 of 78 PageID #:9097

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

medicinal cannabis and its proven success in treating a range of medical conditions, including chronic pain.

16.    Today, as a leading researcher and renowned advocate, Doctor Frank has, for the last six years, dedicated his medical practice to helping patients from all over the United States incorporate medical cannabis into their daily health routines.

17.    Doctor Frank also continues to advocate for the medicinal use of cannabis all over the world, in June 2018 briefing British lawmakers on a potential change to U.K. laws regulating marijuana—an effort recognized by CNN[1]—and in November 2018 speaking at the World Health Organization committee in Geneva.

18.    Several websites dedicated to medical cannabis reference and applaud Doctor Frank and his services, including www.directcannabisnetwork.com (highlighting Doctor Frank as the entrepreneur of the week in June 2017 for launching the Doctor Frank Website), www.magneticmag.com (in "*How to Get a Medical Recommendation in 3 Easy Steps*"), and www.upalliance.org (commenting on Doctor Frank's World Health Organization speech).

19.    From 2016 to 2018, Doctor Frank hosted a podcast called *Elevate the Conversation with Doctor Frank*.  The podcast was described as "one of our country's leading voices for medicinal marijuana policy reform; every week, celebrities, personalities, comedians, athletes, authors, politicians and other notable join him for a lively discussion ranging from pop culture to headline news."  Over thirty episodes of the podcast are currently available on Apple podcasts.

20.    A critical component of Doctor Frank's patient outreach has been providing telehealth services through various websites.  His first, www.420recs.com ("420 Recs"), was established in or about March 2016 and provides California patients the ability to obtain medical cannabis prescriptions online after the patient undergoes a medical evaluation by a licensed physician.

---

[1] https://www.cnn.com/2018/06/20/health/medical-marijuana-law-uk-billy-caldwell-intl/index.html.

21.     In October 2016, in order to take advantage of the growing international recognition of the DOCTOR FRANK name in the field of medical cannabis advocacy, Doctor Frank developed and launched the website *doctorfrank.com* (the "Doctor Frank Website"), which was a more robust version of the 420 Recs website, providing a large amount of information on medical cannabis, and which was intended to expand the medical marijuana referral business to the growing number of states now allowing such services.

22.     The Doctor Frank Website included a wide variety of information on medical cannabis, including among other things:

- An "A to Z" list of medical conditions with information on how cannabis can relieve symptoms.
- A compendium of cannabis laws in all 50 states.
- The ability to purchase and download Doctor Frank's 2018 book entitled *Cannabis Is Medicine*, a guide to understanding medical marijuana.  This book is the culmination of Doctor Frank's five-year research project, comprised of a 4,276-patient survey, entitled "Can Cannabis Be Used To Replace Addictive Pharmaceuticals," the results of which are published in the book.
- The *Elevate the Conversation* podcast.
- General information, studies, research and opinion pieces on medical cannabis.
- A telehealth portal where patients can obtain a recommendation for a medical marijuana card.

23.     The Doctor Frank website was well-branded with the trademark DOCTOR FRANK, as shown below in the upper left corner:

DocuSign Envelope ID: 19A6B5EC-289F-424D-BB0D-C41E80D36053

Case 2:19-cv-00592-GBW-JCW Document 156-1 Filed 08/20/20 Page 53 of 78 PageID #:3099
Case 2:19-cv-00592-GBW-JCW Document 1 Filed 03/24/19 Page 7 of 22 PageID #:7

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543





24.    The Doctor Frank website also prominently featured Doctor Frank himself:



DocuSign Envelope ID: 19A6B5FC-289F-424D-BB0D-C41F80D36053

Case 2:19-cv-00992-GBW-90 Document 156-1 Filed 08/20/20 Page 54 of 78 PageID #: 9100
Case 2:19-cv-00592-GBW-90 Document 1 Filed 01/24/19 Page 6 of 22 Page ID #:8

25.     The Doctor Frank website was in operation until approximately September 2018, at which time it was unlawfully shut down by Defendant Emily Fisher in her attempt to divert Doctor Frank's lucrative medical cannabis referral business to her own competing website.

26.     As a result of Fisher's unlawful takeover and shutdown of the Doctor Frank Website, Doctor Frank was forced to create, from scratch, an entirely new website, Doctor Frank Live, located at www.doctorfranklive.com.  This website went live in late December 2018.  Fisher's actions also resulted in approximately three months of disruption to Doctor Frank's online business.

