**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GCM PARTNERS, LLC, an Illinois limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 1:20-cv-06401 |
| v. | ) ) | Hon. Georgia N. Alexakis |
| ONLINE MD LTD., a limited company of England and Wales; and EMILY ARIDA FISHER, | ) ) ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

<u>**SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**</u>

Plaintiff GCM Partners, LLC ("GCM Partners" or "Plaintiff") states the following as its Second Amended Complaint for Injunctive and Other Relief against Online MD Ltd. ("Online MD") and Emily Arida Fisher ("Fisher" and, together with Online MD, "Defendants").

**NATURE OF THE ACTION**

1.      GCM Partners is a state-of-the-art company that originally operated brick-and-mortar medical clinics to treat patients pursuant to medical cannabis programs in various states where such programs are sanctioned under state law. Beginning in October 2019, GCM Partners began working with Fisher personally to provide a platform to Plaintiff that facilitated virtual physician-patient visits over the internet (sometimes described as, "telehealth"). In consultation with Fisher and her subsequently formed entity, Hipaaline Ltd. ("Hipaaline"), GCM Partners expanded its business to include the provision of telehealth services through use of Hipaaline's licensed domain name which was, at the time, www.leafwell.co ("Leafwell" or the "Leafwell platform"). Hipaaline and GCM also entered into an Exclusive Marketing and Consultant Services

Agreement (as hereafter defined, the "Agreement"). Although the Agreement indicates that Hipaaline owns and has full right to use the Leafwell platform and domain name, Fisher later stated under oath and now represents that she has always personally owned the domain name, she personally paid to build the telemedicine platform in 2017, and she retains ownership of the platform. *See* Opinion and Order dated April 19, 2021 [Docket No. 89], at 8 (hereafter, "Opinion").

2.      From October 2019 through July 7, 2020, GCM worked with Fisher personally who was doing business with GCM as "Leafwell". It was not until the Agreement became effective (on July 7, 2020) that GCM began doing business with Hipaaline.

3.      Fisher admitted under oath that she worked with GCM for many months prior to March 2020, and she admitted under oath that she personally "found the doctors and got them to sign a contract with GCM."

4.      By October 2020, the relationship between Plaintiff, Hipaaline, and Fisher had soured. Due to the COVID-19 pandemic and the rapid expansion of telehealth, GCM's business increased significantly. As more profits were realized, Fisher wanted a larger share, decided that she had made a "bad deal" with GCM Partners, and began trying in earnest to cause Hipaaline to renegotiate the Agreement so that she could make more money from her interest in the Leafwell platform. Fisher also attempted to cause Hipaaline to terminate the Agreement in October 2020 and threated to remove GCM's access to the Leafwell platform. In response, Plaintiff commenced an action in this Court against Hipaaline and Fisher and successfully obtained injunctive relief against them terminating Plaintiff's access to the platform.

5.      With the Court's injunction in place, Hipaaline became an impediment to her efforts to maximize her personal interest in the Leafwell platform, so she abandoned Hipaaline and sought to free herself and her interest in the Leafwell platform from the Court's injunction. Fisher created

as new company, Online MD, and using the insolvency processes available at that time in England and Wales, purchased substantially all of Hipaaline's assets through Online MD without any sort of marketing process being conducted and for only £100,000—funded primarily through a series of monthly payments to be paid from Online MD's go-forward revenue. Fisher has represented to this Court that this transfer included Hipaaline's exclusive license to use the Leafwell platform. Next, wearing her Online MD hat, Fisher did exactly what this Court had said she could not do: she caused Online MD to shut down GCM Partner's access to the telehealth platform. Online MD then proceeded to engage in the same telehealth business previously conducted by Hipaaline, but now without GCM Partners.

6.      Since Online MD acquired Hipaaline's assets associated with the Leafwell platform, Fisher, through Online MD, has continued to engage in the same business and provide the same telehealth-related services in the United States for which GCM Partners had contracted with Hipaaline through the Agreement. Fisher and Online MD have done so using certain of GCM Partners's trade secret information, including GCM Partners former healthcare partners (*i.e.*, the licensed medical providers who previously worked with GCM Partners). These actions, had they been undertaken by Hipaaline would violate the Agreement, as well as both the Computer Fraud and Abuse Act and the Defend Trade Secrets Act. As Judge Sara Ellis (then presiding in this Court over this action) herself observed:

> Online MD has continued Hipaaline's operations almost without interruption, with the only real changes being the name of the corporation—though not of the brand— and the removal of GCM [Partners] as the entity through whom the medical providers contract. Fisher remains in control of the Leafwell operations as Online MD's CEO, Hipaaline's staff now works for Online MD, and the user experience has not changed.

Op. at 20.

7.     When GCM Partners attempted to move forward with contempt proceedings against Fisher, Hipaaline, and Online MD, Fisher persuaded the administrators of Hipaaline's U.K. proceedings to seek recognition of those proceedings in the United States Bankruptcy Court for the Northern District of Illinois, which recognition imposed the stay provisions of section 362 of the Bankruptcy Code on further action against Hipaaline. Fisher and Online MD then argued that the U.K. proceedings and the chapter 15 case should also protect her and her new company. Faced with the complexities of the foreign U.K. proceedings and a chapter 15 recognition proceeding in the Bankruptcy Court, Judge Ellis stayed this action in its entirety to avoid any interference with the administration of Hipaaline's insolvency proceeding.

8.     Further, while noting that "even Fisher must acknowledge, under ordinary circumstances, Online MD's continued operation of the Leafwell business presents a strong case for binding Online MD to the [District Court's preliminary] injunction," Op. at 20, Judge Ellis declined to impose successor liability on Online MD in the context of enforcing the Court's preliminary injunction order pursuant to Rule 65 of the Federal Rules of Civil Procedure: "***at this stage***, the Court concludes that good reason exists not to extend the Court's preliminary injunction order to Online MD or to Fisher in her official capacity as Online MD's sole shareholder and CEO." *Id.* at 22 (emphasis added).

9.     On two separate occasions, Plaintiff asked Judge Ellis to reconsider her decision not to extend the preliminary injunction and impose civil contempt sanctions of Online MD, and each time Judge Ellis denied the request but left open the possibility of imposing liability on Online MD if named as a defendant in its own right:

> the Court questions the value of GCM's continued attempt to reestablish that relationship through contempt proceedings against Online MD. But, to the extent GCM chooses to continue to pursue this litigation after Hipaaline's insolvency proceeding concludes, the Court will more fully address the legal basis for

4

injunctive and monetary relief against Hipaaline, Fisher, and, if named as a defendant, Online MD at that time.

Order dated February 10, 2022 [Docket No. 106]; *see also* Order dated August 9, 2022 [Docket No. 115], at 2 (quoting same).

10.     As the stay of this action has now terminated, Plaintiff files this amended complaint to name Online MD as a defendant and pursue Plaintiff's claims against it directly. Those claims, which sound in federal law but also state law.

## THE PARTIES, JURISDICTION, AND VENUE

11.     Plaintiff, GCM Partners, LLC, is an Illinois limited liability company with its principal place of business in Chicago, Illinois.

12.     Defendant, Online MD Ltd., is a limited company of England and Wales, with its registered office address in Essex, England. On information and belief, Online MD operates the Leafwell business from its headquarters located at 9100 S. Dadeland Boulevard, Suite 1710, Miami, Florida, in affiliation with Leafwell, Inc. a Delaware corporation of which Fisher is the sole director, president, secretary, treasurer, and CEO, and Hipaaline LLC, a Delaware limited liability company that also maintains a "telemedicine platform" at onlinemd.co. Online MD conducts its telemedicine business throughout the United States, including in the State of Illinois; this includes partnering with, and making its telemedicine platform available to, medical providers licensed in the State of Illinois who use the platform to meet with residents of the State of Illinois in the practice of medicine, including writing prescriptions for such residents.

13.     Defendant, Emily Arida Fisher, Online MD Ltd.'s Chief Executive Officer, sole shareholder, and sole director, is a citizen of the United Kingdom and resides in London, England.

14.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because it is a civil action where the matter in controversy exceeds the sum or value of $75,000 and is between a citizen of a State and citizens or subjects of a foreign state.

15.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff raises federal questions under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the Defend Trade Secrets Act, 18 U.S.C. §§ 1836-39, *et seq*.

16.     The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims arise out of the same case or controversy as the federal claims.

17.     This Court has personal jurisdiction over Online MD because it regularly conducts business in the State of Illinois.

18.     This Court has personal jurisdiction over Fisher because she regularly conducted business in the State of Illinois from October 2019 through July 7, 2020.

19.     Venue is proper in this District because a substantial part of the events giving rise to the claims occurred within this District.

20.     At all times relevant to this action, all of GCM's members (George Gavrilos, Jonathan Mraunac, and Jenna Kioussis) were residents of the State of Illinois.

21.     Nearly all of GCM's work with Fisher and pursuant to the Agreement was performed by GCM's members while they were present in Illinois.

22.     All financial transactions of GCM relative to its work with Fisher and pursuant to the Agreement, including receipt of patient payments, were conducted via U.S. Bank online and through a local branch thereof located in Cook County, Illinois.

23. Dr. Steven Salzman, a physician contracted through GCM, who saw nearly all of the Illinois medical-cannabis patients on the Leafwell platform from April 2020 through February 2021, did so as a resident of Illinois and while physically present in Illinois.

## FACTUAL BACKGROUND

**Fisher Approaches GCM Partners**

24. In September 2017, Dr. George Gavrilos, Pharm.D., M.A. ("Dr. Gavrilos") and Dr. Steven Salzman, D.O. ("Dr. Salzman") founded a brick-and-mortar practice to treat patients via state-sanctioned medical cannabis programs. The practice began first in Illinois only and then expanded into Maryland, Ohio, and Pennsylvania in the fall of 2018. Dr. Gavrilos formed the legal entity GCM Partners, LLC ("GCM Partners") in October 2018 to reorganize and accommodate the out-of-state expansion. **Exhibit 1**, Declaration of Dr. George Gavrilos, Pharm.D., M.A., ¶ 1.

