## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

GCM PARTNERS, LLC,

     Plaintiff,

     v.

ONLINE MD LTD., and EMILY ARIDA
FISHER,

     Defendants.

Case No. 20 CV 6401

Judge Georgia N. Alexakis

### MEMORANDUM OPINION AND ORDER

Plaintiff GCM Partners, LLC ("GCM Partners") connects doctors to patients for the purpose of enrolling them in state-sanctioned medical cannabis programs. In 2019, GCM Partners began working with defendant Emily Arida Fisher and her company Hipaaline LLC ("Hipaaline") to provide these services via Fisher's telehealth platform called Leafwell. GCM Partners and Hipaaline eventually formalized Hipaaline's provision of services in a written agreement ("the Agreement").

GCM Partners alleges that when its relationship with Fisher soured, Fisher devised a scheme in which she placed Hipaaline in insolvency proceedings in the United Kingdom ("U.K."), sold Hipaaline's assets but not its liabilities to a new company she created called Online MD, then continued operating using GCM

Partners' patients and providers without paying GCM Partners the share of profits Hipaaline would have owed it under the Agreement.[1]

GCM Partners has sued Fisher and Online MD alleging they violated various federal and state law causes of action in carrying out this scheme. Defendants now move to dismiss all counts of GCM Partners' second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). [191]. The Court grants in part and denies in part GCM Partners' motion to dismiss.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint need only contain factual allegations that, accepted as true, are sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

At the pleading stage, the Court must "accept all well-pleaded factual allegations as true and view them in the light most favorable to the plaintiff." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). But "allegations in the form of legal conclusions are insufficient." *McReynolds v. Merrill Lynch & Co.*,

---

[1] As in previous opinions, the Court refers to Online MD's termination of GCM Partners' access to the Leafwell platform as the "Switchover."

694 F.3d 873, 885 (7th Cir. 2012). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

In February 2025, the Court denied Fisher's motion to dismiss for lack of personal jurisdiction. [182] at 1–6. In the same order, the Court also held that Online MD could not be held liable for Hipaaline's actions on a theory of successor liability. *Id.* at 6–9. Because GCM Partners' claims relied on Online MD being liable as Hipaaline's successor, the Court granted Online MD's motion to dismiss the claims against it without prejudice. *Id.* at 8–9.

With no objection from defendants, [186], GCM Partners filed its second amended complaint on March 19, 2025, [187]. The second amended complaint brings claims for violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1832 *et seq.*, and Illinois Trade Secrets Act ("ITSA"), 765 Ill. Comp. Stat. 1065; and fraudulent inducement, tortious interference with prospective economic advantage, tortious interference with contractual relationships, and unjust enrichment under Illinois law. [187].

Defendants have since moved to dismiss the second amended complaint. *See* [191]. Rather than summarize all its allegations, in the sections that follow, the Court describes those allegations that bear on its analysis. The Court assumes familiarity with the parties' relationships with one another and the relevant procedural history as outlined in previous orders. *See* [26] at 2–11; [89] at 1–9; [106] at 1–2; [115].

3

But before addressing the merits of plaintiffs' claims, the Court first addresses defendants' threshold argument that GCM Partners' claims are barred by the corporate practice of medicine doctrine.

## A. Corporate Practice of Medicine

The corporate practice of medicine doctrine prohibits corporations from providing professional medical services. *See GCM Partners, LLC v. Hipaaline Ltd.*, No. 20 C 6401, 2020 WL 6867207, at *8 (N.D. Ill. Nov. 23, 2020); *see also Berlin v. Sarah Bush Lincoln Health Ctr.*, 179 Ill. 2d 1, 10 (1997). The doctrine is "animated by the public policy purpose of safeguarding the public health and welfare by protecting the physician-patient relationship from lay interference with the physician's professional judgment." *Carter-Shields, M.D. v. Alton Health Inst.*, 201 Ill. 2d 441, 458 (2002). Illinois law extends the doctrine to limited liability companies like GCM Partners. Specifically, the Illinois Limited Liability Company Act ("LLC Act") requires "[e]ach organizer of a limited liability company organized to engage in the practice of medicine [to] be a licensed physician of this State or an attorney licensed to practice law in this State." 805 Ill. Comp. Stat. 180/5-1.

GCM Partners does not dispute that none of its organizers are licensed physicians or attorneys. *See generally* [193] at 6–9. Defendants argue that the Agreement between Hipaaline and GCM Partners is therefore void because it was made "in furtherance of [GCM Partners'] unlawful practice." [191] at 7 (citing *Frydman v. Horn Eye Ctr., Ltd.*, 286 Ill. App. 3d 853, 859 (Ill. App. Ct. 1997)). But defendants do not provide any support for their argument that the corporate practice

4

of medicine doctrine extends so far as to void a contract between two parties for the provision of marketing and telehealth services.[2] See *GCM Partners*, 2020 WL 6867207, at *11 n.15 ("Hipaaline does not explain how the potential invalidity of GCM's contracts with its independent contractor physicians requires finding GCM and Hipaaline's Agreement void."). Defendants point to *Frydman* for that proposition, but *Frydman* determined the validity of an employment contract placing a non-physician in charge of a medical practice, which is a practice the LLC Act prohibits.[3] 286 Ill. App. 3d at 859. Defendants relatedly argue that "where two or more persons embark in an unlawful transaction," a party wronged by that transaction is not entitled to relief. [191] at 7 (quoting *Klein v. Chicago Title & Trust Co.*, 295 Ill. App. 208, 221 (Ill. App. Ct. 1938)). But defendants do not explain how there was anything inherently unlawful about the marketing and telehealth services Hipaaline rendered pursuant to the Agreement.