27.     The new Doctor Frank Live website continues to be closely associated with Doctor Frank the individual, and branded with the Doctor Frank mark, as shown in the screenshot below.



## B.     Defendant Fisher's Breach of her Contract with Doctor Frank

28.     In October 2016, Doctor Frank hired Fisher to create and run the Doctor Frank Website and to market Doctor Frank's services, including through a telehealth portal called *Hippocratica* where California patients could obtain recommendations for a medical marijuana card.

DocuSign Envelope ID: 19A6B5FC-288F-424D-BB0D-C41F80D36053

Case 2:19-cv-00592-GBW-GGH Document 56-1 Filed 06/29/20 Page 55 of 78 PageID #: 9501
Case 2:19-cv-00592-GBW-GGH Document 1 Filed 03/24/19 Page 9 of 22 Page ID #: 9

29.     As set forth in an October 1, 2016 contract between Doctor Frank and Fisher (hereinafter, the "2016 Contract"), Doctor Frank hired Fisher to, among other things: (i) acquire the *doctorfrank.com* domain name for the Doctor Frank Website; (ii) develop medical cannabis-related content for the website, including blogs, articles, patient case studies, interviews and other multi-media content related to the benefits of medical cannabis; (iii) use Doctor Frank's previous research to develop a section of the website entitled "A to Z of Medical Conditions" describing the benefits of medical marijuana in treating symptoms; (iv) use Doctor Frank's previous research and survey findings to create a book entitled *Cannabis is Medicine*, which book was to be promoted by Fisher and offered for sale on the Doctor Frank Website; and (v) most importantly, develop the telehealth portal *Hippocratica* to allow Doctor Frank to expand his services of providing medical marijuana card recommendations.

30.     From the beginning of their relationship, Doctor Frank had concerns that Fisher was not acting in good faith under their contract.  For instance, while Doctor Frank's specific payment obligations were set out in the 2016 Contract, as early as November 2016 Fisher was invoicing Doctor Frank for fees not identified in the contract.  And even for those fees that were outlined in the 2016 Contract, Fisher's invoices exceeded those amounts, including a series of invoices commencing in or about July 2017 in which Fisher charged amounts of £1000 over the contracted monthly fee for her services.  Furthermore, Doctor Frank has paid Fisher an amount of at least $7000 to purchase digital media advertising for the Doctor Frank Website that Fisher has never purchased.

31.     In addition to concerns over Fisher's charges, Doctor Frank was also concerned that Fisher was holding the *doctorfrank.com* domain name, and thus, the Doctor Frank Website, hostage.  As the parties agreed, Fisher was to register the *doctorfrank.com* domain name through Doctor Frank's own GoDaddy account and in Doctor Frank's name, and to provide him with the account details and log-in credentials to be able to manage and control the domain.  Fisher never did that.  While

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

admitting in November 2016 that she "bought the domain name on [Doctor Frank's] behalf," Fisher hosted the domain (and the Doctor Frank Website) on her own servers. Despite repeated demands from Doctor Frank, Fisher never transferred the *doctorfrank.com* domain to servers controlled by Doctor Frank, nor did Fisher ever provide Doctor Frank with the account details necessary to access or control the *doctorfrank.com* domain or website. As a result, the websites that the *doctorfrank.com* domain name pointed to are completely controlled by Fisher.

32. Also as part of the agreement between Doctor Frank and Fisher, Fisher was to build out a telehealth portal, to be called *Hippocratica*, on the Doctor Frank Website, through which patients could pay for and obtain recommendations for medical marijuana cards from licensed physicians in California.

33. According to the 2016 Contract, Fisher and Doctor Frank were to negotiate the cost of developing the *Hippocratica* website once that phase of the project was reached. Ultimately, the parties agreed on a budget of $62,000. Once again, however, Fisher overcharged Doctor Frank for development of *Hippocratica*. Specifically, in March 2018, Fisher, without authorization, charged an amount of over $25,000 to the credit card of Doctor Frank's wife, Lisa D'Ambrosio, ostensibly in connection with development of *Hippocratica*, though this charge was never included in the $62,000 budget earlier agreed to. In fact, Doctor Frank only became aware of the charge upon receipt of the credit card statement. Ultimately, Fisher charged Doctor Frank over $90,000 to build the *Hippocratica* portal, well in excess of the $62,000 budget he approved.