25. From approximately September 2017 through October 2019, prior to beginning a business relationship with Fisher, and later Hipaaline, Dr. Gavrilos, while working full-time as a critical-care, clinical pharmacist for a large, academic medical center in the Chicago metropolitan area, undertook the following steps toward building an established, successful medical-cannabis practice: recruited medical providers; searched for and leased brick-and-mortar office spaces; participated in numerous live and recorded educational, topical webinars to drive attention and patient volumes; secured internet, newspaper, magazine, and radio advertising placements; hired clinical staff and patient-support and provider-support personnel; conducted extensive research and created state-specific workflow documentation mapping the medical-cannabis process in each state with a medical-cannabis program; and sponsored charity events for patient referral and relationship-building purposes. **Ex. 1**, ¶ 2.

26. In or about May 2019, Dr. Gavrilos was approached by Emily Arida Fisher about an opportunity to expand GCM Partners' brick-and-mortar practice into the telehealth industry. **Ex. 1**, ¶ 3.

27. Fisher represented herself as a medical cannabis marketing specialist with significant experience in telehealth services. **Ex. 1**, ¶ 4.

28. Fisher did not serve as Chief Executive Officer of Hipaaline until she formed Hipaaline on June 12, 2020. **Ex. 1**, ¶ 5.

29. Fisher explained that, by using her services, GCM Partners could expand into new markets through the provision of telehealth services to patients. **Ex. 1**, ¶ 6.

30. On May 31, 2019, Fisher proposed that GCM Partners could find a team of medical providers in states with medical cannabis programs and operate telemedicine clinics while Fisher would provide marketing efforts and the technological infrastructure to achieve the parties' shared goal of becoming the primary national destination for medical cannabis patients to obtain a doctor's certificate. **Ex. 1**, ¶ 7.

31. Fisher estimated that it would take approximately six weeks to develop the online software platform, and that the parties would begin to see the impact of their marketing efforts within three to six months of the online platform going live and becoming available to potential patients. **Ex. 1**, ¶ 8.

32. By October 1, 2019, after several discussions and negotiations between the parties, GCM Partners and Fisher began working together. **Ex. 1**, ¶ 9.

33. GCM Partners made its first payment to Fisher on or about October 14, 2019. **Ex. 1**, ¶ 10.

34.     Over the course of the next eight months, and with the assistance of the marketing and consulting services provided by Fisher, GCM Partners expended an immeasurable amount of resources and money to grow its network of medical providers, substantially increase its customer base, grow and increase the sophistication of its virtual clinic support staff, and expand its practice from being operational in only four states to operating in at least 21 states through telemedicine with medical providers licensed in each jurisdiction. **Ex. 1**, ¶ 11.

35.     GMC Partners' herculean expansion efforts proved fruitful as the number of patients seen by medical providers of GCM Partners increased tenfold in a matter of months. **Ex. 1**, ¶ 12.

36.     In June 2020, GCM Partners hired Jonathan M. Mraunac ("Mr. Mraunac") as the Chief Operating Officer and General Counsel of GCM Partners. **Ex. 1**, ¶ 13.

37.     Mr. Mraunac recommended that GCM Partners and Fisher memorialize their business relationship in writing. **Ex. 1**, ¶ 14.

**The Parties Enter into an Exclusive Marketing and Consultant Services Agreement**

38.     Fisher incorporated Hipaaline on June 12, 2020, as a private limited company under the laws of England and Wales and thereafter proposed that Hipaaline be made the counterparty to the contract then being discussed between GCM Partners and Fisher to memorialize the parties' business relationship.

39.     On or about July 7, 2020, GCM Partners entered into an Exclusive Marketing and Consultant Services Agreement (the "Agreement") with Hipaaline to formally engage Hipaaline on an exclusive, independent-contractor basis to perform certain marketing and consulting services related to GCM Partners' medical practice in order to facilitate its bricks-and-mortar practice and expand and enhance its telemedicine presence. **Ex. 1**, ¶ 15.

40. A true and correct copy of the Agreement is attached hereto as **Exhibit 2**. **Ex. 1**, ¶ 16.

41. The Agreement is effective for an initial term of five (5) calendar years beginning on July 6, 2020 (the "Initial Term"). The Agreement is set to automatically renew for successive one-year terms (each a "Renewal Term") unless GCM Partners gives written notice to Hipaaline of its election not to renew at least sixty (60) calendar days in advance of the expiration of the Initial Term or then-current Renewal Term. The Initial Term and Renewal Term(s) are collectively referred to as the "Term." **Ex. 2**, § 6.1.

42. Given the highly sensitive nature of the medical, proprietary, and personal information at issue in providing marketing and consultant services to GCM Partners, the Agreement contains intricate terms for the handling of confidential information, trade secrets, and patient data. **Ex. 1**, ¶ 17.

43. "Confidential Information" is defined under the Agreement as "information of a confidential or proprietary nature relating to the subject matter described in this Agreement which is taken from or disclosed by one Party (the "Disclosing Party") by or to the other Party (the "Receiving Party")." **Ex. 2**, § 5.1. Such information includes, but is not limited to, "trade secrets, methods, compositions, data and knowhow; designs; systems; processes; computer programs; files and documentation; research projects; matters of a business nature such as pricing, marketing, advertising, corporate, and sales methods and strategies; the terms of this Agreement; lists of actual, prospective, or potential clients, customers, or patients; any information derived from the foregoing items; and any other information that either Party may expressly designated as confidential during the course of this Agreement." *Id*.

44.     Under Section 5.2 of the Agreement, the parties are directed as to how they must treat Confidential Information:

> Treatment of Confidential Information. The Receiving Party agrees to hold the Disclosing Party's Confidential Information in strict confidence and to take commercially reasonable precautions to protect such Confidential Information (including, without limitation, using all precautions Receiving Party employs with respect to its own Confidential Information). Commercially reasonable precautions shall include compliance with all applicable local, state, federal, and international data-privacy laws, codes, rules, and regulations. The Receiving Party further agrees not to disclose any Confidential Information to any third party; not to use, analyze, transcribe, transmit, decompile, disassemble, or reverse engineer any Confidential Information unless required in the performance of the Receiving Party's duties under this Agreement; not to use any Confidential Information for its own or any third party's benefit unless authorized by this Agreement or by the Disclosing Party in writing; and not to alter or remove any legend, marking, or notice provided by the Disclosing Party on its Confidential Information regarding the confidential and proprietary nature of such information.

> ****

> The confidentiality obligations contained in this Article 5 shall survive the termination, for any reason, of this Agreement for a period of two (2) calendar years from the date of termination.

> ****

45.     To reiterate, in Section 5.2 of the Agreement, the parties agreed ". . . not to use any Confidential Information for its own or any third party's benefit unless authorized by this Agreement or by the Disclosing Party in writing . . ."

46.     The information collected from GCM Partners' patients is confidential, HIPAA-protected data that belongs to GCM Partners. **Ex. 1**, ¶ 18.

47.     Indeed, Section 5.7 of the Agreement contains the following provision:

> Ownership of Data. During the Term of this Agreement, Consultant will necessarily have access to data, data sets, medical records, charts, metadata, and analytics ("Data") containing personal information and protected health information ("PHI") of patients for collaborative use by the Parties in furtherance of this Agreement. Ownership and use of the Data shall be governed as follows: a) **any and all Data originally collected by Company from Company's patients shall permanently be the sole property of Company;** b) any and all Data originally collected by Consultant shall permanently be the sole property of Consultant; c) during the Term

11

of this Agreement and at any time after any termination of this Agreement, any Data owned by one Party but accessible by and/or shared with the other Party may be sold, transferred, and/or used by the non-owning Party for any legitimate business purpose. [**emphasis added**]

48.     The following non-exhaustive list also qualifies as GCM Partners' trade secrets and Confidential Information: (i) pricing structure of payments by GCM Partners to its medical providers, (ii) contact and licensing information of existing and prospective medical providers, (iii) revenue figures, (iv) log of patient activity on the Leafwell platform, including peak traffic hours on the platform, (v) patient data and identifying information, including, but not limited to, qualifying condition, medical records, medication history, procedural/surgical history, demographic information, geographic location, and cannabis-use history, (vi) identity of referral partner or source of lead generation, (vii) medical providers' charts and notes, (viii) medical provider activity on the Leafwell platform, and (ix) marketing and partner strategy and targets. **Ex. 1**, ¶ 19.

49.     The foregoing information has economic value to GCM Partners by virtue of not being generally known to its competitors. **Ex. 1**, ¶ 20.

50.     GCM Partners maintains the confidentiality of its Confidential Information, trade secrets, and patient data by several means, including but not limited to:

    a.  Requiring GCM Partners' independent contractors and medical providers to use computers that are password or biometric face-scan protected;

    b.  Maintaining GCM Partners' records on a cloud-based service that is encrypted and password protected;

    c.  Requiring GCM Partners' vendors, independent contractors, and medical providers with access to Confidential Information and trade secrets to sign confidentiality agreements; and

    d.  Providing access on a tiered basis so that the type and amount of Confidential Information, trade secrets, and other highly-sensitive information is limited to select representatives of GCM Partners based on his or her position and role at GCM Partners.

**Ex. 1**, ¶ 21.

51.     Additionally, the Agreement contains various covenants and restrictions, including

a non-solicitation provision, to outline the contours of the parties' distinct, exclusive arrangement.