---

[2] At the preliminary injunction stage, defendants argued that GCM Partners materially breached the Agreement because the Agreement itself represented that GCM Partners "operates its clinics in compliance with all applicable state and federal corporate and health care rules and regulations, including with respect to corporate practice of medicine rules." *GCM Partners*, 2020 WL 6867207, at *2; *see also id.* at *7–9. Defendants do not repeat the same argument in their motion to dismiss GCM Partners' second amended complaint. *See generally* [191]; [194].

[3] The cases defendants cite elsewhere in their motion also do not support that the doctrine sweeps so broadly. In *Berlin*, 179 Ill. 2d at 5–6, the relevant question was whether a restrictive covenant in a doctor's employment contract was void because the hospital was engaging in the corporate practice of medicine. *Id.* And in *Carter-Shields, M.D.*, 201 Ill. 2d at 453–54, the Court likewise considered whether the doctrine rendered a noncompetition clause in an employment agreement between plaintiff and a nonprofit organization void and unenforceable. *Id.* As GCM Partners points out, *see* [193] at 8–9, these decisions also took place at the summary judgment stage with the benefit of a full record, *see Berlin*, 179 Ill. 2d at 5–6; *Carter-Shields M.D.*, 201 Ill. 2d at 454.

In any event, GCM Partners offers an alternative explanation: instead of engaging in the corporate practice of medicine, GCM Partners says it operates as a management services organization ("MSO"), which is an entity "that provides management services and administrative systems to one or more medical practices." *E.E.O.C. v. Midwest Emergency Assocs., Ltd.*, No. 04 C 4353, 2006 WL 495971, at *2 (N.D. Ill. Feb. 27, 2006). To avoid violating the corporate practice of medicine doctrine, "physicians typically bill patients for their professional services and then pay the MSO a management fee tied to the fair market value of the MSO's services." *GCM Partners*, 2020 WL 6867207, at *9 (citing Melesa Freerks et al., *Corporate Practice of Medicine- "A Bad Penny Always Turns Up,"* 20 J. Health Care Compliance 17, 18 (2018)).

Defendants respond by pointing to various allegations in GCM Partners' complaint suggesting that GCM Partners itself—not individual physicians—provided patients health care services. [191] at 5–6 (citing, for example, GCM Partners' allegation that it is a "state-of-the-art company that originally operated brick-and-mortar medical clinics *to treat patients*") (emphasis added). But while some of GCM Partners' allegations suggest that it took ownership over the physicians' practice of medicine, others suggest that the doctors were GCM Partners' independent contractors and that the doctors themselves—not GCM Partners—were providing medical services. *See, e.g.*, [187] ¶ 80 (describing that "Dr. Jassey was an independent contractor of GCM Partners"); *see also id.* ¶ 23 (describing Dr. Salzman as "a physician contracted through GCM"). Without the benefit of a more developed record,

the Court cannot conclude at this stage that GCM Partners engaged in the corporate practice of medicine. And even if it had, defendants have not shown that doing so would void this Agreement, as discussed above.

The Court therefore will resolve defendants' motion with the assumption that GCM Partners does not engage in the corporate practice of medicine.

## B. Computer Fraud and Abuse Act (Count I)

To state a claim under the CFAA, a plaintiff must allege (1) damage or loss (2) caused by (3) a violation of one of the substantive provisions set forth in § 1030(a), and (4) conduct involving one of the factors of harm set forth in § 1030(c)(4)(A)(i)(I)-(V), which includes $5,000 in losses over a one-year period. *See* 18 U.S.C. § 1030(g); *Segerdahl Corp. v. Ferruzza*, No. 17-cv-3015, 2019 WL 77426, at *4 (N.D. Ill. Jan. 2, 2019).

Three of § 1030(a)'s substantive provisions are relevant here. First, § 1030(a)(2)(C) imposes liability on a person or entity who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains … information from any protected computer." 18 U.S.C. § 1030(a)(2)(C). Second, § 1030(a)(4) penalizes a person or entity who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value." *Id.* § 1030(a)(4). And third, a person or entity violates § 1030(a)(5) when they "intentionally access[] a protected computer without authorization, and as a result of such conduct, recklessly cause[] damage; or … intentionally accesses a protected

7

computer without authorization, and as a result of such conduct causes damage and loss." *Id.* § 1030(a)(5)(B)–(C).

An individual "exceeds authorized access" when she "accesses a computer with authorization but then obtains information located in particular areas of the computer—such as files, folders, or databases—that are off limits to him." *Van Buren v. United States*, 593 U.S. 374, 396 (2021); *see also* 18 U.S.C. § 1030(e)(6). This means liability "stems from a gates-up-or-down inquiry—one either can or cannot access a computer system, and one either can or cannot access certain areas within the system." *Van Buren*, 593 U.S. at 390. The CFAA "does not cover those who … have improper motives for obtaining information that is otherwise available to them." *Id.* at 378.