34. Rather than being satisfied with the amounts Doctor Frank was paying her to develop the Doctor Frank Website and market his services, Fisher saw an opportunity to try to benefit even further by getting a cut of the medical marijuana referrals Doctor Frank made through *Hippocratica*. Fisher proposed to Doctor Frank that *Hippocratica* be owned and run by a new entity, in which Fisher would share 40% ownership with Doctor Frank. Doctor Frank, however, rejected this proposal and

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

9

**COMPLAINT**

made it clear that the only amounts Fisher was entitled to were the agreed-upon amount of $62,000 to develop the *Hippocratica* portal, but that the portal itself, all patients accessing it, and all revenues derived therefrom, belong solely to Doctor Frank.

35.     In an attempt to appease Doctor Frank, on August 1, 2018, Fisher sent an email to Doctor Frank and his wife in which Fisher "agree[d] that [Doctor Frank] own DF [the Doctor Frank Website], the book and patients."

## C.     Defendant Fisher's Diversion of Plaintiff's Business to the Competing Website Leafwell.co

36.     Not satisfied with Doctor Frank's refusal to share his business with Fisher, and still in control of the *doctorfrank.com* domain name and the Doctor Frank Website, in or about September 2018, without notice to or authorization from Doctor Frank, Fisher re-directed the *doctorfrank.com* domain name away from the Doctor Frank Website and instead pointed it to a competing website nearly identical to the Doctor Frank Website—Leafwell.co—which is run by Emily Fisher.  Once the *doctorfrank.com* domain name pointed to Leafwell.co, the Doctor Frank Website and the *Hippocratica* portal effectively disappeared, cutting off Doctor Frank's referral business.

37.     Leafwell.co offers the same information and services as the former Doctor Frank Website did.  The Leafwell.co homepage is pictured below.



38.     Leafwell.co also offers a telehealth site, called "HIPAALINE," where users can enter their personal information and be contacted by a prescribing doctor:

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

DocuSign Envelope ID-19A6B5FC-289F-424D-BB0D-C41E80D36053

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543



39. On information and belief, the Leafwell.co website contains all of the same content that Fisher developed for the Doctor Frank Website, and for which Doctor Frank paid Fisher under the 2016 Contract. The Leafwell.co website even retains several references to Doctor Frank. For instance, the "Getting a Medical Marijuana Card – FAQs" page states that "Dr. Frank can recommend patients from Nevada as well as California." And several pages on the Leafwell.co website still refer to www.doctorfrank.com in the comments section.

DocuSign Envelope ID: 19A6B5EC-288F-424D-BB0D-C41E80D36053

Case 2:15-cv-00952-GSM-OO Document 1156-1 Filed: 00/28/20 Page 59 of 78 PageID #:8905
Case 2:15-cv-00952-GSM-OO Document 1 Filed 02/24/15 Page 13 of 22 Page ID #:13

40.     Furthermore, the Leafwell.co website contains a section called "A-Z Conditions" which describes the benefits of cannabis use to treat various medical conditions and illnesses.  The Doctor Frank Website had an identical section with the same content.  Leafwell.co also contains a section titled "Legal status," detailing the legalities of medical marijuana in 34 U.S. states and territories.  The Doctor Frank Website had this same information under the header "State Laws."

41.     Leafwell.co also sells the downloadable book *Why Cannabis Is Medicine*. This substance of this book is nearly identical to the book Fisher created for Doctor Frank and that was available for purchase on the Doctor Frank Website, except that *Why Cannabis Is Medicine* changed the author's name from "Doctor Frank" to LeafWell, contains a different preface, introduction, and conclusion, and removes any references to and photographs of Doctor Frank.  *Why Cannabis is Medicine* is the content created for Doctor Frank, re-packaged under the LeafWell brand.

42.     In addition, Leafwell.co's telehealth portal, HIPAALINE, contains the identical content and functionality as *Hippocratica* once did – until Fisher disabled the site and redirected all Internet traffic from the *doctorfrank.com* domain to Leafwell.co. In fact, the entire Leafwell.co and HIPAALINE website consists of the content that Doctor Frank hired and paid Fisher to create for him, but which Fisher co-opted for her own financial gain.