**Ex. 1**, ¶ 22.

52.     For instance, Section 5.5 of the Agreement provided as follows:

Restrictive Covenant. During the Term of this Agreement and for a one (1) calendar-year period following termination of this Agreement, regardless of the reason for termination, throughout the entire United States, Company agrees that it will not: (a) solicit, hire, or engage any of Consultant's employees or independent contractors who are employed or engaged by Consultant as of the Effective Date and (b) offer telehealth medical-cannabis evaluations using Consultant's software platform. **During the Term of this Agreement and for a one (1) calendar-year period following termination of this Agreement, regardless of the reason for termination, throughout the entire United States, Consultant agrees that it will not: (a) solicit, hire, or engage any of Company's employees or independent contractors who are employed or engaged by Company as of the Effective Date. [emphasis added]**

53.     In addition, Section 5.6 of the Agreement provided as follows:

Exclusivity. Company hereby grants Consultant, during the Term of this Agreement, the exclusive right, at all bricks-and-mortar locations of Company, including at any new locations Company may create or acquire during the Term of this Agreement, to provide the Marketing and Consultant Services related to Company's medical cannabis practice. To that end, Company (or its employees, officers, or owners) shall not engage any other consultant, contractor, employee, or other person or entity to perform any service that competes, directly or indirectly, with the scope of the Marketing and Consultant Services or invest in a business or entity that does same. **During the Term of this Agreement, Consultant shall not employ or engage any physician or other health care provider or practitioner to promote or utilize Consultant's telehealth platform unless the physician or other health care provider or practitioner is an employee or independent contractor of Company. [emphasis added]**

54.     The Agreement also articulates the importance of Plaintiff's access and license to

use Defendant Hipaaline's software platform to carry out its telehealth services. **Ex. 1**, ¶ 23.

55.     In pertinent part, Section 5.8 of the Agreement states as follows:

<u>License to Use Consultant's Intellectual Property.</u>

(a)     During the Term of this Agreement and subject to Company's prompt payment of all applicable Marketing Service Fees, Consultant hereby grants to Company a nontransferable, non-assignable (whether by contract or operation of law), nonexclusive, fully paid-up, and royalty-free right and license to use the "Consultant-Licensed IP" (as described in <u>Exhibit D</u> hereto) solely for Company's internal business purposes and for the purpose of rendering medical care and treatments to patients through the medical practice owned and operated by Company.

56.     Exhibit D, which is a mere one-sentence statement, clarifies that Hipaaline's Licensed IP is a "propriety software that provides a HIPAA-compliant telehealth environment and EHR with marketing and administrative functions." **Ex. 2**, *Exhibit D*.

57.     The HIPAA-compliant telehealth software platform referred to in Section 5.8 and Exhibit D was[1] publicly hosted at www.leafwell.co and accessible to GCM Partners' patients via personal computer, smartphone, and tablet computer. The platform had separate logins, with tiered access, for medical providers, GCM Partners' staff, and Hipaaline's staff. **Ex. 1**, ¶ 24.

58.     Subsection (c) of Section 5.8 of the Agreement specifies that:

(c)     <u>Use of Names</u>. During the Term of this Agreement, Company and/or George Gavrilos may use the names "Leafwell MD" and "Leafwell M.D." for any legitimate business purpose, without restriction, including use of Consultant's branding, font, and color scheme in Company's display of the names. During the Term of this Agreement, Company shall not use the names in violation of Section 5.6 herein. After expiration of the Term of this Agreement or termination of the Agreement for any reason, Company shall immediately cease use of the Consultant-Licensed IP.

59.     Finally, Section 6.2 of the Agreement states as follows:

<u>Termination</u>. This Agreement may be terminated by a Party prior to the expiration of the Term only upon the occurrence of a material breach by the other Party. This Agreement may not be terminated for convenience. Unless otherwise specifically stated herein, a material breach is defined by Illinois law. In the event Company alleges in writing a material breach by Consultant, Company shall be entitled to

---

[1] Since the filing of GCM Partners' original Complaint on October 28, 2020, the Leafwell software platform is now hosted at www.leafwell.com. Visiting www.leafwell.co automatically redirects the user to www.leafwell.com.

withhold all or any portion of any payment for services Consultant has performed, whether invoiced or uninvoiced, which Company reasonably believes will sufficiently cover Company's damages. Should the withheld amount be less than Company's damages, Company may apply the withheld amount to any claim and enforce this Agreement for the remainder.

**The Leafwell Online Platform**

60.     The software platform that Hipaaline claimed that it owned for purposes of the Agreement was known as www.leafwell.co. **Ex. 1**, ¶ 25.

61.     Hipaaline represented in the Agreement that it owned and had full rights to use the domain name www.leafwell.co, and the "Leafwell MD" and "Leafwell M.D." trade names. **Ex. 1**, ¶ 26.

62.     However, by entering into the Agreement, Hipaaline gave GCM Partners nearly unfettered access to the www.leafwell.co platform and the "Leafwell MD" and "Leafwell M.D." names for the purpose of conducting its business and expanding its telehealth services. For example, Jenna Kioussis ("Ms. Kioussis"), a GCM Partners representative who is in charge of overall clinic operations, had super-administrative access and super-clinician access to the Leafwell platform. **Ex. 1**, ¶ 27.

63.     Dr. Gavrilos and Mr. Mraunac even had leafwell.co email addresses. **Ex. 1**, ¶ 28.

64.     The Leafwell platform had become an integral part of GCM Partners' business. **Ex. 1**, ¶ 29.

65.     Under the Agreement, all patients who used the Leafwell platform were customers of GCM Partners. GCM Partners processed all patient credit card payments and handled all patient-related customer-service issues. **Ex. 1**, ¶ 30.

66.     Potential customers of GCM Partners who had a qualifying medical condition could have visited the Leafwell platform to apply for a medical cannabis card. **Ex. 1**, ¶ 31.

67.    Among other things, qualifying conditions may include autism, cancer, glaucoma, Hepatitis C, lupus, multiple sclerosis, Parkinson's Disease, post-traumatic stress disorder, rheumatoid arthritis, traumatic brain injury, and certain terminal illnesses. **Ex. 1**, ¶ 32.

68.    The application process for obtaining a medical marijuana card on the Leafwell platform had three general steps. An image of a portion of the Leafwell homepage as it existed in October 2020 is displayed below. **Ex. 1**, ¶ 33.



69.    To begin, potential customers of GCM Partners were required to register in order to virtually meet with a GCM Partners medical provider on the Leafwell platform. **Ex. 1**, ¶ 34.

70.    During the registration process, patients submit their medical history, demographic information, identification, relevant medical records, payment details,[2] and related information. **Ex. 1**, ¶ 35.

---

[2] No funds are charged until a GCM Partners medical provider approves the patient for a medical cannabis certification.

71.     If the GCM Partners medical provider that conducted a virtual meeting with the patient determined that he or she has a qualifying condition for which a medical cannabis card is appropriate, the provider would approve the patient, and the Leafwell platform automatically emailed the patient with further, state-specific instructions for completing the process. **Ex. 1**, ¶ 36.

72.     Once approved, patients were charged a fee for a doctor's certificate through GCM Partners' third-party payment processor, Bluepay. **Ex. 1**, ¶ 37.

73.     In many states, patients must have then completed an official state application to become approved for a medical cannabis card. **Ex. 1**, ¶ 38.

74.     For example, in Illinois, patients wishing to obtain a medical cannabis card must apply online via the State of Illinois Medical Cannabis Patient Registry Program located online at https://medicalcannabispatients.illinois.gov/. **Ex. 1**, ¶ 39.

75.     In Illinois, patients are required to submit their doctor's certificates with their state applications for a medical cannabis card. **Ex. 1**, ¶ 40.

76.     Lastly, if approved by the State of Illinois, patients receive a medical cannabis card and become eligible to purchase medical cannabis in any registered Illinois medical-cannabis dispensary. **Ex. 1**, ¶ 41.

77.     Although the licensed medical providers were retained by GCM Partners and the patients are customers of GCM Partners, the name "GCM Partners, LLC" was not identified on the Leafwell software platform in any capacity. **Ex. 1**, ¶ 42.

78.     However, the founders of GCM Partners—Dr. Salzman and Dr. Gavrilos—were identified as two of the featured doctors on the www.leafwell.co homepage. An image of that portion of the homepage is below. **Ex. 1**, ¶ 43.



79.    Dr. Salzman and Dr. Gavrilos acted, without pay or legal obligation, as Leafwell ambassadors, participating in topical webinars and marketing pitch meetings with potential dispensary partners in order to grow the Leafwell patient base. **Ex. 1**, ¶ 44.

80.    Dr. Lewis Jassey was the third doctor featured on the www.leafwell.co homepage. Dr. Jassey was an independent contractor of GCM Partners, and he evaluated patients on the Leafwell platform. Dr. Jassey also evaluated medical-cannabis patients for Heally, a competitor of Leafwell offering a somewhat similar telemedicine platform. Dr. Jassey had seen patients on the Heally platform since approximately April 2020 with the full knowledge and consent of Fisher and Hipaaline. **Ex. 1**, ¶ 45.

81.    From approximately June 19, 2020, through October 23, 2020, Dr. Gavrilos, Dr. Salzman, Ms. Kioussis, and Mr. Mraunac, without pay or legal obligation, and in the spirit of cooperation between the parties, attended weekly web-development meetings (via video call) with

Hipaaline's web-development team who maintained and improved the Leafwell platform. **Ex. 1**, ¶ 46.

82.     During the web-development meetings, GCM Partners' personnel shared detailed feedback regarding technical problems with the Leafwell platform and suggestions for design and feature improvements for the platform. GCM Partners' feedback and suggestions led directly to permanent improvements in the efficiency, look, and operation of the Leafwell platform, ultimately improving the patient experience and the ease of clinic operations. **Ex. 1**, ¶ 47.

83.     Along with new patients, the existing customers of GCM Partners could have used the Leafwell platform to see a medical provider to renew their medical cannabis certifications. Depending on state-specific rules, certifications were valid for a specific duration—ranging from 90 days to three years. **Ex. 1**, ¶ 48.

84.     Medical providers of GCM Partners had access to data on the Leafwell platform which included a record of every patient visit, the amount charged for each visit, patient-supplied medical records, and the providers' notes/charts for each patient visit. All of this data, for learning, accounting, auditing, and planning purposes, was invaluable to GCM Partners' medical providers. **Ex. 1**, ¶ 49.

**Communications Break Down Between the Parties**

85.     Beginning in approximately June 2020, communications between the parties began to break down as Fisher attempted to exert a level of control and management over GCM Partners that is not permitted by the Agreement, which limited her role to the provision of marketing and consultant services. **Ex. 1**, ¶ 50.