Defendants argue that GCM Partners falls short of pleading that they either accessed a computer without authorization or exceeded their authorized access. [191] at 8–9. However, GCM Partners pleads that "defendants *knowingly exceeded their authorized access* to GCM Partners' Confidential Information and patient data and disable[d] GCM Partners' access to its own Confidential Information and patient data stored on the Leafwell platform." [187] ¶ 220 (emphasis added). Accepting this allegation as true and viewing it in the light most favorable to GCM Partners (as the Court must at this stage), the Court reasonably infers that Fisher and Online MD were not authorized to access the parts of the Leafwell system that (1) housed GCM Partners' confidential information, and (2) allowed defendants to switch off GCM Partners' access to the platform. To be sure, defendants' alleged improper motives

play no role in whether they exceeded their authorized access. *See Van Buren*, 593 U.S. at 378. But so long as GCM Partners pleads that defendants did exceed their authorized access, that is enough for now.

Other arguments defendants make are unavailing. As for Online MD, defendants say GCM Partners "admits in the [second amended complaint] that Online MD possesses an exclusive license to use the Leafwell platform." [191] at 8. That takes GCM Partners' allegation out of context; GCM Partners only alleges that "*Fisher has represented to this Court* that this transfer included Hipaaline's exclusive license to use the Leafwell platform." [187] ¶ 5 (emphasis added). Whether Online MD was in fact authorized to access the Leafwell platform post-Switchover is a question of fact to be decided at a later stage. And with respect to Fisher, defendants say GCM Partners' CFAA claim against her falls short because GCM Partners does not allege Fisher accessed a portion of the Leafwell platform she was not already authorized to access "prior to the Switchover." [191] at 8. But again, whether Fisher was initially authorized to access certain areas of the system—and whether that access changed after the Switchover—is a factual question to be determined at a later point. Defendants eventually may be able to offer facts to refute GCM Partners' allegations, but for now, the Court accepts as true that defendants exceeded their authorized access to the Leafwell platform.

Defendants also contend that GCM Partners fails to allege "damage" or "loss" under § 1030(g) because it "fails to allege that any computer, server, or data was impaired, corrupted, changed, or deleted like that resulting from the 'typical

consequences of hacking.'" [191] at 9 (quoting *Van Buren*, 593 U.S. at 392). But as GCM Partners points out, the statute defines "damage" as "any impairment to the … availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). Loss likewise may include "the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* § 1030(e)(11). "The statutory definitions of 'damage' and 'loss' thus focus on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data." *Van Buren*, 593 U.S. at 391–92. Here, GCM Partners straightforwardly alleges that, as a result of defendants' intrusion, it was "permanently unable" to access certain data from the Leafwell platform after its service was disabled, "thereby resulting in lost revenues, costs incurred due to an interruption in service, and costs associated with restoring or rebuilding the lost data." [187] ¶ 222. This is clearly sufficient under § 1030(e)(8)'s statutory definition of damage.[4]

Finally, defendants maintain that GCM Partners does not plausibly allege a CFAA claim under § 1030(a)(4). Specifically, defendants argue "there are no particularized fraud allegations pled against Fisher and Online MD relating to GCM Partners' loss of access to the Leafwell platform as a result of the Switchover." [191]

---

[4] The Court also disagrees with defendants' characterization that GCM Partners' damages arise from defendants "supposedly *continuing to access and use* GCM Partners' data to their commercial benefit." [194] at 6 n.6 (emphasis in original). GCM Partners' alleged injury goes beyond *defendants'* access; GCM Partners also alleges that *it* was "permanently unable to retrieve" certain data from Leafwell after defendants disabled its service. *See* [187] ¶ 222.

at 9–10. The Court disagrees. GCM Partners alleges with particularity exactly how defendants' activity "further[ed] the intended fraud." 18 U.S.C. § 1030(a)(4). It alleges, for example, that Fisher used the Switchover to "contact and usurp GCM Partners' existing patients and medical providers, and did indeed do so, as the patients and providers were already familiar with the Leafwell brand and platform but unaware of GCM Partners as an entity now separated from that brand." [187] ¶ 211.

In a recurring theme in their opening and reply briefs, defendants respond that this is not the proper venue to challenge the validity of the insolvency proceeding or the sale of Hipaaline's assets to Online MD. [194] at 5.[5] Even assuming GCM Partners were barred from mounting such a challenge, the Court does not understand GCM Partners to be challenging the validity of the insolvency proceedings. In addition, a premise of GCM Partners' allegations—not just in the CFAA context but in the context of other claims as well—is that Hipaaline's assets did not include GCM Partners' data.[6] Thus, even if a challenge to the sale of Hipaaline's assets were off-limits, those assets would not include the property of GCM Partners. When GCM Partners' allegations are more broadly (and fairly) construed, it is apparent that the

---

[5] In staking out this position, defendants point to statements by an earlier district court assigned to this matter. *See, e.g.*, [191] at 3. But if defendants intended to advance an argument under the law of the case doctrine, they never actually articulate one, and it is not this Court's responsibility to craft those arguments on defendants' behalf. *See Tyler v. Runyon*, 70 F.3d 458, 466 (7th Cir. 1995). Besides, the law of the case doctrine is discretionary, *see United States v. Harris*, 531 F.3d 507, 513 (7th Cir. 2008), and again, defendants advance no argument why it should be applied here.