43.     As an example of Fisher's widespread use of the *doctorfrank.com* domain name to direct internet traffic to her Leafwell.co website, including the *doctorfrank.com* link in a text message causes a Leafwell.co pop-up ad to automatically appear.  A screenshot of a text showing the *doctorfrank.com* link with the Leafwell.co pop-up is shown below:

//

//

//

//

//

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20



21    44.    Demonstrating Fisher's ill-intent, Doctor Frank was not aware that Fisher

22  had redirected the *doctorfrank.com* domain until a patient called Doctor Frank because

23  Doctor Frank's name and phone number were included in an email from HIPAALINE

24  responding to the patient's request for a medical referral.

25    45.    On information and belief, Fisher's hijacking of the Doctor Frank

26  Website, and her use of the *doctorfrank.com* domain name, are harming Doctor

27  Frank's reputation and causing him to lose consumers.  For instance, in addition to the

28  patient that called Doctor Frank in response to a HIPAALINE email, Doctor Frank is

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

aware of at least one disgruntled patient that was trying to obtain a medical referral through the *doctorfrank.com* domain name which directed the patent to Leafwell.co, and that the patient could never reach anyone at Leafwell.co that could respond to the request. Further, because Fisher not only has control of the *doctorfrank.com* domain name, but also has control of the emails going to that domain, Doctor Frank has been unable to communicate with dispensaries with which he provides referral services, resulting in a loss of revenues to Doctor Frank.

## FIRST CAUSE OF ACTION
### Breach of Contract

46.     Plaintiff incorporates by reference and realleges all previous paragraphs as though fully set forth herein.

47.     Plaintiff and Defendant Fisher entered into an agreement in 2016, in which Defendant agreed, among other things, to acquire the *doctorfrank.com* domain and develop and manage the Doctor Frank Website and the *Hippocratica* telehealth portal on Plaintiff's behalf and in his name, for his control.

48.     Plaintiff performed all of his material obligations under the agreement.

49.     Defendant failed to perform numerous material obligations required to be performed under the agreement.

50.     As a direct and proximate result of Defendant's conduct, Plaintiff has been damaged by Defendant's actions in an amount to be proved at trial.

## SECOND CAUSE OF ACTION
### Violation of the Anticybersquatting Consumer Protection Act
### Lanham Act, 15 U.S.C. § 1125(d)

51.     Plaintiff incorporates by reference and realleges all previous paragraphs as though fully set forth herein.

52.     Plaintiff is a world-renown advocate for medical cannabis and is known throughout the United States and globally as "Doctor Frank."

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

53. Plaintiff also owns and enjoys valid, enforceable, and fully subsisting common-law trademark rights in the distinctive DOCTOR FRANK mark in California and throughout the United States.

54. In October 2016, Plaintiff hired Defendant Fisher to register the domain name *doctorfrank.com* in Plaintiff's name and on his behalf, and to develop and operate the Doctor Frank Website to promote Plaintiff and his medical cannabis-related services.

55. Defendant purchased the *doctorfrank.com* domain name and developed the Doctor Frank Website, which launched to the public in or about March 2017. Despite numerous requests to do so, Defendant never delivered to Plaintiff the log-in credentials so that Plaintiff could manage and control the *doctorfrank.com* domain name or website.

56. On or about September 2018, with the *doctorfrank.com* domain name still in Plaintiff's control, and without Plaintiff's authorization, Defendant caused the *doctorfrank.com* domain name to redirect all Internet traffic away from the Doctor Frank Website and directly to Plaintiff's competing website, Leafwell.co, evidencing a bad faith intent to profit from using the DOCTOR FRANK name and mark.

57. Defendant is not known by the name Doctor Frank nor does Defendant offer services under the DOCTOR FRANK mark. Plaintiff is not affiliated with Defendant's website, and does not provide on behalf of Defendant any of the services offered on Defendant's website.

58. On information and belief, Defendant used and is using the *doctorfrank.com* domain name to confuse consumers into believing that Plaintiff is the source of Defendant's competing Leafwell.co website and the services offered on that site, or that Plaintiff sponsors, is affiliated with, or endorses Defendant's Leafwell.co website and the services offered on that site, when he does not. By using the *doctorfrank.com* domain name, which wholly incorporates and is identical to Plaintiff's mark and name, to redirect Internet users to Defendant's website,

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Defendant was and is attempting to create an association between Plaintiff and Defendant's Leafwell.co website and to trade off the goodwill of Plaintiff and his DOCTOR FRANK name and mark, solely for Defendant's commercial gain and to Plaintiff's commercial detriment.