86.     For example, Fisher routinely micromanaged GCM Partners' clinic operations (despite having no contractual duty or other legal right to do so). This micromanagement included,

but was not limited to: incessantly calling and sending instant messages to Ms. Kioussis regarding patient waiting room times and contact correspondence practices; demanding compliance with unrealistic deadlines to complete research-heavy, complicated, state-specific workflows; and calling and instant messaging Ms. Kioussis during non-business hours, including at times when the virtual clinic was closed. This micromanagement interfered materially with GCM Partners' clinic operations. **Ex. 1**, ¶ 51.

87.     Such complaints and requests also greatly exceeded the scope of Hipaaline's marketing and consultant services in the Agreement. **Ex. 2**, *Exhibit A*; **Ex. 1**, ¶ 52.

88.     For further example, Fisher routinely demanded constant, detailed status updates regarding GCM Partners' preparation of workflow documents as the parties expanded into new medical-cannabis state markets. Conversely, when GCM Partners requested updates from Fisher regarding the status of dispensary partnerships or website platform bug fixes or new-feature implementations, she always became opaque, refused to share details, and acted as if GCM Partners' requests for updates were an imposition to her. Fisher's communication style materially impacted interpersonal relations and overall operation of the business arrangement. **Ex. 1**, ¶ 53.

89.     In hopes of maintaining a mutually-beneficial relationship, GCM Partners nonetheless addressed Fisher's complaints and requests, but Fisher became increasingly emboldened and demanding in ways that exceeded the scope of her authority as a principal of Hipaaline under the Agreement, and she rarely provided details regarding the statuses of her business undertakings. **Ex. 1**, ¶ 54.

**GCM Partners Learns About Federal Complaint Against Fisher**

90.     On July 8, 2020, Fisher misdirected a file attachment to Mr. Mraunac via email. **Ex. 1**, ¶ 55.

91.     The attachment contained a filing[3] from a federal legal action filed in the United States District Court for the Central District of California entitled, *Frank D'Ambrosio, M.D. v. Emily Fisher; and Does 1 through 10*, Case No. 2:19-cv-552. **Ex. 1**, ¶ 56.

92.     From this pleading, GCM Partners learned for the first time that Fisher had been previously sued for "wholesale theft of Plaintiff Frank D'Ambrosio's lucrative on-line medical marijuana card referral business by Defendant Emily Fisher, a person he hired – and paid handsomely – to develop the web portal through which D'Ambrosio was offering his services." **Ex. 1**, ¶ 58.

93.     On August 13, 2019, the judge in the *D'Ambrosio* action entered a permanent injunction against Fisher permanently enjoining her from:

> (i) using, registering or seeking to register the DOCTOR FRANK trademark or any mark confusingly similar thereto, (ii) using, registering or seeking to register the *doctorfrank.com* domain name; (iii) using the Doctor Frank website; (iv) using, registering or seeking to register any social media accounts under the name Doctor Frank Live; (v) using the content of the publication *Cannabis is Medicine*; (vi) promoting, selling, offering for sale, distributing or otherwise exploiting the publication *Cannabis is Medicine;* and (vii) using, reproducing, or otherwise exploiting the dataset resulting from D'Ambrosio's patient research and survey entitled "Can Cannabis Be Used To Replace Addictive Pharmaceuticals".

**Ex. 1**, ¶ 59.

94.     Thus, it appears that immediately after Dr. D'Ambrosio uncovered Fisher's unlawful scheme, she targeted a new victim—GCM Partners. **Ex. 1**, ¶ 60.

**Hipaaline Falsely and Pretextually Claimed GCM Partners Breached the Agreement, and Hipaaline Attempted to Wrongfully Terminate the Agreement**

95.     On October 11, 2020, Dr. Salzman and Dr. Gavrilos met with Fisher via a Zoom virtual meeting to confront Fisher about her recent demanding behavior and the scope of the Agreement. **Ex. 1**, ¶ 61.

---

[3] Report on the Filing or Determination of an Action Regarding a Patent or Trademark. Dkt. 21.

96.     During the virtual meeting, Fisher delivered a presentation that concluded the Agreement must be terminated for the following reasons: that GCM Partners communicated in an unproductive fashion; that Hipaaline preferred to contract with Dr. Gavrilos and Dr. Salzman individually (as opposed to with a legal entity); that she felt the Agreement was merely a "formality" and that it had no real effect; that Leafwell, despite the efforts of GCM Partners in growing Leafwell, was "her company" only; and because Dr. Gavrilos and Dr. Salzman were not "founders" of Leafwell. **Ex. 1**, ¶ 62.

97.     Further, during this virtual meeting, Fisher said that all revenue would be redirected to be collected by Hipaaline. **Ex. 1**, ¶ 63.

98.     During the virtual meeting, GCM Partners first learned of Hipaaline's desire to terminate the Agreement. Dr. Gavrilos and Dr. Salzman were shocked at this news. **Ex. 1**, ¶ 64.

99.     Hipaaline had no legal basis to terminate the Agreement. **Ex. 1**, ¶ 65.

100.    On October 12, 2020, Fisher sent an email to Dr. Salzman and Dr. Gavrilos with a proposal stating, in part, that "[a]ll operations and hiring will come under Leafwell," and Fisher "would like George, Steven, and Lewis to join our [Leafwell] executive team as Medical Directors/Advisors." She also suggested that Dr. Salzman and Dr. Gavrilos would receive "15% of any revenue from partnerships." At the end of the email, Fisher vaguely noted, "Although we must push forward with the transition, we will allow till 10/31 for a smooth transition." **Ex. 1**, ¶ 66.

101.    On October 13, 2020, Dr. Gavrilos notified Fisher via email that her proposal was rejected. In his email, Dr. Gavrilos explained: "From GCM's perspective, HIPAALINE has no legal basis upon which to avoid the continued, binding effect of the current agreement between the parties (hereafter, "Agreement"). Accordingly, HIPAALINE's proposal and, more generally, its forecasted intent to avoid the Agreement are viewed as a plea for relief from what HIPAALINE

considers to be a bad deal for itself (despite it being negotiated at arm's length by sophisticated business entities, each with their own legal counsel)." **Ex. 1**, ¶ 67.

102.    On October 16, 2020, Fisher responded to Dr. Gavrilos by stating, in pertinent part, "Today we terminate our contract with GCM with immediate effect. We will honor any financial agreement of our previous contract till the end of the month to allow for a smooth transition, however, should any employees or contractors wish to continue to work with us, they will need to sign a new agreement with HIPAALINE by Monday and they should email me directly." **Ex. 1**, ¶ 68.

103.    Also, on October 16, 2020, counsel for Hipaaline served a "Notice of Breach of Contract and Termination" to Dr. Gavrilos and Mr. Mraunac ("Purported Termination Notice"). **Ex. 1**, ¶ 69.

104.    The Purported Termination Notice began by stating: "Our firm represents Hipaaline, LLC. This letter shall constitute notice that GCM Partners, LLC is in material breach of the Exclusive Marketing and Consulting Services Agreement between Hipaaline and GCM Partners, LLC, effective October 1, 2019 (the "Agreement"). Consequently, Hipaaline hereby terminates the Agreement effective immediately." **Ex. 1**, ¶ 70.

105.    The Purported Termination Notice indicated that there were two bases for termination of the Agreement. **Ex. 1**, ¶ 71.

106.    First, Hipaaline supposedly "bec[a]me aware that GCM Partners engaged a direct competitor of Hipaaline to provide services that are substantially similar, if not identical, to those for which GCM Partners contract[ed] Hipaaline to provide on an exclusive basis. Such conduct is a material breach of the Agreement under Illinois law." **Ex. 1**, ¶ 72.

107. Second, Hipaaline purportedly "bec[a]me aware that GCM Partners contracts with providers where it is billing for and receiving payments for services in multiple states in apparent violation of state corporate practice of medicine rules." **Ex. 1**, ¶ 73.

108. Both of the allegations made by Hipaaline's counsel in the Purported Termination Letter are false. **Ex. 1**, ¶ 74.

109. In closing, Hipaaline demanded that "GCM Partners (i) immediately cease to use Hipaaline's intellectual property, including but not limited to marketing and advertising materials, name, tradenames, trademarks, service marks, logos, and, specifically, the "Leafwell MD" or "Leafwell M.D." names; [and] (ii) immediately return or destroy all Confidential Information of Hipaaline in its possession and provide written certification to Hipaaline of such return and/or destruction." **Ex. 1**, ¶ 75.

110. Hipaaline orchestrated the preparation and service of the Purported Termination Notice for the sole purpose of pretextually terminating the Agreement for convenience as a means to take control of GCM Partners' Confidential Information, patient data, and medical providers. **Ex. 1**, ¶ 76.

111. Contrary to Hipaaline's allegation in the Purported Termination Notice, GCM Partners did not engage a direct competitor of Hipaaline or any other person or entity to provide marketing and consultant services on behalf of GCM Partners. **Ex. 1**, ¶ 77.

112. Furthermore, GCM Partners has not violated any state corporate practice of medicine rules as suggested in the Purported Termination Notice. **Ex. 1**, ¶ 78.

113. Moreover, the Purported Termination Notice was based on an unsigned, outdated draft of the Agreement that was provided to Hipaaline's counsel by Fisher. **Ex. 1**, ¶ 79.

114.    Hipaaline's counsel mistakenly referred to "Hipaaline, LLC" in the Purported Termination Notice despite the correct party to the Agreement being "Hipaaline Ltd." **Ex. 1**, ¶ 80.

115.    In addition, the exclusivity clause quoted in the Purported Termination Notice was inaccurate and incomplete. **Ex. 1**, ¶ 81.

116.    As a professional courtesy, Mr. Mraunac sent the operative Agreement to Hipaaline's counsel on October 22, 2020. Hipaaline's counsel acknowledged he had not seen the operative Agreement before he received it from Mr. Mraunac. **Ex. 1**, ¶ 82.

117.    Hipaaline's attempt to terminate the Agreement was ineffective, and, at that time, GCM Partners still had access the Leafwell platform. **Ex. 1**, ¶ 83.

118.    However, Hipaaline threatened and confirmed multiple times that it would (i) disable GCM Partners' access to the Leafwell platform on November 1, 2020, and (ii) replace Bluepay with Hipaaline's own payment processor on November 1, 2020, thereby rerouting all Leafwell revenues to Hipaaline. Both actions violated the Agreement and caused irreparable, incalculable loss to GCM Partners. **Ex. 1**, ¶ 84.