[6] Consistent with that allegation, the previous district court noted that "Hipaaline's main assets, as determined for the insolvency proceedings, consisted of the goodwill, intellectual property, and content it generated for the Leafwell name." [89] at 8.

conduct alleged in GCM Partners' § 1030(a)(4) claim is rooted in the larger scheme by which "Fisher developed and implemented a plan to free her personal, economic interest in the Leafwell platform from Hipaaline's obligations to GCM Partners under the Agreement." [187] ¶ 140. Fisher may have used the insolvency proceedings to accomplish this goal, but that doesn't reduce GCM Partners' claim under § 1030(a)(4) to a mere challenge to those proceedings.

Defendants' motion to dismiss Count I is denied.

## C. Fraudulent Inducement Against Fisher (Count II)

To state a claim for fraudulent inducement under Illinois law, a plaintiff must allege: "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Hoseman v. Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003) (quoting *Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1341 (7th Cir. 1992)). GCM Partners alleges that Fisher fraudulently induced it to enter into the Agreement with Hipaaline by falsely representing in the Agreement that Hipaaline owned the Leafwell platform, even though Fisher personally owned it. *See* [187] ¶ 233 (Section 7.5 of the Agreement represented that "[c]onsultant [Hipaaline] owns and has full rights to use for the purposes of this agreement the domain name leafwell.co and subject matter appearing at that Web address as of May 1st, 2020").

The problem for GCM Partners is that it has no remedy for a fraudulent inducement claim against Fisher. "A claim of fraudulent inducement has one of two

remedies: rescission of the contract, or performance and a lawsuit for damages" under the contract. *On Command Video Corp. v. Roti*, No. 09 C 3130, 2010 WL 2740309, at *2 (N.D. Ill. July 12, 2010) (citing *Wilbur v. Potpora*, 123 Ill.App.3d 166, 171–72 (Ill. App. Ct. 1984)); *see also Wilbur*, 123 Ill.App.3d at 171–72 ("One induced to contract through fraud may at his election rescind the contract and recover the consideration that he has paid or affirm the contract and recover."). Here, GCM Partners seeks damages and not recission. [193] at 14–15. But a fraudulent inducement claim seeking damages lies in breach of contract, and Fisher was not a party to the Agreement between GCM and Hipaaline. *See Officer v. Duran*, No. 12 C 10195, 2014 WL 5439782, at *5 (N.D. Ill. Oct. 27, 2014). GCM Partners can only seek performance and damages from the party who allegedly breached the contract—in this case, Hipaaline.

Because GCM Partners has no remedy against Fisher for fraudulent inducement, the Court grants Fisher's motion to dismiss Count II.

## D. Tortious Interference with Prospective Economic Advantage (Count III)

To prevail on a tortious interference with prospective economic advantage claim in Illinois, a plaintiff must prove: "(1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 484 (1998). GCM Partners alleges that "Fisher caused Online

13

MD to purposely interfere and prevent GCM Partners' expectancies from being fulfilled by (i) disabling GCM Partners' access to the Leafwell online platform and (ii) usurping GCM Partners' customer base for her own benefit, as the sole shareholder of Online MD, without any compensation to GCM Partners." [187] ¶ 248.

Fisher argues she cannot be liable as an officer of Hipaaline for her pre-Switchover actions because GCM Partners' business expectancies arose out of the Agreement with Hipaaline, and "a party cannot tortiously interfere with … any business expectancies created by [its own] contract." *Heiman v. Bimbo Foods Bakeries Distribution Co.*, 902 F.3d 715, 720 (7th Cir. 2018) (cleaned up); *see* [191] at 13–15; *see also id.* at 13 n.7 (clarifying that this theory only applies to pre-Switchover conduct). Even if Fisher is right about that theory, GCM Partners' allegations are that Fisher committed tortious interference in her actions *after* the insolvency proceedings when Fisher was acting on behalf of Online MD, not Hipaaline. [187] ¶ 248 (alleging that Fisher caused *Online MD* to purposely interfere" by disabling GCM Partners' access to Leafwell and "usurping [GCM Partners'] customer base") (emphasis added).

Focusing then on Fisher's post-Switchover conduct on behalf of Online MD, Fisher argues she is shielded from liability because she acted on behalf of Online MD. [191] at 15. "[A]s legal figments, [corporations] act in the flesh and blood world through their agents" and in return "those agents are generally shielded from liability by the corporation for acts undertaken on its behalf." *Creation Supply, Inc. v. Cherrie*, 61 F.4th 511, 513 (7th Cir. 2023). "The privilege is conditional, meaning it will not

shield a corporate officer from liability if the reason a corporate officer interfered with a contract was either to further his personal goals or to injure a party to the contract, *and* his actions were not in the best interests of the corporation." *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018) (emphasis in original) (citing *Nation v. Am. Cap., Ltd.*, 682 F.3d 648, 653 (7th Cir. 2012)); *see also Creation Supply*, 61 F.4th at 513–14 ("So long as an agent acts in the corporation's interests, she is protected from liability for interfering in her principal's contractual affairs."). Despite earlier noting some ambiguity on this issue, *see, e.g.*, *Nation*, 682 F.3d at 652 n.2, the Seventh Circuit has more recently, and more definitively, asserted that it is a plaintiff's burden to plead facts overcoming the conditional privilege. *See Creation Supply*, 61 F.4th at 514; *see also Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 512 (1991).