59.     On information and belief, Internet users searching for Plaintiff's Doctor Frank Website to obtain information about medical cannabis and to obtain a recommendation for a medical marijuana prescription have been diverted to Defendant's own website, Leafwell.co.  Rather than obtain a recommendation from Plaintiff through the Doctor Frank Website, these Internet users pay for a recommendation from Defendant's website, constituting a lost sale to Plaintiff.

60.     On information and belief, Defendant continues to use the *doctorfrank.com* domain name to redirect users from Plaintiff's website without authorization and in bad faith.

61.     As a direct and proximate result of Defendant's conduct, Plaintiff has been damaged by Defendants' unlawful use of the *doctorfrank.com* domain name and will suffer irreparable harm.

62.     Defendants' acts, as aforesaid, are in violation of the Anticybersquatting Consumer Protection Act under Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d).

### THIRD CAUSE OF ACTION

### False Designation of Origin

### Lanham Act, 15 U.S.C. § 1125(a)

63.     Plaintiff incorporates by reference and realleges all previous paragraphs as though fully set forth herein.

64.     Plaintiff is a world-renowned advocate for medical cannabis and is known throughout the United States and globally as "Doctor Frank."

65.     Plaintiff also owns and enjoys valid, enforceable, and fully subsisting common-law trademark rights in the DOCTOR FRANK mark in California and

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

throughout the United States, a mark he uses in connection with providing various services relating to medical cannabis.

66. As a result, the public has come to know, identify, and recognize services related to medical cannabis marketed in association with the DOCTOR FRANK mark as originating solely with, or authorized by, Plaintiff. Accordingly, Plaintiff has established tremendous goodwill in the DOCTOR FRANK name and mark.

67. Defendant's use of the DOCTOR FRANK mark in commerce to attract consumers to Defendant's competing medical cannabis referral business constitutes a false designation of origin, and creates a false association with Plaintiff, as such use is likely to cause confusion, or to cause mistake, or to deceive consumers as to an affiliation, connection, or association between Plaintiff and Defendant, or as to the origin, sponsorship, or approval of Defendant's goods and services by Plaintiff, when there is none.

68. As a direct and proximate result of Defendant's wrongful conduct, Plaintiff has been, is now, and will be irreparably injured and damaged, and unless Defendant is enjoined by the Court, Plaintiff will suffer further harm to his name, reputation, and goodwill. This harm constitutes an injury for which Plaintiff has no adequate remedy at law.

69. On information and belief, Defendant has acted willfully and should be held liable for treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

## FOURTH CAUSE OF ACTION

### Unlawful, Unfair, and Fraudulent Business Practices
### California Business and Professions Code § 17200

70. Plaintiff incorporates by reference and realleges all previous paragraphs as though fully set forth herein.

71. Defendants' conduct, described above, constitutes unlawful or fraudulent business acts or practices and as such constitutes unfair competition under California Business & Professions Code §§ 17200 *et seq.*

72.     Defendants' conduct constitutes unlawful business acts or practices in that Defendants have engaged in unfair competition through cybersquatting under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(d) and false designations of origin under 15 U.S.C. § 1125(a).

73.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has been, is now, and will be irreparably injured and damaged, and unless Defendants are enjoined by the Court, Plaintiff will suffer further harm to its name, reputation, and goodwill.  This harm constitutes an injury for which Plaintiff has no adequate remedy at law.

74.     Defendants have acted willfully.

## FIFTH CAUSE OF ACTION

## Conversion Under California Common Law

75.     Plaintiff incorporates by reference and realleges all previous paragraphs as though fully set forth herein.

76.     Pursuant to the October 2016 contract between Doctor Frank and Fisher, Fisher acquired the *doctorfrank.com* domain name and developed the Doctor Frank Website and its contents, including the telehealth portal *Hippocratica*, on behalf of and for the benefit of Doctor Frank.

77.     Doctor Frank paid to Fisher a substantial sum of money, in excess of $100,000, since October 2016 for Fisher's services to develop the Doctor Frank Website and its contents.

78.     Through Fisher's actions described above, including among other things, failing to provide Doctor Frank with the log-in credentials to control the *doctorfrank.com* domain name and website, re-directing the *doctorfrank.com* domain name to Fisher's competing website, Leafwell.co, using the content developed for the Doctor Frank Website as the content for the Leafwell.co website, and failing to perform the services for which Doctor Frank paid her, Fisher has intentionally and

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

substantially interfered with Doctor Frank's property and prevented him from having access to such property despite numerous demands for its return.

79. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has been, is now, and will be irreparably injured and damaged, and unless Defendant is enjoined by the Court, Plaintiff will suffer further harm to his name, reputation, and goodwill. This harm constitutes an injury for which Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

1. Pursuant to 15 U.S.C. § 1125(d)(1)(C), ordering Defendants to transfer the *doctorfrank.com* domain name to Plaintiff.

2. Pursuant to 15 U.S.C. § 1116, preliminarily and permanently enjoining Defendants, and all persons in active concert or participation with them, from directly or indirectly:

- using the DOCTOR FRANK mark, or any other mark, word, or name incorporating or confusingly similar to the DOCTOR FRANK mark;

- from representing by any means whatsoever, that Defendants and their goods and services are associated in any way with Plaintiff or its DOCTOR FRANK mark;

- from doing any other acts calculated or likely to cause confusion or mistake in the mind of the public or to lead others to believe that Defendants' products or services come from or are the products or services of Plaintiff, or are somehow sponsored by or associated with Plaintiff;

- from otherwise unfairly competing with Plaintiff or misappropriating Plaintiff's reputation and goodwill; and

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

- from assisting, aiding, or abetting any other person or business entity from engaging in or performing any of the activities described above;

3. Ordering expedited discovery to commence immediately;

4. Awarding Plaintiff his actual damages and Defendants' unjust and unlawful profits arising from Defendants' misconduct, pursuant to 15 U.S.C. § 1117(a);

5. Trebling Plaintiff's actual damages and Defendants' unjust and unlawful profits pursuant to 15 U.S.C. § 1117(b);

6. Ordering restitution to Plaintiff for Defendants' unjust enrichment and unlawful gains to the detriment of Plaintiff;

7. Awarding exemplary damages in an amount to be determined by jury;

8. Awarding Plaintiff his costs of suit, attorneys' fees, and reasonable expenses in this exceptional case;

9. Awarding pre-and post-judgment interest at the maximum rate allowable by the law; and

10. Granting such other relief as the Court may deem just and equitable.

Dated: January 24, 2019                    WINSTON & STRAWN LLP

By: */s/ Diana Hughes Leiden*
Diana Hughes Leiden
Laura M. Franco

Attorneys for Plaintiff
FRANK D'AMBROSIO, M.D.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

# DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: January 24, 2019       WINSTON & STRAWN LLP

By: */s/ Diana Hughes Leiden*
     Diana Hughes Leiden
     Laura M. Franco

     Attorneys for Plaintiff
     FRANK D'AMBROSIO, M.D.

# EXHIBIT C

to Gavrilos Declaration
-- D'Ambrosio Permanent Injunction

1

2

3

4

5

6

7

8

9 **UNITED STATES DISTRICT COURT**

10 **CENTRAL DISTRICT OF CALIFORNIA**

11

12 FRANK D'AMBROSIO, M.D. | Case No. 2:19-cv-00552-CBM-JC

13        Plaintiff,

14   v. | **[PROPOSED] ORDER FOR PERMANENT INJUNCTION** [18]

15 EMILY FISHER; and DOES 1 through 10,

16

17       Defendants.

18

19

20

21

22

23

24

25

26

27

28

# PERMANENT INJUNCTION

IT IS HEREBY ORDERED THAT Defendant Emily Fisher ("Fisher"), her agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them, or having knowledge of this Permanent Injunction by personal service or otherwise be, and hereby are permanently enjoined from (i) using, registering or seeking to register the DOCTOR FRANK trademark or any mark confusingly similar thereto, (ii) using, registering or seeking to register the *doctorfrank.com* domain name; (iii) using the Doctor Frank website; (iv) using, registering or seeking to register any social media accounts under the name Doctor Frank Live; (v) using the content of the publication *Cannabis is Medicine;* (vi) promoting, selling, offering for sale, distributing or otherwise exploiting the publication *Cannabis is Medicine*; and (vii) using, reproducing, or otherwise exploiting the dataset resulting from D'Ambrosio's patient research and survey entitled "Can Cannabis Be Used To Replace Addictive Pharmaceuticals".

Fisher is hereby given further notice that she shall be deemed to have actual notice of the issuance and terms of this permanent injunction and that any act by her in violation of any of the terms hereof may be considered and prosecuted as contempt of this Court.