**GCM Partners Responds to the Purported Termination Notice and Points Out That Hipaaline Had Breached Multiple Provisions of the Agreement**

119.    On October 19, 2020, Mr. Mraunac sent a response to the Purported Termination Notice (the "First Letter"). **Ex. 1**, ¶ 85.

120.    In the First Letter, Mr. Mraunac noted that "GCM disagrees that it has breached the Agreement in any manner whatsoever. GCM considers the Agreement to be in full force and effect, as it has been since its execution, and expects HIPAALINE to fully abide by its terms." **Ex. 1**, ¶ 86.

121.    He also declared that "HIPAALINE has anticipatorily repudiated the Agreement by: vetting payment processors to replace Bluepay (GCM's current processor); Emily Fisher's

statement to Lewis Jassey on October 18 that she intends to replace Bluepay on October 19; Ms. Fisher's admission to Dr. Jassey on October 18 that she had communicated with GCM providers to solicit them to sign new independent-contractor agreements with HIPAALINE to see patients on Leafwell's platform; and wrongfully terminating the Agreement via your Notice." **Ex. 1**, ¶ 87.

122. On October 22, 2020, after acquiring further details regarding the extent of Hipaaline and Fisher's misconduct, Mr. Mraunac sent a follow-up letter to Hipaaline's counsel entitled, "Notice of HIPAALINE's Material Breach of Contact" (the "Second Letter"). **Ex. 1**, ¶ 88.

123. In the Second Letter, Mr. Mraunac stated as follows:

GCM Partners, LLC ("GCM") has learned that HIPAALINE has engaged two providers, Drs. Walter Nyabere and Takayoshi Kakiuchi, who have evaluated patients on the Leafwell platform in Minnesota and Pennsylvania, respectively. HIPAALINE's direct engagement of these providers violates Section 5.6 of the Agreement. As exclusivity is fundamental to the spirit of the Agreement, this violation constitutes a material breach of the Agreement.

**Ex. 1**, ¶ 89.

124. Mr. Mraunac graciously provided Hipaaline an "opportunity to cure this material breach by cancelling any agreements, written or oral, with Drs. Nyabere and Kakiuchi and referring them to Dr. Gavrilos so they can enter independent-contractor agreements with GCM in accordance with the Agreement" no later than October 26, 2020, at 5:00 p.m. **Ex. 1**, ¶ 90.

125. Hipaaline had no authority under the Agreement or otherwise to vet or replace GCM Partners' third-party payment processor, Bluepay, and directly collect payments from GCM Partners' patients. **Ex. 1**, ¶ 91.

126. Section 3.3 of the Agreement states, "[a]ll patient payments received through [Hipaaline's] telehealth platform shall be solely collected and held by [GCM Partners]." **Ex. 1**, ¶ 92.

127.     Any act by Hipaaline to change the payment processor did result in an interruption of service to GCM Partners' patients, a complete loss of revenue to GCM Partners, and constituted a material breach of Section 3.3 of the Agreement. **Ex. 1**, ¶ 93.

128.     In addition, Section 5.6 of the Agreement prohibited Hipaaline from employing or engaging any physician or other health care provider or practitioner to promote or utilize the Leafwell platform unless the physician or other health care provider or practitioner is an employee or independent contractor of GCM Partners. **Ex. 1**, ¶ 94.

129.     Hipaaline directly engaged Dr. Nyabere and Dr. Kakiuchi to promote or utilize the Leafwell telehealth platform, even though neither physician is an employee or independent contractor of GCM Partners, in direct contravention of Section 5.6 of the Agreement. **Ex. 1**, ¶ 95.

130.     Therefore, Hipaaline's solicitation of both medical providers was in direct contravention of the terms of the Agreement. **Ex. 1**, ¶ 96.

131.     Finally, the Termination provision of the Agreement provides that the Agreement may be terminated only upon the occurrence of a material breach, not for convenience. Ex. 2, § 6.2; **Ex. 1**, ¶ 97.

132.     By concocting false, unsupported, and immaterial grounds for attempting to terminate the Agreement in a sheer maneuver to terminate the Agreement for convenience and selfish gain, Hipaaline violated Section 6.2 of the Agreement. **Ex. 1**, ¶ 98.

**Fisher Threatens to Shut Down GCM Partners' Access to Leafwell, Seize Its Confidential Data, and Upend Its Business**

133.     On October 18, 2020, Dr. Gavrilos and Dr. Salzman attended a virtual Zoom meeting with Fisher to discuss various letters and email correspondence exchanged between the parties. **Ex. 1**, ¶ 99.

134.    During that same meeting, Fisher again proposed that the parties settle their dispute on the following terms: (i) Hipaaline would assume all overhead and engage all medical providers and staff of GCM Partners directly, (ii) Dr. Salzman, Dr. Gavrilos, and Dr. Jassey would become directors of Leafwell and collect 15% of revenues derived only from marketing partnerships that Dr. Salzman, Dr. Gavrilos, and Dr. Jassey generated, and (iii) the three doctors would receive, collectively, 6% equity interest in the event of a sale of Hipaaline. **Ex. 1**, ¶ 100.

135.    Dr. Gavrilos rejected this proposal from Fisher. **Ex. 1**, ¶ 101.

136.    GCM Partners had not and has not violated the Agreement, and there is no justifiable explanation as to why GCM Partners would have accepted an offer to receive 15% of ill-defined, self-generated partnership revenue when GCM Partners then received 60% of all revenues derived from Leafwell. **Ex. 1**, ¶ 102.

137.    After Dr. Gavrilos rejected Fisher's proposal for a second time during the virtual meeting, Fisher notified Dr. Gavrilos that Hipaaline would be disabling Bluepay and collecting all revenue directly, and removing GCM Partners' access to the Leafwell platform on November 1, 2020. At that time, Dr. Gavrilos was not certain that Hipaaline would actually disable GCM Partners' access to its payment processor and the Leafwell platform. **Ex. 1**, ¶ 103.

138.    However, on October 23, 2020, counsel to Hipaaline and Fischer clearly and positively confirmed in a telephone conference with Mr. Mraunac that his clients indeed intended to eliminate GCM Partners' access to the Leafwell platform and disable GCM Partners' payment processor, Bluepay, beginning on November 1, 2020. **Exhibit 3**, Declaration of Jonathan M. Mraunac, ¶ 6.

28

139.    Fisher later testified before this Court that, in fact, "she has always personally owned the [Leafwell] domain name, she personally paid to build the telemedicine platform in 2017, and she retains ownership of the platform." Op. at 8.

**Fisher Implements a Plan to Put Hipaaline into Insolvency and Sell Its Assets to Her New, Wholly Owned Entity, Online MD, to Free Her Interest in the Leafwell Platform from the Agreement and the Court's Injunction**

140.    With the Court's injunction in place, Fisher developed and implemented a plan to free her personal, economic interest in the Leafwell platform from Hipaaline's obligations to GCM Partners under the Agreement and from the Court's injunction.

141.    On November 23, 2020, the same day the Court entered its injunction, Fisher changed the corporate name of Hipaaline Ltd. to "OnlineMD Ltd."

142.    On December 1, 2020, Fisher created a Delaware entity named "Online MD Corp.".

143.    Fisher, with the help of Brittany Paradise, a personal friend of Fisher's and a U.S. citizen, created Online MD Corp. for the purpose of holding an online merchant account.

144.    Fisher enlisted the help of Paradise to create Online MD Corp. and apply for a merchant account because Fisher, as a citizen of the U.K., could not obtain a merchant account herself.

145.    Fisher, by her own admission, enlisted the help of Paradise in order to circumvent the requirement of being a U.S. citizen in order to create and hold an online merchant account for Leafwell.

146.    On December 8, 2020, Fisher changed the corporate name of OnlineMD Ltd. back to "Hipaaline Ltd."

147.    On December 9, 2020, Fisher formed a new England and Wales limited company by the name of "Online MD Ltd." (the Defendant in this action).

148.    On February 24, 2021, Fisher, as Hipaaline's CEO, placed Hipaaline into administration in the United Kingdom.

149.    On February 23, 2021, Hipaaline, acting through its U.K. insolvency administrators sold certain assets, consisting of associated goodwill and intellectual property to Online MD Ltd. for £100,000, without any prior marketing of these assets by the Debtor, or the administrators, or any prior notice to creditors such as GCM Partners (the "Sale").

150.    Pursuant to the Sale agreement with the U.K. administrators, Fisher paid £20,000 up front, with the balance of the purchase price to be paid over time in installments by Online MD. On information and belief, the source for those installments was Online MD's continued operation of the Leafwell platform.

151.    On February 24, 2021, just after the filing which placed Hipaaline into administration and the Sale, Online MD terminated GCM Partners' access to the Leafwell platform (hereafter, the "Switchover").

152.    As part of the Switchover, Online MD terminated GCM Partners' access to its Leafwell e-mail accounts.

153.    As part of the Switchover, Online MD terminated GCM Partners' access to Aircall, an internet-based telephone service, which was used in Leafwell's operation.

154.    As part of the Switchover, Online MD terminated GCM Partners' access to Hubspot, a technology platform for managing customer profiles and information, used in Leafwell's operation.

155.    As part of the Switchover, Online MD terminated GCM Partners' access to Slack, a technology platform used for internal company messaging and collaboration used in Leafwell's operation.

156.     As part of the Switchover, Online MD terminated GCM Partners' merchant services account, Blueplay, and replaced it with another merchant services account.

157.     As part of the Switchover, Online MD terminated the access of GCM Partners' independent-contractor physicians to the Leafwell platform.

158.     The Switchover occurred without any material cessation in Leafwell's operations.

159.     One of GCM Partners' physicians, Dr. Lewis Jassey, evaluated patients on the Leafwell platform prior to the Switchover and immediately after the Switchover with no material interruption in his access or ability to do so.

160.     Online MD made arrangements prior to the Switchover so that immediately after the Switchover, Online MD would have a physician available to evaluate patients in every state in which Leafwell operated prior to the Switchover, including the State of Illinois.