GCM Partners does not plausibly allege that Fisher acted against Online MD's best interests when she disabled GCM Partners' access to Leafwell and continued its operations without compensating GCM Partners. Instead, GCM Partners asks the Court to apply a different standard altogether, which is whether Fisher's conduct was "malicious." [193] at 15–16 (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 156–57 (1989)). But while some older cases have allowed a plaintiff to overcome a privilege when they plead a defendant's conduct was "unjustified or malicious," *HPI*, 131 Ill. 2d at 156; *Fellhauer*, 142 Ill. 2d at 512, since then the Seventh Circuit repeatedly has articulated a different standard to overcome the corporate-officer privilege. That standard is the one described above, which requires a plaintiff to plead the defendant's actions were not in the best interests of

the corporation. *See Webb*, 906 F.3d at 577; *Nation*, 682 F.3d at 653; *Creation Supply*, 61 F.4th at 513–14; *TABFG, LLC v. Pfeil*, 746 F.3d 820, 825 (7th Cir. 2014); *Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 866–67 (7th Cir. 2009). Because GCM Partners has not pled that Fisher was acting contrary to Online MD's best interests, Fisher cannot be liable for tortious interference in her personal capacity.

GCM Partners also brings a tortious interference with prospective economic advantage claim against Online MD itself. *See* [187] ¶¶ 244–50. Under Illinois law, an entity's actions are privileged from tortious interference claims "when the business relation concerns a matter involving competition between the actor and the competitor." *A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1405 (7th Cir. 1992) (quoting *Mannion v. Stallings & Co.*, 149 Ill.Dec. 438, 445 (Ill. App. Ct. 1990)); *see also Gen. Motors Corp. v. State Motor Vehicle Rev. Bd.*, 224 Ill. 2d 1, 15 (2007) (recognizing competitor's privilege as "an affirmative defense to the tort of intentional interference with prospective business advantage"). The privilege "allows one to divert business from one's competitors … provided one's intent is, at least in part, to further one's business and is not solely motivated by spite or ill will." *Gen. Motors*, 224 Ill. 2d at 15.

GCM Partners maintains that the privilege does not apply because Online MD's actions were motivated by spite or ill will. *See* [193] at 17; *see also* [187] ¶ 250 (alleging that defendants' tortious interference was "willful and malicious"). For its part, Online MD says its disabling of the Leafwell system was "consistent with the

rights Online MD purchased and with its ongoing business" given that "Online MD had [no] obligation to GCM." [191] at 15–16.

The Court agrees with GCM Partners. GCM Partners and Online MD are not run-of-the-mill competitors battling for the same market share. The second amended complaint describes a plan—orchestrated by Fisher and ultimately carried about by Online MD—in which Fisher would place Hipaaline into U.K. insolvency proceedings, acquire Hipaaline's assets (and access to GCM Partners' information) but shed its liabilities, execute the Switchover, then continue operating as before without being bound by Hipaaline's former obligations to GCM Partners. [187] ¶ 140. In addition, GCM Partners alleges Fisher targeted another individual with a similar scheme, which was also the subject of a federal lawsuit. *See id.* ¶¶ 92–93. Taken as true, this alleged scheme was "not the kind of 'healthy competition' that the privilege protects." *Am. Wire Grp., LLC v. WTEC Holdings Corp.*, No. 23 CV 4678, 2024 WL 2019792, at *6 (N.D. Ill. May 4, 2024) (quoting *Talman Consultants, LLC v. Urevig*, No. 22 C 6540, 2023 WL 1451532, at *6 (N.D. Ill. Feb. 1, 2023)). The privilege therefore does not apply.

Online MD unsuccessfully raises two more arguments to undermine GCM Partners' claim of tortious interference with prospective economic advantage. It first argues that GCM Partners does not plead "a reasonable expectation of entering into a valid business relationship" because once Hipaaline "sold substantially all of its assets to Online MD, GCM could not expect to enter into any new patient relationships through a service it previously obtained from a now insolvent entity."

17

[191] at 16. But at this point in the proceedings, and without the benefit of discovery, the Court will not hold as a matter of law that it was unreasonable for GCM Partners to expect its access to Leafwell—and thus its ability to gain prospective clients—to continue, whether that expectation is assessed before or after Hipaaline was sold in insolvency proceedings.

Second, Online MD argues that "GCM fails to identify any specific patients (i.e. the business relationships that form the basis of Count III) with whom Online MD (or Fisher) interfered." *Id.* But the only opinion Online MD offers for that proposition took place at a later stage after the parties presented evidence during a bench trial. *See Intervisual Commc's, Inc. v. Volkert*, 975 F. Supp. 1092, 1095 n.1 (N.D. Ill. 1997). Online MD cites no case holding that GCM Partners must identify specific patients this early in the proceedings to state its claim.