**IT IS SO ORDERED.**

Dated: ___AUGUST 13, 2019___

_____
Hon. Consuelo B. Marshall
United States District Judge

DocuSign Envelope ID: 19A6B5EC-289F-424D-BB0D-C41E80D36053

# EXHIBIT D

to Gavrilos Declaration
-- Purported Termination Notice

# FOX SWIBEL

FOX, SWIBEL, LEVIN & CARROLL, LLP
WWW.FOXSWIBEL.COM ▪ 312.224.1200
200 W MADISON ST, STE 3000
CHICAGO, IL 60606

MARTIN B. CARROLL
mcarroll@foxswibel.com

DIRECT  312.224.1230

October 16, 2020

**Via email (ggavrilos@leafwell.co and jmraunac@gcmp.us) and overnight delivery**

GCM Partners, LLC
c/o George Gavrilos
835 N. California Ave, Apt. 3
Chicago, IL 60622

### Re: Notice of Breach of Contract and Termination

Mr. Gavrilos:

Our firm represents Hipaaline, LLC. This letter shall constitute notice that GCM Partners, LLC is in material breach of the Exclusive Marketing and Consulting Services Agreement between Hipaaline and GCM Partners, LLC, effective October 1, 2019 (the "Agreement"). Consequently, Hipaaline hereby terminates the Agreement effective immediately.

Hipaaline has become aware that GCM Partners engaged a direct competitor of Hipaaline to provide services that are substantially similar, if not identical, to those for which GCM Partners contract Hipaaline to provide on an exclusive basis. Such conduct is a material breach of the Agreement under Illinois law. Hipaaline would not have entered into the Agreement with GCM Partners without the guarantee of exclusivity. As you are aware, Section 5.6 of the Agreement states as follows:

> <u>Exclusivity</u>. Company hereby grants Consultant, during the Term of this Agreement, **the exclusive right**, at all bricks-and-mortar locations of Company, including at any new locations Company may create or acquire during the Term of this Agreement, to provide the Marketing and Consultant Services related to Company's medical cannabis practice. **To that end, Company (or its employees, officers, or owners) shall not engage any other consultant, contractor, employee, or other person or entity to perform any service that competes, directly or indirectly, with the scope of the Marketing and Consultant Services, or invest in a business or entity that does same.**

DocuSign Envelope ID: 19A6B5EC-288F-424D-BB0D-C41E80D36053

George Gavrilos
GCM Partners, LLC
October 16, 2020
Page 2


The importance of the Agreement's exclusivity provision to Hipaaline's business cannot be overstated. In fact, it is mentioned in the very title ("Exclusive Marketing and Consultant Agreement) and again in the recitals.

Furthermore, GCM Partners is in breach of the representation made in Section 7.5(b) stating that: "As of the Effective Date and currently, Company operates its clinics in compliance with all applicable state and federal corporate and health care rules and regulations, including with respect to corporate practice of medicine rules, licensure rules, and telemedicine guidelines."

Hipaaline has become aware that GCM Partners contracts with providers where it is billing for and receiving payments for services in multiple states in apparent violation of state corporate practice of medicine rules. This conduct constitutes a material breach of the Agreement. Hipaaline takes very seriously its obligations to operate in compliance with the law – and partner with companies that share this sentiment – and would not have entered into the Agreement had it known about GCM Partners' failure to operate in compliance with legal requirements. Additionally, GCM Partners' misrepresentation regarding the legality of its operations poses an unfair risk of reputational harm to Hipaaline.

Hipaaline hereby demands that, as of the date of this notice, GCM Partners (i) immediately cease to use Hipaaline's intellectual property, including but not limited to marketing and advertising materials, name, tradenames, trademarks, service marks, logos, and, specifically, the "Leafwell MD" or "Leafwell M.D." names; (ii) immediately return or destroy all Confidential Information of Hipaaline in its possession and provide written certification to Hipaaline of such return and/or destruction.

Please contact me should you have any questions or concerns regarding this notice.

Sincerely,

Martin B. Carroll

# EXHIBIT E

to Gavrilos Declaration
-- First Letter

GCM PARTNERS

GCM Partners
835 N. California Ave, Unit 3
Chicago, IL 60622

t: 734.657.4212
e: jmraunac@gcmp.us

October 19, 2020

**Via E-mail**

Martin B. Carroll
Fox Swibel
200 W. Madison St., Suite 3000
Chicago, IL 60606
mcarroll@foxswibel.com

      **Re:**     **Response to HIPAALINE Notice of Termination of October 16, 2020**

Dear Mr. Carroll:

Please be advised that I represent GCM Partners, LLC ("GCM") as General Counsel relative to the above-captioned matter. Kindly direct all future communication regarding the same to my attention.