161.     Online MD had proposed contracts ready to present to at least some of GCM Partners' physicians so they could continue working on the Leafwell platform to evaluate patients after the Switchover with as little interruption as possible.

162.     From October 2019 until just prior to the Switchover, www.leafwell.co was the homepage of Leafwell.

163.     From October 2019 until just prior to the Switchover, the phone number for Leafwell listed on the website was (800) 660-9085.

164.     From October 2019 until just prior to the Switchover, Miguel Marinhas and his company, Minuscode, were Hipaaline's software engineers.

165.     From October 2019 until just prior to the Switchover, Dipak Hemraj was Hipaaline's head of research.

166. From October 2019 until just prior to the Switchover, Fisher was Hipaaline's chief executive officer.

167. From October 2019 until just prior to the Switchover, Fisher owned 80% of Hipaaline's shares.

168. From October 2019 until just prior to the Switchover, an email address used by Fisher in Hipaaline's operation was efisher@leafwell.co.

169. From October 2019 until just prior to the Switchover, an email address used by Fisher in Hipaaline's operation was emily@leafwell.co.

170. From October 2019 until just prior to the Switchover, the telemedicine portion of the Leafwell platform was hosted at www.medicalcard.io.

171. From October 2019 until just prior to the Switchover, physicians associated with GCM Partners evaluated patients by telehealth means for medical-cannabis certification on the Leafwell platform.

172. Beginning immediately after the Switchover, Leafwell was operated by Online MD.

173. Beginning immediately after the Switchover, Fisher owned 100% of Online MD's shares and was its sole officer and director.

174. Beginning immediately after the Switchover, www.leafwell.co was the homepage of Leafwell.

175. At some point after the Switchover, the Leafwell homepage was reassigned to www.leafwell.com. Any attempt to visit www.leafwell.co results in an automatic redirection to www.leafwell.com.

176. Beginning immediately after the Switchover, the phone number for Leafwell listed on the website was (800) 660-9085.

177. Beginning immediately after the Switchover, Miguel Marinhas and his company, Minuscode, were Online MD's software engineers.

178. Beginning immediately after the Switchover, Dipak Hemraj was Online MD's head of research.

179. Beginning immediately after the Switchover, Fisher was Online MD's chief executive officer.

180. Beginning immediately after the Switchover, an email address used by Fisher in Hipaaline's operation was efisher@leafwell.co.

181. Beginning immediately after the Switchover, an email address used by Fisher in Hipaaline's operation was emily@leafwell.co.

182. Beginning immediately after the Switchover, physicians associated with Online MD evaluated patients by telehealth means for medical-cannabis certification on the Leafwell platform.

183. The Switchover did not cause any material cessation in Leafwell's operations. Incident to the Switchover, Leafwell's operations did not pause for more than 60 minutes.

184. In every material respect, Leafwell was the same business before and after the Switchover.

185. The Terms of Service displayed on the Leafwell website were materially the same before and after the Switchover.

186. The "How It Works" section of the Leafwell website was materially the same before and after the Switchover.

187.    Stephanie Budin worked for Leafwell before and after the Switchover.

188.    Ruth Lemon worked for Leafwell before and after the Switchover.

189.    Fisher lent personal funds, consisting of at least the initial £20,000 up-front payment, to Online MD so it could purchase Hipaaline's assets through the U.K. administration proceeding.

190.    No contemporaneous written agreement between Fisher and Online MD was created to memorialize the terms with respect to the funds she lent Online MD to purchase Hipaaline's assets through the U.K. administration proceeding.

191.    After this Court issued its injunction on November 23, 2020, but before the Switchover, Fisher used her personal TransferWise account to operate Hipaaline.

192.    After the Court issued its injunction on November 23, 2020, but before the Switchover, Fisher attempted to open a new bank account which she planned to use for the operation of Online MD.

193.    After the Court issued its injunction on November 23, 2020, but before the Switchover, Fisher in fact opened a new bank account which she planned to use for the operation of Online MD.

194.    After the Switchover, Fisher used this bank account she opened before the Switchover for the operation of Online MD.

195.    The U.K. administration proceeding did not require Fisher to be the chief executive officer of Online MD.

196.    The U.K. administration proceeding did not require, legally or procedurally, Hipaaline's assets to be purchased by Online MD.

197.    It was Fisher's intention, in placing Hipaaline into a U.K. insolvency proceeding, to acquire Hipaaline's assets with respect to the Leafwell platform through Online MD and execute the Switchover, excluding GCM Partners from the Leafwell platform.

198.    Fisher put in place every mechanism to maximize the chances that she, as the sole owner of Online MD, would end up with Hipaaline's assets as a result of the U.K. administration proceeding, including meeting and corresponding with the U.K. administrators prior to their appointment.

199.    Further, prior to the Switchover, Fisher communicated with Shannon Mitchell, then a contractor of GCM Partners, in an attempt to hire her to work for Leafwell.

200.    Fisher took the foregoing actions to implement the Switchover and thereby further her own personal, financial interests: specifically, she sought to free her ownership interest in the Leafwell platform from the Hipaaline's obligations pursuant to the Agreement and from the limitations imposed by this Court's injunction.

**GCM Partners Is Irreparably Damaged by Fisher's Actions to Implement the Switchover and Further Her Personal Interest in the Leafwell Platform, at the Expense of Both Hipaaline and GCM Partners.**

201.    Shutting down GCM Partners' access to the Leafwell platform resulted in a catastrophic, immeasurable loss to GCM Partners. **Ex. 1,** ¶ 104.

202.    Without access to Leafwell, GCM Partners has been unable to contact its existing and prospective patients. **Ex. 1,** ¶ 105.

203.    GCM Partners has been unable to access its Confidential Information and patient data stored on the Leafwell platform. **Ex. 1,** ¶ 106.

204.    GCM Partners was left without an online platform by which to conduct telehealth services for any existing or prospective patients. **Ex. 1,** ¶ 107.

205.    The medical providers of GCM Partners were unable to conduct consultations or otherwise communicate with existing and prospective patients evaluated and acquired via the Leafwell platform. **Ex. 1**, ¶ 108.

206.    In essence, GCM Partners' 12 months of effort to grow and expand in the telehealth industry were completely destroyed as a result of Hipaaline's election to disable GCM Partners' access to the Leafwell platform and replace Bluepay. **Ex. 1**, ¶ 109.

207.    GCM Partners was forced to join a different online medical cannabis platform under significantly less lucrative financial terms. **Ex. 1**, ¶ 110.

208.    This resulted in a tremendous loss of revenue as it took several months to customize a platform to align with GCM Partners' business model and brand and advertise that platform. **Ex. 1**, ¶ 111.

209.    The Leafwell platform was and is, objectively, well-designed and patient-friendly. Since October 1, 2019, the "Leafwell" brand name has gained notoriety as a trusted, reliable source for medical-cannabis certifications. Hipaaline's election to disable GCM Partners' access to the Leafwell platform and replace Bluepay caused GCM Partners to immediately lose the value of that brand cache and forced it to directly compete with it, fundamentally undermining the intent of exclusivity in the Agreement. **Ex. 1**, ¶ 112.

210.    There was no guarantee that any of GCM Partners' existing patients and/or medical providers would agree to join GCM Partners' new platform, and several did not. **Ex. 1**, ¶ 113.

211.    To the contrary, after the Switchover Online MD, with the information Fisher had personally and the information acquired from Hipaaline, became uniquely poised to contact and usurp GCM Partners' existing patients and medical providers, and did indeed do so, as the patients

and providers were already familiar with the Leafwell brand and platform but unaware of GCM Partners as an entity now separated from that brand. **Ex. 1**, ¶ 114.

**COUNT I**
**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT**
**AGAINST ALL DEFENDANTS**

212.    GCM Partners incorporates all prior paragraphs and factual allegations by reference.

213.    18 U.S.C. § 1030(a)(7) of the Computer Fraud and Abuse Act provides as follows:

(a) Whoever –

****

>    (2) intentionally accesses a computer without authorization or exceeds authorized access, and there by obtains—

>        (C) information from any protected computer;

>    (4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value . . . ; [or]

>    (5) (B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or (C) intentionally accesses a protected computer without authorization, and as a result of such conduct causes damage and loss

shall be punished as provided in subsection (c) of this section.

214.    In addition to criminal penalties, "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

215.    At the time of the Switchover, GCM Partners was engaged in the provision of telehealth services in 21 states across the United States of America, such that the computers used by GCM Partners are protected computers used in interstate commerce. **Ex. 1**, ¶ 11.

216.    Defendants are residents of a foreign state providing internet-based marketing and consulting services to GCM Partners, which provides telehealth services across the country.

Accordingly, the computers used by Defendants are protected computers used in interstate and foreign commerce.

217. In the present case, Defendants accessed one or more protected computers to remove damage GCM Partners' protected computers by disabling its access to the Leafwell platform, by seizing GCM Partners' Confidential Information and patient data, and by disabling GCM Partners' access to such information.

218. Fisher and Online MD were not authorized to disable GCM Partners' access to the Leafwell platform.

219. Fisher and Online MD were not authorized to seize GCM Partners' Confidential Information and patient data and was not authorized to simultaneously disable GCM Partners' access to such vital information.

220. Nevertheless, Defendants knowingly exceeded their authorized access to GCM Partners' Confidential Information and patient data and disable GCM Partners' access to its own Confidential Information and patient data stored on the Leafwell platform.

221. In violation of Section 1030(a) of the Computer Fraud and Abuse Act as set forth above, Fisher and Online MD single-handedly destroyed GCM Partners' then-existing telehealth business by (i) disabling its access to Leafwell and any Confidential Information and patient data stored the Leafwell platform, and (ii) interrupting GCM Partners' ability to provide service to all of GCM Partners' patients.

222. GCM Partners has been irreparably harmed by Defendants' actions, as it was (i) temporarily unable to market to new prospective clients; and (ii) permanently unable to retrieve order history, address unique patient needs, and access other patient data from the Leafwell platform after its service is disabled, thereby resulting in lost revenues, costs incurred due to an

interruption in service, and costs associated with restoring or rebuilding the lost data. **Ex. 1**, ¶¶ 105-108.