Online MD's motion to dismiss Count III is denied. Fisher's motion to dismiss the same count is granted.

### E. Tortious Interference with Contractual Relationship (Count IV)

"To state a claim for tortious interference with contract, a plaintiff must allege facts sufficient to establish: (1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages." *Webb*, 906 F.3d at 577. GCM Partners alleges that Fisher and Online MD interfered with two contractual relationships: (1) its relationships "with active patients in need of medical cannabis to treat qualifying conditions," and (2)

GCM Partners' Agreement with Hipaaline to operate via the Leafwell platform. *See* [187] ¶¶ 252–53.

Fisher again argues that she is protected from this claim in her personal capacity by the corporate-officer privilege. The Court agrees for the same reasons already discussed in the previous count. *See supra* at 15–16.

That leaves GCM Partners' claim against Online MD. GCM Partners alleges that "Online MD interfered with GCM Partners' contractual relationships by engaging in Fisher's scheme to convey Hipaaline's assets to Online MD." [187] ¶ 256. But while Online MD as the entity surviving the transaction was certainly an instrumental part of the scheme to shed Hipaaline's liabilities, GCM Partners does not say how Online MD directed Hipaaline to breach the Agreement. *See George A. Fuller Co., a Div. of Northrop Corp. v. Chicago Coll. of Osteopathic Med.*, 719 F.2d 1326, 1331 (7th Cir. 1983) (liability "may only be premised on acts *immediately directed at a third party* which cause that party to breach its contract with the plaintiff") (emphasis added). GCM Partners vaguely asserts that Hipaaline breached the agreement "as a result of Online MD's conduct during the Switchover," [193] at 18, but it does not say what specific role Online MD played other than as a vehicle to carry on the business. GCM Partners also does not explain how Online MD could have caused Hipaaline to breach the Agreement during the Switchover when, by that point in time, Hipaaline's assets had been sold as part of the insolvency proceedings. *See* [194] at 12 (arguing that "[f]rom the point Hipaaline filed for insolvency, it was impossible for it to perform under the Agreement").

Indeed, GCM Partners' allegations suggest that it was Fisher—at that time acting on behalf of Hipaaline—who orchestrated the plan leading up to Hipaaline's eventual breach. *See* [187] ¶ 140 ("With the Court's injunction in place, *Fisher* developed and implemented a plan to free *her personal, economic interest* in the Leafwell platform from Hipaaline's obligations to GCM Partners.") (emphases added); *see also id.* ¶ 148 (alleging that "Fisher, *as Hipaaline's CEO*, placed Hipaaline into administration in the United Kingdom") (emphasis added). GCM Partners does not plausibly allege that Online MD itself did anything to cause Hipaaline's breach or "had any role in" Hipaaline's insolvency filing. [191] at 18.

To the extent GCM Partners alleges Online MD tortiously interfered with its "contractual relationships with patients," [187] ¶ 254, that theory also fails. GCM Partners does not allege the basic details necessary to state a claim—for example, that the patients breached any contracts or that Online MD somehow interfered to cause such a breach.

The Court grants defendants' motion to dismiss Count IV.

## F. Defend Trade Secrets Act & Illinois Trade Secrets Act (Counts V & VI)

The DTSA creates a private cause of action for "an owner of a trade secret that is misappropriated … if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Because the analysis is the same under the DTSA and the ITSA, the Court considers the two claims together. *See Sonrai Sys., LLC v. Waste Connections, Inc.*, 658 F. Supp. 3d 604, 613 (N.D. Ill. 2023). To state a trade secret claim under the DTSA or ITSA, GCM

Partners must allege the "(1) existence of a trade secret; (2) that a Defendant misappropriated; and (3) used in the Defendant's business." *Id.* (citing *UTStarcom, Inc. v. Starent Networks, Corp.*, 675 F. Supp. 2d 854, 864 (N.D. Ill. 2009)).

### 1. Trade Secrets

Defendants first argue that GCM Partners fails to plead the existence of a trade secret. [191] at 20–23. "The DTSA defines a trade secret as business-related information that the owner of which has taken reasonable measures to keep secret and from which the owner derives economic value from the information not being generally known or readily ascertainable by others who could gain an economic advantage from the information." *Busey Bank v. Turney*, No. 21 C 2900, 2022 WL 92940, at *5 (N.D. Ill. Jan. 10, 2022) (citing 18 U.S.C. § 1839(3)). The ITSA defines a trade secret as:

> information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 Ill. Comp. Stat. 1065/2(d).

GCM Partners identifies nine sources of trade secrets in its second amended complaint. *See generally* [187] ¶ 260. These include "pricing structure of payments by GCM Partners to its medical providers"; "contact and licensing information of existing and prospective medical providers"; "revenue figures"; "logs of patient activity on the Leafwell platform"; "patient data and identifying information,

21

including, but not limited to, protected health information"; "marketing and partner strategy and targets"; "identity of referral partner or source of lead generation"; "medical providers' charts and notes"; and "medical provider activity on the Leafwell platform." *Id.* GCM Partners pleads that, "[b]ecause of the value of the information, which [it] has spent a significant amount of time and invested substantial resources developing, GCM Partners restricts access to such information and requires that it be kept confidential." *Id.* ¶ 265; *see also id.* ¶ 261 (describing the various measures GCM Partners has taken to protect its confidential information).