I am in receipt of your letter of October 16 captioned "Notice of Breach of Contract and Termination" (hereafter, "Notice"). To avoid confusion, I want to clarify that by identifying "Hipaaline, LLC" as your client, you actually meant HIPAALINE Ltd. ("HIPAALINE"), the party which entered the Agreement with GCM. Please advise.

With respect to the Notice's claims, GCM disagrees that it has breached the Agreement in any manner whatsoever. GCM considers the Agreement to be in full force and effect, as it has been since its execution, and expects HIPAALINE to fully abide by its terms. HIPAALINE has anticipatorily repudiated the Agreement by: vetting payment processors to replace Bluepay (GCM's current processor); Emily Fisher's statement to Lewis Jassey on October 18 that she intends to replace Bluepay on October 19; Ms. Fisher's admission to Dr. Jassey on October 18 that she had communicated with GCM providers to solicit them to sign new independent-contractor agreements with HIPAALINE to see patients on Leafwell's platform; and wrongfully terminating the Agreement via your Notice.

If HIPAALINE replaces Bluepay and/or engages any providers directly, GCM will file an emergency application for a temporary restraining order seeking a prohibitive injunction enjoining the same.

During a telephone conversation between Dr. George Gavrilos, Dr. Steven Salzman, and Ms. Fisher on October 18 concerning settlement negotiations, Ms. Fisher committed to providing GCM with a counteroffer in response to GCM's of October 13 by the end of business CST on October 21. GCM looks forward to timely receiving both that proposal and written assurance from HIPAALINE that it does not intend to breach the Agreement as forecasted by the aforementioned anticipatory repudiations.

Sincerely,

Jonathan Mraunac
Chief Operating Officer
General Counsel

# EXHIBIT F

to Gavrilos Declaration
-- Second Letter


**GCM Partners**
835 N. California Ave, Unit 3
Chicago, IL 60622

t: 734.657.4212
e: jmraunac@gcmp.us

October 22, 2020

**Via E-mail and FedEx International Economy**      **Via E-mail**

HIPAALINE Ltd.                                        Martin B. Carroll
c/o Emily A. Fisher                                   Fox Swibel
20-22 Wenlock Road                                    200 W. Madison St., Suite 3000
London, England N1 7GU                                Chicago, IL 60606
efisher@leafwell.co                                   mcarroll@foxswibel.com

      Re:      Notice of HIPAALINE's Material Breach of Contract

Dear Ms. Fisher:

Please be advised that HIPAALINE Ltd. ("HIPAALINE") has materially breached the Exclusive Marketing and Consultant Services Agreement ("Agreement") by contracting directly with healthcare providers.

GCM Partners, LLC ("GCM") has learned that HIPAALINE has engaged two providers, Drs. Walter Nyabere and Takayoshi Kakiuchi, who have evaluated patients on the Leafwell platform in Minnesota and Pennsylvania, respectively. HIPAALINE's direct engagement of these providers violates Section 5.6 of the Agreement. As exclusivity is fundamental to the spirit of the Agreement, this violation constitutes a material breach of the Agreement.

GCM provides HIPAALINE with the opportunity to cure this material breach by cancelling any agreements, written or oral, with Drs. Nyabere and Kakiuchi and referring them to Dr. Gavrilos so they can enter independent-contractor agreements with GCM in accordance with the Agreement. HIPAALINE is granted until October 26 at 5:00 p.m. CST to cure and inform GCM of the same.

Additionally, per my letter to Mr. Carroll of October 19, HIPAALINE has not provided written assurance against its anticipatory repudiations. Should HIPAALINE fail to deliver that assurance by the above-referenced cure deadline, GCM will consider those anticipatory repudiations to be material breaches as well.

Lastly, your personal solicitation of Dr. Lewis Jassey (the most recent instance of which occurred today) to enter an independent-contractor agreement with HIPAALINE is an anticipatory repudiation of the Agreement. Kindly provide written assurance against the same by October 26.

Sincerely,

Jonathan Mraunac
Chief Operating Officer
General Counsel