223.    GCM Partners' 12 months of effort to grow and expand into the telehealth industry was completely destroyed by Fisher's and Online MD's election to disable GCM Partners' access to the Leafwell platform. **Ex. 1**, ¶ 109.

224.    GCM Partners was forced to join a different online medical cannabis platform. **Ex. 1**, ¶ 110.

225.    It took several months to customize a new platform to align with GCM Partners' business model, resulting in significant costs and lost revenues as compared with GCM Partners' business and operations using the Leafwell platform pursuant to the Agreement. **Ex. 1**, ¶ 111.

**WHEREFORE**, Plaintiff GCM Partners LLC respectfully requests (i) that this Court enter Judgment in favor of GCM Partners and against Defendants Emily Arida Fisher and Online MD Ltd. to Count I, (ii) that compensatory damages be awarded in an amount to be determined at trial in excess of $75,000, and (iii) that this Court grant any such other and further relief, including injunctive relief, that it deems proper and just.

**COUNT II**
**FRAUDULENT INDUCEMENT**
**AGAINST FISHER**

226.    GCM Partners incorporates all prior paragraphs and factual allegations by reference.

227.    Prior to Fisher's execution of the Agreement, Fisher personally owned the URL www.leafwell.co.

228.     Prior to Fisher's execution of the Agreement, Fisher personally owned the telemedicine software which operated the portion of the Leafwell platform hosted at www.medicard.io.

229.     At no time prior to Hipaaline entering into the Agreement or thereafter did Hipaaline own the URL www.leafwell.co or the telemedicine software which operated the portion of the Leafwell platform hosted at www.medicard.io.

230.     In light of Fisher's personal ownership of the URL and telemedicine software, neither were included as part of Hipaaline's assets in the U.K. administration proceeding.

231.     At the time of the Switchover, the URL www.leafwell.co itself had a market value in excess of £100,000.00.

232.     At the time of the Switchover, the telemedicine software itself had a market value in excess of £100,000.00.

233.     The Agreement states as follows:

> 7.5     Representations. (a) Consultant makes the following representations: "Consultant owns and has full rights to use for the purposes of this agreement the domain name leafwell.co and subject matter appearing at that Web address as of May 1st, 2020…" **Ex. 2**, § 7.5.

234.     Fisher misrepresented the ownership of the Leafwell URL and telemedicine software.

235.     Fisher (who became CEO of Online MD), knew at the time Hipaaline entered the Agreement that the above representation in Section 7.5 was false.

236.     Fisher (who became CEO of Online MD), intentionally misrepresented the ownership of the Leafwell URL and telemedicine software in order to shield those assets from potential liability to GCM Partners.

237.    Fisher (who became CEO of Online MD), intentionally misrepresented the ownership of the Leafwell URL and telemedicine software in order to shield those assets from becoming part of the Hipaaline estate in the U.K. administration proceeding.

238.    Hipaaline would not have qualified for administration in the U.K. had the URL and telemedicine software been properly classified as assets of Hipaaline.

239.    Fisher (who became CEO of Online MD) intentionally misrepresented the ownership of the Leafwell URL and telemedicine software in order to induce GCM Partners into entering the Agreement.

240.    Fisher needed GCM Partners to operate the clinical aspects of the Leafwell business, so she knowingly committed an unlawful act in order to get GCM Partners to enter the Agreement.

241.    GCM Partners reasonably relied on Fisher's misrepresentation regarding ownership of the Leafwell URL and telemedicine software, believing it to be true and, as a result, entered the Agreement.

242.    GCM Partners would not have entered the Agreement had Fisher not represented that Hipaaline owned the Leafwell URL and the telemedicine software.

243.    As a proximate result of this misrepresentation, GCM Partners was damaged by entering the Agreement with a party, Hipaaline, whose collective assets were of lower economic value than represented and which were owned by a person or entity other than Hipaaline.

**WHEREFORE**, GCM Partners LLC respectfully requests (i) that a temporary restraining order be entered prohibiting Emily Arida Fisher from continuing to operate Leafwell and receiving the benefit of her fraudulent scheme; (ii) that preliminary and permanent injunctions be entered prohibiting Fisher from operating Leafwell for a period equivalent to the duration of the Term of

the Agreement; (iii) that this Court enter Judgment in favor of GCM Partners and against Fisher

as to Count II; (iv) that damages be awarded in an amount to be determined at trial in excess of

$75,000; and (v) that this Court grant any such other and further relief that it deems proper and

just.

**COUNT III**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**AGAINST ALL DEFENDANTS**

244.    GCM Partners incorporates all prior paragraphs and factual allegations by

reference.

245.    GCM Partners had a reasonable expectation that it would enter into valid business

relationships with prospective patients in need of medical cannabis to treat qualifying conditions.

246.    Fisher and Online MD were aware of GCM Partners' reasonable expectations of

the anticipated operation and success of the Leafwell business.

247.    Fisher clearly and positively indicated she would purposely interfere and prevent

GCM Partners' expectancies from being fulfilled by (i) disabling GCM Partners' access to the

Leafwell online platform and (ii) usurping GCM Partners' customer base for her own benefit

without any compensation to GCM Partners. **Ex. 1**, ¶¶ 84, 103.

248.    Following the Switchover, Fisher caused Online MD to purposely interfere and

prevent GCM Partners' expectancies from being fulfilled by (i) disabling GCM Partners' access

to the Leafwell online platform and (ii) usurping GCM Partners' customer base for her own benefit,

as the sole shareholder of Online MD, without any compensation to GCM Partners.

249.    In doing so, the Defendants' actions were not taken in good faith, were not based

on a legitimate business interest, involved unfair competitive practices, and were intended to

benefit Fisher as Online MD's sole shareholder, notwithstanding the agreements that she had freely negotiated and entered into with GCM Partners on behalf of Hipaaline.

250.    As a direct and proximate result of the Defendants' tortious conduct, which was both willful and malicious, GCM Partners has suffered and will continue to suffer damages in an amount to be determined at trial.

**WHEREFORE**, GCM Partners LLC respectfully requests (i) that this Court enter Judgment in favor of GCM Partners and against Emily Arida Fisher and Online MD Ltd. as to Count III; (ii) that damages be awarded in an amount to be determined at trial in excess of $75,000; and (iii) that this Court grant any such other and further relief that it deems proper and just.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP**
**AGAINST ALL DEFENDANTS**

251.    GCM Partners incorporates all prior paragraphs and factual allegations by reference.

252.    GCM Partners had valid contractual relationships with active patients in need of medical cannabis to treat qualifying conditions.

253.    GCM Partners had a valid contractual relationship with Hipaaline at the time Fisher intentionally interfered with it by, in bad faith, arranging to convey the assets of Hipaaline to her wholly owned entity, Online MD through a sale to be conducted after she placed Hipaaline into administration in the United Kingdom.

254.    Fisher, and therefore Online MD because Fisher was Online MD's sole shareholder and CEO, were aware of GCM Partners' contractual relationships with patients in connection with her operation of and involvement in the Leafwell business.

255.     Fisher, and therefore Online MD because Fisher was Online MD's sole shareholder and CEO, was aware of GCM Partners' contractual relationship with Hipaaline in connection with her operation of and involvement in the Leafwell business.

256.     Fisher and Online MD interfered with GCM Partners' contractual relationships by engaging in Fisher's scheme to convey Hipaaline's assets to Online MD and thereafter cause Online MD to (i) disable GCM Partners' access to the Leafwell online platform and (ii) usurp GCM Partners' customer base for their own benefit without any compensation to GCM Partners. **Ex. 1**, ¶¶ 84, 103.

257.     As a direct and proximate result of Fisher's and Online MD's tortious conduct, which was willful and malicious, GCM Partners has suffered damages in an amount to be determined at trial.

**WHEREFORE**, GCM Partners LLC respectfully requests (i) that this Court enter Judgment in favor of GCM Partners and against Emily Arida Fisher and Online MD Ltd. as to Count IV; (ii) that damages be awarded in an amount to be determined at trial in excess of $75,000; and (iii) that this Court grant any such other and further relief that it deems proper and just.

### COUNT V
### VIOLATION OF THE DEFEND TRADE SECRETS ACT
### AGAINST ALL DEFENDANTS

258.     GCM Partners incorporates all prior paragraphs and factual allegations by reference.

259.     The Defend Trade Secrets Act, 18 U.S.C. §§ 1836-39, *et seq*., provides a remedy against Fisher and Online MD for their improper use and misappropriation of GCM Partners' trade secrets.

260.     GCM Partners' is the owner of certain valuable trade secrets, at issue here, related to products and services used in, or intended for use in, interstate commerce. Those trade secrets include, among other things: (i) pricing structure of payments by GCM Partners to its medical providers; (ii) contact and licensing information of existing and prospective medical providers; (iii) revenue figures; (iv) logs of patient activity on the Leafwell platform, including peak traffic hours on the platform; (v) patient data and identifying information, including, but not limited to, protected health information as defined by the Health Insurance Portability and Accountability Act, qualifying condition, medical records, medication history, procedural/surgical history, demographic information, geographic location, and cannabis-use history; (vi) identity of referral partner or source of lead generation; (vii) medical providers' charts and notes; (viii) medical provider activity on the Leafwell platform; and (ix) marketing and partner strategy and targets. **Ex. 1**, ¶ 19.

261.     GCM Partners has taken measures to protect its Confidential Information, trade secrets and patient data from disclosure in several ways, including but not limited to:

    a.  Requiring GCM Partners' independent contractors and medical providers to use computers that are password or biometric face-scan protected;

    b.  Maintaining GCM Partners' records on a cloud-based service that is encrypted and password protected;

    c.  Requiring GCM Partners' vendors, independent contractors, and medical providers with access to Confidential Information to sign confidentiality agreements; and

    d.  Providing access on a tiered basis so that the type and amount of Confidential Information, trade secrets, and other highly-sensitive information is limited to select representatives of GCM Partners based on his or her position and role at GCM Partners. **Ex. 1**, ¶ 21.