Defendants argue that none of these nine categories supports a DTSA and ITSA claim, but the Court finds GCM Partners' pleadings sufficient. For example, as to information about GCM Partners' pricing structure with doctors, defendants only argue that the pricing structure itself violates the corporate practice of medicine doctrine. *See* [191] at 20. But for the reasons already discussed, *see supra* at 4–7, the Court will not decide at this juncture whether that doctrine bars GCM Partners from seeking relief. Defendants also argue that the contact and licensing information of medical providers "is publicly available information and therefore 'readily ascertainable by others.'" [191] at 20 (quoting *Busey Bank*, 2022 WL 92940, at *5). However, whether this information is publicly available and readily ascertainable is a question of fact that the Court cannot determine from the face of GCM Partners' complaint. For now, the Court accepts as true GCM Partners' allegation that the information "is not generally known outside of GCM Partners and is valuable as a result." [187] ¶ 264; *see also Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342

F.3d 714, 723 (7th Cir. 2003) ("[T]he question of whether certain information constitutes a trade secret ordinarily is best resolved by a fact finder after full presentation of evidence from each side.") (cleaned up). The Court is satisfied that GCM Partners pleads enough to state a claim on at least one of its nine categories of trade secrets.

### 2. Misappropriation

Defendants next argue that GCM Partners fails to allege a "misappropriation" of trade secrets. [191] at 23–24. A plaintiff may allege misappropriation under the DTSA by pleading that a defendant "acquired a trade secret knowing or with reason to know that it was acquired by improper means." *Sonrai Sys.*, 658 F. Supp. 3d at 616 (citing 18 U.S.C. § 1839(5)(A); 765 Ill. Comp. Stat. 1065/2). Misappropriation under the DTSA can also include "use of a trade secret of another without express or implied consent" under certain conditions, for example when at the time of use the person "knew or had reason to know" the trade secret was derived through "improper means." *Id.* § 1839(5)(B)(ii)(I). Under the ITSA, "'misappropriation' can be shown in one of three ways: improper acquisition, unauthorized disclosure, or unauthorized use." *Traffic Tech, Inc. v. Kreiter*, No. 14-CV-7528, 2015 WL 9259544, at *12 (N.D. Ill. Dec. 18, 2015) (citing 765 Ill. Comp. Stat. 1065/2(b)).

The DTSA defines "improper means" as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A). Improper means do not include any "lawful means of acquisition." *Id.* § 1839(6)(B).

23

GCM Partners says a misappropriation occurred when defendants "improperly acquired GCM Partners' trade secret information" by "engineering the conveyance of substantially all of Hipaaline's assets, including the Leafwell platform, to Online MD" through the U.K. insolvency proceedings. [187] ¶ 267; *see also* [193] at 21. GCM Partners further alleges that Hipaaline's access to GCM Partners' trade secrets was subject to the Agreement, "which required Hipaaline, and anyone through whom Hipaaline might act, to maintain the confidentiality of the trade secret information on the Leafwell platform." [187] ¶ 266. According to GCM Partners, Fisher and Online MD "knew or had reason to know that Hipaaline did not have the right under the Agreement to convey GCM Partners' trade secret information to the purchaser of the Leafwell platform." *Id.* ¶ 268. GCM Partners also pleads that "Fisher and Online MD have taken complete control over and has used GCM Partners' trade secret information" for their commercial benefit. *Id.* ¶¶ 270–71.

Defendants maintain that because Online MD acquired the alleged trade secrets through the U.K. insolvency proceedings and those proceedings were a "lawful means of acquisition" under § 1839(6)(B), there can be no misappropriation. [191] at 24. But even assuming the legitimacy of the U.K. insolvency proceedings, no Court has ever decided the lawfulness of the larger scheme in which GCM Partners alleges Fisher participated to "usurp GCM Partners' existing patients and medical providers." [187] ¶¶ 114, 211. As described in more detail below, *see infra* at 26–27, for now the Court credits GCM Partners' argument that its patient data "never belonged to Hipaaline" and therefore should not have been transferred to Online MD

as part of the insolvency proceedings. [193] at 23; *see also id.* at 10 & n.3 (arguing, without subsequent rebuttal from defendants, that "[n]othing about the UK insolvency does (or could) change" the fact that defendants accessed data they were not permitted to access). Viewing Fisher and Online MD's allegations in the light most favorable GCM Partners, GCM Partners plausibly pleads that Online MD acquired its data using improper means. Because the Court finds these allegations sufficient, it does not reach GCM Partners' argument that the inevitable disclosure doctrine applies. *See id.* at 22–23.

The Court denies defendants' motion to dismiss Counts V and VI.

### G. Unjust Enrichment (Count VII)

"To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI*, 131 Ill. 2d at 160. GCM Partners alleges that, after the Switchover, defendants "have unjustly retained the benefit of GCM Partners' patient relationships and goodwill with patients, GCM Partners' trade secrets, and the profits GCM Partners would have realized from the Agreement." [187] ¶ 289.