262. This information has value by virtue of its secrecy, and through it, GCM Partners is able to maintain and grow customer relationships in an efficient, cost-effective, and successful fashion that its competitors cannot duplicate. **Ex. 1**, ¶ 20.

263. Compiling and maintaining such information provides GCM Partners with a strong competitive advantage that allows it to better serve its patients in the medical cannabis market.

264. The information is not generally known outside of GCM Partners and is valuable as a result, and would give any competitors of GCM Partners an unfair competitive advantage. **Ex. 1**, ¶ 20.

265. Because of the value of the information, which GCM Partners has spent a significant amount of time and invested substantial resources developing, GCM Partners restricts access to such information and requires that it be kept confidential.

266. Hipaaline's access to GCM Partners trade secret information was governed by, and subject to the Agreement, which required Hipaaline, and anyone through whom Hipaaline might act, to maintain the confidentiality of the trade secret information on the Leafwell platform.

267. By engineering the conveyance of substantially all of Hipaaline's assets, including the Leafwell platform, to Online MD through the orchestration of its U.K. insolvency proceeding, the resulting sale, and the Switchover, Fisher and Online MD improperly acquired GCM Partners' trade secret information.

268. Fisher, and therefore Online MD as Fisher is Online MD's sole shareholder and CEO, knew or had reason to know that Hipaaline did not have the right under the Agreement to convey GCM Partners' trade secret information to the purchaser of the Leafwell platform and that such conveyance by Hipaaline and acquisition by Online MD was improper.

269.    Fisher and Online MD therefore willfully and maliciously misappropriated GCM Partners' trade secrets in order to gain economic value from the information.

270.    Fisher and Online MD have taken complete control over and has used GCM Partners' trade secret information and suspended GCM Partners' access to such information.

271.    Fisher's and Online MD's decision to engage physicians to promote or utilize the Leafwell telehealth platform to provide medical-cannabis related telehealth services in the United States, including in the State of Illinois, necessarily indicates that Defendants have utilized GCM Partners' trade secrets to their commercial benefit. Further, Defendants have improperly used GCM Partners' trade secrets (including, but not limited to: lists of patient names and contact information; patients' personal health information; GCM's evaluation protocol for medical-cannabis certification; and lists of physician names and contact information) to gain an unfair advantage over GCM Partners in the marketplace. **Ex. 1**, ¶ 95.

272.    Misappropriation and use of GCM Partners' trade secret information has provided Defendants with an unfair advantage and has caused significant harm to GCM Partners, including, among other things, the loss of the value of that trade secret information, a loss in profits and revenues, and a loss in market share in the medical-cannabis-certification industry.

**WHEREFORE**, GCM Partners LLC respectfully requests (i) that a temporary restraining order be entered prohibiting Emily Arida Fisher and Online MD Ltd. from misappropriating GCM Partners' trade secrets; (ii) that preliminary and permanent injunctions be entered prohibiting Defendants from misappropriating GCM Partners' trade secrets; (iii) that this Court enter Judgment in favor of GCM Partners and against all Defendants as to Count V; (iv) that damages be awarded in an amount to be determined at trial in excess of $75,000; and (v) that this Court grant any such other and further relief that it deems proper and just.

47

**COUNT VI**
**VIOLATION OF THE ILLINOIS TRADE SECRETS ACT**
**AGAINST ALL DEFENDANTS**

273.    GCM Partners incorporates all prior paragraphs and factual allegations by reference.

274.    The Illinois Trade Secret Act, 765 ILCS 1065/1 *et seq.*, provides a remedy against Fisher and Online MD for their improper use and misappropriation of GCM Partners' trade secrets.

275.    GCM Partners' is the owner of certain valuable trade secrets, at issue here, related to products and services used in, or intended for use in, interstate commerce. Those trade secrets include, among other things: (i) pricing structure of payments by GCM Partners to its medical providers; (ii) contact and licensing information of existing and prospective medical providers; (iii) revenue figures; (iv) logs of patient activity on the Leafwell platform, including peak traffic hours on the platform; (v) patient data and identifying information, including, but not limited to, protected health information as defined by the Health Insurance Portability and Accountability Act, qualifying condition, medical records, medication history, procedural/surgical history, demographic information, geographic location, and cannabis-use history; (vi) identity of referral partner or source of lead generation; (vii) medical providers' charts and notes; (viii) medical provider activity on the Leafwell platform; and (ix) marketing and partner strategy and targets. **Ex. 1**, ¶ 19.

276.    GCM Partners has taken measures to protect its Confidential Information, trade secrets and patient data from disclosure in several ways, including but not limited to:

    a.    Requiring GCM Partners' independent contractors and medical providers to use computers that are password or biometric face-scan protected;

    b.    Maintaining GCM Partners' records on a cloud-based service that is encrypted and password protected;

      c.   Requiring GCM Partners' vendors, independent contractors, and medical providers with access to Confidential Information to sign confidentiality agreements; and

      d.   Providing access on a tiered basis so that the type and amount of Confidential Information, trade secrets, and other highly-sensitive information is limited to select representatives of GCM Partners based on his or her position and role at GCM Partners. **Ex. 1**, ¶ 21.

277.    This information has value by virtue of its secrecy, and through it, GCM Partners is able to maintain and grow customer relationships in an efficient, cost-effective, and successful fashion that its competitors cannot duplicate. **Ex. 1**, ¶ 20.

278.    Compiling and maintaining such information provides GCM Partners with a strong competitive advantage that allows it to better serve its patients in the medical cannabis market.

279.    The information is not generally known outside of GCM Partners and is valuable as a result, and would give any competitors of GCM Partners an unfair competitive advantage. **Ex. 1**, ¶ 20.

280.    Because of the value of the information, which GCM Partners has spent a significant amount of time and invested substantial resources developing, GCM Partners restricts access to such information and requires that it be kept confidential.

281.    Hipaaline's access to GCM Partners trade secret information was governed by, and subject to the Agreement, which required Hipaaline, and anyone through whom Hipaaline might act, to maintain the confidentiality of the trade secret information on the Leafwell platform.

282.    By engineering the conveyance of substantially all of Hipaaline's assets, including the Leafwell platform, to Online MD through the orchestration of its U.K. insolvency proceeding, the resulting sale, and the Switchover, Fisher and Online MD improperly acquired GCM Partners' trade secret information.

283.    Fisher, and therefore Online MD as Fisher is Online MD's sole shareholder and CEO, knew or had reason to know that Hipaaline did not have the right under the Agreement to convey GCM Partners' trade secret information to the purchaser of the Leafwell platform and that such conveyance by Hipaaline and acquisition by Online MD was improper.

284.    Fisher and Online MD therefore willfully and maliciously misappropriated GCM Partners' trade secrets in order to gain economic value from the information.

285.    Fisher and Online MD have taken complete control over and have used GCM Partners' trade secret information and suspended GCM Partners' access to such information.

286.    Fisher's and Online MD's decision to engage physicians to promote or utilize the Leafwell telehealth platform to provide medical-cannabis related telehealth services in the United States, including in the State of Illinois, necessarily indicates that Defendants have utilized GCM Partners' trade secrets to their commercial benefit. Further, Defendants have improperly used GCM Partners' trade secrets (including, but not limited to: lists of patient names and contact information; patients' personal health information; GCM's evaluation protocol for medical-cannabis certification; and lists of physician names and contact information) to gain an unfair advantage over GCM Partners in the marketplace. **Ex. 1**, ¶ 95.

287.    Misappropriation and use of GCM Partners' trade secret information has provided Defendants with an unfair advantage and has caused significant harm to GCM Partners, including, among other things, the loss of the value of that trade secret information, a loss in profits and revenues, and a loss in market share in the medical-cannabis-certification industry.

**WHEREFORE**, GCM Partners LLC respectfully requests (i) that a temporary restraining order be entered prohibiting Emily Arida Fisher and Online MD Ltd. from misappropriating GCM Partners' trade secrets; (ii) that preliminary and permanent injunctions be entered prohibiting

Defendants from misappropriating GCM Partners' trade secrets; (iii) that this Court enter Judgment in favor of GCM Partners and against all Defendants as to Count VI; (iv) that damages be awarded in an amount to be determined at trial in excess of $75,000; and (v) that this Court grant any such other and further relief that it deems proper and just.

**COUNT VII**
**UNJUST ENRICHMENT**
**AGAINST ALL DEFENDANTS**

288.    GCM Partners incorporates all prior paragraphs and factual allegations by reference.

289.    Defendants have unjustly retained the benefit of GCM Partners' patient relationships and goodwill with patients, GCM Partners' trade secrets, and the profits GCM Partners would have realized from the Agreement.

290.    Defendants' retention of these benefits violates the fundamental principles of justice, equity, and good conscience.

291.    Defendants have been able to retain these benefits as a direct and proximate result of their unlawful conduct as alleged herein.

**WHEREFORE**, GCM Partners LLC respectfully requests (i) that a temporary restraining order be entered prohibiting Emily Arida Fisher and Online MD Ltd. from retaining the benefits of GCM Partners' patient relationships, trade secrets, and profits; (ii) that preliminary and permanent injunctions be entered prohibiting Defendants from misappropriating GCM Partners' patient relationships, trade secrets, and profits and disgorging those benefits already received; (iii) that this Court enter Judgment in favor of GCM Partners and against all Defendants as to Count VII; (iv) that damages be awarded in an amount to be determined at trial in excess of $75,000; and (v) that this Court grant any such other and further relief that it deems proper and just.

## JURY DEMAND

Plaintiff demands a jury on all issues so triable.

Respectfully submitted,

**GCM PARTNERS, LLC**

By: _____/s/ Trisha M. Rich_____
     One of Its Attorneys

Trisha M. Rich (ADRC 6288544)
Phillip W. Nelson (ARDC 6283615)
Holland & Knight LLP
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
312-263-3600
Trisha.Rich@hklaw.com
Phillip.Nelson@hklaw.com

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure, the undersigned certifies that on **March 19, 2025**, the foregoing **Second Amended Complaint for Injunctive and Other Relief** was filed with the Clerk of the United States District for the Northern District of Illinois by filing through the CM/ECF system, which served a copy upon all counsel of record.


         */s/ Trisha M. Rich*