Defendants argue that GCM Partners' unjust enrichment claim is another attempt to attack the validity of the U.K. insolvency proceedings. But as GCM Partners explains, its unjust enrichment claim is not based entirely on Hipaaline's sale of its assets to Online MD and its failure to abide by the terms of the Agreement.

25

*See* [193] at 23–24. Instead, GCM Partners claims that Online MD has been unjustly enriched because it acquired GCM Partners' confidential information which "never belonged to Hipaaline" and therefore should not have been transferred to Online MD as part of the insolvency proceedings.[7] *Id.* at 23; *see also id.* at 24 ("[T]he Agreement did not give Hipaaline authority to convey GCM's property, and the Defendants do not argue that it did.").

Neither of defendants' responses to this theory of unjust enrichment are persuasive. They first argue that "GCM cannot have patient relationships since it is not authorized to practice medicine." [194] at 15. As discussed, the Court will not dismiss GCM Partners' claims on this ground. *See supra* at 4–7. Nor is the Court convinced by defendants' argument that "patients are not bound to seeing any one doctor." [194] at 15. Defendants cite no authority for the proposition that usurping a company's patient base cannot support a claim for unjust enrichment, even though

---

[7] Although defendants say GCM Partners' unjust enrichment claim is "yet another belated challenge to the UK insolvency proceeding," [194] at 15 n.11, they (again) do not support this argument with any binding authority, [191] at 25. For example, courts have found unjust enrichment claims are preempted by the bankruptcy code where they would "allow the trustee or a creditor to make an end run around the bankruptcy code's allocation of assets and losses." *Grede v. FCStone, LLC*, 746 F.3d 244, 259 (7th Cir. 2014); *see also Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 426 (6th Cir. 2000). Here, however, defendants do not frame their argument in federal preemption principles, nor do they offer a specific provision of U.K. insolvency law that would directly conflict with GCM Partners' unjust enrichment claim. *C.f. Petr Tr. for BWGS, LLC v. BMO Harris Bank N.A.*, 95 F.4th 1090, 1103 (7th Cir. 2024) (holding that § 546(e) of the bankruptcy code "preempts state law claims to recover the value of transfers shielded by the safe harbor"); *In re Repository Techs., Inc.*, 601 F.3d 710, 723 (7th Cir. 2010) (for purposes of complete preemption, the court could not "identify any [Bankruptcy] Code provision that provides an 'exclusive cause of action' for the defendants' alleged filing for bankruptcy for the unlawful purpose of enriching themselves"); *see also id.* at 724 (the bankruptcy code "does not provide such comprehensive, express remedies for a creditor … allegedly harmed by a debtor's abusive, voluntary bankruptcy petition"). For such a significant point in defendants' motion, it is remarkably underdeveloped. *See also supra* at n.5.

26

patients often have a choice to seek care elsewhere. Given the circumstances alleged, it is plausible that customers who only interface with the Leafwell brand would not recognize a difference between services provided through GCM Partners and Online MD. *See* [187] ¶ 211 (alleging that "patients and providers were already familiar with the Leafwell brand and platform but unaware of GCM Partners").

Defendants also argue that GCM Partners did not have any trade secrets that could be transferred. *See* [194] at 15. But whether the information alleged technically qualifies as "trade secrets" under the DTSA and ITSA, the Court accepts as true GCM Partners' allegation that it lost patient relationships, goodwill, and certain confidential information that GCM Partners details in its earlier allegations. *See* [187] ¶ 289 (alleging loss of patient relationships and goodwill); *see also id.* ¶ 260 (alleging the specific information Online MD acquired from GCM Partners as a result of the Switchover).[8] For now, that is enough to state a claim for unjust enrichment.

## CONCLUSION

The Court grants in part and denies in part defendants' motion to dismiss. [191]. To summarize: GCM Partners has stated claims under the CFAA, tortious interference with prospective economic advantage against Online MD, the DTSA and ITSA, and unjust enrichment. GCM Partners' remaining claims are dismissed with prejudice. *See Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 347 (7th Cir.

---

[8] Because GCM Partners roots its unjust enrichment claim in more than just its lost profits under the Agreement, the Court need not address defendants' argument that GCM Partners could not expect future profits under the Agreement given Hipaaline's insolvency. *See* [194] at 15. Moreover, because the Court finds GCM Partners has stated a claim under other causes of action, the Court need not address defendants' argument that unjust enrichment is not a standalone cause of action under Illinois law. *See* [191] at 25 n.10.

2012) ("[A] district court is not required to grant [leave to amend] when a plaintiff has had multiple opportunities to state a claim upon which relief may be granted.").

Defendants have until 9/19/25 to answer GCM Partners' second amended complaint. *See* Fed. R. Civ. P. 12(a)(4)(A). The parties are directed to appear on 9/26/25 at 9:30 a.m. for a status hearing to discuss next steps in the case, including to provide a recap of any discovery already conducted, to propose a timeline for remaining discovery, and to discuss any mutual interest for a settlement conference. In advance of the status hearing, the parties are directed to meet and confer on these issues.

Georgia N. Alexakis
United States District Judge

Date: 9/5/25

28