# Exhibit A

# Deposition Transcript

Case Number: 1:20-cv-06401
Date: August 6, 2026

In the matter of:

## GCM PARTNERS, LLC v ONLINE MD LTD, et al.

## JONATHAN MRAUNAC

CERTIFIED COPY

Reported by:
Vernetta H. McCree

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GCM PARTNERS, LLC, an Illinois )
Limited liability company, )
)
Plaintiff, )
)
VS )No. 1:20-cv-06401
)
ONLINE MD LTD., a limited company )
of England and Wales and )
EMILY ARIDA FISHER, )
)
Defendant. )

The deposition of JONATHAN MRAUNAC, taken pursuant to the provisions of the Rules of the Supreme Court of the State of Illinois pertaining to the taking of depositions for the purpose of discovery, taken before Ms. Vernetta McCree, Notary Public and Certified Shorthand Reporter in the County of Will, State of Illinois at the law offices of HAYNES BOONE, 180 N. LaSalle Street, Suite 2215, Chicago, IL 60601 on the 6th day of August, A.D., 2026 at 10:52 a.m.

APPEARANCES:

MR. JONATHAN MRAUNAC
General Counsel,
GCM, LLC

HAYNES and BOONE LLP
One Financial Center
Suite 1100
Boston, MA 02111
(617) 598-2422
Brett.walker@haynesboone.com
Appeared on behalf of the Defendant,
Emily Fisher.

# INDEX

JONATHAN MRAUNAC,

Direct Examination..............................4

## EXHIBITS


| Number | Description | Page |
|---|---|---|
| 1 | Notice of Deposition Jonathan Mraunac | 11 |
| 2 | Second Amended Complaint | 11 |
| 3 | Mraunac Declaration | 11 |
| 4 | LLC Filing GCM, LLC | 20 |
| 5 | License lookup Gavrilos | 23 |
| 6 | Excerpts of transcript of 10-30-2020 hearing | 63 |
| 7 | Independent Contractor Agreement - Maria Garelick | 100 |
| 8 | Independent Contractor Agreement - Anshi Thapilyal | 100 |
| 9 | Independent Contractor Agreement - Tammy Tucker | 103 |
| 10 | Exclusive Marketing Agreement - GCM-Hipaaline | 111 |
| 11 | Draft Agreement | 115 |
| 12 | Marketing Agreement GCM-Hipaaline 2019 | 115 |
| 13 | Letter from Martin Carroll | 119 |
| 14 | Annual Report GCM Partners | 123 |

EXHIBITS


| | | |
|---|---|---|
| 15 | Assumed name applications | 128 |
| 16 | Declaration - Gavrilos | 147 |
| 17 | Correspondence from Holland & Knight | 187 |


(Exhibit 14 was not provided at the time of production)

VIDEOGRAPHER: Good morning. We are on the record. The time is 10:52 a.m. Central Time. Today is Thursday, August 6th, 2026, at the beginning of the deposition of Jonathan Mraunac in the matter of GMC Partners, LLC vs Online MD LTD, et al. The case is venued in the United States District Court of the Northern District of Illinois, Eastern Division. Case number is 1:20-cv-06401. This deposition is taking place at Haynes Boone, 180 North LaSalle Street, Chicago Illinois. Legal videographer is Robert Zimay on behalf of Steno. The court reporter is Vernetta McCree also here on behalf of Steno. Counsel, please identify yourselves and state whom you represent.

MR. WALKER: On behalf of Emily Fisher, Attorney Brett Walker, and I'm from Haynes Boone.

MR. MRAUNAC: Jonathan Mraunac for the deponent, General Counsel, GCM Partners.

VIDEOGRAPHER: Thank you. Will the reporter please swear the witness?

(Witness sworn)

JONATHAN MRAUNAC,

After having been first duly sworn, on oath, deposes and testifies as follows:

DIRECT EXAMINATION

BY MR. WALKER:

Q. Good morning to you, Mr. Mraunac. And, I just want to make sure I'm pronouncing the name right. It's Mraunac, is that correct?
A. Yes.
Q. May I ask you to please state your name and spell, please, your first and last name, for the record?
A. Jonathan Mraunac, J O N A T H A N M R A U N A C.
Q. Very good. Now, I know you're an experienced attorney, and I know you've done many, many depositions, so you know all the rules here. But, I still feel as though it's necessary for me to just go over a few of our ground rules here. And, the first one is that you; of course, are invited to bring counsel to this deposition if you choose to do so. It looks as though while you have brought a representative of * client or I'm sorry -- of the Plaintiff GMC Partners, but you've not brought an attorney with you, is that correct?
A. Yes.
Q. Okay. But, you, yourself; of course, are an attorney in good standing, and have been for quite sometime?
A. Yes.

10:54 Q. Now, we are here on a deposition, which means that there are rules, but they are relaxed rules. And, inasmuch as we want to put objections onto the record, and note certain issues for potential litigation at a later time, you're invited to do so. But, the expectation is after having made such a record, we'll all move on with the deposition, is that your understanding and expectations also?
10:55 A. It depends on the question, but I understand what you're getting at.
10:55 Q. Okay. Now, presumably you are going to be attempting to not only testify as the deponent today, but also to assert certain objections and assert certain privileges, is that correct?
10:55 A. Yes.
10:55 Q. I trust you've done many depositions in the past, I'm sorry, as an attorney in the past?
10:55 A. Yes, I've been in many depositions, yes.
10:55 Q. And, you're well familiar with the customs of the practice, inasmuch as you can ask for a break at any time that you choose the do so. It can be for any reason or no reason at all. If you do not understand my questions, I ask that you tell me, inasmuch, so that I can ask the question in a better way, or at least a way that makes more sense to you.

10:56 Do you understand and agree to both of those?
10:56 A. I understand what the rules are, yeah.
10:56 Q. And, I am now going to go through just a few preliminary questions. And, please understand that these are questions that I ask of, not about every deponent. And, they are not personalized to you. I ask that you not take any of them personally, just understand I typically ask these of most deponents. So, to begin with, are you suffering from any medical condition today that would affect your ability to remember or to communicate your memories?
10:56 A. No.
10:56 Q. Are you under the influence of any sort of medication or narcotic right now, be it prescribed or otherwise, that would prevent you from being able to process thoughts and communicate them appropriately?
10:57 A. No.
10:57 Q. Have you taken any alcohol, have you partaken in any alcohol in the last 12 hours?
10:57 A. No. You didn't ask about other drugs, right?
10:57 Q. Well, I'm going to -- I'm trying to find out the right way to ask this. Are you using any other sort of intoxicant right now through a certified or prescribed circumstance that would in any way

10:57 affect your ability to remember or recite information?
10:57 A. No.
10:57 Q. Any time -- I believe you graduated in
10:57 college in 2004, is that correct?
10:57 A. Yes.
10:57 Q. Any time since you graduated college in
10:57 2004, have you been convicted of a crime?
10:57 A. No.
10:57 Q. Misdemeanor or felony.
10:58 A. No.
10:58 Q. Have you have ever, yourself, been deposed
10:58 before?
10:58 A. No.
10:58 Q. Have you ever, yourself, been a defendant
10:58 in a civil lawsuit?
10:58 A. No.
10:58 Q. Have you ever, yourself, been a Plaintiff
10:58 in a civil lawsuit?
10:58 A. Yes.
10:58 Q. And, how many lawsuits?
10:58 A. One.
10:58 Q. And, is it fair to say that the contracted
10:58 GCM Hipaaline agreement contract constituting Exhibit
10:58 3 of the Second Amended Complaint for this case, the
10:58 one that's at the center of this controversy, that was

your idea?
A. Objection, vague. Objection, work product. Objection, attorney/client privilege.
Q. Even though, it's written into the complaint that it was your idea?
A. Objection, vague.
Q. Are you familiar with the GCM Hipaaline agreement contract that is Exhibit 2 of the second amended complaint?
A. I thought you said it was Exhibit 3.
Q. I did not.
A. I'm familiar with the agreement, yeah.
Q. Was that your idea?
A. Objection, vague. The parties entered in an agreement.
Q. Do your best to answer.
A. The parties entered an agreement.
Q. Well, could you do your best to answer that question even if you think it's vague, can you do your best to answer, was it your idea for, to enter into a formal written agreement that became the GCM Hipaaline contract?
A. I still think there's an objection to attorney/client privilege as to what I might have recommended that GCM do.

10:59 Q. Okay. Even if that same statement appears in the second amended complaint?
10:59 A. Why don't you read from the complaint and I can give you an answer based on that.
11:00 Q. And, we'll get there. But, for right now, you don't understand the question.
11:00 A. I personally wanted there to be a written agreement for the transaction.
11:00 Q. Okay. Can I ask that this be Exhibit 1?
11:00 (WHEREUPON, Exhibit No. 1 was marked for Identification)
11:00 Q. All right. Mr. Mraunac, may I please ask you to take a look at what is now marked as Exhibit 1, are you familiar with this notice of deposition?
11:01 A. I've seen it before.
11:01 Q. And, is that what brought you here today?
11:01 A. By agreement on the date and time, yes.
11:01 Q. And, I think we're jumping ahead of my script a little bit, but since you asked about it, might as well just do it now. So, I'm going to offer Exhibits 2 and 3.
11:02 (WHEREUPON, Exhibits 2 and 3 were marked for Identification)
11:02 Q. May I ask if you could please take a look at Exhibits 2 and 3, tell me if you have any

familiarity with these documents?
A. 2 looks like the second amended complaint, 3 looks like it's incomplete, but yeah, I know what this is.
Q. All right. What is 3?
A. It's my declaration.
Q. And, that was submitted in support of the second amended complaint?
A. Yes.
Q. You said it's incomplete, what do you believe to be missing?
A. I'm looking at the page ID, you handed me a 2 page document, but the header from the file stamp says page 2 of 8, the second page says page 3 of 8.
Q. But -- do you believe that there's other parts -- so, you're talking about the part that was marked on there by the court, by the clerk?
A. Yes.
Q. The heading that was put on there by the clerk, but is there any part of your attestation there that is missing?
A. No, it looks fine.
Q. Can I ask you to take a look at paragraph 36 within Exhibit 2 there?
A. Okay.

Q. And then, also I think paragraph 37 that follows.

A. I see it.

Q. Having refreshed your memory reading paragraphs 36 and 37 of the second amended complaint constituting Exhibit 2, do you believe it was your idea to create a formal written contract between Hipaaline and GCM?

A. Objection, privileged, and objection, work product.

Q. All right. So, the privilege is being asserted on something that was entered on the second amended complaint.

A. You've asked me Brett, whether it was my idea, and paragraph 37 says I recommended that those are different things.

Q. Right, but I'm asking -- you're asserting a privilege on this question even though it is stated right there in the second amended.

A. I just explained to you why the question can't be answered. You asked me if it was my idea and paragraph 37 says it was my recommendation. I couldn't recommend something that was someone else's idea.

Q. Okay. Now, I believe you graduated law

11:04 school in the year 2007, is that correct?

11:04 A. Yes.

11:05 Q. Would you be so kind as to walk me through your career since 2007?

11:05 A. I was licensed in November of '07. I worked in contract capacity for a handful of months beginning in 2008 in Chicago -- no, that's not right, let me back up. My first role was as a law clerk with the Chicago Park District that began sometime in early '08. I did that through November or December of 2008. After that, I had a contract position for a handful of months. Beginning in spring of '09, I began working for a law firm called Fuksa Khorshid, F U K S A, K H O R S H I D, and I worked there as an associate from, I think it was March of 2009 through June of 2011. In June of 2011, I began working for Foran Glennon, Palandech Ponzi & Rudloff. I was an associate there until April of 2014. In April of 2014, I began as * Counsel for Ogletree Deakins. I worked there in that capacity until May of 2020. I joined GCM Partners in May of 2020.

11:06 Q. And, there's one other firm, though, isn't there?

11:06 A. You want to date?

11:06 Q. Yes.

A. Is that what you're asking?
Q. Yes.
A. I ran a solo private practice concurrently with GCM Partners part-time, Mraunac and Associates was the entity. And, in July of 2025, I began working for Amundsen Davis, LLC.
Q. The solo firm you ran, the name of that firm was?
A. Mraunac and Associates LLC.
Q. Was that law firm ever named as a defendant in a lawsuit?
A. Yes.
Q. And, how many was that?
A. Once.
Q. What was the name of the Plaintiff on that matter?
A. I'll have to take that back. Mraunac and Associates was the Plaintiff in one matter against a former client.
Q. And, who was the former client?
A. Ramin, R A M I N, Ghayoori, G H A Y O O R I.
Q. So, did Mraunac and Associates service other clients beyond GCM?
A. It did not service GCM Partners, it served

11:08 clients other than GCM Partners.
11:08 Q. *My apologies.
11:08 A. Independently.
11:08 Q. And, how many associates were at Mraunac and Associates?
11:08 A. None.
11:08 Q. I see that in the year 2018, you wrote a piece on medical marijuana in the workplace. Is that correct?
11:08 A. I don't remember.
11:08 Q. Do you remember writing a piece on medical marijuana in the workplace?
11:08 A. Maybe in connection with Ogletree Deakens maybe, yeah, I'd have to see it, but I don't know.
11:08 Q. When did you first become interested in medical marijuana law?
11:08 A. Probably as I got to know George Gavrilos, and learn that he was working in the field.
11:09 Q. How many published legal pieces have you authored or contributed to the authorship of?
11:09 A. On any topic?
11:09 Q. Yeah, on any topic?
11:09 A. I don't know.
11:09 Q. More than one?
11:09 A. Yes.

11:09 Q. Less than 10?
11:09 A. Not sure.
11:09 Q. And, have any of them had to do with medical marijuana?
11:09 A. At least one, I take it.
11:09 Q. But, you have no memory of that?
11:09 A. No, not as we sit here.
11:09 Q. Now, I believe you told me that in the year 2018, you were of counsel at Ogletree, is that correct?
11:09 A. Yes.
11:09 Q. And then, what was your work situation like during the Covid 19 pandemic, so 2018 through 2020, you remained of counsel at Ogletree throughout that time period?
11:10 A. Yeah, I left Ogletree Deakens in May of 2020.
11:10 Q. And, in what year were Mraunac and Associates a going concern, as it were?
11:10 A. Maybe I started it that fall.
11:10 Q. Which fall?
11:10 A. October, November, 2020.
11:10 Q. October, November of 2020?
11:10 A. That's in the public record, whenever I formed the entity, that's when I started doing it.

11:10 Q. And, how long did Mraunac and Associates remain an active law firm?
11:10 A. I stopped actively taking clients and advising clients when I joined Amundsen Davis.
11:10 Q. And, that was 2025, July of 2025?
11:10 A. Yes. For obvious reasons.
11:11 Q. I'm not sure what the obvious reasons are, I'm lost on the reason. What's the reason?
11:11 A. Joining a law firm, I was precluded from running my own law firm.
11:11 Q. But, you continued to serve as the general counsel for GCM Partners, is that correct?
11:11 A. Yes.
11:11 Q. So, bringing your attention to your Exhibit 3 there which is your March 19 affidavit. There you said you've been working continuously as a lawyer since the year 2007, that's correct, right?
11:11 A. Yes.
11:11 Q. And, you've just walked me through your legal career, going from law clerk to short period as a contract attorney to being an associate at two different firms to being of counsel at a firm to now being a partner, you're not a partner, right, of counsel?
11:12 A. Senior counsel.

11:12 Q. Senior counsel. And, you had one solo practice that was Mraunac and Associates, is that correct?
11:12 A. Yes.
11:12 Q. But, I guess aside from the law clerk position, you haven't worked for any government entities in a lawyers's capacity?
11:12 A. I have not.
11:12 Q. At any of these prior firms, did you handle any cases that involved medicinal marijuana or cannabis?
11:12 A. No.
11:12 Q. And, at your current firm, you focus more on construction law, mostly on construction law, is that correct?
11:12 A. It's one of the areas that I practice in.
11:12 Q. At your current firm, are you doing any sort of medicinal marijuana or cannabis law?
11:12 A. No.
11:12 Q. When, for any of these law firms, past or present or even your solo firm, did you have any cases that involved health care law?
11:13 A. I don't think so, I don't know for sure.
11:13 Q. Aside from GCM Partners, have you spent any time as an in-house counsel?

11:13 A. No.
11:13 Q. Now, you gave us a prelude here, but what, when did you first learn about GCM Partners?
11:13 A. I don't know.
11:13 Q. Well, was it sometime before 2016?
11:14 A. I don't think it existed then, I don't remember.
11:14 Q. Was it sometime before 2017?
11:14 A. I don't know.
11:14 Q. So, it might have been in 2017?
11:14 A. I mean, you're using GCM Partners.
11:14 Q. I am.
11:14 A. I don't know when the entity was formed off the top of my head. That would give you a sense of when I learned about it.
11:14 Q. Okay. Well, let's see if we can do something to refresh your recollection here. May I ask if this could please be marked as Exhibit 4?
11:14 (WHEREUPON, Exhibit No. 4 was marked for Identification)
11:14 Q. Could I ask you to please take a look at what has been marked as Exhibit 4, and let me know if you've ever seen that before?
11:15 A. Yes.
11:15 Q. And, what is Exhibit 4?

11:15 A. It's an articles of organization with the Illinois Secretary of State.
11:15 Q. And, how is it that you are familiar with that?
11:15 A. I assisted GCM Partners in creating the entity.
11:15 Q. So, you contributed to the filing of what is now Exhibit 4?
11:15 A. Objection, vague. But, yes, this was formed while I had a relationship with George Gavrilos.
11:15 Q. Now, how did you come into having a relationship with Dr. George Gavrilos?
11:15 A. We met as members of the associate board for make a wish foundation.
11:15 Q. And, just for the record, can I please ask you to spell Dr. Gavrilos' name?
11:15 A. G E O R G E, G A V R I L O S.
11:15 Q. So, you were sitting on the board for make a wish?
11:16 A. The associate board for make a wish.
11:16 Q. The associate board. And, that's how you came to meet Dr. Gavrilos?
11:16 A. Yes.
11:16 Q. When was that?

11:16 A. I believe he joined in 2018. I joined the year before.
11:16 Q. And, at that time, 2018, when he joined the board, what did you understand his profession to be?
11:16 A. He worked in cardiac critical care, still does.
11:16 Q. In what capacity?
11:16 A. He's a PharmD, and my general understanding of it is he has expertise in cardiac care in connection with serious cardiac conditions.
11:16 Q. And, I used the term PharmD and I assume that's P H A R M, pharmaceutical, can you extrapolate a bit on PharmD?
11:17 A. Not really.
11:17 Q. Do you know what PharmD means?
11:17 A. Not in a technical sense, no.
11:17 Q. Do you know the full term?
11:17 A. No.
11:17 Q. Do you know if he is a physician?
11:17 A. Objection, vague.
11:17 Q. Well, can you do your best to answer the question, objection is on the record. Now, the question is, do you know if Dr. Gavrilos is a physician?

11:17 A. This is in our answer, Dr. Gavrilos is not an MD or a DO, he's a PharmD.
11:17 Q. I was asking if he's a physician.
11:17 A. No.
11:17 Q. Are we on 5?
11:17 COURT REPORTER: Yeah.
11:17 Q. May I offer this as Exhibit 5, please?
11:18 (WHEREUPON, Exhibit No. 5 was marked for Identification)
11:18 Q. All right. Can I ask you to take a look at Exhibit 5, do you have any familiarity with that?
11:18 A. I know what it is.
11:18 Q. And, what is it?
11:18 A. It's an IDFPR record and specifically for George Gavrilos.
11:18 Q. How is it that you come about having familiarity with documents such as this?
11:18 A. Working as an attorney I understand how to access public information, and I'm familiar with the IDFPR license, *look up function.
11:18 Q. And, indeed, is that something you've ever used before in regard to GCM?
11:18 A. Yes.
11:18 Q. For what purpose?
11:19 A. You mean before today?

11:19 Q. Yes.
11:19 A. Yes. I've looked up life insurance for a number of people in connection with working with GCM Partners.
11:19 Q. And, are you mostly related to medical licenses?
11:19 A. Mostly.
11:19 Q. So, could you please, I'm going to go back to 2018, when you first met Dr. Gavrilos, and ask how it is that you came to learn about GCM Partners through him?
11:19 A. I didn't learn about GCM Partners through George.
11:19 Q. Okay. Well, how did you learn of it?
11:19 A. We created it, by the Exhibit that you just showed me, Exhibit 4.
11:19 Q. And, when was that?
11:19 A. It's on the Exhibit, October 5th, 2018.
11:19 Q. And, that's accurate?
11:20 A. It's the Secretary of State's record, so I presume it is.
11:20 Q. But, is that, in keeping with your own memory?
11:20 A. It must be, it doesn't matter what I remember, this is when the organi -- the LLC was

formed.

Q. Well, it does matter if you remember it. Do you remember forming GCM Partners, LLC, in October of 2018?

A. Yes.

Q. And, for what purpose was GCM Partners, LLC formed?

A. To conduct the business that Dr. Gavrilos and Dr. Salzman were running.

Q. Who's Dr. Salzman?

A. Objection, vague.

Q. Well, could you do your best to answer?

A. His name is Steven L Salzman.

Q. Okay. What's his profession?

A. He is a physician.

Q. And, how did you come to meet him?

A. Through Dr. Gavrilos.

Q. So, you never knew him before meeting Dr. Gavrilos?

A. I did not.

Q. Was he already familiar with Dr. Salzman and Dr. Gavrilos already familiar with one another prior to 2018?

A. Yes.

Q. Were they already working together?

A. Yes.
Q. And, were they working together in emergency cardiac care?
A. I don't believe so. At some point they were, but not when I met them.
Q. Were they working together on any sort of project that involved or any sort of business that involved medicinal cannabis?
A. Yes.
Q. Did they have a name for that?
A. I don't know.
Q. So, when did you first start discussing the formation of GCM Partners?
A. I don't know.
Q. Do you believe it to have been around the exact same day you will filed for the LLC or was it months preceding?
A. I don't know.
Q. You don't know or you can't remember?
A. I don't remember. I knew at one time because we did it. I don't remember.
Q. And, do you remember filing for an LLC, say the same week that you came up with the idea of the business?
A. I don't remember, I don't remember.

Q. When was the first time you meet Dr. Salzman in person?
A. I don't remember.
Q. Was it before or after forming the LLC?
A. I don't remember.
Q. Now, when you formed the LLC, so I'm bringing your attention to Exhibit 5 or 4, yeah, Exhibit 4, are you listed anywhere on there?
A. No.
Q. Why would you have not been listed if you were forming the LLC with Dr. Gavrilos and Dr. Salzman?
A. Objection, argumentative. All the information that is required to be on form 5.5 is there.
Q. But, you didn't consider yourself one of the founders?
A. Objection, relevance.
Q. You can go ahead and answer. There's an objection, that's noted for the record, but did you -- do you consider yourself one of the founders of GCM Partners, LLC?
A. No.
Q. Did you ever actually apply to GCM Partners for a position?

A. Objection, vague. What do you mean by apply?
Q. Did you submit a resume or CV, and were you formally interviewed for a position at GCM Partners?
A. Objection, vague as to formally interviewed.
Q. Well, did you submit a resume or CV --
A. No.
Q. -- for the consideration to the founders?
A. No, I did not.
Q. Did you sit down and speak to the two founders?
A. Yes.
Q. Was that in person?
A. Yes.
Q. And, was that before or after the company was formed?
A. I don't know.
Q. At the time that you sat down with them to interview with them, who was there?
A. I spoke with them on many occasions. There wasn't a single instance like a scheduled interview.
Q. Well, to whom did you speak with?

11:25 A. I spoke with George, I spoke with Steven, I spoke with them together on many occasions.
11:25 Q. On those many occasions, what did you believe to be the vision of those two founders for GCM Partners, LLC?
11:25 A. Objection, vague and relevance. They were operating a medical cannabis certification practice.
11:25 Q. Was it *brick and mortar?
11:25 A. Yes.
11:25 Q. Was there any telehealth component at the time?
11:25 A. At the time I met them, no.
11:25 Q. And, what about that interested you?
11:25 A. I liked that they were entrepreneurial.
11:25 Q. Do you consider yourself entrepreneurial?
11:26 A. Yes.
11:26 Q. In the course of your interviews or discussions with George and Steven as you've described, did your understanding of their vision for GCM Partners evolve?
11:26 A. Objection, vague as to when.
11:26 Q. At any point prior to joining GCM, did your understanding of the business model change?
11:26 A. Prior to joining as general counsel?
11:26 Q. Yes.

A. No, it did not.
Q. So, your understanding was that they were operating brick and mortar medical operations for medicinal cannabis?
A. Yes.
Q. Throughout the time. And in the course of these many discussions as you said with physician Steven and pharmacist George, did you, at any time, ask them if they had a business entity?
A. Objection, attorney/client privilege.
Q. Were you their attorney at the time?
A. I formed an attorney/client relationship with them before officially joining as general counsel.
Q. Okay. When did you do that?
A. I don't know.
Q. What could refresh your recollection on that because this is kind of important, if you're going to be asserting a privilege based on having formed a relationship with them, we got to nail it down. So, what could we do to help with that?
A. I don't know.
Q. Well, how did you form the attorney/client relationship there?
A. Like any attorney forms an attorney/client

relationship with a client through communications and the request and provision of advice.

Q. So, there's an engagement letter?

A. No.

Q. Well, isn't that how any attorney would do it?

A. There doesn't need to be a written engagement letter, and you know that, so if you want to keep pushing on this, we can burn time. But --

Q. Well, I think I'm going to reserve on this because, so, there's no engagement letter which means you've got no documentation to establish the beginning of the attorney/client privilege, and you're saying you don't recall when the attorney/client privilege began?

A. Not previously.

Q. Well, give me a closest estimate?

A. Probably sometime in late 2017, or early 2018 when we started talking business.

Q. So, were you speaking business strictly as general counsel to them?

A. No, I told you already when I joined as general counsel. When was that, that was May of 2020.

Q. You sure about of that?

A. Yes, I am.

Q. Okay. And, it's not as though you would have written an affidavit or complaint, that was June of 2020?

A. May 31, June 1, there was a riot in Chicago, it was one of those days.

Q. Right.

A. I appreciate the attempt to impeach, Brett, that's a good one.

Q. It's not an attempt to impeach, it's just to say that I'm trying to keep this cordial, nothing about this is personal to me.

A. It's personal to the two of us, so you can deal with the witness as I come.

Q. And so, I shall. So, you formed an attorney/client relationship, now were you also the Chief Operating Officer at the time?

A. No, not until June 1 or May 31 of 2020.

Q. What was the elevator pitch that either George or Steven gave to you to convince you to leave your law practice and start working with them?

A. Objection, relevance. Objection, attorney/client communication, and objection that it presumes facts not in evidence.

Q. So, I've got your objection on the record now, which, of course, is different than asserting a

privilege. Are you asserting a privilege as to the question of what it was that caused to you leave your existing practice and start practicing law for them?

A. You asked me how they convinced me to leave.

Q. Uh huh.

A. I objected to as assumes facts not in evidence. And, as to some of those communications about whether I would join their business, that's attorney/client privilege.

Q. The question is what convinced you to want to become their attorney?

A. I think that they, at the time, they had something special that had huge growth opportunity, and they were one of the few organizations willing to take it on.

Q. Okay. And, what was that something special?

A. At the time, very few physicians were willing to write medical cannabis prescriptions or certifications because of the federal illegality, and they had to courage to go forward and do it. And, they were demonstrating that they weren't afraid of any hypothetical repercussions, and they were making headway and I liked that they were hustlers.

11:31 Q. You said there were very few other people in that space at that time, is that correct?
11:31 A. Yep.
11:31 Q. Did you have any knowledge of anybody else in Illinois doing anything similar?
11:32 A. There were a couple of solo practice physicians, I don't remember their names.
11:32 Q. Did you know of any corporate entities that were supporting similar efforts?
11:32 A. I don't know.
11:32 Q. *So, when you first became officially affiliated with GCM in the capacity of apparently being their attorney through Mraunac and Associates, is that correct?
11:32 A. No.
11:32 Q. Can you explain to me -- so, Mraunac and Associates existed at the time?
11:32 A. I don't know. If you had one of these from Mraunac and Associates, I could tell you when it was formed.
11:32 Q. So, you weren't -- was there any overlap between the time that Mraunac and Associates existed and you were in an attorney/client relationship with GCM?
11:33 A. Yes.

11:33 Q. But, Mraunac and Associates had nothing to do with that representation?
11:33 A. Correct.
11:33 Q. Nor did any of the two other law firms for which you worked at that same time?
11:33 A. No, it wasn't the same time.
11:33 Q. Well, you worked for at least one of the law firms at that same time, is that correct?
11:33 A. What time are you talking about?
11:33 Q. 2018, 2017, 2018.
11:33 A. I did not begin to work in the capacity of Mraunac and Associates until I left Ogletree Deacons.
11:33 Q. Okay. Is that -- but, weren't you working for another law firm at the same time that you entered into an attorney/client relationship with Steven and George --
11:34 A. Yes.
11:34 Q. -- as you've termed them?
11:34 A. Yes.
11:34 Q. And, what was that law firm?
11:34 A. Ogletree Deacons.
11:34 Q. Okay. So, but your Ogletree Deacons work had nothing to do with your work for George and Steven?
11:34 A. What do you mean by my work?

Q. You weren't representing George and Steven, or Dr. Salzman and Dr. Gavrilos in association with your law firm at the time?
A. There was no engagement letter.
Q. Right. But, you said that wasn't necessary, you said that you still entered into an attorney/client relationship through communication and agreement?
A. Yes.
Q. So, you entered into an attorney/client relationship with Dr. George Gavrilos and Dr. Steven Salzman while you were also working for Ogletree Deacons?
A. Yes.
Q. So, at that time, where was the corporate headquarters or whatever work it was that George and Steven were performing?
A. It's on here corporate address, Exhibit 4.
Q. All right. And so, what's Exhibit 4 tell us?
A. It says 835 North California Avenue, apartment 3, Chicago Illinois.
Q. To your, do you know where that is?
A. I do.
Q. Is that somebody's private residence?

11:35 A. At the time, it was George Gavrilos' private residence, yes.
11:35 Q. At any other time in the history of GCM, to your knowledge, have they had a different corporate headquarters?
11:35 A. I don't know.
11:35 Q. If they did, would it be the responsibility of GCM to update the annual filings with said corporate headquarters?
11:36 A. If so, if there's a principle office field, but I don't know if it changed or not.
11:36 Q. To your knowledge, has GCM, the corporate or the LLC itself, ever owned any real estate?
11:36 A. I don't believe so.
11:36 Q. Has it ever leased any real estate?
11:36 A. Yes.
11:36 Q. And, where did it lease real estate?
11:36 A. There were a few offices, I don't remember the addresses.
11:36 Q. Were they offices that performed administrative functions or were they clinics that performed medical functions?
11:36 A. The office leases were with GCM Partners. The activities that were conducted at those locations were both GCM Partners activities and medical

activities through Green Care Professional Service.
Q. Okay. So, there were professional medical services taking place at some of the real estate that was leased by GCM Partners?
A. Yes.
Q. And, what nature, and of what nature were those medical practices?
A. The ones we're here talking about today, medical cannabis certifications.
Q. Anything else?
A. I don't know. I didn't work in the offices.
Q. And, how many do you believe there to have been?
A. At the heights, there were maybe four or five, ten, I'm not sure.
Q. When do you believe the height would have been?
A. Before March of 2020.
Q. Were they all in the State of Illinois?
A. No.
Q. What other states?
A. Maryland, Ohio, it's in the second amended complaint.
Q. Pennsylvania perhaps?

11:38 A. If that's what it says in the second amended complaint, then, yes, there was one there.
11:38 Q. When did GCM first start acquiring real estate in the form of leases?
11:38 A. I don't know.
11:38 Q. Was it while you were working there?
11:38 A. It was before that.
11:38 Q. So, when you -- so, when you started in June of 2020, GCM already had, as you said, 4 to 10 physical offices/clinics?
11:38 A. Yes.
11:38 Q. Spread across four states?
11:38 A. At least four, yeah, maybe more.
11:39 Q. So, when you joined GCM in 2020, what would you have considered the market competitors?
11:39 A. Objection to form as what I would have done.
11:39 Q. All right. What -- who did you consider market competitors?
11:39 A. The other physicians I mentioned. There were virtually none.
11:39 Q. Across all of those states?
11:39 A. Right, there were very few physicians across the United States doing there at the time.
11:39 Q. And, as of now, who would you consider to

be GCM's market competitors?

A. I don't know.

Q. So, I know that you were, and you are a general counsel for GCM Partners, but I'd like to start by talking about your position as the Chief Operating Officer, and you were the Chief Operating Officer for GCM, were you not?

A. For awhile.

Q. So, for purposes of questions that follow, I ask that you answer in the capacity of the Chief Operating Officer or COO. When did you first become the Chief Operating Officer for GCM?

A. May 31st or June 1st, 2020.

Q. What were your duties?

A. I had responsibility for the overall operation of the business. And, I reported directly to George on that premise.

Q. What did that entail, what were the overall operations?

A. Like the categories that any business has to undertake, human resources, advertising, marketing, operations, work flow, management of other individuals working with us.

Q. Well, how many full-time employees did GCM have as of the time you started --

A. None
Q. -- in June of 2020?
A. None.
Q. How many part-time?
A. None.
Q. How many independent contractors?
A. Two.
Q. Who were those two independent contractors?
A. Myself, and Jenna Kioussis.
COURT REPORTER: What was the name?
A. J E N N A, K I O U S S I S.
Q. And, was Jenna, was she in Illinois?
A. Yes.
Q. And, you were in Illinois at the time, too?
A. Yes.
Q. So, GCM did not have any independent contractors, part-time employees, full-time employees beyond you and Jenna as of June, 2020?
A. Correct.
Q. So, GCM Partners itself was not generating any revenue, then, as of that time?
A. No, I don't believe that's true.
Q. Well, how could it be generating revenue?

A. You tell me, what do you mean by your question?

Q. How did GCM Partners generate revenue in June, 2020?

A. What do you mean by that?

Q. Who was paying money to GCM Partners in June, 2020, and for what purpose?

A. Patients were being evaluated for certification for medical cannabis through physicians, and GCM partners managed the business aspects of that operation.

Q. Were patients paying money directly to GCM?

A. No.

Q. So, I ask again, who was paying money to GCM Partners in June, 2020, and for what purpose?

A. The physicians were paid for the service.

Q. The physicians were paying?

A. Yeah.

Q. Okay. So, the physicians were paying GCM?

A. Not physicians.

Q. Who was paying GCM?

A. I don't remember when Green Care Professional Services was formed, so I'm not sure.

Q. That's green care medical, right?

11:44 A. No.
11:44 Q. Is there a difference between Green Care Medical and Green Care Professional Services?
11:44 A. Yes.
11:44 Q. All right. So, in June, 2020, was anybody paying any money to GCM Partners?
11:44 A. I don't know because I didn't do the books.
11:44 Q. Well, who did the books?
11:44 A. George handled the books. That was his part of his duties, that wasn't mine.
11:44 Q. Well, what was his role?
11:44 A. CEO and CFO that wasn't his title, but he also did the finances.
11:45 Q. When is the first time you have knowledge that GCM Partners was actually earning any money at all?
11:45 A. I don't know.
11:45 Q. Well, I asked when you have knowledge of it.
11:45 A. I don't remember when I first acquired that knowledge.
11:45 Q. Do you have knowledge now of GCM Partners is making money?
11:45 A. I don't.

Q. You don't know if GCM Partners is making any money now?
A. I don't, it's not part of my duty. I was a full-time contractor, general counsel, I'm now part-time as general counsel. I'm not as involved as I used to be.
Q. At that time, June, 2020, when you became the Chief Operating Officer, who was paying you?
A. GCM Partners.
Q. And, that was your full-time job?
A. Yes.
Q. But, you don't know where any of the money came from that was paying you or Jenna for that matter?
A. That's not what I said.
Q. Well, I have asked who was paying GCM Partners, you told me you don't know?
A. I don't.
Q. All right. Had somebody invested in GCM Partners?
A. No.
Q. How did GCM Partners have any money to pay you or Jenna --
A. I don't know.
Q. -- in June of 2020?

11:46 A. I don't know.
11:46 Q. The Chief Operating Officer had no idea where the money was?
11:46 A. Correct.
11:46 Q. The Chief Operating Officer had no idea how much money GCM Partners had?
11:46 A. Correct.
11:46 Q. Even though you were doing things like human resources, advertising, marketing, you didn't actually know how much money the company had?
11:46 A. Correct.
11:47 Q. So, I'm well aware that you hold a doctorate of law. Do you hold any other advance degrees?
11:47 A. No.
11:47 Q. So, safe to say, not a medical doctor?
11:47 A. Correct.
11:47 Q. And, you didn't have any prior professional experience in health law?
11:47 A. What do you mean by professional.
11:47 Q. That you would charge people money for your expertise in health law?
11:47 A. No.
11:47 Q. When you joined GCM as the Chief Operating Officer, what did you understand the business model to

be?
A. Objection, vague.
Q. Well, does the Chief Operating Officer understand what a business model is?
A. I want to know what you mean by it because I'm not sure that I do.
Q. What services was it that GCM Partners intended to provide in order to generate revenue?
A. GCM Partners ran the business operations of the medical practice.
Q. Of which medical practice?
A. The medical practice seeing the patients.
Q. For who?
A. For, what do you mean for who?
Q. Well, who was seeing the patients?
A. Physicians.
Q. Okay. And, how many physicians were there?
A. When?
Q. When you joined in June, 2020?
A. I don't know.
Q. Was it more than one?
A. Yes.
Q. Was it fewer than one hundred?
A. Yes.

Q. Was it more than 2?
A. Yes.
Q. Was it fewer than 50?
A. Yes.
Q. Was it more than four?
A. I think so.
Q. Was it fewer than 25?
A. Yes.
Q. Was it more than 5?
A. I'm not sure. That's as good as I can do for you, 4 and 25.
Q. Somewhere between 4 and 25?
A. Uh huh.
Q. You think it was more than 10?
A. I don't know.
Q. At the time, I'm still in June, 2020, at the time, did GCM Partners provide any services to patients?
A. Objection, vague. I don't know what you mean by that.
Q. Did you provide individual anything of value to patients?
A. Objection, vague, what's value?
Q. We can bring Socrates in here to discuss the matter, but in your own interpretation, what the

term value means?

A. I don't know what you mean, and I'm not going to presume what your question means. And so, if you can be more specific, I can try to answer it for you.

Q. Did GCM Partners do anything that assisted patients?

A. Yes.

Q. What did they do to assist the patients?

A. Scheduling appointments, greeted at the office when they came in, gave them access to medical records.

Q. All right. So, GCM Partners scheduled appointments for people, for patients?

A. Uh huh.

Q. Who was doing that, was that you or was that Jenna?

A. Jenna.

Q. And, Jenna greeted them when they walked in?

A. Yes.

Q. They walked in, when they walked into where?

A. One of the offices in Illinois.

Q. Between 4 and 10 offices?

A. Yeah, she only worked in person in the Illinois offices.
Q. And, she gave them access to medical records?
A. Yes.
Q. Where were those medical records stored?
A. I don't know.
Q. What was the nature, so we previously talked that there was between 4 and 25 physicians that were paying GCM Partners as of June, 2020, is that correct?
A. Objection, asked and answered.
Q. Well, I'm asking am I correct about that?
A. I answered the question already.
Q. All right.
A. I'm not going to risk that you've rephrased it somehow --
Q. Can I ask we please check the record, I just want to make sure--
(WHEREUPON, the record was read by the Court Reporter)
Q. Are you saying at some point you said there was between 4 and 5 physicians were paying GCM?
A. I don't know anything about the finances, I didn't handle it.

Q. Did they have some sort of independent contractor contract?

A. I don't know, probably, but I don't know.

Q. Do you know if there's any sort of contract, be it written or oral, between GCM Partners and any of these 4 to 25 physicians?

A. I'm not sure.

Q. While you were there as the Chief Operating Officer, did you make any significant changes to operations at GCM?

A. Objection, vague as to significant. I'm not sure.

Q. Do you recall any changes that you made at all to the operations at GCM?

A. I know that we kept records electronically after some point, and it wasn't happening across the board when I got there.

Q. You saw records, you mean medical records?

A. No, all records, but yes, including medical records.

Q. By what method did GCM check it's money from the supported physicians?

A. Objection, vague as to when?

Q. In June of 2020.

A. I don't know.

11:54 Q. Did you ever learn, at any point, how it is that GCM checked money from it's supported physicians?
11:55 A. I don't know, depends, you're asking about the finances, I didn't handle them.
11:55 Q. Well, I'm asking if you have any knowledge of it?
11:55 A. I don't, I don't know, I can't answer the question.
11:55 Q. Are you familiar with BluePay?
11:55 A. Yeah.
11:55 Q. What's BluePay?
11:55 A. It was a mechanism to take payments online, it's mentioned in the second amended complaint.
11:55 Q. How did you become familiar with BluePay?
11:55 A. I don't remember.
11:55 Q. So, earlier I had asked about Green Care Medical versus another company, I forget what it is. What is the distinction?
11:56 A. I don't know what you're talking about when you say Green Care Medical.
11:56 Q. You've never heard of a company called Green Care Medical?
11:56 A. Not by that specific name, no.

11:56 Q. Do you know anything that sounds like Green Care Medical, or is even close or approximate to Green Care Medical?
11:56 A. There's a Green Care Medical Incorporated.
11:56 Q. Right. So, Green Care Medical Incorporated, then?
11:56 A. Yeah.
11:56 Q. What is Green Care Medical Incorporated?
11:56 A. Objection, vague as to when, now?
11:56 Q. Sure.
11:56 A. 6 years ago?
11:56 Q. Now.
11:56 A. Now, I have no idea, it's probably defunct, I don't know.
11:56 Q. Well, what was it 6 years ago?
11:56 A. I don't know.
11:56 Q. Do you have a recollection of discussing it with the court about 5 years ago?
11:56 A. No.
11:57 Q. At what point did you depart the COO position with GCM Partners?
11:57 A. I'm not sure. At some point Jenna took a larger role in the operations and I relinquished the title, but still helped to a large degree, run the business.

Q. And, was that any time in the last four years?
A. Could have been.
Q. What would you need to review in order to remember when it was you relinquished the position of Chief Operating Officer to Jenna?
A. I'm not sure, I didn't say that she became COO, she took a larger role than she had while I was COO, I don't know if there are any documents. I'm sure there were just telephone conversations about the transition.
Q. Do you suppose were any e-mails that you passed to anybody in the company that talks about Jenna's role expanding and yours contracting?
A. I don't know.
Q. When you first joined, when you were -- I'm sorry, while you were of the Chief Operating Officer for GCM, in how many different states was GCM conducting business?
A. When?
Q. Oh. At any time during your period as the Chief Operating Officer.
A. It changed quite a bit.
Q. All right. So, what was the most number of states and the least number of states during your

11:59 tenure as Chief Operating Officer?
11:59 A. The highest might have been in the 20s somewhere before there litigation began, and when I started four, maybe.
11:59 Q. So, while you were the Chief Operating Officer, you went from four maybe as you have termed it to 20?
11:59 A. Into 20.
11:59 Q. Or, into the 20s.
11:59 A. I think so.
11:59 Q. Now, what allowed that growth?
11:59 A. Objection, vague.
11:59 Q. As the Chief Operating Officer, to what do you, as the former Chief Operating Officer, to what do you attribute that growth?
11:59 A. The ability to conduct telemedicine evaluations due to the Covid 19 pandemic.
12:00 Q. Are you aware of any differences between the way billing was conducted in any of the states during your period as Chief Operating Officer?
12:00 A. Objection, vague. No.
12:00 Q. But, it's your position that you wouldn't really know because you were not the chief operate -- because you were not the Chief Financial Officer nor the Chief Executive Officer, and that's a question

better directed to Dr. George Gavrilos?

A. Yes.

Q. Okay. As the Chief Operating Officer, did you have any occasion to interact with any of the supported physicians?

A. Yes.

Q. And, under what circumstances might you do so?

A. I interviewed many of them. I communicated with them prior to interviewing. And then, occasionally, if there were operational issues, log-ins, something that wasn't related to patient care, I would assist with. Occasionally, I would fill in for Jenna who ran the day-to-day, moment to moment communication with the physicians if she were taking a break or out sick, I would jump into her role and communicate with them then.

Q. In addition to physicians, was, during your time as the Chief Operating Officer, was GCM also supporting advanced practice nurses or physician assistants?

A. I don't believe so, but I can't be sure. There may have been one or two, at some point.

Q. Are you aware of who set the pricing structure for GCM's services during your time as the

12:02 Chief Operating Officer?
12:02 A. No.
12:02 Q. Are you aware of what the pricing structures were for GCM's services during your time as a Chief Operating Officer?
12:02 A. I came across pricing, yes.
12:02 Q. And, how would you come across the pricing?
12:02 A. I don't remember how, I believe there were --
12:02 Q. Is it your recollection that it was standardized across all of the states in which GCM was conducting business, or was it customized to different states?
12:02 A. I think it was more of the latter. There was not a flat price for all states, that's the best I can tell.
12:02 Q. And, what about within each state, was there a flat price within each state?
12:02 A. I don't know, most of the exposure I got to pricing was through the Leafwell platform.
12:02 COURT REPORTER: Could you spell that?
12:02 A. L E A F W E L L.
12:03 Q. And, how is that, what was it that you
12:03 encountered through the leaf well platform that gave

12:03 you insight to the payment structure?

12:03 A. I was able to view transactions, I had a log in and I could see as patients paid, what they were paying.

12:03 Q. Because the patients were paying directly into the leaf well platform?

12:03 A. Yes.

12:03 Q. And, were they using BluePay?

12:03 A. I don't know.

12:03 Q. Do you have any knowledge of whether the physicians or for that matter, if there were any advanced practicing nurses and physician assistants, what's called medical professionals were able to set their own rates?

12:03 A. I don't know, I didn't handle that.

12:03 Q. That would be George, is that correct?

12:03 A. George would have some knowledge, I don't know if he was the ultimate arbiter of it, but George would have more knowledge than me.

12:03 Q. Well, who was, so we're talking about your time as the Chief Operating Officer -- during your time as the Chief Operating Officer, were there ever more than just you and Jenna working at GCM Partners?

12:04 A. Yes.

12:04 Q. And, how many other people joined GCM

12:04 Partners as employees during your time as the Chief Operating Officer?
12:04 A. None.
12:04 Q. How many people joined as some sort of independent contractor like you and Jenna were?
12:04 A. Objection, vague as to some sort of.
12:04 Q. Okay.
12:04 A. An employee --
12:04 Q. As an independent contractor, that's fair. How many people joined as independent contractors as you and Jenna were, during your time as the Chief Operating Officer?
12:04 A. I don't know. There were a handful of assistants that we hired.
12:04 Q. Do you believe any of those assistants set the billing rates?
12:04 A. I doubt it.
12:05 Q. Who else could have set the billing rates and the price structure beyond Dr. George Gavrilos?
12:05 A. I don't know, physicians and/or Emily Fisher.
12:05 Q. I'm talking about during your time as the Chief Operating Officer.
12:05 A. That's what I'm talking about.
12:05 Q. Now, you mentioned that part of your

12:05 duties as the Chief Operating Officer included
12:05 advertising and the marketing. Who was the target
12:05 audience for GCM Partners during your time as the
12:05 Chief Operating Officer?
12:05 A. Objection, vague and relevance. The only
12:05 part of this that should be relevant is up until
12:05 November of 2020. But, while I was COO and while we
12:06 were working with Leafwell, I was not primarily
12:06 handling marketing and advertising, Ms. Fisher was.
12:06 Q. You said the only thing that's relevant is
12:06 up to November of 2020, why is that?
12:06 A. That's why we're here today Brett.
12:06 Q. Well, what's the significance of November
12:06 of 2020, why is nothing relevant thereafter?
12:06 A. Let me see, we got an injunction against
12:06 your client and Hipaaline for kicking us out of the
12:06 platform. And anything that GCM Partners did, after
12:06 the fact, is relevant only to mitigation of damages.
12:06 So, my time as COO when we were no longer working with
12:06 Leafwell is irrelevant.
12:07 Q. So, what about when you first came on --
12:07 strike that -- so, as the Chief Operating Officer, you
12:07 oversaw advertising and marketing, is that correct?
12:07 A. At some point after we no longer were
12:07 working with Leafwell, yes.

Q. Okay. So, who was the target audience for your services at that time?

A. You'd have to ask your client.

Q. Well, you said after. So, once you resumed responsibility for advertising and marketing, who was your target audience?

A. The target audience was current patients and referrals.

Q. Referrals for what?

A. Referrals from current patients.

Q. So, your target audience was current patients. So, you wanted to just maintain the status quo?

A. No.

Q. So, what was, who was it that you were hoping to bring to your services by means of your advertising and marketing?

A. I'm going to clarify for you, most of what I did in advertising and marketing did not relate to cannabis certifications, but you didn't parse that out when you asked me.

Q. Okay. So, was GCM Partners doing things besides cannabis and marijuana certifications and prescriptions?

A. Objection, vague. When?

12:08 Q. At any time during your period as the Chief Operating Officer?
12:08 A. Yes.
12:08 Q. And, what other business were they conducting beyond certification and prescription of medical marijuana and cannabis?
12:08 A. Practice that worked in ketamine therapy for many years.
12:08 Q. And, in what states was ketamine therapy conducted?
12:09 A. Many. Between 25 and 30 some, at one point.
12:09 Q. Including in Illinois?
12:09 A. Yes.
12:09 Q. And, what percent of your time as Chief Operating Officer was dedicated to ketamine treatment versus medical marijuana and cannabis?
12:09 A. Objection, vague. When?
12:09 Q. During the entirety of your time as Chief Operating Officer?
12:09 A. It changed drastically
12:09 Q. Okay. What was the height and the nader?
12:09 A. I did very little in terms of medical cannabis marketing after this litigation ensued.
12:09 Q. So, it was somewhere around 90 percent of

12:09 the marketing and advertising went toward ketamine at that point?
12:09 A. Not immediately.
12:10 Q. But eventually?
12:10 A. At some point, it was almost all of it, yes.
12:10 Q. To your knowledge, during your time as the Chief Operating Officer, did GCM charge people money if they did not get approved for a medical marijuana or cannabis card?
12:10 A. I don't know.
12:10 Q. Were you ever present in a courtroom where this matter was discussed on the record?
12:10 A. Perhaps, I don't know.
12:10 Q. But, you have no recollection of it?
12:10 A. Not by that prompt, no.
12:10 Q. All right. Let's see here. So, we've been going for about an hour and 15 minutes here, do you have any interest in taking a break, you want to go for another 15 and take a break?
12:10 A. How much time are you going to take overall, I'd rather power through it.
12:11 Q. Well, I anticipate it's going to take all day. Do you have a hard stop, or does Dr. Gavrilos have a hard stop?

A. 5:00 o'clock would be preferable, but that's not really my call. I need to stop for lunch.
Q. All right. So, we can go for another 15 minutes here, and then I'm going to have to take a break, take a bathroom break. All right. So, I'm going to, let's see. Do you recall there being a hearing on, a hearing related to this case in the U.S. District Court for the Northern District of Illinois on October 30th, the year 2020?
A. Yes.
Q. And, do you recall if you were present for it?
A. I imagine I was.
Q. Do you recall if Dr. Gavrilos was present for it?
A. Yes, he was. It was a virtual hearing?
Q. Yes.
A. Yes, then, I was and Dr. Gavrilos was.
Q. All right. May I please have this marked 6?
(WHEREUPON, Exhibit No. 6 was marked for Identification)
Q. Can I ask you to flip to page 24 there? If I could ask to you take a look at the words that are attributed to Dr. Gavrilos up there, let me know

12:13 if that refreshes your recollection?
12:13 A. Which part do you want me to read?
12:13 Q. I'll tell you which line if you want. If
12:13 you hand it over to me, I'll tell you which line.
12:13 A. 24.
12:13 Q. Oh, well, it's on page 24. The final full
12:13 paragraph on page 24.
12:13 A. Beginning at line 20.
12:14 Q. Sure.
12:14 A. Okay. What's your question?
12:14 Q. I'm asking you to read that paragraph and
12:14 ask if that refreshes your recollection.
12:14 A. I see it, you asked me if someone was
12:14 charged if they didn't receive a certification.
12:14 Q. That's correct.
12:14 A. Right. It says they were not.
12:14 Q. Do you recall hearing that during the
12:14 hearing, albeit virtual, back in 2020?
12:14 A. I was there. I don't have a specific
12:14 memory of everything that was said during those
12:14 several hours, so that's why we keep a transcript.
12:14 Q. Do you have any reason to doubt the
12:14 statement there by Dr. Gavrilos?
12:14 A. No.
12:14 Q. Do you have any knowledge if the patient

consultation fees are waived if the medical professional does not approve the patient for a medical marijuana or cannabis card?

A. I don't know. I was never privy to any of those visits, for obvious reasons.

Q. Are you aware, do you have any personal knowledge of any instance in which any medical professional has actually paid money to GCM?

A. I don't know.

Q. So, you have no personal knowledge of that?

A. Right. I'm not saying it did or didn't happen, I don't know.

Q. When you first became the Chief Operating Officer, how many hours per week were you working at GCM doing COO stuff, and this is exclusive to general counsel duties or --

A. In June of 2020?

Q. Yes.

A. That's really hard to say. I couldn't give you an accurate delineation of how much time was spent on operations versus legal.

Q. Was it split somewhere around 50-50?

A. Just, it could be, any given day there was something else. It was probably more operations than

12:16 legal until October of 2020.
12:16 Q. Until, what was it, until October of 2020?
12:16 A. Yes.
12:16 Q. During your time as the Chief Operating
12:16 Officer for GCM, did you draft any policies or written
12:16 practices?
12:17 A. I don't know, maybe.
12:17 Q. Or, any procedures, throw in there?
12:17 A. Generically, maybe. I recall a, some type
12:17 of a state by state document that I helped draft for
12:17 Leafwell.
12:17 Q. And, when you say state by state, you
12:17 mean, what, how the process should work for each state
12:17 given it's owned regulations?
12:17 A. Yes, vaguely, yes.
12:17 Q. Do you recall writing any beyond the state
12:17 by state document?
12:17 A. No.
12:17 Q. Do you recall there being any written
12:17 policies or procedures at GCM during your time as the
12:18 Chief Operating Officer?
12:18 A. I don't know.
12:18 Q. Well, I guess the question is, do you
12:18 recall there being any, not were there any, do you
12:18 recall there being any?

A. No. It doesn't mean that there were or weren't, I just don't know.

Q. Do you have any recollection that you, as the Chief Operating Officer, ever inquiring about the existence of policies and procedures?

A. Objection, vague as to policies and procedures. About what?

Q. About anything.

A. I don't know.

Q. Was there an employee handbook?

A. We didn't have any employees.

Q. But, was there one?

A. Why would we have one if we didn't have any employees?

Q. So, there wasn't one?

A. We have no employee handbook currently or then.

Q. And, was there any sort of library of rules, or procedures, or best practices if a person is working with GCM Partners in any capacity, be it independent contractor or otherwise?

A. I don't really know what you mean. The document that I referenced earlier, the Leafwell document, that was some type of manual --

Q. Okay.

A. -- for employees, independent contractors, whatever Fisher was doing over there that I helped draft.
Q. And, who did you help?
A. Emily Fisher.
Q. She was writing this thing?
A. It was requested of us to put it together, and it was Leafwell branded, yes.
Q. And, did you write it or did she write it?
A. I wrote most of it. Jenna wrote a good amount of it, too.
Q. Well, did you provide input or suggestions to Hipaaline on how to be, on how to operate the Leafwell platform?
A. Yes.
Q. And, how would you do so?
A. We sat in weekly meetings with it's web developer to give feedback about problems with the site, ways it could be improved.
Q. Who is the web developer?
A. The individual's name was Miguel Marinhas.
COURT REPORTER: Do you know how to spell that?
A. M I G U E L, and it's probably M I R -- M A R I N H A S.

12:21 COURT REPORTER: Thank you.
12:21 Q. Who else would attend these weekly meetings with Miguel?
12:21 A. Emily, George, Jenna, sometimes Steven Salzman, and then Miguel, and I think there was a minion or something on his side.
12:21 Q. And, what type of input or suggestions do you recall you personally offering to Hipaaline during those weekly meetings with the web developer?
12:21 A. I remember asking for a development calendar and time line to be able to track requests to understand whether they were implemented and when they would be implemented.
12:21 Q. What kind of requests?
12:21 A. Any revision to the website, functionality or aesthetically. And, at some point we did, Miguel did create some, something like that. But, we were constantly tinkering with the look and feel and the functionality of the Leafwell platform.
12:22 Q. Were those -- now, you said that eventually Miguel did implement the development tracker, that's correct, right?
12:22 A. Something like that, yeah, after a few weeks.
12:22 Q. What about other suggestions, were other

12:22 suggestions adopted?
12:22 A. I don't know specifically.
12:22 Q. Do you recall any suggestions that were
12:22 ignored or not implemented?
12:22 A. I don't remember. Emily ignored a lot of
12:22 what we said, but I don't remember specifically if it
12:22 had to do with website revisions.
12:22 Q. What kind of stuff did she ignore?
12:23 A. She ignored our insistence that she let us
12:23 operate the clinic. She micro managed it a lot,
12:23 texting and calling and e-mailing.
12:23 Q. To you or to--
12:23 A. To me.
12:23 Q. George?
12:23 A. Me and Jenna and George, yes. And, she
12:23 often took the air as she was the boss of everyone.
12:23 Q. So, do you recall any of the specific
12:23 things on which she was pressuring you or George or
12:23 Jenna?
12:23 A. It's in the Second Amended Complaint.
12:23 Q. But, do you recall any specifically, right
12:24 now?
12:24 A. Yeah, my memory went into drafting that
12:24 document as I sit here, no, but if you'd like to
12:24 refresh it, we could break it out.

12:24 Q. Okay. We will get to that, but I do have to use the restroom, so I'm going to ask if we could take a 10 minute break here?

12:24 A. Okay.

12:24 VIDEOGRAPHER: It's 12:24, we are off the record.

12:34 (WHEREUPON, a short break was taken)

12:34 VIDEOGRAPHER: The time is 12:34, we are back on the record.

12:34 Q. So, resuming, we've established that you are no longer the Chief Operating Officer, can you tell us do you have any recollection of when you ceased to conduct any duties related to Chief Operating Officer?

12:34 A. Objection, vague. I remained in an operations capacity after I was no longer COO. But, as far as when title was relinquished, maybe sometimes, sometime in 2024, I don't remember exactly.

12:35 Q. And, were you compensated separately for your COO duties vis-a-vis your general counsel duties?

12:35 A. Objection, relevance. I'm not going to answer any questions about my comp.

12:35 Q. I'm asking because I'm trying to figure out to what extent GCM recognized a distinction between you as the Chief Operating Officer and you as

12:35 the general counsel?
12:35 A. Companies employ people or contract with
12:35 people to do roles all the time.
12:35 Q. Be that as it may, I'm asking what
12:35 happened in this specific situation. Did GCM
12:35 recognize you separately as a Chief Operating Officer
12:35 with one form of compensation, and recognize you
12:35 separately as the general counsel with a different
12:36 form of remediation?
12:36 A. I'm not going to answer any questions
12:36 about my comp.
12:36 Q. Reserve on the issue.
12:36 A. Go for it.
12:36 Q. And so, as you just said, you are still,
12:36 to some extent, performing some operational functions
12:36 for GCM?
12:36 A. No.
12:36 Q. When did you cease performing any sort of
12:36 operations for GCM?
12:36 A. When I joined Amundsen Davis.
12:36 Q. And, it was Jenna that took over most of
12:36 those duties to which you had previously attended?
12:36 A. She took over some, I don't remember what
12:36 her title was or is, something like Director of
12:36 Clinical Operations.

12:36 Q. I think we established that you started with Amundsen in the summer of 2025, is that correct?
12:36 A. July, 2025.
12:37 Q. And, is that when you ceased performing and that's when I you ceased performing any operations, functions for GCM. So, at that time, were there any employees of GCM?
12:37 A. No.
12:37 Q. At that time, how many independent contractors were contracted with GCM?
12:37 A. I don't know.
12:37 Q. Was it more than when you had started?
12:37 A. No.
12:37 Q. Was it fewer than when you had started?
12:37 A. Yes.
12:37 Q. And, were most of those independent contractors medical professionals of some sort, or were most of them non medical people?
12:37 A. Objection, vague. When?
12:37 Q. At the time that you left or, I'm sorry, at the time you ceased performing any sort of Chief Operating Officer duties?
12:37 A. Those are different times, Brett, which one are we talking about?
12:37 Q. The time that you--

A. When I stopped being COO or when I stopped doing any operations?

Q. When you stopped doing any operations?

A. In July of 2025, there were no medical professionals that were independent contractors.

Q. In July of 2025, were there any brick and mortar facilities that GCM Partners leased?

A. Yes.

Q. How many?

A. Two or three, I think.

Q. Were they all in Illinois?

A. Yes.

Q. In what year did Jenna begin increasing her role in operations?

A. Jenna always worked well above full-time in operations, so I don't know if that answers your question or not.

Q. Well, in what year do you believe that you relinquished the official title of Chief Operating Officer?

A. Objection, asked and answered. I said it was sometime in 2024, I think.

Q. And, at that time, sometime in 2024 you think, how had the duties of that position, the Chief Operating Officer position changed from when you

started it in June of 2020, four years earlier?
A. It hadn't.
Q. When did, you just told us that as of July of 2025, GCM Partners did not have a single medical professional working with it in an independent contractor facility -- sorry, capacity I meant to say. So, when did GCM Partners lose its last medical professional independent contractor?
A. I don't know.
Q. Was it a year prior?
A. I don't know.
Q. What might refresh your recollection on that?
A. I couldn't tell you.
Q. So, as of July of 2025, GCM Partners was not charging any sort of fee or collecting any sort of money from medical professionals, is that correct?
A. I don't know.
Q. What services was GCM Partners providing to its clients in July of 2025?
A. The same as its always been. It's a management services organization.
Q. And those management services are scheduling appointments and greeting people as they enter, and giving people access to medical records, is

that correct?
A. Among other things.
Q. Are there other things you can think of right now?
A. Yes, any business operation task outside of patient care.
Q. Does that include billing?
A. Yes.
Q. And as of July of 2025, was GCM Partners collecting payments from patients on behalf of medical professionals?
A. I don't know. I'm curious, is Emily's entity collecting payments from patients directly, or does she have a physician owned entity that handles that?
Q. That would have to be a question for Emily, of course?
A. Right.
Q. Were the services GCM Partners provided at the brick and mortar facilities different than the services they were providing through the telehealth platforms as of the time that you relinquished the Chief Operating Officer title sometime in 2024?
A. Different only in that the patient doesn't come into an office when seen on telehealth.

Q. But, all the same examination was conducted?
A. Not by GCM Partners.
Q. No, but the patients received the same examination, the same treatment?
A. Yes, to telehealth and in person examination is no different, other than it's happening over a computer.
Q. And, by the time that you relinquished the Chief Operating Officer position in 2024, at that point had the functions, the general counsel functions surpassed the operating officer functions in your daily balance?
A. I don't know. I just remember that Jenna was taking on some more managerial role because we had some other independent contractors helping her. And so, she was more of a day-to-day or week to week manager as opposed to moment to moment.
Q. Did you interview Jenna before she was offered an independent contractor position with GCM?
A. No, Jenna was, she pre-dated me.
Q. Are you familiar at all with how a typical transaction with a patient on the telehealth platform would occur as of 2024 on, through GCM's telehealth platform?

12:45 A. Objection, vague as to transaction and which platform.
12:45 Q. How many different telehealth platforms did GCM use in 2024?
12:45 A. I think two.
12:45 Q. And what were those two?
12:45 A. Mind clinic, Mind.Clinic.
12:45 Q. That's mostly for ketamine, is it not?
12:45 A. All for ketamine.
12:45 Q. It's all for ketamine?
12:45 A. Yes.
12:45 Q. So, we got Mind.Clinic. And what was the other one?
12:45 A. I think it was called Healy H E A L Y or H E A L L Y.
12:46 Q. At any point would Healy have been considered a competitor to GCM?
12:46 A. No, it was a competitor to Leafwell.
12:46 Q. And, as of 2024, there wasn't any cannabis our medical marijuana examinations, assessments or referrals taking place on either Mind.Clinic nor Healy?
12:46 A. I don't know. Not on Mind.Clinic for sure.
12:46 Q. All right. So, if we'll call it 2020, when

12:47 the GCM and Hipaaline agreement was in force and GCM was still using the Leafwell Telehealth platform, do you know how a typical patient experience would work using that platform?
12:47 A. Yes.
12:47 Q. All right. Could you walk me through it, please?
12:47 A. A patient, they would visit the platform, create some type of an intake, basic medical history.
12:47 Q. And, you'd have to visit the platform on the internet is that correct?
12:47 A. Yes.
12:47 Q. And at that time, it was using, do you know the website it was using at that time?
12:47 A. I think it was Leafwell.co.
12:47 Q. Okay. So they visit Leafwell.co, and what would they encounter there?
12:47 A. A home page.
12:48 Q. And, what would they do on that home page?
12:48 A. There were a lot of things on the home page. It was an FAQ section, a knowledge based section about cannabis, there was a way to create an account and begin an intake in order to begin the patient process. Not everybody that visits Leafwell is a patient.

Q. Well, who else might visit?
A. Anyone. Leafwell.co was a home page available to anybody with internet access.
Q. Actually, on that, does GCM have a public facing website?
A. No.
Q. All right. So, sorry, to get back, so now -- so, the patient goes onto, I'm sorry, the potential patient goes onto the website. And, if she or he desires an evaluation for suitability for participation in the medical cannabis program, and let's call it the State of Illinois, what would she or he do next?
A. Complete an intake. And, if the potential patient isn't disqualified, gets thrown into a awaiting room.
Q. Wasn't the intake, let's slow down a little bit on that. Complete the intake. How is that done?
A. Objection to this is all irrelevant. You know this, and I'm not the medical professional. You want to waste your time on this, we can do it. But, we're bordering on wasting my time.
VIDEOGRAPHER: Excuse me, we have to go off the record, technical issue, please. It's 12:49, we're

12:49 off the record.

12:51 (WHEREUPON, a short break was taken)

12:51 VIDEOGRAPHER: The time is 12:51, we're back on the record.

12:51 Q. Is it your position that anything that is in the Complaint is established as fact and cannot be disputed?

12:51 A. I'm not committing to any of that. The Complaint is a pleading, and you can take it for what it is as it's currently filed.

12:51 Q. And, when we were off the record, I guess I'll put this on the record. If you don't want me to put it on the record, I think it's important to.

12:51 A. Let's do it.

12:51 MR. WALKER: While we were off the record, Mr. Mraunac is concerned that I'm wasting his time, and that's certainly not my intent. I'm a professional trying to do my job the best way that I can. I'm trying to represent my client and her interests in the best way that I can, and I expect the same is of you. The difference here is that to you, this is personal.

12:52 A. It's not the only difference. My objection to this line of questioning is you're asking me, who is not a medical professional, to describe how your client's platform works. You know the answers to

these questions, and all the doctors do that work for her. So, to waste my time discovering how your clients product works is a waste of my time.

Q. But, you keep noting that you're not a medical professional. Are you suggesting that the manner in which the website operates requires--

A. You asked me what an intake is.

Q. Right.

A. And, that's very squarely a medical question. I know what it is because I've seen a lot of them, and I advised on how to structure them, but I can't tell you what must or must not be or cannot be in a medical intake because I'm not evaluating the content of that intake because I'm not a doctor.

Q. Well, I'm not asking about that, and maybe it was a matter that you misunderstood the question or I didn't communicate it properly. So, let's try this again. Does a person need to have an account in order to be evaluated for suitability for medical marijuana?

A. I don't know how you're defining account, but before being seen by a physician, a patient has to complete an intake, which consists of inputting personal information and medical history.

Q. And, the patient herself or himself does that, right?

12:53 A. The potential patient, yes.
12:53 Q. Potential patient enters that information himself or herself on the website?
12:53 A. Yes.
12:53 Q. And, that then goes into the Leafwell platform?
12:53 A. Yes.
12:53 Q. And, do they have to upload any documents?
12:53 A. Yes.
12:53 Q. What?
12:53 A. Drivers license and some kind of prescription history.
12:53 Q. And, where does that, at what point does that information become available to the provider?
12:54 A. When it's completed, it would get randomly assigned to the next available physician, to the best of my recollection.
12:54 Q. And, am I correct that the physicians operated almost like a Uber service, they would all get a notification that there is a patient in the waiting room and whoever was available would then select I'm available to see this patient?
12:54 A. No, that's not how it worked.
12:54 Q. Well, can you correct me on that, then?
12:54 A. Yeah, it wasn't the first to grab it,

there was some type of a round robin system that Miguel programmed so physicians would more or less evenly receive patient visits. They put in their availability, and then the next available patient would be assigned to a physician. If the physician didn't pick it up or agree to it within a certain amount of time, it offered to somebody else. But, you know all this already because your client operates the Leafwell platform.

Q. To your knowledge, did a potential patient need to provide information on their medical history before being put into the wait room?

A. Yes.

Q. And, to your knowledge, to create an account with the Leafwell platform, did the potential patient have to provide contact information such as name, e-mail address and address?

A. I'm sure, among other things.

Q. Is that the information that's at issue in the Second Amended Complaint?

A. Is what information?

Q. The name, the contact information, the medical history, the e-mail address, the address?

A. I don't know.

Q. You don't know if that information is--

12:56 A. No, I don't. As we discussed here, Brett, my last involvement with the Leafwell platform was 5 years ago.
12:56 Q. Well, I'm not talking about the Leafwell Platform--
12:56 A. 6 years ago?
12:56 Q. --I'm talking about the Complaint, which is a year ago.
12:56 A. So, my memory what data patients inputted into the platform when they signed up from 6 years ago is fuzzy, so I don't know.
12:56 Q. What could refresh your recollection on that?
12:57 A. I don't know.
12:57 Q. We'll get to some of the potential ones here. If you don't know, we'll just reserve on that. So, of that information, medical history and the names and the contact information and the medical questionnaires and such, does GCM claim it rightfully owns that data?
12:57 A. Objection calls for a legal conclusion. Objection, attorney/client privilege. Objection, work product. I'm not going to get into what GCM is claiming because it's in the Second Amended Complaint.
12:57 Q. Does GCM own that data as a factual--

12:57 A. Objection, calls for a legal conclusion. And, whatever GCM's position is, is stated in the Second Amended Complaint. So, I'm going to defer to that document.
12:58 Q. You've got an objection on the record.
12:58 A. Yeah.
12:58 Q. But now the question is, I'm asking you as the deponent does GCM own that data?
12:58 A. Objection, calls for a legal conclusion. That is something that's governed by the contract between the parties, so I don't have to answer your question. The court will decide who owns the data
12:58 Q. So, the first thing here is, so you said it's a legal conclusion as to what constitutes the data, is that correct?
12:58 A. That's right, it's defined in the contracts in many different ways. There isn't just one definition for data, there's several that relate to data, and the ownership of those data sets is governed by the contract.
12:58 Q. Did you have any part in writing the definitions for data?
12:58 A. Objection, relevance. I did have part in drafting the agreement.
12:58 Q. And, did you write or did you in any way

12:59 contribute to the definition of data?
12:59 A. I don't remember, it was 6 years ago so I don't know which parts I did and did not edit.
12:59 Q. And so, you are -- you, as the deponent are not giving an answer as to whether GCM owned the data that we just discussed, that data that was entered by the potential patients into the website operated by Leafwell?
12:59 A. Objection, you've defined the data as you call it in the intake process incompletely, and it calls for a legal conclusion because data ownership is governed by the agreement.
12:59 Q. Right, and that's why you put an objection on the record.
12:59 A. And, I'm not going to answer it because it calls for a legal conclusion. And, you've been in this game a long time, so you know it's not a fact question. So, if you want to take it up to the Judge, you can. But, I'm not answering it.
13:00 Q. Did patients provide, to your knowledge, did patients, potential patients, to your knowledge did potential patients provide their contact information, their medical history, their medical questionnaires prior to ever interacting with another human?

13:00 A. Objection, vague as interacting with what human?

13:00 Q. Any human through the Leafwell platform?

13:00 A. I don't know. I don't remember what the work flow was of the intake process.

13:00 Q. Let's take a look at the Second Amended Complaint, is that Exhibit 2, does that sound right? We've already established you're familiar with the Exhibit Number 2, the Second Amended Complaint?

13:01 A. Yes.

13:01 Q. And you've read the entire thing?

13:01 A. At some point.

13:01 Q. Do you have any reason to believe there are any errors in it?

13:01 A. I don't know. I don't think so, but if you want to ask me about specific sections of it, you can.

13:01 Q. I will. Let's talk about paragraphs 69 through 72. Would you mind reading through those, you'll find them on pages 16 through 17.

13:02 A. Okay.

13:02 Q. All right. Having read paragraph 69 through 72, do you believe that is complete and accurate?

13:02 A. Yes.

13:02 Q. And, having read 69 through 72, having

13:02 your recollection refreshed to some extent, do you
13:02 believe that a potential patient interacted with any
13:02 human through the platform before entering all of the
13:02 contact information, the medical history and the
13:02 medical questionnaire?
13:02 A. I don't know. I never even went through
13:02 the intake process myself, so I don't know.
13:02 Q. When do you believe was the first time
13:02 that a potential patient interacted with a GCM
13:02 representative?
13:02 A. The first single instance ever?
13:03 Q. No, in any typical, in a typical visit to
13:03 the Hipaaline website there?
13:03 A. We've been over this. I don't know the
13:03 specifics of the intake process beyond what's here.
13:03 Q. Skipping over things we've already
13:03 addressed here, give me a moment.
13:04 So, when you were fulfilling the role of
13:04 Chief Operating Officer or attending to any of the
13:04 operating officer duties, regardless of whether you
13:04 had the title, whose responsibility was it to check
13:04 active licensure for the various independent
13:04 contractor medical professionals?
13:04 A. Objection, vague. When?
13:04 Q. At any time did it shift?

A. Yeah.
Q. Okay. So, who were the different people, then?
A. Why don't we talk about June 1, 2020 to October, 2020 when we filed for the injunction?
Q. Okay. We can start there. So, who during that time period, who was responsible for checking the licensure status?
A. George, Steven and I all looked at it for the physicians.
Q. So, it's just a matter of who was available to do it at the time?
A. No.
Q. Did you have certain, did you divide it up so that certain people were responsible for certain independent contractors, and certain people were responsible for others?
A. Nope.
Q. How did you divide it?
A. There was no specific or written division. I would usually pull the credentials and George and Steven would look at it.
Q. How often would you do that?
A. Whenever there was a physician to join the team.

13:05 Q. And then annually thereafter?
13:05 A. For renewals, yeah.
13:05 Q. The independent contractor contracts, I suppose what was their duration?
13:05 A. I don't remember. They're all different.
13:06 Q. And why was it important to verify the licensure status of these independent contractors for GCM?
13:06 A. Are we talking about physicians or any--
13:06 Q. Any medical professional?
13:06 A. A medical professional can't conduct his or her profession unless licensed.
13:06 Q. And they were conducting their profession throughout that time as part of their independent contractor status with GCM, is that correct?
13:06 A. Objection, calls for a legal conclusion. In some states seeing patients for medical cannabis, certifications is not the practice of medicine. Nonetheless, we required licensure anyway.
13:06 Q. And in what states?
13:06 A. I don't remember.
13:06 Q. Florida?
13:06 A. I don't know.
13:06 Q. Actually, it was -- at any time while you were the Chief Operating Officer, so going to 2024,

was GCM providing any services in the State of Florida?

A. I don't know.

Q. Do you have knowledge of at any time in its existence that GCM has ever provided or conducted business in Florida?

A. We had at least one Florida licensed physician at some point.

Q. And was that licensed physician actually seeing Florida patients?

A. I don't know.

Q. And, you say there were no brick and mortar facilities in Florida?

A. Correct.

Q. Do you have any knowledge of, at any time, GCM having independent contractors provide consultations, assessments, anything related to medicinal marijuana availability for -- strike that, I'm going to rephrase this question.

Are you aware of any time when a non medical professional has been allowed to evaluate somebody for eligibility for medical marijuana or medical cannabis while working with GCM?

A. Objection, vague as to non medical professional. But, I'm not aware of any such

13:08 instance.
13:08 Q. Okay. And, I'll clarify, are you aware of any instance in which a non physician, non medical doctor, non advanced practicing nurse, non physician assistant has been, has provided assessment for medical marijuana or medical cannabis eligibility while working with GCM Partners?
13:09 A. I'm not aware.
13:09 Q. Why was it that you chose to -- I'm nearing the end of Chief Operating Officer questions here -- why was it that you chose to cede many of your operating officer duties to Jenna?
13:09 A. Objection, assumes facts not in evidence. Jenna wanted some more responsibility. And, given the demand on our time, it wasn't necessary that both of us had that same higher level of operations responsibility.
13:09 Q. And, she's still with the company now, is that correct?
13:09 A. Yes.
13:09 Q. All right. So, transitioning now to general counsel position, when did you become the general counsel for GCM?
13:10 A. First day I started.
13:10 Q. And that's June, 2020?

13:10 A. June 1 or May 31, whatever day it was.
13:10 Q. How would you now, sitting here now, how would you describe your relationship with GCM prior to that event, the May 31st/June 1, 2020?
13:10 A. Objection, vague as to relationship.
13:10 Q. Would you have considered yourself their attorney, or do you -- I'm sorry, do you consider yourself to have been their attorney prior to May 31st?
13:10 A. There was an attorney/client relationship formed, yes.
13:10 Q. But were you their attorney?
13:10 A. Objection, vague.
13:10 Q. It's a yes or no question.
13:10 A. For what purpose?
13:10 Q. Any purpose.
13:10 A. An attorney/client relationship can be formed with no actual legal work taking place, so--
13:11 Q. I'm not asking about that.
13:11 A. Yeah.
13:11 Q. I'm asking do you now consider yourself to have been their attorney prior to May 31st, 2020?
13:11 A. There were times at which I gave some discreet legal advice. I was not the company's "attorney" until I joined as general counsel.

13:11 Q. And, what's your position on how that affects your privilege?
13:11 A. Objection, vague. In what context?
13:11 Q. Well, you earlier asserted a privilege to questions--
13:11 A. That's right.
13:11 Q. --saying that even though you weren't their general counsel at the time, you were their attorney. And you had--
13:11 A. I said there is an attorney/client relationship.
13:11 Q. Right. You had a an attorney/client relationship. So, does that answer you just gave now, does that in any way change your position on the earlier privilege assertion?
13:12 A. No.
13:12 Q. So, prior to May 31st, 2020, what type of legal services were you providing to GCM?
13:12 A. I wasn't.
13:12 Q. All right. What type of legal services were you providing to George or Steven or Jenna?
13:12 A. There were conversations that were attorney/client privileged about certain things, and I was never paid for any of it.
13:12 Q. How often would you speak to them during

that period, 2018 to -- well, I guess 2018 to May 31st, 2021 -- 2020 sorry?

A. Objection, vague. Speak to them in the capacity of an attorney, or acquaintance, or a friend or what?

Q. Any, speak to them at all.

A. I saw George a lot during that period. I saw Jenna sometimes and I saw Steven sometimes.

Q. And would sometimes be more than once a month?

A. More or less.

Q. And, did you also have an attorney/client privilege with Jenna?

A. During conversations where the three of us were present, or George and Jenna were present, yes. I never had an occasion to speak to Jenna one-one-one about any legal issues.

Q. But, did you have an attorney/client, and I said privilege, I meant to say relationship. Did you have an attorney/client relationship with Jenna at any time?

A. Yes, while in a group setting between 2 or 3 of us. But, I don't recall a situation where Jenna and I spoke, an attorney/client relationship formed.

Q. But, it's your recollection that prior to

June, 20 -- prior to May 31st, 2020 you were never compensated for any of the legal services you provided?
A. Objection, asked and answered. Yes.
Q. And, what about for the non legal services you provided, just consultations?
A. I didn't say anything about having done any non legal services.
Q. So, the only services you provided at that time were legal services?
A. Yes.
Q. When you became an independent contractor with GCM, did you receive any equity in the company?
A. Yes.
Q. Do you still hold equity in the company?
A. Yes.
Q. And how much equity?
A. Objection, relevance. I'm not going to tell you that.
Q. Has equity increased or decreased since you started with GCM?
A. Same objection.
Q. By what mechanism did you obtain equity in GCM?
A. There's an agreement.

13:15 Q. Is it a written agreement?
13:15 A. Yes.
13:15 Q. When you started as the general counsel for GCM, what were your duties and responsibilities?
13:15 A. Anything legal related went through me. Proactive and reactive.
13:16 Q. And, fair to say there was no Legal Department, aside from you?
13:16 A. Objection, vague as to fair to say. But yes, I was the only person doing any legal work for GCM Partners.
13:16 Q. To your knowledge, has there ever been anybody in house providing legal services beyond you?
13:16 A. There has not.
13:16 Q. And, how has the general counsel role evolved from the time you started in May 31st, 2022 to present?
13:17 A. Only that it became part time, it hasn't changed.
13:17 Q. And that was a year ago?
13:17 A. Yes.
13:17 Q. Now, you said that when you first started with GCM, you reported to George. Now that you are, now that 6 years have elapsed and you're part time, do you still report to George?

13:17 A. Yes.
13:17 Q. Does anybody at GCM report to you?
13:17 A. No.
13:17 Q. Has there, was there ever a time when anybody at GCM reported to you?
13:17 A. No.
13:17 Q. So, we've made reference to independent contractor contracts between GCM and its physicians, are you familiar with those?
13:18 A. Assumes facts not in evidence. I don't know if there are physician contracts with GCM Partners.
13:18 Q. You don't know if there was ever an independent contractor contract with GCM?
13:18 A. I don't.
13:18 Q. And, it's independent contractors?
13:18 A. Some non physician independent contractors there were, well after the Leafwell episode, yeah.
13:18 Q. Prior to, I'll say in the year 2020, you don't know if -- strike that -- you don't know that if in the year 2020 GCM had independent contractor contracts with the medical professionals, physicians, advanced practicing nurse, physicians assistants that were providing assessments for medical marijuana eligibility?

13:19 A. Correct, I don't remember.
13:19 Q. Well, you don't remember or you don't
13:19 know?
13:19 A. I don't remember if there were, so what's
13:19 the difference between those two answers, Brett.
13:19 Q. Don't remember typically means that there
13:19 was a time that you may have known, but not now. And,
13:19 I don't know means I've never known.
13:19 A. That's one way to interpret it.
13:19 Q. All right. I'm going to offer you
13:19 Exhibits, I guess we'll call them 7 and 8.
13:21 (WHEREUPON, Exhibits 7 and 8 were marked
13:21 for Identification)
13:21 Q. All right have you had an opportunity to
13:21 examine Exhibits 7 and 8?
13:21 A. Yeah, I've looked at them.
13:21 Q. Do you have any familiarity to them prior
13:21 to seeing them today?
13:21 A. Vaguely.
13:21 Q. And so, what memory do you have of these
13:21 documents?
13:21 A. They look somewhat familiar, but nothing
13:21 beyond that.
13:21 Q. Do you believe that you ever read these in
13:21 their entirety?

A. Couldn't tell you.
Q. Given your position as general counsel and chief operating officer for years, as you sit here today, do you think it's likely that you read through them at some point?
A. I can't give you an assessment on the likelihood of something I don't remember.
Q. So, as you sit here today, you have no memory of reading through these word for word?
A. Correct.
Q. And, if I bring your attention to the top line there for Exhibit 7, you'll see it's dated, it goes to the second line, August 14th, 2020, and Exhibit 8, August 7th, 2020. So, these are both after you took over as general counsel and chief operating officer, is that correct?
A. I didn't take over from anybody, I became it. But yes, it was during the time that I was general counsel before we got into litigation with Leafwell.
Q. And, bringing your attention to page 2 of both of them, there is a section there, number 13, Confidentiality?
A. Uh huh.
Q. Are you familiar with the language in that

section?
A. I told you what my familiarity with the documents is.
Q. So, you're not familiar with that language?
A. Objection, vague. What do you want me to do, am I familiar, do you want me to read it, do you want to ask me about it?
Q. Well, sure, yeah, if you read it, you can tell me whether you know about that language before sitting here reading it today?
A. Objection, vague and relevance. You want me to read it so I now know about it, is that what you're asking me?
Q. No, I want you to read it to see if it refreshes your memory. This is a contested issue on which you've actually argued in court.
A. If we're going to get into you asking me about legal conclusions again, you know where that's going.
Q. I'm not asking about legal conclusions.
A. Looking at these document does not refresh my recollection about this.
Q. Okay.
A. I do notice that neither of them are

13:23 signed.

13:24 Q. I am now going to offer you Exhibit Number 9.

13:24 (WHEREUPON, Exhibit No. 9 was marked for Identification)

13:24 Q. Could I ask you to please take a look at that?

13:24 A. Okay.

13:24 Q. And, do you recognize that there are some differences between Exhibit Number 9 and Exhibits Number 7 and 8?

13:25 A. I don't know without looking at them line by line, Brett.

13:25 Q. I'll ask to bring your attention, on Exhibit Number 9 you see the date there, May 1 of 2020?

13:25 A. That's what it says.

13:25 Q. And so, that was before you became the general counsel and chief operating officer, is that correct?

13:25 A. Yes.

13:25 Q. To the extent that there aren't distinctions or differences, is it your recollection sitting here today that you are the one that would have made such changes?

A. No, I don't have any recollection about it.

Q. If I could bring your attention, I guess we'll go to 7 and 8 at this point, but if I could bring your attention to Section 5, and so that's on page 1, Section 5 there's, the second sentence reads, "Contractor shall use contractor's best professional efforts to perform the services in accordance with the terms and conditions of this agreement and with the company's policies and procedures as issued from time to time." How do you interpret, as you sit here today, how do you interpret the term "company", is that GCM?

A. Objection, calls for a legal conclusion. And, it's defined in the agreement.

Q. As what?

A. I'm not going to answer any questions where you seek to have me interpret the document, that's for the courts to do. So, I can do this with you all day, but you aren't going to get out of me a legal interpretation about a legal instrument.

Q. You're taking the position you won't answer that question?

A. Yes.

Q. You won't answer that question as to what

13:27 is meant by company?
13:27 A. The definition of company is as written in these agreements. So, I'm not going to characterize or interpret that. Judge Alexakis will do that if and when it comes to her desk.
13:27 Q. What policies and procedures are being referenced there in Section 5?
13:27 A. I don't know, these are 6 year old documents, and I don't know.
13:27 Q. So, back to section 13. Who--
13:28 A. Which one?
13:28 Q. 7 or 8, they're the same. I'll bring your attention to the sentence that begins at the very bottom of page 2 reading, "Such confidential information includes but is not limited to the names, addresses, and medical information of the company's customers, the terms including cost and price of the company's services or contractual relations with such customers, and any other information relating to the company's business methods, procedures, sales and marketing processes, including but not limited to all software programs and code used in the company's sales and marketing programs, policies and pricing that the company treats as confidential". And then it says after that "Contractor shall treat such confidential

13:29 information as the sole property of the company". Is, while you will were the chief operating officer, is that how GCM understood the confidential information to be owned by GCM?

13:29 A. Objection, calls for a legal conclusion.

13:29 Q. I'm asking is that how GCM interpreted it?

13:29 A. Interpreted what, Brett?

13:29 Q. Interpreted the ownership of the confidential information?

13:29 A. As defined in this document or elsewhere?

13:29 Q. Elsewhere.

13:29 A. Oh, I don't have, what information are you talking about if not the information described in this contract?

13:29 Q. No -- yes, the information described in this. I'm asking did the management of GCM understand that it owned all that information that was just listed there in the two sentences that I read?

13:30 A. I still think you're asking for a legal conclusion, with respect to whom.

13:30 Q. GCM?

13:30 A. I don't understand your question, Brett. You're going to have to be more, be clearer about it.

13:30 Q. Did GCM own the names, addresses, medical information of the company's customers?

A. Regardless of who is asking or who is doing business with?

Q. With the patients.

A. With respect to whom? If there's an agreement between; for example, GCM and the patient, that answer might be different than if there's an agreement between GCM and an independent contractor physician, or an independent contractor administrative assistant. So, these hypotheticals, did we own it, with respect to whom and according to what? And, I'm not going to get into this with you.

Q. Are you aware of any instances in which GCM had agreements with its patients?

A. I don't know, I was giving hypotheticals that it matters with respect to whom.

Q. Well, you threw that out there, so do you know of a single instance in which GCM has ever entered into an agreement with a patient?

A. I don't know. I'm trying to parse out your confusing questions to help you then, so we can get out of here sooner.

Q. Does GCM own the names, addresses and medical information of the GCM patients using its telehealth medicine services?

A. I don't know because I don't know if there

13:32 is an agreement between GCM and patients. Whether there was at this time in August of 2020, I can't answer it.

13:32 Q. If there wasn't?

13:32 A. If there wasn't, how could I know? I'm not a medical professional, I'm not going to give you opinions on what HIPAA or other laws required.

13:32 Q. We can talk about that, do you know what a business associate agreement is?

13:32 A. Generally.

13:32 Q. What is it?

13:32 A. It governs data usage between a covered entity and somebody else handling HIPAA protected information.

13:32 Q. Has GCM ever developed its own business associate agreement?

13:32 A. At some point after the Leafwell episode, yes, it did.

13:32 Q. And, was that sometime after 2021?

13:33 A. I think so. When I say GCM, GCM Health. GCM wasn't the party, but --

13:33 Q. Prior to 2021, did GCM have any business associate agreement agreements with any entities?

13:33 A. I don't know, I don't remember.

13:33 Q. I'm sorry, I forgot a question as far as

13:33 Exhibit 7, 8 and 9. I believe that you've already said you only have a vague memory of these things, but do you recall how often independent contractors were given the opportunity to re-sign an independent contractor agreement with GCM before 2025?
13:34 A. Re-sign?
13:34 Q. Yes.
13:34 A. Well, none of the three that you put in front of me are signed.
13:34 Q. Right.
13:34 A. But, I don't know what that means. Are you asking how often they were permitted to renegotiate or something? What are we getting at?
13:34 Q. Sure, we can go with that?
13:34 A. I don't know.
13:34 Q. Is the, as the chief operating officer at least up until 2024, you didn't know how it was that independent contractors performing the business of GCM were bound to GCM?
13:35 A. Objection, vague as to who are we talking about.
13:35 Q. You, when you were the chief operating officer between 2020 and 2024, how did you think that the independent contractors providing medical services were bound to the company?

13:35 A. There were all kinds of arrangements in that four year period.

13:35 Q. So, there were people that didn't have--

13:35 A. You've spent a lot of this deposition talking about things that occurred well after October, 2020 that aren't relevant. I mean--

13:35 Q. Well then, I'll try to keep it to things that are.

13:35 A. Why don't you keep it to the dealings with GCM Partners and your client.

13:35 Q. So, resuming back to the business associate agreements and prior to November, October of 2020, there were no business associate agreements in place with any of the independent contractor physicians of which you had knowledge?

13:36 A. Yes, I don't know if there were or not.

13:36 Q. And, did you have any involvement once GCM did create a business associate agreement, did you have any involvement in drafting it?

13:36 A. Some.

13:36 Q. And, do you know if it's in place right now with any entities?

13:36 A. I don't know if they're still in effect. They were related to ketamine therapy.

13:36 Q. Are you familiar with a -- are you

familiar with the exclusive marketing and consultants services agreement signed July 6th and 7th of the year 2020 that was, accompanied the Second Amended Complaint as Exhibit 2?

A. Yeah, I know what it is.

(WHEREUPON, Exhibit No. 10 was marked for Identification)

Q. So, I ask you to take a look at Exhibit 10 and tell me if you're familiar with that?

A. Is this the same document that's attached to the Second Amended Complaint?

Q. Yes.

A. Then yes, I am.

Q. All right. And why was it necessary to create a formal written agreement between Hipaaline and GCM?

A. Objection, attorney/client privilege as to the necessity of anything that has legal effect. But in general, businesses enter into contracts all the time to memorialize the deal they've made with each other.

Q. And by that time, how long had GCM been working with Hipaaline?

A. This is in the Second Amended Complaint. I don't know, when was this signed?

Q. July 6th and 7th, 2020?
A. So a few weeks.
Q. And how long had GCM been working with Emily Fisher?
A. I think since October of 2019, that's what it says in the Second Amended Complaint. But, that's my memory of it.
Q. So, how is it that GCM came into contact with Emily Fisher initially?
A. I don't remember. It's in the Second Amended Complaint. To the best of my recollection, she sought George out.
Q. And, do you have any recollection of when that might have been?
A. No.
Q. Do you have any recollection of what means; e-mail, phone, third party introduction, or anything like that?
A. I don't.
Q. Who initially proposed the formal written agreement between GCM and Hipaaline?
A. I proposed the concept of entering into a written agreement.
Q. And about when was that?
A. It started on the beginning of June, and

13:40 this was signed a month later, so sometime in there.
13:40 Q. And you've read through the entire contract that's now marked as Exhibit 10, is that correct?
13:40 A. At some point, yes.
13:40 Q. And I believe you previously said you contributed to the drafting of it, to some respect?
13:40 A. Yes.
13:40 Q. And which parts did you, to which parts did you contribute?
13:40 A. I don't recall it's 6 years ago, I don't know.
13:40 Q. Do you have any knowledge of how it was that Emily Fisher pitched her services, like what her elevator pitch was?
13:41 A. No. It seems she needed a new physician to scam after Frank Ambrosio took her to court. So, maybe that was part of it.
13:41 MR. WALKER: I'll just object, non-responsive.
13:41 Q. But, since you bring it up, that's also in the Complaint, is it not?
13:41 A. It is.
13:41 Q. And you read that part of the Complaint that talks about previous lawsuitS against her?

13:41 A. Yes. I discovered it.
13:41 Q. And that was based on your memory?
13:41 A. What was?
13:41 Q. The inclusion of those paragraphs about the other lawsuit, that was based on your memories, right? Nobody else brought that to the attention of the drafting attorneys, it was you that brought that to the attention of the drafting attorneys?
13:42 A. Everybody at GCM was well aware of the Frank Ambrosio lawsuit well before we brought our Complaint before the district court.
13:42 Q. All right. Going back to the Exhibit 10 there, the contracts between GCM and HIPPA Line, otherwise known as the GCM Hipaaline agreement, who was involved in drafting that besides you?
13:42 A. George.
13:42 Q. George contributed also?
13:42 A. From our end, yes, me and George.
13:42 Q. Do you know who on the other side was involved?
13:42 A. There was a Florida based lawyer helping Emily, I forget his name.
13:42 Q. Mark Goldsand?
13:42 A. Sounds about right.
13:42 Q. What did you understand his relationship

to be with Emily Fisher?
A. I don't know, but he purported to represent her, and then at some point Hipaaline when it came into existence. And, he and I were exchanging e-mails and edits to this document.
Q. And how many drafts of the GCM Hipaaline agreement do you recall trading back and forth before you finalized something?
A. I don't know.
Q. Do you believe it to be more than a half dozen?
A. I don't even know how that's relevant, but it went back and forth for maybe a couple of weeks and we signed it.
Q. And you do recall corresponding with Mark Goldsand?
A. Uh huh, I do. Sorry, yes, I do.
Q. And did he share with you a draft of a Hipaaline GCM contract in November of 2019?
A. I don't know, I don't remember that.
Q. I'm going to over here, Exhibit 11 and 12, 11 being an e-mail and 12 being the attachment thereto.
(WHEREUPON, Exhibit Nos. 11 and 12 were marked for Identification)

13:45 Q. Do you mind taking a look at Exhibit 11, then Exhibit 12 which is a printout of the attachment?
13:45 A. Are you stipulating that 12 is the attachment to 11?
13:45 Q. I don't expect you to do that, I'll represent to you--
13:45 A. That's what I'm asking. I don't really remember this, but I see that he sent it.
13:45 Q. And as you said you don't really remember it, you don't remember Mark sending you a contract in November of 2019?
13:45 A. I don't.
13:45 Q. And, you don't recall reading that version of the contract?
13:45 A. No.
13:45 Q. So, I suppose it goes without saying, I'll go ahead and put it on the record anyway, you don't recall what edits you may have made to that before it became the finally executed version?
13:46 A. I don't. There were a lot of edits.
13:46 Q. And, you'll see that the parties, there are; of course, GCM Partners and Hipaaline?
13:46 A. Uh huh -- yes, sorry. The purported parties to this draft are different than the parties that entered the agreement.

13:46 Q. Indeed. They are, and how so?
13:46 A. Well, it's a different entity on behalf of Emily.
13:46 Q. What's the distinction there?
13:46 A. They are different legal entities.
13:46 Q. Is a reference made to that in the Second Amended Complaint?
13:46 A. I don't remember.
13:46 Q. So, looking at this now, the e-mails and that draft of it, does that refresh your recollection in any way as to when dialogue actually began as to the need for, or the wisdom of having a contract between Hipaaline and GCM?
13:47 A. Yeah, the conversation clearly started in November of 2019.
13:47 Q. So, what took until July of 2020, 8, 9 months to get a fully executed contract?
13:47 A. Beats me. I wasn't there until June of 2020.
13:47 Q. But, according to Exhibit 11, you were the attorney handling this matter on behalf of GCM, is that correct?
13:47 A. I wasn't the general counsel.
13:47 Q. But, you were handl1ing this on behalf of GCM--

13:47 A. Regardless of what was handled, it didn't get signed until after I showed up.

13:47 Q. That's my other question, I suppose. Do you have any knowledge if an earlier draft was signed, something that precedes what we now call Exhibit 10?

13:48 A. No, I'm not aware of another agreement.

13:48 Q. If take you a look at the choice of law provision in Exhibit 12.

13:48 A. Object to this on relevance, to the extent that we're going to spend time discussing a draft agreement that the parties didn't enter, what are we doing?

13:48 Q. Do you have any recollection of changing the choice of law from Florida to Illinois?

13:48 A. Objection, relevance. The contract as attached to the Second Amended Complaint says what it says. There's no relevance to any negotiation that led up to that contract, it doesn't matter.

13:49 Q. And the question stands.

13:49 A. What did you ask me, do I have knowledge?

13:49 Q. Do you have a recollection of changing the choice of law provision from Florida to Illinois?

13:49 A. I don't, but it was clearly a wise choice, wasn't it, Brett?

13:49 Q. As you look at Section 5.5 of Exhibit 12--

13:49 A. You still doing this?
13:49 Q. --which is ownership of data. Do you have any recollection of modifying any aspect of that?
13:49 A. No.
13:49 Q. Do you recognize that to be at the heart of the 12 C motion that's presently before the Court?
13:49 A. Objection, vague as to at the heart. And further, I'm not going to answer anything that calls for a legal conclusion. The legal issues that are at play in your client's motion are in the motion, and GCM has submitted a response that motion and Judge Alexakis will make a ruling on it at some point. So, are we done with the legal conclusion questions, or do you have something factual that I can add to this?
13:50 Q. On October 19th, 2020, do you recall sending a letter to Hipaaline through its attorney, Attorney Carroll?
13:50 A. Yes.
13:51 (WHEREUPON, Exhibit No. 13 was marked for Identification)
13:51 Q. Take a look at Exhibit 13. Does that look at the letter that you penned and sent on October 19th, 2020?
13:51 A. If it's what's attached to the Second Amended Complaint, then yes, it is.

13:51 Q. Well, as you look at it now, do you have any, is there anything in there that you don't recall writing?
13:51 A. I remember the GCM team strategizing and preparing this and sending it, yes.
13:51 Q. Now, you see that line that says, it's toward the top, it says GCM disagrees that it has breached the agreement in any manner whatsoever?
13:51 A. I see that.
13:51 Q. And by agreement, do you mean the GCM Hipaaline agreement contract, the one that's now that, Exhibit 10?
13:51 A. Yes, the agreement that's attached to the Second Amended Complaint is the one that I'm referring to in this letter.
13:52 Q. So, putting aside materiality, which is a whole another situation, not getting into it, but sitting here now, do you agree that or do you still believe 6 years later that GCM has breached that agreement in any manner whatsoever?
13:52 A. Objection, calls for a legal conclusion. GCM's position in this case is in the Second Amended Complaint.
13:52 Q. So, you're not answering the question?
13:52 A. Correct.

13:52 Q. So, slightly more broadly, do you believe that nobody working with or representing GCM breached the GCM Hipaaline agreement in any manner whatsoever?
13:52 A. Same objection, Brett. I'm not going to answer any questions that call for legal conclusions.
13:53 Q. Besides the chief operating officer general counsel, have you held any other titles or jobs with GCM?
13:53 A. No.
13:53 Q. Outside of your general counsel responsibilities and -- outside of your general counsel responsibilities, do you have any other responsibilities at GCM?
13:53 A. Currently?
13:53 Q. Yes.
13:53 A. No.
13:53 Q. At any point have you identified yourself as a member of the limited liability company, GCM Partners, LLC?
13:53 A. Yes.
13:53 Q. Are you presently a member of GCM Partners, LLC?
13:53 A. Objection asked and answered. Yes, I have equity, I'm a member.
13:53 Q. And when did you become a member of the

13:54 LLC?
13:54 A. In and around May or June of 2020, maybe a little bit after that.
13:54 Q. Who are the other members of the LLC?
13:54 A. George and Jenna.
13:54 Q. What about Dr. Salzman?
13:54 A. No.
13:54 Q. Why is that?
13:54 A. Objection, argumentative.
13:54 Q. Was Dr. Salzman ever a member of the LLC?
13:54 A. No.
13:54 Q. From a work and duties perspective, what does it mean to be a member of GCM Partners Limited Liability Company?
13:54 A. Are you asking about me or any member?
13:54 Q. Yes, you?
13:54 A. I have an agreement that sets out my duties, but I also have professional responsibilities that any in house counsel would have to its client.
13:54 Q. And, as far as the member piece, what's the document outline as your duties as a member, putting aside general counsel stuff?
13:55 A. Membership in an LLC doesn't come with any duties. I don't have any by virtue of being a member.
13:55 Q. Didn't you say you also have a written

13:55 agreement with GCM that describes it?
13:55 A. That's right.
13:55 Q. So, GCM chose to assign you certain duties associated with your membership, even if it's not necessitated --
13:55 A. The membership is part of my compensation.
13:55 Q. Do you have any role with Green Care Medical, Inc?
13:55 A. No.
13:55 Q. To your knowledge, does Green Care Medical, Inc. have any legal relationship with GCM?
13:55 A. No, not to my knowledge.
13:55 Q. Who is responsible for the corporate filings for GCM at present?
13:55 A. I don't know, there haven't been, any in awhile. In the past I've taken care of the annual report but it's --
13:56 Q. So Exhibit 14 here.
13:56 (WHEREUPON, Exhibit No. 14 was marked for Identification)
13:56 Q. Could I ask you to take a look at Exhibit 14?
13:56 A. Okay.
13:56 Q. Do you recognize those documents?
13:56 A. Yes.

Q. Are those the annual filings with the State of Illinois as to the Limited Liability Company of GCM Partners, LLC?
A. They appear to be.
Q. And did you file those?
A. Probably.
Q. So, what I've provided to you there is 2019, 2020, 2021 and 2022, is that correct?
A. There are four pages, that's what it appears to be.
Q. And those four pages appear to correspond with the years 2019 to 2022?
A. Yes.
Q. Did you file a similar reports in any other states?
A. Objection, relevance. At some point after dealing with Hipaaline and Emily, we did.
Q. In any of the annual filings, be they those that constitute Exhibit 14 or otherwise, have you ever identified a medical doctor, physician, or -- medical doctor or physician as a manager or a member of GCM Partners LLC?
A. Not to my recollection, no.
Q. And so, at least according to 2022, there in Exhibit 14, you and George are identified as the

managers, is that correct?
A. As of that year, yes.
Q. And in the years preceding it was just George?
A. Yes.
Q. And, all of that remains accurate?
A. I don't know, without seeing the other ones, I'm not going to assume.
Q. Without seeing the other ones?
A. '23, '24, '25. I don't know.
Q. As far as those years that are in front of you, that was accurate in 2019?
A. This is how they were filed.
Q. That's how they were filed, but was that accurate that the true manager was George, and then as of 2022, you became a manager?
A. Yes.
Q. And, in all instances the principal place of business was always George's home on northern California Avenue, right?
A. Yes.
Q. Or North California, I should say.
So, did Jenna have a membership in the LLC prior to your arrival?
A. I don't know, I don't think so, but I

13:59 don't know for sure.

14:00 Q. And, Dr. Salzman was never listed as a member in the GCM Partners LLC, is that correct?

14:00 A. Objection, listed where? Members aren't listed in these filings.

14:00 Q. He was never listed as a manager?

14:00 A. Correct.

14:00 Q. And he never was a member?

14:00 A. Salzman has never been a member or manager of GCM Partners.

14:00 Q. And this that we're looking at here, this is a, I guess actually I should refer to an earlier Exhibit that was the Articles of Formation there, Articles of Organization LLC 50.1 here, Exhibit 14. But, GCM Partners is a limited liability company, not a professional limited liability company, PLLC, is that correct?

14:01 A. Correct.

14:01 Q. Does GCM Partners need to be a PLLC to perform its business functions?

14:01 A. Objection, calls for a legal conclusion?

14:01 Q. Sitting here today, are you aware of any instances or instance in which a government regulatory agency, be it municipal or state or federal, has made any inquiries of GCM related to any of its business

practices?
A. I'm not.
Q. Are you aware of any instances in which a regulatory agency has asked any questions of GCM at all for any reason?
A. I'm not.
Q. Under how many different names has GCM operated between 2019 and 2022?
A. Objection, vague. Are you asking about assumed names or fictitious names?
Q. Yes, right.
A. Many, I don't know how many.
Q. And why would it do so?
A. Why does any business do so?
Q. I'm a lawyer, I'm not a business guy.
A. Oh, you don't know? Yeah, a legal entity can go by one or more assumed names to change the name of how it appears to the public.
Q. But why would it want to do so? Or, in this instance, why did GCM elect to do so?
A. Well, very commonly, businesses use an assumed name so they don't have to put the legal entity suffix at the end of it. It's stylistic; for example, AT&T instead of AT&T Holdings, Incorporated. GCM has been involved in many business ventures over

the years, and has used assumed names so they can brand those accordingly.

Q. So, if I could offer you -- do you have any recollection of the names that GCM has used over the years?

A. Some of them.

Q. Which ones to you recall?

A. Mind Clinic. Trip Sitter, or some derivation of that, maybe. There are a bunch, so unless you show me something, I can't rattle them all off.

(WHEREUPON, Exhibit No. 15 was marked for Identification)

Q. So, this is marked as Exhibit 15.

A. I also don't understand how any of this is relevant, either.

Q. So, taking a look at Exhibit 15. Could I ask you to flip through those and see if that refreshes your recollection?

A. Yep, I remember these.

Q. All right. So, starting with the one that's most immediate interest to this lawsuit, why did you want to change the assumed name to Leafwell MD?

A. I don't know, before my full time

14:04 involvement.
14:04 Q. Did you file that?
14:04 A. I don't know.
14:04 Q. All right. So, going to the next one
14:04 there, the next one in your stack, New Fix?
14:04 A. Yes.
14:04 Q. And, why did GCM want to use the adopted
14:05 name--
14:05 A. This is a potential Ketamine venture.
14:05 Q. Okay. That was in 2020, that was January
14:05 of 2023?
14:05 A. That's what it says.
14:05 Q. Is that when you recall wanting to use the
14:05 assumed name?
14:05 A. I don't know when we first conceived of
14:05 it, but this is when it was filed.
14:05 Q. Did you address going into the Ketamine
14:05 market with Hipaaline at any point?
14:05 A. No.
14:05 Q. When did GCM move into the Ketamine
14:05 market?
14:05 A. Sometime in 2021, I think.
14:05 Q. Mind Clinic?
14:05 A. That's another Ketamine venture.
14:05 Q. Okay. And, was it distinguished in any

14:05 way from Nufix?
14:05 A. They were not related.
14:06 Q. And then there's RX MD, RX MD Wellness?
14:06 A. Yes.
14:06 Q. Is that another Ketamine --
14:06 A. I don't remember exactly what that was.
14:06 Q. That was a little bit, that was about a
14:06 year and a half ago, yes?
14:06 A. Yes.
14:06 Q. You don't recall why it was you filed
14:06 that?
14:06 A. No.
14:06 Q. All right. Safe to say that you're
14:06 familiar with the Defendant in this case, Ms. Emily
14:06 Fisher?
14:06 A. I know who she is.
14:06 Q. When did you first come to meet Emily
14:06 Fisher?
14:06 A. I don't remember, but probably in the fall
14:06 of 2019 on a video call or a phone call.
14:07 Q. I suppose on that topic, have you ever met
14:07 Emily Fisher in person?
14:07 A. No, thankfully.
14:07 Q. Do you have any knowledge of her ever
14:07 being here in Illinois, or even being in the United

States?
A. Yes.
Q. When do you know that she was in the United States?
A. I know she's traveled to Las Vegas several times, was in Tennessee recently. I assume other places, Florida.
Q. How do you know, how do you come about knowing that she went to Las Vegas?
A. I don't remember, but there was at one point we were where she posted something on LinkedIn, maybe that's how I learned about it.
Q. So, this is not personal knowledge, this is you were following her on LinkedIn and you saw that she posted something about being in Las Vegas?
A. I don't know that I follow her or not, but I saw something at some point about her being at a conference.
Q. And when was that?
A. I don't know.
Q. Last year?
A. I don't think so, before that.
Q. Two years ago?
A. I don't know.
Q. Was it more than three years ago?

A. I don't know.
Q. When was she in Tennessee, you said recently, yes. So, what's recent to you?
A. I don't know, sometime in the past year maybe.
Q. And, is that also from LinkedIn?
A. I'm not sure where I heard that. I try not to think about her at all, Brett. Sometimes the information seeps through.
Q. During the course of your business involvement with her, do you have any personal knowledge that she was ever in the United States?
A. I don't know.
Q. The question is, do you have any personal knowledge that she was ever in the United States?
A. I don't know if I do or not. Right now, no.
Q. What might be able to refresh your recollection on that?
A. I don't know.
Q. So, you first encountered her, your thought is probably sometime in the fall of 2019 through some sort of video teleconference is what you just told us. What were your initial impressions of Ms. Fisher?

A. I object to relevance. She came off as overly polite and partially charming for a little while. And, there was some level of excitement about growing the business.

Q. And, has that perception changed in the subsequent 6 years?

A. You tell me, she's a fraudster, Brett. We were her second victim that we know of. She uses people, discards them like she used Britain Paradise. She's being investigated in a couple of jurisdictions. I think she's a terrible person. Do you have time to continue, or is that enough for the record?

Q. By whom is she being investigated?

A. State of Florida, I believe, or some department thereof.

Q. Do you know for what?

A. Body brokering, maybe, patient brokering, something like that.

Q. How did you come about that information?

A. I don't know. Again, seeps through.

Q. She being investigated for criminal or civil matters?

A. Hopefully the former, but I don't know.

Q. Have you been contracted by anybody regarding that?

14:11 A. I'm not sure. About the Florida stuff?
14:11 Q. Yes.
14:11 A. No, no.
14:11 Q. When you first met Ms. Fisher in the fall of 2019, what did you understand her business to be?
14:12 A. Internet portal.
14:12 Q. With what specialty?
14:12 A. Medical cannabis.
14:12 Q. And initially, what value did you think that Ms. Fisher was going to bring to GCM?
14:12 A. The expansion of the patient base.
14:12 Q. Because at that time GCM was only doing business in the brick and mortar facility, is that correct?
14:12 A. Yes.
14:12 Q. And had you, prior to interacting with Ms. Fisher, had you heard anybody talking about taking medical cannabis, medical marijuana to a telehealth platform?
14:13 A. Had I heard of anyone?
14:13 Q. Yes.
14:13 A. I don't know if I heard of anybody doing it before.
14:13 Q. Did it sound like a novel idea when she pitched it to you?

A. I don't know if it was novel, it was new, fresh, but I don't know if she was the first or if it was the first time I ever heard of it. I can't tell you that.

Q. But, you have no recollection of, say, discussing it with George or Steven or anybody else?

A. I don't remember if we did or not.

Q. And, did you support the concept of GCM entering into a business arrangement with Emily Fisher?

A. In general, yes, we entered an agreement.

Q. But, did you support that idea or is this one of these things where because you weren't a manager at the time, the managers overruled your objection?

A. Objection to relevance. Whether I supported it or not. But, yes, I was in support of the idea of bringing our service online.

Q. And, as the relationship matured between Hipaaline and GCM--

A. That's not the word I would use.

Q. Well, okay. So, how about this, when Hipaaline first entered into a formal agreement with GCM, that was October of 2019, right?

A. No, July of 2020.

Q. That's when they signed the contracts, what was the effective date of the contract?

A. I don't know, October maybe.

Q. October, 2019, and I'd like you to, of course, check. But, so, from October, 2019 until the end of 2020 did the relationship between GCM and Hipaaline flourish?

A. Well, I'm going to say this. At issue in this case is who we were dealing with at the time. Hipaaline didn't exist until June or July of 2020. So, we were dealing with Emily Fisher until that time, regardless of any retroactive provision in the contract. With that said, yes, things were going good for a full month, yeah.

Q. When did things stop going good?

A. It's in the Second Amended Complaint, I don't know, August, September maybe?

Q. Of 2020?

A. Yes.

Q. By that time Hipaaline was in existence, right?

A. I just said that, yes.

Q. So, while you were dealing with Emily Fisher in her individual capacity, things were going well?

14:16 A. Yes.
14:16 Q. So, then, because you said things started to go not so well in August of 2020 thereabouts. So--
14:16 A. Whatever it says in the Second Amended Complaint, that's when it began to sour.
14:16 Q. When did -- I'm sorry, what contributions did each of the parties to this business arrangement provide to each other for the relationship to succeed and flourish until August of 2020?
14:17 A. The parties were doing what they promised to do until she like a maniac tried to take over the company.
14:17 Q. Do you believe there's any sort of trigger point where she transitioned to what you have described as turning into a maniac and trying to take over the company?
14:17 A. I don't know what it is that changed. I mean, my presumption is she saw how much money it was making and tried to cut us out. That's not a mystery to you.
14:17 Q. Up until August of 2020, GCM and Hipaaline were, in fact, working quite well together. And GCM was providing input to Hipaaline as to how to improve its product, is that correct?
14:17 A. It always was, yes.

14:18 Q. And, was Hipaaline providing input to GCM as to how to better improve its services?
14:18 A. No. She attempted to, through micromanaging.
14:18 Q. And, what sort of suggestions was she providing?
14:18 A. This is in the complaint, Brett. She would incessantly bug us while we were working. This patient has been in the waiting room for 5 minutes, why haven't they been seen, like every day. Instead of out there marketing and finding partnerships, she's watching the computer screen, splitting hairs over 2 and 3 minute wait times.
14:18 Q. Well, okay. So, let's talk about that a little bit. What is it you believe Emily Fisher was personally doing with Hipaaline during the period of functional relationship between GCM and Hipaaline?
14:19 A. Objection, vague. What, personally doing what?
14:19 Q. Was she coding?
14:19 A. No.
14:19 Q. To your knowledge, do you have any knowledge if she knows how to code?
14:19 A. I doubt it, based on the way she would talk on the development calls.

14:19 Q. Do you believe that she was marketing, creating new marketing material for GCM?
14:19 A. Material, I don't know. She talked a lot about making partnerships with dispensaries and other avenues for developing patients.
14:19 Q. And, was GCM able to capitalize on those partnerships that she described?
14:19 A. We don't have any data on that.
14:19 Q. Well, did you ever form a partnership with any dispensaries?
14:19 DR. GAVRILOS: We introduced --
14:20 A. I'll take George's prompt on that. We made the introductions to cannabis companies.
14:20 Q. The question -- I'm going to object, I've got to object to his intervention on that.
14:20 DR. GAVRILOS: Sorry.
14:20 Q. So, what's the answer?
14:20 A. To the extent that she made partnerships, we introduced her to them. We don't have any data on what her efforts did in terms of our increased revenue. The business was flourishing because it was online. But, her sole value, as far as we were concerned, was giving us access to the platform.
14:20 Q. Are you aware of, at this time, so sometime in the summer of 2020, are you aware of any

other entities providing online referral services for medical marijuana or cannabis?

A. Yeah, there was one I think called Marijuana Doctors or something. There might have been another one. We had MAPS is another one that comes to mind, but they weren't quite what we were doing.

Q. What was the distinction?

A. Weed Maps was a dispensary locator, and Marijuana Docs, I think, was a directory where people could go and find a doctor, but then had to contact that doctor independently. Made Well was a funnel.

Q. So, what equipment or systems do you have personal knowledge Emily ever used for her work; talking about laptops versus tablets versus desktops or MAC versus PC or Android versus iPhone?

A. I don't know, she had her own computer that she would use to video call us. Her developers had computers, some of her staff had computers. Deepak, (ph) whatever his name was, he had a computer. She had a phone like everything. It seemed that everybody that we encountered had a phone and a laptop.

Q. So, beyond just drawing the concussion that she had a computer by virtue of you being able to meet with her virtually online, and having a phone by

14:22 virtue of speaking to her on said phone, do you have any further knowledge about whatever her computer was?
14:22 A. No.
14:22 Q. Or where it was?
14:22 A. No, I don't.
14:22 Q. What services do you believe Emily Fisher was using for internet connectivity as of 2020 and 2021?
14:22 A. I don't know, I have no idea.
14:22 Q. What e-mail provider do you believe Emily Fisher was using for work purposes in 2020 and 2021?
14:22 A. I don't know, and it doesn't matter.
14:22 Q. So, do you believe that Emily Fisher is entrepreneurial in spirit?
14:23 A. Objection, relevance and vague as to spirit. I think that she's greedy and opportunistic. She had a good idea, then she clawed it back for herself.
14:23 Q. So, who made the decision to retain outside counsel once it came time to file this lawsuit?
14:23 A. Objection, relevance and attorney/client privilege. I'm not going to tell you that.
14:24 Q. When was the determination made to retain outside counsel?

A. October of 2020, it's laid out in the Second Amended Complaint, the dates.
Q. So, as far as the Second Amended Complaint, did you participate in writing any aspect of it?
A. Yes.
Q. Did you do so in your capacity as a witness, or as an attorney, or as something else?
A. Both.
Q. So, what position are you taking on asking about details that appear within the Second Amended Complaint?
A. You going to have to ask me specific questions.
Q. Okay. We'll start with this one. So, is it Exhibit 2, is that Exhibit 2?
A. 2.
Q. So, on Exhibit 2, if I bring your attention to page 3, paragraph 6, it says "Since Online MD acquired Hipaaline assets associated with the Leafwell platform, Fisher, through online MD, has continued to engage in the same business". Are you familiar with that language?
A. I mean, I'm reading it as you are.
Q. So, did you contribute at all to that part

of the complaint?
A. I don't know. The facts are the facts.
Q. And so, it is a fact that Fisher through Online MD is continuing to engage in the same business practices for telehealth related services in the United States?
A. We don't know now, do we, Brett.
Q. What's that?
A. There are probably some other entities involved, given that no one has appeared for Online MD. We'll find out who those are.
Q. But, do you believe that what appears in the Complaint is fact?
A. At the time we wrote it, yeah. But, it could have changed. So, I don't know if it's true as of this moment.
Q. So, going down also in paragraph 6 there, going down to the line Fisher and Online MD have done so using certain of GCM Partners trade secrets; for example, what are the trade secrets that are at issue in this case. Objection, calls for a legal conclusion. Trade secrets is a defined term. I'm not going to answer it.
Q. Well, I don't think it's going to work that way because in order to prove this case, you're

going to have to explain to the jury what the trade secrets were. So, we have a right to make a discovery inquiry on what are the trade secrets.

A. Maybe, but for the purposes of this testimony right now, I think it's a legal conclusion. I'm not going to answer the question.

Q. All right. So, it is your personal position as the deponent today that though you contributed to the writing of this Complaint and though you stand by the bleeding within the complaint you can not tell me what the trade secrets were?

A. No, that's incorrect, I won't.

Q. Fisher of course reserves. Were the list of physicians or licensed medical providers, in any events, would that have been a trade secret?

A. Whatever it says in this Exhibit 2 is what GCM's position is.

Q. I'm not asking GCM's position, I'm asking your position.

A. I am GCM.

Q. All right. Does the fact that you are GCM and that the Plaintiff here is GCM, does that create any sort of difficulty in testifying today?

A. Objection, vague.

Q. Yes.

14:29 A. How so?
14:29 Q. Does it cloud the issues?
14:29 A. Not for me. Does it for you?
14:29 Q. Well, I've said multiple times this is purely business for me. I'm an attorney advocating for my client.
14:29 A. Oh, that's what you're asking.
14:29 Q. Yes.
14:29 A. No, it doesn't at all. I've been doing this a long time, and I can separate the issues even though it remains personal to me, nonetheless.
14:29 Q. So, I'd like to bring your attention to page 7 of the Second Amended Complaint there. Looking at paragraph 25?
14:30 A. Okay.
14:30 Q. It says that from approximately September of 2017 through October of 2019, prior to beginning a business relationship with Fisher and then later Hipaaline Dr. Gavrilos, while working full time as a critical clinic pharmacist for a large academic medical center in the Chicago metropolitan area, undertook the following steps toward building an established, successful medical cannabis practice. So, I'm sorry, you know what, strike that. We already addressed that issue right there. So, if I could

bring your attention to the next page, it's, look at paragraphs 28 and 29.
A. Okay.
Q. Taking a look at paragraphs 28 and 29, do you believe that it was Fisher that introduced the idea of taking GCM online?
A. I don't know, probably not, but I don't know. It says here that she told us we could expand. I don't know.
Q. Well, when you say probably not, why probably?
A. I don't know, that's, the idea of doing medicine online is not something Emily Fisher created.
Q. Is this something GCM created?
A. Of course not. GCM didn't create telehealth, but it was being done before Emily Fisher and before Leafwell.
Q. Was the conducting of telehealth and the blending with medical marijuana or medical cannabis referrals, was that GCM's idea?
A. You got to explain what you mean by that, I don't know.
Q. Was GCM the first one to come up with the idea for doing telehealth for medical marijuana and cannabis?

A. Of course not, no. We're not claiming that, either. So, I don't know why you're asking me about it.

Q. Are you familiar with the declaration of Dr. George Gavrilos dated March 19th, the year 2025?

A. Exhibit 1 to the Second Amended Complaint. Is that what we're talking about?

Q. Yes.

A. Yes, I'm familiar with it. Before you start -- bathroom.

VIDEOGRAPHER: It's 2:34, we're off the record.

(WHEREUPON, a short recess was taken)

VIDEOGRAPHER: The time is 2:37, we're back on the record.

(WHEREUPON, Exhibit No. 16 was marked for Identification)

BY MR. WALKER:

Q. So, looking at Exhibit 16, which is the Dr. Gavrilos Declaration, bringing your attention to page 4 going into 5, paragraphs 21, Alpha through Delta.

A. Okay.

Q. Are you familiar with those protocols that Dr. Gavrilos is describing there?

14:38 A. Yes.
14:38 Q. And, how would you check for compliance on these things?
14:39 A. What do you mean by check for compliance?
14:39 Q. How would you make sure that GCM's independent contractors were complying with these requirements?
14:39 A. We control the database.
14:39 Q. Which database?
14:39 A. We had everything in a cloud service and we controlled the log-ins.
14:39 Q. Which cloud service were you using?
14:39 A. Google.
14:39 Q. And the medical records were there, in the Google--
14:39 A. No, the medical records were on Leafwell's servers, wherever that was.
14:39 Q. Well--
14:39 A. They uploaded -- when stuff was uploaded to Leafwell, it was on Fisher's hardware.
14:39 Q. So then where, what was it that was going onto your cloud?
14:39 A. Anything else. Anything else that's part of our business records and patient care, but whatever was uploaded to Leafwell was not controlled by us.

Q. Was it controlled by the independent providers -- I'm sorry, was it controlled by the professional providers, the medical--
A. They had access.
Q. Was it controlled by them?
A. I don't know, what do you mean by control? It's another legal conclusion, we're not going to get into that.
Q. Did they have the ability to move those records any time they chose?
A. Yes, they had access to them, yeah.
Q. And they could move them?
A. Yes?
Q. They could pull them right off the Leafwell platform?
A. I don't know about Leafwell, I can't comment on what Leafwell's capabilities and hardware was, for any records that we had under our control, physicians always had access to.
Q. No, I'm asking could the physicians, the physicians who are acting as independent contractors for GCM, could they remove medical records from the Leafwell platform and put them onto--
A. You'd have to ask Fisher, I don't know. I was never in that part of the interface because, let's

14:41 see here, it's coming to me, I'm not a physician.

14:41 Q. If I bring your attention to the paragraph 2 above it, paragraph 19, this purports to be non exhaustive list of trade secrets and confidential information. Are you familiar with the 9 items listed there?

14:41 A. Yes.

14:41 Q. And, do you agree with Dr. Gavrilos that those are a non exhaustive list of the trade secrets and confidential information at issue in this case?

14:41 A. I agree with the way that this allegation is pled in paragraph 19.

14:41 Q. That sounds like a legal conclusion. I'm asking do you personally agree that all 9 of these things were among the trade secrets and confidential information?

14:41 A. Objection as to relevance, as to whether I personally agree.

14:41 Q. You are GCM?

14:41 A. GCM's position, not Jonathan Mraunac's, GCM's position is these are the trade secrets in a non exhaustive list. How many hours are we going to waste where you ask me to make a conclusion about something we put in writing? I tell you I'm not going to do it, and you do it again a few minutes later. What is the

point of this?

Q. So, you'll notice there that it says Roman Numeral 1, pricing structure of payments by GCM Partners to its medical providers. So it's GCM's position that they were paying money to their medical providers?

A. In some capacity, yes.

Q. So, what was GCM paying to its medical providers?

A. I don't know. Probably for the medical services they were providing, but I'm not sure because I didn't handle the books as we've discussed, and I'm not a physician.

Q. What is meant by log of patient activity on a Leafwell platform?

A. I don't know. I'm not sure what it means. It seems to mean what it says, it means patient activity on the Leafwell platform. When patients are on it, I would imagine Leafwell logs all of those events, a website visit, a log-in to a patient's account, a log out, etc.

Q. So, number 5 there, patient data and identifying information, which includes but not limited to condition medical records, medical history, it goes on. It's GCM's position that that is their

14:44 confidential information?
14:44 A. It says what it says here. Yes. I'm not going to give you any more characterization other than what's written in paragraph 19.
14:44 Q. You already said yes, the yes was sufficient. These are all things we've already addressed, going through.
14:45 At the time of the Second Amended Complaint, the GCM was no longer operating brick and mortar facilities, despite what it says in the introduction of the Second Amended Complaint, is that correct?
14:45 A. No.
14:45 Q. No, it was not, or that's not correct?
14:45 A. The answer to your question -- what was the question.
14:45 Q. That--
14:45 A. I'm asking the court reporter what the question was.
14:46 (WHEREUPON, the record was read by the Court Reporter)
14:46 A. My answer was no.
14:46 Q. What about so much of the Second Amended Complaint that refers to GCM's medical practice, is that an accurate characterization of the business GCM performs?

14:46 A. Objection, calls for a legal conclusion. Do you want to point me to a specific place you can ask me about it?
14:46 Q. Well, are there any instances in which it could be said that GCM was engaged in medical practice?
14:46 A. No.
14:46 Q. Are there any instances in which GCM would have considered the people using its services to be patients versus clients or customers?
14:47 A. Objection, relevance and objection calls for a legal conclusion. The definition of a patient is a question of law.
14:47 Q. Customarily within GCM, do the people who are representing GCM, be they you, or George, or Jenna refer to the people using your services as patients?
14:47 A. Objection, vague. When?
14:47 Q. Right now.
14:47 A. Currently?
14:47 Q. Yes.
14:47 A. I don't know. I'm not involved in the operations anymore. I don't know what the nomenclature is currently.
14:47 Q. How about in 2020?
14:47 A. I don't remember what we were all calling

them. But, whatever it was, it was the same thing that Fisher was calling them. I don't know if it was clients, or customers, or patients, or some combination thereof.

Q. So, for right now, I'm going to switch back to the GCM Hipaaline agreement contract, and I'm going to, I believe that's Exhibit 10, is it not?

A. Yes.

Q. And, I'm going to ask if you have any knowledge of distinctions in this contract between confidential information, proprietary information, and data?

A. I can tell you right now, I'm going to make a blanket objection if you're going to ask me to interpret any of the provisions in this agreement, I've said it a few times now. These are legal conclusions. The court will interpret the meaning of anything in this document. I'm not going to do it for you. So, if you want to save both of us some time, we can skip it. Or, if you want to hear my objections piece by piece, we can do that, too.

Q. My question actually relates to what your intention was upon the drafting.

A. Objection, relevance. The document is self-defining. And, unless it's found to be

ambiguous, the parties intent is gleaned solely from the document. So, I'm not going to answer those questions, either.

Q. Reserve on the issue.

A. Affirmative.

Q. You are aware that this is a live issue within the case, are you not?

A. Yes, I understand exactly what's going on, Brett.

Q. If I bring your attention to section 5.4, this addresses transfer right and title, and specifically, the absence of transferring right and title. And, it starts with "Except as specifically provided herein", what are the specific exceptions, when it says except as specifically provided herein, what are those specific exceptions provided therein?

A. I don't know, I imagine they're somewhere in the agreement.

Q. Do you know why proprietary information was never defined in the GCM Hipaaline agreement contract?

A. I don't know if it is or isn't. Which portion are you thinking of?

Q. Well none, that's the problem, it's never defined. So, there's no portion -- there's reference

14:51 in section 5.1, if you want to familiarize yourself
14:51 with that, or 5.2 also, but it's never defined. Is
14:52 there a reason for that?
14:52 A. Objection, relevance, argumentative. And,
14:52 to the extent it calls for a legal conclusion, then
14:52 I'm not going to answer it, the reason.
14:52 Q. All right. So, you're not going to answer
14:52 on that one?
14:52 A. They're all the same.
14:52 Q. Which is you're not going to answer?
14:52 A. Yes, I'm not going to answer. If you're
14:52 going to try to get me to interpret this agreement,
14:52 I'm not going to do it.
14:52 Q. That's not what the question is seeking.
14:52 It's seeking the factual question of why was it not
14:52 defined?
14:52 A. That goes to the parties intent, and I
14:52 already put that one on the record. So, it's the same
14:52 thing.
14:52 Q. The parties intent?
14:52 A. You're asking me why something was or was
14:52 not defined in the agreement.
14:52 Q. Yes.
14:52 A. That goes to the parties intent as to
14:52 whether or not they wanted to define it. And the

14:53 parties intent is gleaned from this document, not my opinion. So, I don't have to give it to you, and I'm not going to give it to you.
14:53 Q. Do you, sitting here now, distinguish between confidential information and proprietary information as it relates to the Second Amended Complaint in this lawsuit, or is it the same?
14:53 A. Same objection, calls for a legal conclusion. I'm not going to answer the question.
14:53 Q. So, once again, this is a difficult one here, Mr. Mraunac because we're trying to figure out what it is against which we're supposed to be defending?
14:53 A. It's only difficult for you because you're trying to get me to answer questions I don't have to answer under the law.
14:53 Q. So, we're in agreement that -- well, let me ask, are you aware that confidential information and proprietary information are used in that manner throughout the Complaint, that being you'll use the term "confidential information and proprietary information".
14:54 A. Objection, form. I didn't understand what you asked me.
14:54 Q. Are you aware that that's a common

14:54 occurrence within the Second Amended Complaint?
14:54 A. I'm still not sure what you asked me there, there was a lot of words coming at me.
14:54 Q. We can take a break if you need a break.
14:54 A. Oh, I'm good. I don't think you're asking me clear questions.
14:54 Q. The Second Amended Complaint often lumps together confidential information and proprietary information, but it does not distinguish between these two. And, as there are implications on the lawsuit arising that relate separately to those two categories, in order to have a fair chance at this lawsuit, we need to understand how it is GCM is distinguishing between what is confidential information and what is proprietary information?
14:55 A. And, we've identified that in the Second Amended Complaint.
14:55 Q. Okay, where?
14:55 A. We went through that paragraph already, paragraph 19, you just asked me about.
14:55 Paragraph 19 reads venue is properly -- sorry, Exhibit 1 to the Second Amended Complaint you asked me about paragraph 19.
14:55 Q. Yeah, see that's the whole, actually illustrates my point here, it reads the following non

14:55 exhaustive list qualifies as GCM Partners trade secrets and confidential information.

14:55 A. Okay.

14:55 Q. So, which one is trade secrets, which one
14:56 is confidential information, which one is proprietary information?

14:56 A. I don't know for proprietary, I can't give
14:56 you an answer.

14:56 Q. You have no knowledge of that distinction
14:56 appearing anywhere in the Complaint?

14:56 A. I don't. These factual allegations arose
14:56 almost 6 years ago, and I don't know anymore. The
14:56 facts haven't changed since then.

14:56 Q. So, similarly, because part of it is
14:56 because we're on the topic, as to the Second Amended
14:56 Complaint on page 12, paragraph 48, you've got similar
14:56 language appearing once again says this is in the
14:56 allegations, a following non exhaustive list qualifies
14:56 as GCM Partners trade secrets and confidential
14:56 information. Of course, there's no distinction. And
14:57 this, once again, illustrates for instance, the
14:57 patient data and identifying information. But, you're
14:57 not able to tell me if that's a trade secret or if
14:57 that's confidential information?

14:57 A. No, I'm not.

Q. All right. And actually since you're looking at the page anyway, be efficient here and I'll skip ahead. Paragraph 49 that follows the foregoing information has economic value to GCM Partners. What was the economic value?

A. I don't know.

Q. And since we're once again somewhat proximate to it, we'll flip forward a couple of pages here to paragraphs 69 through 72, which is pages 16 and 17. That's, once again, the language that describes the process that a potential customer would use, and you believe that to be a fair and accurate statement of how the system worked at the time of the alleged incident?

A. Yes.

Q. And, as we read a few paragraphs that follow, I think you already know this and probably already answered it, but the payments would then go straight from the potential patient straight to -- not straight to, let me rephrase that. Payments would go from the potential patient to GCM by way of the Blue Pay that was somehow managed by the Leafwell platform?

A. Whatever it says in here, that's how it worked.

Q. Do you know if any of the medical

14:59 professionals ever assessed the effects of these medical marijuana referrals for any of the GCM patients?

14:59 A. The effects, I don't know what you mean.

14:59 Q. Is it helping with whatever condition qualified them for it in the first place?

14:59 A. All of them.

14:59 Q. So, how would the physicians go about following up?

15:00 A. I'm not a physician, I don't know. I mean, there were, each one had its own protocol. So, in the way it exercised his professional judgment, his or her professional judgment, I don't know.

15:00 Q. And, how did they record those follow ups?

15:00 A. The Leafwell platform has all the data.

15:00 Q. So if it's not on the Leafwell?

15:00 A. Every log-in, every appointment.

15:00 Q. So, if it's not on the Leafwell platform there's no record of it?

15:00 A. During the time we were using the Leafwell platform, yes, we kept our own records after we got kicked out of it.

15:00 Q. So, GCM didn't check to make sure that these follow ups were happening?

15:00 A. I don't know what you mean.

Q. GCM did not exercise any sort of monitoring with these physicians to make sure that they were conducting a follow-up examination or assessment?

A. No, that's not true. The length of the certifications varied, as it says in there, from 90 days to 3 years. Most of the patients were on one year, certain that's what most of the states do. We weren't even using Leafwell for a year. So, there were probably very few follow-ups that happened on the Leafwell platform.

Q. But, you're confident that all the physicians were doing that?

A. I'm confident the physicians were exercising their judgment appropriately wherever they were licensed to make sure that the patients were being seen when they needed to be seen.

Q. All right. So, that's something of a distinction from what you previously said?

A. What's that?

Q. That all the physicians conducted follow-up assessments?

A. I don't know if they all did, other than when the patients were required to be re-certified. There was nothing preventing any physician from seeing

15:02 a patient sooner than the expiration of the certification.

15:02 Q. How did GCM compensate the physicians for doing these follow-up exams?

15:02 A. I don't know, I didn't handle that part of it.

15:02 Q. Do you know how the physicians were compensated at all, at any point, in any way?

15:02 A. I didn't touch it, it was all George Gavrilos.

15:02 Q. Is there anybody at GCM that's responsible for making sure the physicians are complying with the regulatory requirements for each state?

15:02 A. Objection, vague. What do you mean by regulatory requirements?

15:02 Q. Any regulatory requirements?

15:02 A. You have to be more specific.

15:03 Q. The regulatory requirements specific to the practice of medicine.

15:03 A. No, that's the physician's responsibility.

15:03 Q. Do you know if at any point in the process the physician certified that they have an ongoing doctor/patient relationship with GCM's patients?

15:03 A. I don't know what you mean by that.

15:03 Q. Is there a part in the process that has

been developed and operates through GCM's -- actually, you know what, I'm going to reduce, this is only for the year, say, 2020. In the year 2020, was there anything built into the system that required the physicians to certify that they had an ongoing patient relation, doctor/patient relationship?

A. I don't know. I don't know. I don't know if that was part of the state forms that each state required to be filled out or if Leafwell had something separate, but that's a question for your client, perhaps.

Q. During the years 2019 to 2021, did the physicians or other medical professionals keep control of the medical records and treatment notes for GCM patients?

A. I don't know, I was not involved in any physician recordkeeping. That's a question for Jenna and the physicians.

Q. At any point in the process in 2019 to 2020 did the physicians or any other medical professional certify that they confirmed a diagnosis in the potential patient as part of the process of certifying that patient for medical marijuana or cannabis?

A. I don't know. Some states require

15:04 diagnoses, some didn't.
15:04 Q. How about in Illinois?
15:04 A. Some only accepted certain diagnoses, so I can't answer that specifically.
15:04 Q. How about for Illinois?
15:04 A. I don't know what Illinois required. I also wasn't a part of completing those forms, or making sure that the physicians completed their parts of them, that was something Jenna did.
15:04 Q. Where were all the patient visit records kept in the year 2020?
15:05 A. Probably on the Leafwell platform.
15:05 Q. And was that by agreement?
15:05 A. It was by the way it worked.
15:05 Q. Was it written into the GCM Hipaaline agreement contract?
15:05 A. I'm not sure. If you want to go through it, we could. But, I know that there was a separate website that was HIPAA compliant that Emily loved to tout around.
15:05 Q. Was that a Hipaaline website of some sort?
15:05 A. I'm not sure. I think it was mentioned in the evidentiary hearings.
15:05 Q. Do you recall such part of the GCM
15:06 Hipaaline agreement, Exhibit A to it that discusses

15:06 providing a HIPAA compliant telehealth platform publicly hosted at www.leafwell.co and accessible to patients via personal computer, smart phone and tablet computer, number 5?

15:06 A. Where, what are you looking at?

15:06 Q. It's Exhibit A of the Hipaaline, GCM--

15:06 A. I see.

15:06 Q. And then you go to number 5 on the second page.

15:06 A. Yeah, there was a second website that was not public facing that Leafwell.co linked to. I know it was discussed in the evidentiary hearing.

15:06 Q. So, if you look down at the 6th bullet in that same section, number 5, take a look at that?

15:07 A. Yeah, the 5th and 6th bullet point would relate to what you're asking about.

15:07 Q. Okay. So, that's hosted by Hipaaline also?

15:07 A. Yes, that was Emily's system.

15:07 Q. Well, it's Hipaaline's system.

15:07 A. Well, we'll see.

15:07 Q. Why do you say it's Emily's system? This is a Hipaaline contract, right?

15:07 A. We're not going to get into this. We briefed this in front of the court for years.

15:07 Q. You said it's Hipaaline's contracts?

15:07 A. I'm being facetious, Brett. Who is the Defendant in this case? It's Emily, right? So, we'll see what the court says about who is responsible for all of this.

15:07 Q. Why is it Emily's, why is it Emily's system if it's a Hipaaline contract, Hipaaline providing the services?

15:07 A. You know what I meant, and I've given you my answer.

15:07 Q. What's the answer?

15:07 A. What is the question?

15:07 Q. The question is, why are you saying that this is Emily Fisher's website and data hosting service versus Hipaaline website --

15:08 A. I have a couple of die' as she's the defendant in this case now and she committed a misrepresentation about who owned those systems when we signed the agreement I can go further if you want.

15:08 Q. I think you're going to need to.

15:08 A. It's already been in the briefs, so you can go back and look at it if you want. I've given you my answer. If you want more, you can bring a motion to compel.

15:08 Q. So, is it your position right now that

Emily Fisher, all the stuff that's covered here in Exhibit A of the GCM Hipaaline Agreement, you're saying that's all Emily Fisher, that's not Hipaaline at all?

A. That's not what I'm saying at all.

Q. Well, that's the issue, then. Clarify, was it Hipaaline?

A. This is -- objection, calls for a legal conclusion. You can try to do this dance with me all day, you're not going to get what you think it is you might get, okay? Our claims in this case are in the Second Amended Complaint. We've been using interchangeably Leafwell and Emily all day, and your client, and this and that, and Hipaaline. So, if you think that my off the cuff statement about these 5th and 6th bullet points calling it Emily's system somehow has some legal effect, bring a motion for summary judgment on that basis. Try it.

Q. Is it your position that that is Emily Fisher's website or obligation, or is it Hipaaline's website and obligation to --

A. I'm not going to answer the question, it calls for a legal conclusion. So, next question.

MR. WALKER: Fisher reserves.

Q. This is a critical aspect to the case.

15:09 A. And, you're asking about a legal conclusion. Is it Emily's or Hipaaline's legal obligation per the terms of that contract, it could not be more of a legal conclusion. I think I've made it clear to you at this point how many hours into this that you're not going to get this out of me. So, we could be here until 5 o'clock or we could get this done more quickly.

15:10 Q. I'm not sure what you think I'm trying to get out of you, other than to understand how these allegations are because you've correctly identified that I'm confused how it is that these issues attributable to Hipaaline and Online MD are being assigned to Fisher, but that's not what I'm asking right now?

15:10 A. Yes, it is, You're asking me who is liable, that is the core legal conclusion in this case.

15:10 Q. Let me ask you this, was it Hipaaline's duty, putting aside Emily Fisher--

15:10 A. Oh, Jesus Christ.

15:10 Q. Was it Hipaaline's duty to fulfill the conditions of this contract, the Exhibit 10?

15:10 A. Objection, calls for a legal conclusion as to whether Hipaaline Limited had a duty and what the

15:11 scope of that duty was. Next question. I know this isn't your first time, I thought maybe that you would--

15:11 Q. Fisher reserves.

15:11 A. --outsmart me on some of these questions or something. I don't know what it was, but let's just move on.

15:11 Q. I have the wisdom to know that I don't outsmart anybody, I play by the rules.

15:11 A. I'm having a little fun here. Let's try this. If you submitted any of these questions you have asked me today in a request for admission, they would all be objectionable and none would have to be answered. But, somehow you think that if it's in a deposition room, it transforms into I have to answer all these. So, let's just get through this.

15:11 Q. So, is it your understanding that these files were kept on those databases and websites that you and I were discussing 5 minutes ago?

15:11 A. Yes, the Exhibit A, Part 5 to the agreement described the front end and back end of the Leafwell platform.

15:12 Q. And, you have no personal knowledge of any of the medical professionals keeping copies of those documents anywhere within their own personal control

15:12 or perhaps on another third party platform?
15:12 A. I don't know if they did or not, that was
15:12 up to the physicians under their duties, under their
15:12 licenses.
15:12 Q. And, once those documents were on the --
15:12 once those documents were -- so, to remain consistent
15:12 here, I'm using the words straight out of the
15:12 agreement, Exhibit 10. Once the documents were on the
15:12 consultant's web based servers, who owned those
15:13 documents?
15:13 A. Objection, calls for a legal conclusion as
15:13 dictated by the agreement.
15:13 Q. And, you're not answering?
15:13 A. Yes, I'm not answering.
15:13 Q. Did you expect that Hipaaline
15:13 representatives would have access to documents that
15:13 were stored on, once again, using the language here
15:13 consultant's web based servers?
15:13 A. Yes, I expected that the system that
15:13 Hipaaline and Emily were the purveyors of had access
15:13 to that system.
15:13 Q. Were there any parts of the Leafwell
15:13 platform or the consultants web based servers that
15:14 would be considered off limits to Hipaaline
15:14 representatives?

15:14 A. I'm not aware of any part of it that they couldn't get into.

15:14 Q. But, it was not a matter of whether they could or couldn't, it's a matter of whether they were allowed to or not allowed to.

15:14 A. To the extent you're asking me whether they were permitted or allowed to, under the agreement, that's a legal conclusion. I'm not going to answer that as far as whether I knew whether they could or could not access certain areas, I don't know.

15:14 Q. Did you, yourself, ever communicate to anybody at Hipaaline that certain parts of their software, or their websites, or their data storage sites were off limits to them?

15:14 A. I don't remember any kind of a communication like that.

15:15 Q. And, you mentioned this a few minutes ago, but as of 2020, what did you believe that Hipaaline's role was as regards to the Leafwell platform?

15:15 A. Objection, vague as to believe.

15:15 Q. Okay.

15:15 A. HIPPA Line's role, or duty, or whatever you want to call it is described in the agreement.

15:15 Q. In 2020, what did you think Hipaaline's role was with--

15:15 A. Objection, relevance. Hipaaline's role, or duty, or obligation or whatever else you want to call it is defined in the agreement. That's what I expected. I expected this to be upheld and adhered to.
15:15 Q. So, which part of the agreement?
15:15 A. The agreement, all of its terms, we expected adherence to all the terms.
15:16 Q. What did you understand Hipaaline's relationship to be with the Leafwell platform?
15:16 A. Oh, God, same objection. Calls for a legal conclusion. Your answers are in the agreement. I'm not going to give you my opinion or characterization of the agreement.
15:16 Q. Even though you're the deponent, you're not going to give me your understanding of what the relationship was? Okay. So, how about this, before the agreement was in effect, so let's say June, 2020, what did you believe Hipaaline's relationship was with Leafwell?
15:16 A. Hipaaline didn't exist before June of 2020.
15:16 Q. A different variant of it did?
15:16 A. We didn't do business with that entity, we were doing business with Emily Fisher. There's no

15:16 agreement between Hipaaline LLC or any other entity
15:16 before the agreement that we've been talking about
15:17 today.
15:17 Q. In 2019, 2020, 2021, what role did you
15:17 believe Emily Fisher played in maintaining,
15:17 administering, updating or managing the Leafwell
15:17 platform?
15:17 A. Objection, calls for a legal conclusion.
15:17 I expected Emily, as the owner of Hipaaline, to do
15:17 whatever was required of that entity under this
15:17 agreement. Is this, do you think this is like the
15:18 laser pointer with the cat, you're hoping I'm just
15:18 going to jump at it one of these times? What are we
15:18 doing here, Brett?
15:18 Q. As is the case with both of us, we've been
15:18 in the game for a long time.
15:18 A. I don't have any sympathy for you,
15:18 especially because of who you represent. If you want
15:18 to be here until 6:00 o'clock--
15:18 Q. I'm not asking for sympathy.
15:18 A. --it's not like I'm going to fall for one
15:18 of these, like after 90 you going to go, I got him,
15:18 this is not going to happen.
15:18 Q. I don't believe any such thing will be
15:18 happening. I've always said any lawyer who thinks

they're going to get that Few Good Men moment is a fool. It's, it doesn't happen, I don't think it's going to happen. I don't think you are anything but sincere in your feelings on this matter. But--

A. Not just feelings.

Q. Well--

A. This is my understanding of the rules of evidence and all the discovery procedures, and you haven't, you've not asked me a proper question that I haven't answered, and all the objections I've made are valid. You're free to test those if you want, but I'm trying to encourage you to give up on this because if you think that you're going to get me to interpret one of these legal instruments, it's not going to happen. So, if that's nothing more than my effort to deter you, you have it. But, let's keep going.

Q. Well, I guess we'll just ask this, then. How do you distinguish the wrong doings visited upon GCM by Emily Fisher the individual versus Emily Fisher who was the CEO of Hipaaline and the CEO of Online MD?

A. Objection, calls for a legal conclusion. These issues have all been briefed. I'm not going--

Q. They're not on the record. I need them on the record under your sworn testimony.

A. Objection, calls for a legal conclusion.

15:20 These legal issues have been briefed ad nauseam in this court over the last 6 years. I'm not going to answer the question.

15:20 Q. All right.

15:20 A. You're not asking me a factual question, you're asking me to make legal conclusions about people's responsibilities and roles. It's not going to happen.

15:20 Q. What action did Emily Fisher take as an individual that was different than the action she took as a CEO of either Online MD and Hipaaline?

15:20 A. Same objection. This is all, the record is replete with briefing on this.

15:20 Q. Well then, hit me?

15:20 A. I'm not going to give it to you. You can look it up.

15:20 Q. It is not under sworn testimony at that point?

15:21 A. It's not factual, these are legal issues you're asking me about. I'm not answering these questions.

15:21 Q. I think your definition of legal issues here is so broad to the point where I can't properly explore the evidence that would theoretically be entered against my client. You're saying that you

15:21 won't distinguish between what Emily Fisher the individual did versus what Emily Fisher the CEO of Hipaaline or CEO of Online M.D. did, which is critical to my defense of the case on account of I represent Emily Fisher?

15:21 A. It's not. Those issues have been briefed before two judges you can find them in the ECF. These are not factual questions, these are legal issues.

15:21 Q. Matters that have been briefed are not part of the evidentiary record.

15:21 A. And the evidence that you're allowed to distill from me is factual. These are legal issues that you're asking me about, I've already refused to answer the question, so you can do what you want with that. But, let's get on to the next one.

15:22 Q. Fisher reserves on the issue again.

15:22 As of 2020, how many people do you think were working at Hipaaline?

15:22 A. When in 2020?

15:22 Q. At any time.

15:22 A. Well, it changed as we grew.

15:22 Q. So, say the end of 2020?

15:22 A. Regardless of employee or independent contractor status, maybe there were 10.

15:22 Q. And, do you have any knowledge of other

clients of Hipaaline beyond GCM Partners?
A. When?
Q. In that same, say, the summer of 2020?
A. No, I remember us entering an exclusive marketing agreement, there shouldn't have been any.
Q. Now, what function do you think those 10 people were performing in the spring of 2020 for Hipaaline?
A. We talked about some of them, Deepak was a researcher, Miguel and his team wrote the software. She had some administrative assistant. I don't know who else, so that's the best I can remember.
Q. And, according to GCM Hipaaline agreement contract, was Hipaaline supposed to be compensated at the rate of $450 per hour?
A. Objection, calls for a legal conclusion.
Q. Initially how much was GCM paying to Hipaaline for its services?
A. I don't know, that's a financial question for George.
Q. So, you have no knowledge on how much it was that GCM was paying to Hipaaline for its services in the summer of 2020?
A. The only thing I remember about it is the 60/40.

15:24 Q. What do you remember about that?
15:24 A. That that's what she was getting, 40 percent.
15:24 Q. 40 percent of what?
15:24 A. All the revenue.
15:24 Q. And, do you know to what that equated to at the time, the summer of 2020?
15:24 A. The hard number?
15:24 Q. Anything.
15:24 A. I don't remember.
15:24 Q. Generally?
15:24 A. I don't remember.
15:24 Q. But, you knew at one point?
15:24 A. Yeah, when it was coming in, yeah, I remember it.
15:25 Q. You knew the revenues then?
15:25 A. I did. I knew Calculus in high school, I don't anymore.
15:25 Q. So, there was a time that you knew how much money was coming in to GCM?
15:25 A. Yes.
15:25 Q. Is there a time that you knew how much money was going out of GCM?
15:25 A. I'd probably have less knowledge of that. But, again, not my department.

15:25 Q. Why did the payment structure shift to 60/40?

15:25 A. I don't know.

15:25 Q. Do you know whose idea it was to change the compensation structure between GCM and Hipaaline?

15:25 A. I don't know that it was ever changed.

15:25 Q. So, to the best of your memory, it was always 60/40?

15:25 A. That's to the best of my memory, yes.

15:26 Q. When did you first learn that Hipaaline had initiated an insolvency proceeding in United Kingdom?

15:26 A. Now, that's a good example of a fact question, Brett, back on track here. It's in the Second Amended Complaint, February 23, 2021 I think is the date.

15:26 Q. And when was insolvency entered by the court?

15:26 A. The next day, I think. It's in the Second Amended Complaint as well.

15:26 Q. It is, but would you agree that the dates are incorrect?

15:26 A. No, not to my knowledge. Not that that matters, either, but we could spend time on that.

15:26 Q. So, if you go to the Second Amended

Complaint, Exhibit 2, page 30, paragraphs 148 and 149.
A. Okay, what's the question?
Q. Do you think it's likely that they actually sold off all of their assets pursuant to the administrative insolvency on February 23 when it wasn't until the following day when it was placed into administrative insolvency?
A. We have records from the U.K. proceeding, so if the dates are mixed up or something, I don't know, but the records will show.
Q. All right. So, how did you get the records from the U.K. insolvency proceeding?
A. I remember pulling them up from company's house.
Q. And they're publicly available?
A. I think so, that or Martin Carroll sent them to us, one of the two.
Q. When did you become aware that the insolvency was taking place?
A. Whatever the first day, if these are transposed, I don't know. But, let's just, for purposes of this answer, it's February 23 we found out around lunchtime, and all of our access was cut off and we got an e-mail from Fox Swibel.
Q. And, you had no knowledge that an

15:28 insolvency proceeding had been initiated, either prior to February 23 or February 24 the year 2021?

15:28 A. Yes, correct.

15:28 Q. How long did that insolvency process ultimately take?

15:28 A. A couple of years at least.

15:28 Q. And, at any point did GCM Partners attempt to object in that United Kingdom court?

15:28 A. No, it's also irrelevant because it's been briefed, so--

15:29 Q. And, in those few years, did GCM hire any U.K. attorney?

15:29 A. Yes?

15:29 Q. And, did that U.K. attorney attempt to appeal the insolvency proceeding?

15:29 A. No.

15:29 Q. Did GCM attempt to purchase Hipaaline or any of it's assets?

15:29 A. There was no opportunity. The sale was completed the moment the proceeding became public. And, you know the answers to all these questions, too.

15:29 Q. Looking back on it now, do you wish that GCM had objected to the insolvency procedure?

15:30 A. Objection, irrelevance as to what I wish.

15:30 Q. Be that as it may, the question is before

you.

A. I'm not going to answer that question whether I wished anything. Ask a better one.

Q. In hindsight, would it have been a good idea for GCM to object to the insolvency proceeding in the years for which it took place?

A. Objection, relevance. No.

Q. Why not?

A. The U.K. system of permitting successor liability avoidance is so problematic that it changed very recently after Fisher put this through. We weren't the only ones that got scammed by this. It wouldn't have made a difference. There was no opportunity to buy the assets.

Q. Are you familiar with GCM's claim for damages on this matter?

A. Somewhat.

Q. By what means does GCM calculate its damages?

A. I don't know.

Q. To what are the economic damages to GCM attributable?

A. I don't know.

Q. Are GCM's economic damages the result of being denied access to data it believed it owned, or

15:32 something else?
15:32 A. Objection, calls for a legal conclusion. The reason for the damages is in the Second Amended Complaint.
15:32 Q. Oh, I'm not asking for the reason for them at this point, I'm just trying to figure out what those damages are?
15:32 A. To your last question, let's have it back.
15:32 (WHEREUPON, the record was read by the Court Reporter)
15:32 A. You're asking me about causation, that's alleged in the Second Amended Complaint.
15:33 Q. Does GCM link its damages to returning customers?
15:33 A. Some.
15:33 Q. All right. How does GCM -- what does GCM consider to be a returning customer?
15:33 A. A patient that any physician working under the auspice of GCM, if that patient was seen once and didn't come back, that's a patient that we think would have but didn't, `a la, the patient was stolen.
15:34 Q. And so that's one?
15:34 A. That's one aspect.
15:34 Q. What are the other aspects of the damages?
15:34 A. I don't know. As you can see throughout

this today, I have been detached from it for awhile, but you chose to take my dep first.

Q. How many customers did GCM see in the year 2020?

A. I have no idea, your client has that number.

Q. Does GCM, do you believe that GCM's patient base would continue to grow had it not been for the folding of Hipaaline?

A. What we call in the Second Amended Complaint, the switch over, had it not been for the switch over, yeah, I think every patient that we were seeing would have come back.

Q. And, has GCM been able to create a new system now, albeit a year later, 2 years later whatever it be, that has every customer coming back?

A. Of course not, Emily stole them.

Q. No, I mean of your new customers?

A. That, I don't know. I don't know what our customer or patient retention rate is now because I haven't been involved in that part of the operations for awhile.

Q. Well, how about the year 2021?

A. I don't know.

Q. What about in 2022?

15:35 A. I don't know any of these specific statistical answers.
15:36 Q. Who would know them?
15:36 A. George.
15:36 Q. So, in -- what platform did GCM adopt once the Leafwell platform was no longer available to it?
15:36 A. GCM used the Healy platform for awhile to do medical cannabis certifications, and then very quickly pivoted into Ketamine therapy.
15:36 Q. And, why did it abandon the medical marijuana, medical cannabis?
15:36 A. I didn't say that it did, there may still be some medical cannabis certifications going on, but I don't know. But probably not, but I have no idea, so I can't answer that one. But, it's a, Ketamine is a better treatment for people that have more serious illnesses.
15:37 Q. Does, do you have any idea how it is that GCM came up with the figures that are reflected in the demand letter of June 25, 2026 appearing on page 2?
15:37 A. Page 2.
15:37 Q. The June 25, 2026 demand letter?
15:37 A. Yeah, but where is that, is that an exhibit yet?
15:37 Q. No. I can offer it here as an exhibit.

15:37 (WHEREUPON, Exhibit No. 17 was marked for Identification)
15:38 A. The calculations are in here what are you asking me?
15:38 Q. Were you involved with the calculating of those damages?
15:38 A. I have contributed to this letter partially, yes.
15:38 Q. Were you, how did the returning cohort factor into that, the returning customer cohort factor in that?
15:38 A. I don't know.
15:38 Q. Because it's not actually mentioned at all in this letter, is it?
15:38 A. How can we know 5 years later?
15:38 Q. Well, did you get to take a look at the data that Hipaaline -- no, not Hipaaline. Did you get the data that my office sent over to you that has actually that answer?
15:38 A. I don't know.
15:39 Q. You're aware that my office sent over the data to you, right?
15:39 A. I think so, yeah.
15:39 Q. But then, after reviewing that data, looks like GCM decided they no longer wanted to endorse or

at least it's not reflected in that letter?
A. You're taking a 408 letter and you want to what, you want to put in into evidence? What are we trying to do here?
Q. No, I'm asking you a question. I'm asking why the damages model shifted from the returning clients after having seen the data, then all of a sudden it switched?
A. This is a settlement letter.
Q. Uh huh.
A. So, this doesn't necessarily represent what the damages claims are in this case. This was an offer to settle.
Q. That's fine. Is it GCM's position that had the, as you've termed it, switch over never taken place, they would make every single dollar that they currently earned in these last 5 years, in addition to whatever additional money they would have received through their work with--
A. GCM would have earned a lot more money than it has in the last 5 years had the switch over not occurred.
Q. But, is there no crossover between the money that GCM partners earned in that 5 year period and what would have been, what they would have earned

had they stayed together with Leafwell?
A. Leafwell was in charge of marketing to new customers or patients, whatever you wanted to call them. I have no idea whether we were able to, subsequent to the switch over, capture patients that might otherwise have gone to Leafwell, I have no idea. I'm not saying GCM doesn't, but it's impossible to tell 5 years later.
Q. Do you believe that since you were chief operating officer, and since you were involved with these weekly meetings with the Hipaaline team, do you believe that GCM, and do you believe GCM would have operated the exact same way had they stayed together with Hipaaline through the year 2024?
A. Objection, vague. What do you mean by the exact same way?
Q. Would they have operated the same way, or would they have made different business decisions?
A. What does that mean?
Q. They employed different strategies from a business perspective?
A. I don't, it's vague, I don't even know what you're asking me, would we have employed different strategies.
Q. Is Online MD right now running the same

operation as GCM Hipaaline would have been running had they, had Hipaaline stayed with GCM?

A. We suspect it's not Online MD, like I said earlier in this deposition, it's some other entity.

Q. Whatever that other entity is, are they running the exact same business that GCM would have otherwise been running?

A. How do I know what your client is doing 5 years after the fact? Objection, foundation. How could I know that, Brett.

Q. I can refer you to the Second Amended Complaint where it says that she continued to operate at the same manner?

A. Yeah, the Leafwell platform is the same, Brett, whether what's happening behind the scenes, who owns it, whose invested in it, I have no idea because that's opaque.

Q. Do you believe the Hipaaline is the exact same as it was 5 years ago?

A. It is conceptually the same, you go on, you see a physician, you pay, you get a certification. It's the same. Is there more content, is there more social media going on, sure, but it's the same business.

Q. So, paragraph 6, the Second Amended

15:43 Complaint, it says that Online MD is operating the same business?
15:43 A. We already went over this. I don't know if it's Online MD, I highly doubt it but since you guys aren't representing it and you're going to let it go into default or it's some other entity. But, if Online MD sold it off, we're going to come for that one through successor liability. And, the law in the U.K. is different now.
15:43 Q. So, I was just asking you about how GCM's operations work. Do you believe that Online MD or whatever you believe to be operating the Leafwell platform right now is conducting its business the same way that GCM would have?
15:44 A. Objection, vague. What do you mean by that? GCM was never running Leafwell's business. GCM was administering from a business standpoint, the medical service. Leafwell was the online portal, they weren't the same business, that's why we partnered together.
15:44 Q. And so I guess what I'm trying to get at here is to the extent that damages -- this is the point I'm trying to get at, the damages claim, is that based on the money that whatever entity is operating Leafwell right now, be it Online MD or whatever else,

15:44 is earning that GCM believes it should get a portion of that?
15:44 A. Yes.
15:44 Q. Even though it is running its operations differently now than it did when it was working with GCM?
15:45 A. I don't know that.
15:45 Q. If they were, would you still stand by that, the damages?
15:45 A. Objection, incomplete hypothetical. I have no idea what the facts are underlying that assumption, so I'm not going to answer that.
15:45 Q. At what rate were the new customers growing during the period that GCM was working with Hipaaline?
15:45 A. I don't know, that's, your client has that data, too.
15:45 Q. And, we've provided it?
15:45 A. I don't know what it is.
15:46 Q. Are the damages related to GCM's inability to access customer information, or patient information, or client information of prior patients of GCM?
15:46 A. I don't know, what does it say in the Second Amended Complaint?

Q. It says it does.
A. Then it does.
Q. So, at the beginning I was asking you about -- hold on -- is a larger portion of the damages in the case attributable to GCM losing access to medical professionals, or losing access to potential patients?
A. The latter.
Q. And, how is it that the actions of Emily Fisher resulted in GCM not being able to reach out to potential customers?
A. Objection, calls for a legal conclusion. The answer to that is in the Second Amended Complaint.
Q. I don't think it is.
A. Yeah. It's a legal issue, so we can have another tiff if you want, or you can ask me the next question.
Q. We don't have tiff's. So, is GCM alleging any damages related to the solicitation of medical professionals from GCM to Online MD's?
A. What does it say in the Second Amended Complaint?
Q. It says it does.
A. Based on that representation, yes.
Q. Which medical professional are we talking

15:48 about?
15:49 A. She tried to steal several of them, and
15:49 did. And, I'm sure some of them are still working on
15:49 the Leafwell platform.
15:49 Q. And, we're aware of Dr. Lewis Jassey?
15:49 A. Yeah, you should be.
15:49 Q. And is Dr. Jassey still working for GCM?
15:49 A. I don't know.
15:49 Q. Was he still working for GCM after the, as
15:49 you call it, the switch over?
15:49 A. I don't know if he was or not.
15:49 Q. You don't know if Dr. Jassey was?
15:49 A. I'm not sure, it's 5 years ago, I don't
15:49 know.
15:49 Q. Are you aware of a claim appearing in the
15:49 Second Amended Complaint and also in Dr. Gavrilos'
15:49 affidavit declaration that Emily Fisher contacted two
15:49 other physicians who then refused to leave?
15:49 A. Yeah, I remember that.
15:49 Q. Would that be part of the damages, the two
15:49 that refused to leave?
15:49 A. Of course not.
15:49 Q. And is GCM claiming that part of its
15:50 damages are not having access to the medical records
15:50 of the patients that were formally seen through the

Leafwell platform?
A. Yes.
Q. So, it is, so GCM's position is that they should be able to get those medical records back?
A. Yes, it is. Anything that's in the Second Amended Complaint that we describe as a damage or any kind of confidential or proprietary data, or whatever you want to call it, it's a damage, yeah. The data in the medical field has value.
Q. And, did you, did GCM actually ever sell any data?
A. I don't know if we did or not. Ever, at any time?
Q. Ever.
A. I don't know if we have or not.
Q. In your experience, is that, does that ever happen in the health care field that the identified patient data is sold?
A. Yes.
Q. And, you don't know if GCM has ever engaged in that?
A. I don't know if we did. I know there were discussions about doing it in the Ketamine space. I'm not sure if we did or not.
Q. We'll go to the last section that I have

15:51 for this part, and probably the quickest, too. Of course, we reserve on the, we reserve on the issues that we've put on the record.

15:51 So, at the very beginning, we talked about earlier lawsuits in which --

15:52 A. Here we go.

15:52 Q. -- in which you've been a Plaintiff. You knew this was going to come up. Earlier lawsuits in which you've been a Plaintiff or a party, to some extent. We'll start with UTC Fire and Security. Are you familiar with that case?

15:52 A. UTC?

15:52 Q. Class action lawsuit.

15:52 A. I joined a few of them over the years, I have no idea.

15:52 Q. How did you become involved with these suits?

15:52 A. I don't even remember what it's about.

15:52 Q. Well, have you been a named Plaintiff in multiple class action lawsuits?

15:52 A. No, you got to give me more information to jog my memory. I don't even know what this UTC thing is about.

15:52 Q. Well, how many different lawsuits -- to how many different class action lawsuits have you been

15:52 a party?
15:52 A. A named party or joined in?
15:53 Q. Joined in party.
15:53 A. I mean 10, 15 over the years, Facebook and AT&T and Verizon. You get paid $30, $50 or $100 bucks out of them. So, I don't know. A named party, this is somewhat memorable, but you're going to have to give me more.
15:53 Q. This is the one where a company kept calling and asking if you wanted fire protection and security and--
15:53 A. Was it a Northern District case?
15:53 Q. It was--
15:53 A. I mean, I don't know how it's relevant, but I mean, I probably was since you found it. I'd forgotten about it because I only answered earlier in this deposition one as the Plaintiff.
15:53 Q. It's Northern District.
15:53 A. I kind of remember this, yeah, we settled it.
15:53 Q. And, did you testify at all in any capacity during that one?
15:53 A. I don't remember.
15:54 Q. And, you don't remember, do you remember if you were deposed for that one?

A. I doubt it. I think I settled quickly because we had them.

Q. And did you, for any of these class actions, did you reach out to the attorney or did the attorney reach out to you?

A. On this one where I was a named Plaintiff, I remember soliciting a firm on the rest of them. It was just opt-ins online. I never dealt with an attorney.

Q. And so in paragraph 17 of that, the Complaint for that UTC one says you suffered damages. Do you recall what the damages were?

A. No. How is this relevant to any of what we're doing today?

Q. Trying to get to how it is that you assess damaged. So, to the extent that, now looking at it now, what do you think your damages would have been for the phone calls you received?

A. I have no idea. What I knew is they broke the law, and we had them red handed. And, I'm sure we made a demand and got it. And by we, I mean me and the lawyers representing me.

Q. And then there's the one in which you're pro se, right?

A. I'm going to make a blanket objection to

15:55 this as irrelevant. You know that if you brought me here to talk about my internet dating history, is that really what we're going to do here? So, I'm not answering any questions about it.
15:55 Q. So, I'll put the questions on the record and you can object.
15:55 A. Okay.
15:55 Q. Are you the Plaintiff in that matter?
15:55 A. Objection, available from publicly available sources. You know that I am.
15:56 Q. Are you the attorney on that matter?
15:56 A. I'm representing myself.
15:56 Q. Did you write the Complaint?
15:56 A. I should, let me take that back. I represented myself, the case is dismissed.
15:56 Q. Did you write the Complaint?
15:56 A. I wrote everything in the case.
15:56 Q. Did you testify in that matter?
15:56 A. No.
15:56 Q. So, this is the case of Jonathan Mraunac versus Hinge and Bumble and the League and Chelsey Smith?
15:56 A. I know what you're talking about.
15:56 Q. And, at present, are you permitted to use Hinge for dating?

15:56 A. Objection, relevance, not answering it.
15:56 Q. At present, are you permitted to use Bumble for dating purposes?
15:57 A. Objection, relevance.
15:57 Q. At present, are you permitted to use the League for dating purposes?
15:57 A. Objection, relevance.
15:57 Q. Are you instead using other dating programs?
15:57 A. Objection, relevance.
15:57 Q. So, how is it that you value your damages in the Hinge/Bumble/The League/Chelsey Smith case?
15:57 A. Objection, relevance.
15:57 Q. You're not answering any of them?
15:57 A. I'm not going to answer them. It has nothing to do with this, what I do as a pro se Plaintiff has nothing to do with GCM Partners.
15:57 Q. It has more to do with the Plaintiff aspect of it.
15:57 A. It doesn't if you think Judge Alexakis will overrule my objections on my process lawsuit, go for it.
15:58 Q. All right. So, the remainder of the material it seems as though we're, you've taken a position you're not going to answer on it, so--

15:58 A. About my pro se case, is that--
15:58 Q. No--
15:58 A. --what are we talking about?
15:58 Q. Yeah, I'm reserving on that one, but I'm talking about the stuff that's of more immediate germane value to the defense of the case. So, with that said, the, Fisher suspends at this time, pending motion to compel practice, and then we can address, if there's things that we can, ways that we can resolve this outside of convening another deposition, or if we just, or if we just to a motion to compel.
15:59 A. I'm not coming back. So, if you think that you can compel another session, go for it. But, I'll be happy to go and argue those objections one by one.
15:59 Q. So, your objection is noted.
15:59 A. And maybe it would have been helpful for you guys to do a little written discovery before you brought in a deponent and dealt with what you dealt with today. I promise you Emily's deposition is going to be different than this one, a lot.
15:59 Q. How so?
15:59 A. Okay. Are we done here?
15:59 Q. I'm curious.
15:59 A. Are we off the record? Are we done here?

15:59 VIDEOGRAPHER: This concludes the deposition of Jonathan Mraunac, GCM Partners LLC vs Online MD et al. We're now off the record. The time is 4:00 o'clock central time?

16:00 A. I'll reserve signature.

16:00 VIDEOGRAPHER: Before I conclude everything, I have a couple of quick questions. We had talked earlier about a copy of the video, you don't need it at this time, is that right? Since you're an attorney on record, you're representing yourself. As such, I need to ask you the same question. Are you interested in a copy of this video at this time?

16:00 A. No video, but we will take the transcript regular delivery, yeah.

16:00 (WHEREUPON, the deposition concluded at 4:00 p.m.)

STATE OF ILLINOIS)
)SS
COUNTY OF C O O K)

CERTIFICATE

I, VERNETTA H. MCCREE, a Notary Public within and for the County of Will, State of Illinois, and a Certified Shorthand Reporter of said state, being empowered to administer oaths and affirmations pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure do hereby certify;

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witness in the foregoing proceeding, prior to testifying, was placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal

case, before completion of the proceedings, review of the transcript was requested.

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: August 11, 2026

Vernetta H. McCree

VERNETTA MCCREE, CSR 084-001830

ERRATA SHEET

INSTRUCTIONS: After reading the transcript of testimony, please note any change, addition or deletion on this sheet. DO NOT make any marks or notations on the actual transcript. (Use additional paper if needed and attach it to this sheet)

Please sign and date this errata sheet and return it to the court reporting agency indicated below.

_____________________________________________________

Case Name: GCM Partners vs Online MD et al
Date Taken: August 6, 2026
Deposition of:__Jonathan Mraunac

PAGE LINE CORRECTION

DATE: ____________________________________
SIGNATURE:________________________________

ACKNOWLEDGEMENT OF DEPONENT

I, ___________________, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and accurate transcription of the testimony given by me, and any corrections appear on the attached errata sheet signed by me.

________________ ______________________________

(DATE) (SIGNATURE)

## Exhibits

**Exhibit 1** 3:7 11:9, 10,13 147:6 158:22
**Exhibit 2** 3:9 10:8 12:24 13:6 88:7,9 111:4 142:16,18 144:16 181:1
**Exhibit 3** 3:10 9:23, 24 10:10 18:15
**Exhibit 4** 3:11 20:18, 19,22,25 21:8 24:16 27:8 36:18,19
**Exhibit 5** 3:12 23:7, 8,11 27:7
**Exhibit 6** 3:13 63:21
**Exhibit 7** 3:14 101:12 109:1
**Exhibit 8** 3:16 101:14
**Exhibit 9** 3:17 103:2, 3,4,10,15
**Exhibit 10** 3:19 111:6,8 113:3 114:12 118:5 120:12 154:7 169:23 171:8
**Exhibit 11** 3:20 115:21 116:1 117:20
**Exhibit 12** 3:21 116:2 118:8
**Exhibit 13** 3:23 119:19,21
**Exhibit 15** 4:2 128:12,14,17
**Exhibit 16** 4:3 147:16,19
**Exhibit 17** 4:4 187:1

## $

**$100** 197:5
**$30** 197:5
**$450** 178:15
**$50** 197:5

## -

**--i'm** 85:7
**--it's** 174:21
**--outsmart** 170:5
**--saying** 95:7
**--what** 201:3
**--which** 119:2

## 0

**07** 14:5
**08** 14:10
**09** 14:12

## 1

**1** 11:9,10,13 32:4,17 90:4 94:1,4 103:15 104:6 147:6 151:3 158:22
**10** 17:1 39:9 47:14 48:25 71:3 111:6,8 113:3 114:12 118:5 120:12 154:7 169:23 171:8 177:24 178:6 197:4
**10:52** 5:2
**11** 115:21,22,24 116:1, 4 117:20
**12** 8:19 115:21,22,24 116:2,3 118:8 119:6 159:16
**12--** 118:25
**12:24** 71:5
**12:34** 71:8
**12:49** 80:25
**12:51** 81:3
**13** 101:22 105:10 119:19,21
**14** 123:18,19,22 124:19,25 126:14
**148** 181:1
**149** 181:1
**14th** 101:13
**15** 62:18,20 63:3 128:12,14,17 197:4
**16** 88:19 147:16,19 160:9
**17** 88:19 160:10 187:1 198:10
**180** 5:9
**19** 17:13 18:15 54:17 150:3,12 152:4 158:20, 21,23
**19th** 119:15,23 147:5
**1:20-cv-06401** 5:8
**1st** 40:13

## 2

**2** 10:8 11:21,22,25 12:2, 13,14,24 13:6 47:1 88:7,9 96:22 101:21 105:14 111:4 138:12 142:16,17,18 144:16 150:3 181:1 185:15 186:20,21
**20** 54:7,8 64:8 97:1
**2004** 9:4,7
**2007** 14:1,4 18:17
**2008** 14:7,10
**2009** 14:15
**2011** 14:15,16
**2014** 14:18
**2016** 20:5
**2017** 20:8,10 31:18 35:10 145:17
**2018** 16:7 17:9,13 22:1,3 24:9,18 25:4,23 31:19 35:10 96:1
**2019** 112:5 115:19 116:11 117:15 124:8,12 125:12 127:8 130:20 132:22 134:5 135:24 136:4,5 145:17 164:12, 19 174:4
**2020** 14:20,21 17:14, 17,22,23 31:23 32:3,17 38:19 39:9,14 40:13 41:2,20 42:4,7,16 43:5 44:7,25 46:20 47:16 49:10 50:24 59:7,11,14 63:9 64:18 65:18 66:1,2 75:1 78:25 90:4,5 93:25 94:4,22 95:17 96:2 97:1 99:19,21 101:13,14 103:16 108:2 109:23 110:6,13 111:3 112:1 117:16,19 119:15,23 122:2 124:8 129:10 135:25 136:6,10,18 137:3,9,21 139:25 141:7,11 142:1 153:24 164:3,20 165:11 172:18,24 173:18,22 174:4 177:17,19,22 178:3,7,23 179:7 185:4
**2021** 96:2 108:19,22 124:8 129:22 141:8,11 164:12 174:4 180:15 182:2 185:23
**2022** 98:16 124:8,12, 24 125:16 127:8 185:25
**2023** 129:11
**2024** 71:18 74:22,23 76:23 77:10,24 78:4,19 91:25 109:17,23 189:14
**2025** 15:5 18:5 73:2,3 74:4,6 75:4,15,20 76:9 109:5 147:5
**2026** 5:3 186:20,22
**20s** 54:2,9
**21** 147:21
**23** 125:10 180:15 181:5,22 182:2
**24** 63:23 64:5,6,7 125:10 182:2
**25** 47:7,11,12 49:9 50:6 61:11 125:10 145:14 186:20,22
**28** 146:2,4
**29** 146:2,4

**2:34** 147:11
**2:37** 147:14

### 3

**3** 9:24 10:10 11:21,22, 25 12:3,5,14 18:15 36:22 96:23 138:13 142:19 162:7
**30** 61:11 181:1
**30th** 63:9
**31** 32:4,17 94:1
**31st** 40:13 94:9,22 95:17 96:2 97:1 98:16
**31st/june** 94:4
**36** 12:24 13:5
**37** 13:1,5,15,22

### 4

**4** 20:18,19,22,25 21:8 24:16 27:7,8 36:18,19 39:9 47:11,12 48:25 49:9,23 50:6 147:21
**40** 179:2,4
**408** 188:2
**48** 159:16
**49** 160:3
**4:00** 202:3,16

### 5

**5** 23:5,7,8,11 27:7 47:9 49:23 52:18 85:2 104:5, 6 105:7 138:9 147:21 151:22 166:4,8,14 169:7 170:19,20 187:15 188:17,21,24 189:8 190:8,19 194:13
**5.1** 156:1
**5.2** 156:2
**5.4** 155:10
**5.5** 27:14 118:25
**50** 47:3
**50-50** 65:23
**50.1** 126:14
**5:00** 63:1
**5th** 24:18 166:15 168:15

### 6

**6** 52:11,15 63:20,21 85:6,10 87:2 98:24 105:8 113:11 120:19 133:6 142:19 143:17 159:12 176:2 190:25
**60/40** 178:25 180:2,8
**69** 88:17,21,25 160:9
**6:00** 174:19
**6th** 5:3 111:2 112:1 166:13,15 168:16

### 7

**7** 100:11,12,15 101:12 103:11 104:4 105:12 109:1 145:13
**72** 88:18,22,25 160:9
**7th** 101:14 111:2 112:1

### 8

**8** 12:14 100:11,12,15 101:14 103:11 104:4 105:12 109:1 117:16
**835** 36:21

### 9

**9** 103:3,4,10,15 109:1 117:16 150:5,14
**90** 61:25 162:6 174:22

### A

**a.m.** 5:2
**abandon** 186:10
**ability** 8:11 9:1 54:16 149:9
**absence** 155:12
**academic** 145:20
**accepted** 165:3
**access** 23:19 48:11 49:3 75:25 80:3 139:23 149:4,11,19 171:16,20 172:10 181:23 183:25 192:21 193:5,6 194:24
**accessible** 166:2
**accompanied** 111:3
**accordance** 104:8
**account** 79:23 82:18, 20 84:15 151:21 177:4
**accurate** 24:19 65:21 88:23 125:6,12, 15 152:24 160:12
**acquaintance** 96:4
**acquired** 43:21 142:20
**acquiring** 39:3
**acting** 149:21
**action** 176:9,10 196:13,20,25
**actions** 193:9 198:4
**active** 18:2 89:22
**actively** 18:3
**activities** 37:24,25 38:1
**activity** 151:14,18
**actual** 94:18
**ad** 176:1
**add** 119:14
**addition** 55:18 188:17
**additional** 188:18
**address** 36:18 84:17, 23 129:17 201:8
**addressed** 89:17 145:25 152:7
**addresses** 37:19 105:16 106:24 107:22 155:11
**adhered** 173:4
**adherence** 173:8
**administering** 174:6 191:17
**administrative** 37:21 107:8 178:11 181:5,7
**admission** 170:12
**adopt** 186:5
**adopted** 70:1 129:7
**advance** 45:13
**advanced** 55:20 57:12 93:4 99:23
**advertising** 40:21 45:9 59:2,9,23 60:5,17, 19 62:1
**advice** 31:2 94:24
**advised** 82:11
**advising** 18:4
**advocating** 145:5
**aesthetically** 69:16
**affect** 8:10 9:1
**affects** 95:2
**affidavit** 18:15 32:2 194:17
**affiliated** 34:12
**Affirmative** 155:5
**afraid** 33:23
**agency** 126:24 127:4
**agree** 8:1 84:6 120:18 150:8,11,14,18 180:21
**agreement** 9:23 10:8,12,15,17,21 11:8, 17 36:8 79:1 86:24

87:12 97:25 98:1 104:9, 15 107:5,7,18 108:1,9, 16,23 109:5 110:18 111:2,15 112:21,23 114:14 115:7 116:25 118:6,11 120:8,10,11, 13,20 121:3 122:17 123:1 135:11,23 154:6, 15 155:18,20 156:12,22 157:17 165:13,16,25 167:19 168:2 170:21 171:8,12 172:8,23 173:3,6,7,12,14,18 174:1,2,11 178:5,13

**agreements** 105:3 107:13 108:23 110:12, 13

**ahead** 11:18 27:19 116:17 160:3

**air** 70:16

**albeit** 64:18 185:15

**alcohol** 8:18,19

**Alexakis** 105:4 119:12 200:20

**allegation** 150:11

**allegations** 159:11, 18 169:11

**alleged** 160:14 184:12

**alleging** 193:18

**allowed** 54:11 92:21 172:5,7 177:11

**Alpha** 147:21

**ambiguous** 155:1

**Ambrosio** 113:17 114:10

**amended** 9:24 10:9 11:2 12:2,8 13:5,13,19 38:23 39:2 51:14 70:20 84:20 85:24 86:3 88:6,9 111:3,11,24 112:6,11 117:7 118:16 119:25 120:14,22 136:16 137:4 142:2,3,11 145:13 147:6 152:8,11,22 157:6 158:1,7,17,22 159:15 168:12 180:15, 20,25 184:3,12 185:10

190:11,25 192:25 193:13,21 194:16 195:6

**amount** 68:11 84:7

**Amundsen** 15:6 18:4 72:20 73:2

**and--** 197:11

**and/or** 58:20

**Android** 140:15

**annual** 37:8 123:16 124:1,18

**annually** 91:1

**answering** 87:19 120:24 171:13,14 176:20 199:4 200:1,14

**answers** 74:16 81:25 100:5 173:12 182:21 186:2

**anticipate** 62:23

**any--** 91:9

**anymore** 153:22 159:12 179:18

**apartment** 36:22

**apologies** 16:2

**apparently** 34:12

**appeal** 182:15

**appeared** 143:10

**appearing** 159:10, 17 186:20 194:15

**appears** 11:1 124:10 127:18 143:12

**apply** 27:24 28:2

**appointment** 161:17

**appointments** 48:10,14 75:24

**appropriately** 8:16 162:15

**approve** 65:2

**approved** 62:9

**approximate** 52:2

**approximately** 145:16

**April** 14:18

**arbiter** 57:18

**area** 145:21

**areas** 19:16 172:10

**argue** 201:14

**argued** 102:17

**argumentative** 27:13 122:9 156:4

**arising** 158:11

**arose** 159:11

**arrangement** 135:9 137:7

**arrangements** 110:1

**arrival** 125:24

**articles** 21:1 126:13, 14

**aspect** 119:3 142:4 168:25 184:23 200:19

**aspects** 42:10 184:24

**assert** 7:13

**asserted** 13:12 95:4

**asserting** 13:17 30:19 32:25 33:1

**assertion** 95:15

**assess** 198:15

**assessed** 161:1

**assessment** 93:5 101:6 162:4

**assessments** 78:20 92:17 99:24 162:22

**assets** 142:20 181:4 182:18 183:14

**assign** 123:3

**assigned** 83:16 84:5 169:14

**assist** 48:9 55:13

**assistant** 93:5 107:9 178:11

**assistants** 55:21 57:12 58:14,15 99:23

**assisted** 21:5 48:6

**associate** 14:14,17 18:21 21:14,21,22 108:9,16,23 110:12,13, 18

**associates** 15:4,9, 18,23 16:4,5 17:19 18:1 19:2 34:13,17,19,22 35:1,12

**association** 36:2

**assume** 22:12 125:8 131:6

**assumed** 127:10,17, 22 128:1,23 129:14

**assumes** 33:7 93:13 99:10

**assumption** 192:12

**AT&T** 127:24 197:5

**attached** 111:10 118:16 119:24 120:13

**attachment** 115:22 116:2,4

**attempt** 32:7,9 182:7, 14,17

**attempted** 138:3

**attempting** 7:12

**attend** 69:2

**attended** 72:22

**attending** 89:19

**attention** 18:14 27:7 101:11,21 103:14 104:3,5 105:13 114:6,8 142:19 145:12 146:1 147:20 150:2 155:10

**attestation** 12:20

**attorney** 5:15 6:11, 20,23 7:17 18:21 23:18 30:11,25 31:5 33:12 34:13 94:7,8,12,22,25 95:9 96:4 117:21 119:16,17 142:8 145:5 182:12,14 198:4,5,9 199:11 202:9

Case: 1:20-cv-06401 Document #: 253-1 Filed: 08/25/26 Page 212 of 233 PageID #:4825



**attorney/client** 10:3,24 30:10,12,23,25 31:13,14 32:15,22 33:10 34:23 35:15 36:7, 10 85:22 94:10,17 95:10,12,23 96:12,18, 20,24 111:17 141:22

**attorneys** 114:7,8

**attributable** 169:13 183:22 193:5

**attribute** 54:15

**attributed** 63:25

**audience** 59:3 60:1, 6,7,11

**August** 5:3 101:13,14 108:2 136:17 137:3,9, 21

**auspice** 184:19

**authored** 16:20

**authorship** 16:20

**availability** 84:4 92:18

**Avenue** 36:21 125:20

**avenues** 139:5

**avoidance** 183:10

**awaiting** 80:16

**aware** 45:12 54:18 55:24 56:3 65:6 92:20, 25 93:2,8 107:12 114:9 118:6 126:22 127:3 139:24,25 155:6 157:18,25 172:1 181:18 187:21 194:5,15

**awhile** 40:8 123:16 185:1,22 186:7

## B

**back** 14:8 15:17 24:8 64:18 71:9 80:7 81:3 105:10 110:11 114:12 115:7,13 141:17 147:14 154:6 167:22 170:21 180:14 182:22 184:8,20 185:13,16 195:4 199:14 201:12

**balance** 77:13

**base** 134:11 185:8

**based** 11:4 30:19 79:21 114:2,5,21 138:24 171:9,18,23 191:24 193:24

**basic** 79:9

**basis** 168:18

**bathroom** 63:5 147:10

**Beats** 117:18

**began** 14:9,12,16,18 15:5 31:15 54:3 117:11 137:5

**begin** 8:9 35:11 74:13 79:23

**beginning** 5:3 14:7, 12 31:12 64:8 112:25 145:17 193:3 196:4

**begins** 105:13

**behalf** 5:11,12,14 76:10 117:2,21,24

**believed** 183:25

**believes** 192:1

**billing** 54:19 58:16,18 76:7

**bit** 11:19 22:14 53:23 80:18 122:3 130:7 138:15

**blanket** 154:14 198:25

**bleeding** 144:10

**blending** 146:19

**Blue** 160:21

**Bluepay** 51:10,12,16 57:8

**board** 21:14,19,21,22 22:4 50:17

**Body** 133:17

**books** 43:8,9,10 151:12

**Boone** 5:9,15

**bordering** 80:23

**boss** 70:16

**bottom** 105:14

**bound** 109:19,25

**brand** 128:2

**branded** 68:8

**breached** 120:8,19 121:2

**break** 7:20 55:16 62:19,20 63:5 70:25 71:3,7 81:2 158:4

**Brett** 5:15 13:14 32:8 59:12 73:23 85:1 100:5 103:13 106:7,22 118:24 121:4 132:8 133:7 138:7 143:7 155:9 167:2 174:14 180:14 190:10,15

**brick** 29:8 30:3 74:6 76:20 92:12 134:13 152:9

**briefed** 166:25 175:22 176:1 177:6,9 182:10

**briefing** 176:13

**briefs** 167:21

**bring** 6:15 47:24 60:16 101:11 103:14 104:3,5 105:12 113:21 134:10 142:18 145:12 146:1 150:2 155:10 167:23 168:17

**bringing** 18:14 27:7 101:21 135:18 147:20

**Britain** 133:9

**broad** 176:23

**broadly** 121:1

**broke** 198:19

**brokering** 133:17

**brought** 6:17,19 11:16 114:6,7,10 199:1 201:19

**bucks** 197:5

**bug** 138:8

**building** 145:22

**built** 164:4

**bullet** 166:13,15 168:16

**Bumble** 199:21 200:3

**bunch** 128:9

**burn** 31:9

**business** 25:8 26:7, 24 29:23 30:9 31:19,20 33:9 40:16,20 42:10 45:25 46:4,9 52:25 53:19 56:13 61:4 76:5 92:6 105:20 107:2 108:9,15,22 109:18 110:11,13,18 125:19 126:20,25 127:14,15,25 132:10 133:4 134:5,13 135:9 137:7 139:21 142:22 143:4 145:5,18 148:24 152:24 173:24, 25 189:18,21 190:6,24 191:2,13,16,17,19

**businesses** 111:19 127:21

**But--** 175:4

**buy** 183:14

## C

**calculate** 183:18

**calculating** 187:5

**calculations** 187:3

**Calculus** 179:17

**calendar** 69:11

**California** 36:21 125:20,22

**call** 63:2 78:25 80:12 87:10 100:11 118:5 121:5 130:20 140:17 172:23 173:3 185:10 189:3 194:10 195:8

**called** 14:13 51:23 57:13 78:14 140:3

**calling** 70:11 153:25 154:2 168:16 197:10

**calls** 85:21 86:1,9 87:11,16 91:16 104:14 106:5 119:8 120:21 126:21 138:25 143:21 153:1,11 156:5 157:8 168:8,23 169:24 171:11 173:11 174:8 175:21,25 178:16 184:2 193:12 198:18

**cannabis** 19:11,18 26:8 29:7 30:4 33:20 38:9 42:9 60:20,23 61:6,17,24 62:10 65:3 78:19 79:22 80:11 91:17 92:22 93:6 134:8, 18 139:13 140:2 145:23 146:19,25 164:24 186:8,11,13

**capabilities** 149:17

**capacity** 14:6,20 19:7 22:8 34:12 35:11 40:10 67:20 71:16 75:6 96:4 136:24 142:7 151:7 197:22

**capitalize** 139:6

**capture** 189:5

**card** 62:10 65:3

**cardiac** 22:6,10,11 26:3

**care** 19:22 22:6,11 26:3 38:1 42:23,25 43:2,3 51:18,22,24 52:2,3,4,5,8 55:13 76:6 123:7,10,16 148:24 195:17

**career** 14:4 18:20

**Carroll** 119:17 181:16

**case** 5:5,7 9:24 63:7 120:22 130:14 136:9 143:21,25 150:10 155:7 167:3,17 168:11,25 169:18 174:15 177:4 188:12 193:5 196:11 197:12 199:15,17,20 200:12 201:1,6

**cases** 19:10,21

**cat** 174:12

**categories** 40:20 158:12

**causation** 184:11

**caused** 33:2

**cease** 72:18

**ceased** 71:13 73:4,5, 21

**cede** 93:11

**center** 9:25 145:21

**central** 5:2 202:4

**CEO** 43:13 175:20 176:11 177:2,3

**certification** 29:7 42:9 61:5 64:14 163:2 190:21

**certifications** 33:21 38:9 60:20,23 91:18 162:6 186:8,13

**certified** 8:24 163:22

**certify** 164:5,21

**certifying** 164:23

**CFO** 43:13

**chance** 158:12

**change** 29:23 95:14 127:17 128:23 180:4

**changed** 37:11 53:23 61:21 74:25 98:19 133:5 137:17 143:15 159:13 177:21 180:6 183:10

**changing** 118:13,21

**characterization** 152:3,24 173:14

**characterize** 105:3

**charge** 45:21 62:8 189:2

**charged** 64:14

**charging** 75:16

**charming** 133:2

**check** 49:18 50:21 89:21 136:5 148:2,4 161:23

**checked** 51:2

**checking** 90:7

**Chelsey** 199:21

**Chicago** 5:10 14:7,9 32:5 36:22 145:21

**chief** 32:16 40:5,6,10, 12 44:8 45:2,5,24 46:3 50:8 53:6,17,22 54:1,5, 13,14,20,23,24,25 55:3, 19 56:1,5 57:21,22 58:1,11,23 59:1,4,22 61:2,15,19 62:8 65:14 66:4,21 67:4 71:11,13, 25 72:6 73:21 74:19,24 76:23 77:10 89:19 91:25 93:10 101:3,15 103:19 106:2 109:16,22 121:6 189:9

**choice** 118:7,14,22, 23

**choose** 6:16 7:21

**chose** 93:9,11 123:3 149:10 185:2

**Christ** 169:21

**circumstance** 8:25

**circumstances** 55:7

**civil** 9:15,18 133:22

**claim** 85:19 183:15 191:23 194:15

**claiming** 85:24 147:1 194:23

**claims** 168:11 188:12

**clarify** 60:18 93:2 168:6

**class** 196:13,20,25 198:3

**clawed** 141:17

**clear** 158:6 169:5

**clearer** 106:23

**clerk** 12:17,20 14:8 18:20 19:5

**client** 6:18 15:19,20 31:1 59:16 60:3 81:19 84:8 110:10 122:19 145:6 164:10 168:14 176:25 185:5 190:8 192:16,22

**client's** 81:25 119:10

**clients** 15:24 16:1 18:3,4 75:20 82:3 153:10 154:3 178:1 188:7

**clinic** 70:10 78:7 128:8 129:23 145:20

**Clinical** 72:25

**clinics** 37:21

**close** 52:2

**closest** 31:17

**cloud** 145:2 148:10, 12,22

**code** 105:22 138:23

**coding** 138:20

**cohort** 187:9,10

**collecting** 75:16 76:10,13

**college** 9:4,6

**combination** 154:4

**comment** 149:17

**committed** 167:17

**committing** 81:8

**common** 157:25

**commonly** 127:21

**communicate** 8:11,16 55:17 82:17 172:11

**communicated** 55:10

**communication** 32:22 36:7 55:15 172:16

**communications** 31:1 33:8

**comp** 71:22 72:11

**companies** 72:2 139:13

**company** 28:17 45:10 51:19,23 53:13 93:18 97:13,15 104:12 105:1,2,24 106:1 109:25 121:18 122:14

124:2 126:15,16 137:12,16 197:9

**company's** 94:24 104:10 105:16,18,20,22 106:25 181:13

**compel** 167:24 201:8,11,13

**compensate** 163:3

**compensated** 71:19 97:2 163:8 178:14

**compensation** 72:7 123:6 180:5

**competitor** 78:17, 18

**competitors** 39:15, 19 40:1

**complaint** 9:24 10:5, 9 11:2,3 12:2,8 13:5,13 32:2 38:24 39:2 51:15 70:20 81:6,9 84:20 85:7,24 86:3 88:7,9 111:4,11,24 112:6,11 113:22,24 114:11 117:7 118:16 119:25 120:14, 23 136:16 137:5 138:7 142:2,4,12 143:1,13 144:9,10 145:13 147:6 152:8,11,23 157:7,20 158:1,7,17,22 159:10, 16 168:12 180:15,20 181:1 184:4,12 185:11 190:12 191:1 192:25 193:13,22 194:16 195:6 198:11 199:13,16

**complete** 80:14,18 82:22 88:22

**completed** 83:15 165:8 182:20

**completing** 165:7

**compliance** 148:2,4

**compliant** 165:19 166:1

**complying** 148:6 163:12

**component** 29:10

**computer** 77:8 138:12 140:16,19,24 141:2 166:3,4

**computers** 140:18

**conceived** 129:15

**concept** 112:22 135:8

**conceptually** 190:20

**concern** 17:19

**concerned** 81:16 139:23

**conclude** 202:6

**concluded** 202:15

**concludes** 202:1

**conclusion** 85:21 86:1,9,14 87:11,16 91:16 104:14 106:5,20 119:9,13 120:21 126:21 143:22 144:5 149:7 150:13,23 153:1,12 156:5 157:9 168:9,23 169:2,4,17,24 171:11 172:8 173:12 174:8 175:21,25 178:16 184:2 193:12

**conclusions** 102:19,21 121:5 154:17 176:6

**concurrently** 15:3

**concussion** 140:23

**condition** 8:10 151:24 161:5

**conditions** 22:11 104:9 169:23

**conduct** 25:8 54:16 71:13 91:11

**conducted** 37:24 54:19 61:10 77:2 92:5 162:21

**conducting** 53:19 56:13 61:5 91:13 146:18 162:3 191:13

**conference** 131:18

**confident** 162:12,14

**confidential** 105:14,24,25 106:3,9 150:4,10,15 152:1 154:11 157:5,18,21 158:8,14 159:2,5,19,24 195:7

**Confidentiality** 101:23

**confirmed** 164:21

**confused** 169:12

**confusing** 107:20

**connection** 16:13 22:11 24:3

**connectivity** 141:7

**consideration** 28:10

**considered** 39:15 78:17 94:6 153:9 171:24

**consistent** 171:6

**consists** 82:22

**constantly** 69:18

**constitute** 124:19

**constitutes** 86:14

**constituting** 9:23 13:6

**construction** 19:14

**consultant's** 171:9, 18

**consultants** 111:1 171:23

**consultation** 65:1

**consultations** 92:17 97:6

**contact** 84:16,22 85:18 87:22 89:4 112:8 140:10

**contacted** 194:17

**content** 82:14 190:22

**contested** 102:16

**context** 95:3

**continue** 133:12 185:8

**continued** 18:11 142:22 190:12

**continuing** 143:4

**continuously** 18:16

**contract** 9:23 10:8, 22 13:7 14:6,11 18:21 50:2,5 72:2 86:10,20 99:14 106:14 113:3 115:19 116:10,14 117:12,17 118:15,18 120:11 136:2,13 154:6, 10 155:21 165:16 166:23 167:7 169:3,23 178:14

**contracted** 9:22 73:10 133:24

**contracting** 53:14

**contractor** 44:4 50:2 58:5,9 67:21 75:6, 8 77:20 89:23 91:3,15 97:12 99:8,14,21 104:7 105:25 107:7,8 109:5 110:14 177:24

**contractor's** 104:7

**contractors** 41:6,9, 19 58:10 68:1 73:10,17 74:5 77:16 90:16 91:7 92:16 99:16,17 109:3, 18,24 148:6 149:21

**contracts** 86:17 91:3 99:8,11,22 111:19 114:13 136:1 167:1

**contractual** 105:18

**contribute** 87:1 113:10 142:25

**contributed** 16:20 21:7 113:7 114:17 144:9 187:7

**contributions** 137:6

**control** 148:8 149:6, 18 164:13 170:25

**controlled** 148:11, 25 149:1,2,5

**controversy** 9:25

**convening** 201:10

**conversation** 117:14
**conversations** 53:10 95:22 96:14
**convicted** 9:7
**convince** 32:19
**convinced** 33:4,11
**COO** 40:11 52:20 53:8,9 59:7,19 65:16 71:16,20 74:1
**copies** 170:24
**copy** 202:8,12
**cordial** 32:10
**core** 169:17
**corporate** 34:8 36:15,18 37:4,9,12 123:13
**correct** 6:3,20 7:14 9:4 14:1 16:9 17:10 18:12,17 19:3,15 34:2, 14 35:3,8 41:21 45:4,7, 11,17 49:11,13 57:16 59:23 64:15 69:22 73:2 75:17 76:1 79:11 83:18, 24 86:15 91:15 92:14 93:19 100:1 101:10,16 103:20 113:4 117:22 120:25 124:8 125:1 126:3,7,17,18 134:14 137:24 152:11,13 182:3
**correctly** 169:11
**correspond** 124:11
**cost** 105:17
**counsel** 5:12,17 6:16 14:19 17:9,14 18:12,22, 24,25 19:1,25 29:24 30:14 31:21,23 40:4 44:4,5 65:17 71:20 72:1,8 77:11 93:22,23 94:25 95:8 98:3,15 101:2,15,19 103:19 117:23 121:7,10,12 122:19,22 141:20,25
**couple** 34:6 115:13 133:10 160:8 167:16 182:6 202:7
**courage** 33:22
**court** 5:6,11 12:17 23:6 41:11 49:21 52:18 56:22 63:8 68:22 69:1 86:12 102:17 113:17 114:11 119:6 152:17,20 154:17 166:25 167:4 176:2 180:18 182:8 184:10
**courtroom** 62:12
**courts** 104:19
**covered** 108:12 168:1
**Covid** 17:13 54:17
**create** 13:7 69:17 79:9,22 84:14 110:18 111:15 144:22 146:15 185:14
**created** 24:15 146:13,14
**creating** 21:5 139:2
**credentials** 90:21
**crime** 9:7
**criminal** 133:21
**critical** 22:6 145:20 168:25 177:3
**crossover** 188:23
**cuff** 168:15
**curious** 76:12 201:24
**current** 19:13,17 60:7,10,11
**Customarily** 153:14
**customer** 160:11 184:17 185:16,20 187:10 192:21
**customers** 105:17, 19 106:25 153:10 154:3 184:14 185:3,18 189:3 192:13 193:11
**customized** 56:13
**customs** 7:19
**cut** 137:19 181:23
**CV** 28:3,8

## D

**daily** 77:13
**damage** 195:6,8
**damaged** 198:16
**damages** 59:18 183:16,19,21,24 184:3, 7,13,24 187:6 188:6,12 191:22,23 192:9,20 193:4,19 194:20,24 198:11,12,17 200:11
**dance** 168:9
**data** 85:9,20,25 86:8, 12,15,18,19,22 87:1,6, 9,11 108:12 119:2 139:8,19 151:22 154:12 159:22 161:15 167:14 172:13 183:25 187:17, 18,22,24 188:7 192:17 195:7,8,11,18
**database** 148:8,9
**databases** 170:18
**date** 11:17 14:24 103:15 136:2 180:16
**dated** 101:12 147:5
**dates** 142:2 180:21 181:9
**dating** 199:2,25 200:3,6,8
**Davis** 15:6 18:4 72:20
**day** 26:16 62:24 65:24 93:24 94:1 104:20 138:10 168:10,13 180:19 181:6,20
**day-to-day** 55:14 77:17
**days** 32:5 162:7
**Deacons** 35:12,21, 22 36:13
**Deakens** 16:13 17:16
**Deakins** 14:19
**deal** 32:13 111:20
**dealing** 124:17 136:9,11,23
**dealings** 110:9
**dealt** 198:8 201:19
**December** 14:10
**decide** 86:12
**decided** 187:25
**decision** 141:19
**decisions** 189:18
**declaration** 12:6 147:4,20 194:17
**decreased** 97:20
**dedicated** 61:16
**Deepak** 140:19 178:9
**default** 191:6
**defendant** 9:14 15:11 130:14 167:3,17
**defending** 157:13
**defense** 177:4 201:6
**defer** 86:3
**define** 156:25
**defined** 86:16 87:9 104:15 106:10 143:22 155:20,25 156:2,16,22 173:3
**defining** 82:20
**definition** 86:18 87:1 105:2 153:12 176:22
**definitions** 86:22
**defunct** 52:14
**degree** 52:24
**degrees** 45:14
**delineation** 65:21
**delivery** 202:14
**Delta** 147:22
**demand** 93:15 186:20,22 198:21
**demonstrating** 33:23

**denied** 183:25
**dep** 185:2
**depart** 52:20
**department** 98:8 133:15 179:25
**depends** 7:9 51:4
**deponent** 5:17 7:12 8:6 86:8 87:4 144:8 173:15 201:19
**deponents** 8:9
**deposed** 9:11 197:25
**deposes** 5:22
**deposition** 5:4,8 6:16 7:1,7 11:14 110:4 170:15 190:4 197:17 201:10,20 202:1,15
**depositions** 6:12 7:16,18
**derivation** 128:9
**describe** 81:24 94:3 195:6
**describes** 123:1 160:11
**describing** 147:25
**desires** 80:10
**desk** 105:5
**desktops** 140:14
**detached** 185:1
**details** 142:11
**deter** 175:15
**determination** 141:24
**developed** 108:15 164:1
**developer** 68:18,20 69:9
**developers** 140:17
**developing** 139:5
**development** 69:10,21 138:25
**diagnoses** 165:1,3
**diagnosis** 164:21
**dialogue** 117:11
**dictated** 171:12
**die'** 167:16
**difference** 43:2 81:21,22 100:5 183:13
**differences** 54:18 103:10,23
**differently** 192:5
**difficult** 157:10,14
**difficulty** 144:23
**DIRECT** 5:24
**directed** 55:1
**directly** 40:16 42:12 57:5 76:13
**Director** 72:24
**directory** 140:9
**disagrees** 120:7
**discards** 133:9
**discovered** 114:1
**discovering** 82:2
**discovery** 144:2 175:8 201:18
**discreet** 94:24
**discuss** 47:24
**discussed** 62:13 85:1 87:6 151:12 166:12
**discusses** 165:25
**discussing** 26:12 52:17 118:10 135:6 170:19
**discussions** 29:18 30:7 195:23
**dismissed** 199:15
**dispensaries** 139:4,10
**dispensary** 140:8
**disputed** 81:7
**disqualified** 80:15
**distill** 177:12
**distinction** 51:20 71:24 117:4 140:7 159:9,20 162:19
**distinctions** 103:23 154:10
**distinguish** 157:4 158:9 175:18 177:1
**distinguished** 129:25
**distinguishing** 158:14
**district** 5:6,7 14:9 63:8 114:11 197:12,18
**divide** 90:14,19
**division** 5:7 90:20
**Docs** 140:9
**doctor** 45:16 82:14 93:4 124:20,21 140:10, 11
**doctor/patient** 163:23 164:6
**doctorate** 45:13
**doctors** 82:1 140:4
**document** 12:13 66:10,17 67:23,24 70:24 86:4 102:22 104:18 106:10 111:10 115:5 122:21 154:18,24 155:2 157:1
**documentation** 31:12
**documents** 12:1 23:17 53:9 83:8 100:21 102:3 105:9 123:24 170:25 171:5,6,8,10,16
**doings** 175:18
**dollar** 188:16
**doubt** 58:17 64:22 138:24 191:4 198:1
**dozen** 115:11
**draft** 66:5,10 68:3 115:18 116:24 117:10 118:4,10
**drafting** 70:23 86:24 110:19 113:7 114:7,8, 15 154:23
**drafts** 115:6
**drastically** 61:21
**drawing** 140:23
**Drivers** 83:11
**drugs** 8:20
**due** 54:17
**duly** 5:22
**duration** 91:4
**duties** 40:14 43:11 59:1 65:17 71:13,20 72:22 73:22 74:24 89:20 93:12 98:4 122:12,18,21,24 123:3 171:3
**duty** 44:3 169:20,22, 25 170:1 172:22 173:2

## E

**e-mail** 84:17,23 112:17 115:22 141:10 181:24
**e-mailing** 70:11
**e-mails** 53:12 115:5 117:9
**earlier** 51:18 67:23 75:1 95:4,15 118:4 126:12 190:4 196:5,8 197:16 202:8
**early** 14:9 31:18
**earned** 188:17,20,24, 25
**earning** 43:16 192:1
**Eastern** 5:7
**ECF** 177:7
**economic** 160:4,5 183:21,24
**edit** 87:3

**edits** 115:5 116:18,20
**effect** 110:23 111:18 168:17 173:18
**effective** 136:2
**effects** 161:1,4
**efficient** 160:2
**effort** 175:15
**efforts** 34:9 104:8 139:20
**elapsed** 98:24
**elect** 127:20
**electronically** 50:15
**elevator** 32:18 113:15
**eligibility** 92:22 93:6 99:25
**else's** 13:23
**emergency** 26:3
**Emily** 5:14 58:20 68:5 69:4 70:5 76:17 112:4,9 113:14 114:22 115:1 117:3 124:17 130:14, 17,22 135:9 136:11,23 138:15 140:13 141:6, 10,13 146:13,16 165:19 167:3,14 168:1,3,13,19 169:20 171:20 173:25 174:5,9 175:19 176:9 177:1,2,5 185:17 193:9 194:17
**Emily's** 76:12 166:19,22 167:6 168:16 169:2 201:20
**employ** 72:2
**employed** 189:20,23
**employee** 58:8 67:10,16 177:23
**employees** 40:24 41:19 58:1 67:11,14 68:1 73:7
**encounter** 79:17
**encountered** 56:25 132:21 140:21
**encourage** 175:12
**end** 93:10 114:18 127:23 136:6 170:21 177:22
**endorse** 187:25
**engage** 142:22 143:4
**engaged** 153:5 195:21
**engagement** 31:3, 8,11 36:4
**ensued** 61:24
**entail** 40:18
**enter** 10:20 75:25 111:19 118:11
**entered** 10:14,17 13:12 35:14 36:6,10 87:7 107:18 116:25 135:11,23 176:25 180:17
**entering** 89:3 112:22 135:9 178:4
**enters** 83:2
**entire** 88:11 113:2
**entirety** 61:19 100:25
**entities** 19:7 34:8 108:23 110:22 117:5 140:1 143:9
**entity** 15:5 17:25 20:13 21:6 30:9 76:13, 14 108:13 117:2 127:16,23 173:24 174:1,10 190:4,5 191:6, 24
**entrepreneurial** 29:14,15 141:14
**episode** 99:18 108:17
**equated** 179:6
**equipment** 140:12
**equity** 97:13,15,17, 20,23 121:24
**errors** 88:14
**establish** 31:12
**established** 71:10 73:1 81:6 88:8 145:23
**estate** 37:13,15,17 38:3 39:4
**estimate** 31:17
**et al** 5:5
**evaluate** 92:21
**evaluated** 42:8 82:19
**evaluating** 82:13
**evaluation** 80:10
**evaluations** 54:17
**evenly** 84:3
**event** 94:4
**events** 144:15 151:20
**eventually** 62:4 69:21
**evidence** 32:23 33:8 93:13 99:10 175:8 176:24 177:11 188:3
**evidentiary** 165:23 166:12 177:10
**evolve** 29:20
**evolved** 98:16
**exact** 26:16 189:13,16 190:6,18
**examination** 5:24 77:1,5,7 162:3
**examinations** 78:20
**examine** 100:15
**exams** 163:4
**exceptions** 155:14, 16
**exchanging** 115:4
**excitement** 133:3
**exclusive** 65:16 111:1 178:4
**Excuse** 80:24
**executed** 116:19 117:17
**Executive** 54:25
**exercise** 162:1
**exercised** 161:12
**exercising** 162:15
**exhaustive** 150:4,9, 22 159:1,18
**exhibit** 9:23 10:8,10 11:9,10,13 12:24 13:6 18:15 20:18,19,22,25 21:8 23:7,8,11 24:15, 16,18 27:7,8 36:18,19 63:21 88:7,9 101:12,14 103:2,4,10,15 109:1 111:4,6,8 113:3 114:12 115:21,24 116:1,2 117:20 118:5,8,25 119:19,21 120:12 123:18,19,21 124:19,25 126:13,14 128:12,14,17 142:16,18 144:16 147:6,16,19 154:7 158:22 165:25 166:6 168:2 169:23 170:20 171:8 181:1 186:24,25 187:1
**Exhibits** 11:21,22,25 100:11,12,15 103:10
**exist** 136:10 173:21
**existed** 20:6 34:17,22
**existence** 67:5 92:5 115:4 136:20
**existing** 33:3
**expand** 146:8
**expanding** 53:14
**expansion** 134:11
**expect** 81:20 116:5 171:15
**expectation** 7:6
**expectations** 7:8
**expected** 171:19 173:4,8 174:9
**experience** 45:19 79:3 195:16
**experienced** 6:11
**expertise** 22:10 45:22

**expiration** 163:1
**explain** 34:16 144:1 146:21
**explained** 13:20
**explore** 176:24
**exposure** 56:20
**extent** 71:24 72:15 89:1 103:22 118:9 139:18 156:5 172:6 191:22 196:10 198:16
**extrapolate** 22:13

## F

**Facebook** 197:4
**facetious** 167:2
**facilities** 74:7 76:20 92:13 152:10
**facility** 75:6 134:13
**facing** 80:5 166:11
**fact** 59:18 81:6 87:17 137:22 143:3,13 144:21 180:13 190:9
**factor** 187:10
**facts** 32:23 33:7 93:13 99:10 143:2 159:13 192:11
**factual** 119:14 156:15 159:11 176:5,19 177:8, 12
**factual--** 85:25
**fair** 9:22 58:9 98:7,9 158:12 160:12
**fall** 17:20,21 130:19 132:22 134:4 174:21
**familiar** 7:19 10:7,12 11:14 21:3 23:19 25:21, 22 51:10,16 77:22 88:8 99:9 100:22 101:25 102:4,7 110:25 111:1,9 130:14 142:23 147:4,9, 24 150:5 183:15 196:11
**familiarity** 12:1 23:11,17 100:17 102:2
**familiarize** 156:1
**FAQ** 79:21
**February** 180:15 181:5,22 182:2
**federal** 33:21 126:24
**fee** 75:16
**feedback** 68:18
**feel** 6:13 69:18
**feelings** 175:4,5
**fees** 65:1
**felony** 9:9
**fewer** 46:24 47:3,7 73:14
**fictitious** 127:10
**field** 16:18 37:11 195:9,17
**figure** 71:23 157:11 184:6
**figures** 186:19
**file** 12:13 124:5,14 129:2 141:20
**filed** 26:16 81:10 90:5 125:13,14 129:16 130:10
**files** 170:18
**filing** 21:7 26:22
**filings** 37:8 123:14 124:1,18 126:5
**fill** 55:13
**filled** 164:9
**final** 64:6
**finalized** 115:8
**finally** 116:19
**finances** 43:14 49:24 51:5
**financial** 54:24 178:19
**find** 8:22 88:19 140:10 143:11 177:7
**finding** 138:11
**fine** 12:22 188:14
**fire** 196:10 197:10
**firm** 14:13,22 15:7,8, 10 18:2,9,10,22 19:13, 17,21 35:14,20 36:3 198:7
**firms** 18:22 19:9,20 35:4,8
**Fisher** 5:14 58:21 59:9 68:2,5 112:4,9 113:14 115:1 130:15, 18,22 132:25 134:4,10, 17 135:10 136:11,24 138:15 141:6,11,13 142:21 143:3,18 144:13 145:18 146:5,13,16 149:24 154:2 168:1,3, 24 169:14 170:4 173:25 174:5 175:19 176:9 177:1,2,5,16 183:11 193:10 194:17 201:7
**Fisher's** 148:20 167:14 168:20
**Fisher--** 169:20
**Fix** 129:5
**flat** 56:16,19
**flip** 63:23 128:18 160:8
**Florida** 91:22 92:2,6, 7,10,13 114:21 118:14, 22 131:7 133:14 134:1
**flourish** 136:7 137:9
**flourishing** 139:21
**flow** 40:22 88:5
**focus** 19:13
**folding** 185:9
**follow** 40:9 131:16 160:17 161:14,24
**follow-up** 162:3,22 163:4
**follow-ups** 162:10
**fool** 175:2
**Foran** 14:16
**force** 79:1
**foregoing** 160:3
**forget** 51:19 114:22
**forgot** 108:25
**forgotten** 197:16
**form** 27:14 30:23 39:4, 16 72:7,9 139:9 157:23
**formal** 10:21 13:7 111:15 112:20 135:23
**formally** 28:4,6 194:25
**formation** 26:13 126:13
**formed** 17:25 20:13 21:10 25:1,7 27:6 28:18 30:12,20 32:14 34:20 42:24 94:11,18 96:24
**forming** 25:3 27:4,11
**forms** 30:25 164:8 165:7
**forward** 33:22 160:8
**found** 154:25 181:22 197:15
**foundation** 21:15 190:9
**founders** 27:17,21 28:10,13 29:4
**Fox** 181:24
**Frank** 113:17 114:10
**fraudster** 133:7
**free** 175:11
**fresh** 135:2
**friend** 96:4
**front** 109:9 125:11 166:25 170:21
**Fuksa** 14:13
**fulfill** 169:22
**fulfilling** 89:18
**full** 22:18 64:6 128:25 136:14 145:19
**full-time** 40:24 41:19 44:4,10 74:15
**fully** 117:17

**fun** 170:10

**function** 23:20 178:6

**functional** 138:17

**functionality** 69:15, 19

**functions** 37:21,22 72:15 73:6 77:11,12 126:20

**funnel** 140:11

**fuzzy** 85:11

## G

**game** 87:17 174:16

**gave** 20:2 32:19 48:11 49:3 56:25 94:23 95:13

**Gavrilos** 16:17 21:11,13,23 22:24 23:1, 15 24:9 25:8,17,19,22 27:11 36:2,11 55:1 58:19 62:24 63:14,18, 25 64:23 139:11,16 145:19 147:5,20,25 150:8 163:10

**Gavrilos'** 21:17 37:1 194:16

**GCM** 5:17 9:23 10:7, 21,25 13:8 14:20 15:4, 24,25 16:1 18:12 19:24 20:3,11 21:5 23:22 24:3,10,12 25:3,6 26:13 27:21,24 28:4 29:4,20, 22 34:12,24 37:3,8,12, 23,25 38:4 39:3,9,14 40:4,7,12,24 41:18,22 42:3,6,10,13,16,20,22 43:6,16,23 44:1,9,16, 19,22 45:6,24 46:7,9 47:17 48:6,13 49:10,23 50:5,10,14,21 51:2 52:21 53:18 55:19 56:12 57:23,25 59:3,17 60:22 62:8 65:8,16 66:5,20 67:20 71:24 72:5,16,19 73:6,7,10 74:7 75:4,7,15,19 76:9, 19 77:3,20 78:4,17 79:1 80:4 85:19,23,25 86:8 87:5 89:9 91:8,15 92:1, 5,16,23 93:7,23 94:3 95:18 97:13,21,24 98:4, 11,23 99:2,5,8,11,14,21 104:13 106:3,4,6,16,21, 24 107:5,7,13,17,22,23 108:1,15,20,21,22 109:5,18,19 110:10,17 111:16,22 112:3,8,21 114:9,13,14 115:6,19 116:22 117:13,21 119:11 120:4,7,10,19 121:2,3,8,13,18,21 122:13 123:1,3,11,14 124:3,22 126:3,10,15, 19,25 127:4,7,20,25 128:4 129:7,20 134:10, 12 135:8,24 136:6 137:21,22 138:1,17 139:2,6 143:19 144:20, 21,22 146:6,14,15,23 149:22 150:19 151:3,8 152:9,24 153:5,8,14,15 154:6 155:20 158:13 159:1,19 160:4,21 161:2,23 162:1 163:3, 11 164:14 165:15,24 168:2 175:19 178:1,13, 17,22 179:20,23 180:5 182:7,11,17,23 183:5, 18,21 184:13,16,19 185:3,7,14 186:5,7,19 187:25 188:20,24 189:7,12 190:1,2,6 191:14,16 192:1,6,14, 23 193:5,10,18,20 194:7,9,23 195:10,20 200:17 202:2

**GCM's** 40:1 55:25 56:4 77:24 86:2 120:22 144:17,18 146:20 148:5 150:20,21 151:4,25 152:23 163:23 164:1 183:15,24 185:7 188:14 191:10 192:20 195:3

**GCM--** 117:25 135:20 166:6

**general** 5:17 18:11 22:9 29:24 30:13 31:21, 23 40:4 44:4,5 65:16 71:20 72:1,8 77:11 93:22,23 94:25 95:8 98:3,15 101:2,15,19 103:19 111:19 117:23 121:7,10,11 122:22 135:11

**Generally** 108:10 179:11

**generate** 42:3 46:8

**generating** 41:22,25

**Generically** 66:9

**George** 16:17 21:10, 13 23:15 24:13 29:1,18 30:8 32:19 35:16,23 36:1,11,16 37:1 40:17 43:10 55:1 57:16,17,18 58:19 69:4 70:14,15,18 90:9,21 95:21 96:7,15 98:23,25 112:12 114:16,17,18 122:5 124:25 125:4,15 135:6 147:5 153:15 163:9 178:20 186:4

**George's** 125:19 139:12

**germane** 201:6

**Ghayoori** 15:21

**give** 11:4 20:14 31:17 65:21 68:18 89:17 101:6 108:6 152:3 157:2,3 159:7 173:13, 16 175:12 176:15 196:21 197:8

**giving** 75:25 87:5 107:14 139:23

**gleaned** 155:1 157:1

**Glennon** 14:16

**GMC** 5:4 6:19

**God** 173:11

**going--** 175:22

**Goldsand** 114:23 115:16

**good** 5:1 6:1,10,23 32:8 47:10 68:10 136:13,15 141:17 158:5 175:1 180:13 183:4

**Google** 148:13

**Google--** 148:15

**governed** 86:10,20 87:12

**government** 19:6 126:23

**governs** 108:12

**grab** 83:25

**graduated** 9:3,6 13:25

**greedy** 141:16

**green** 38:1 42:23,25 43:2,3 51:18,22,24 52:2,3,4,5,8 123:7,10

**greeted** 48:10,19

**greeting** 75:24

**grew** 177:21

**ground** 6:14

**group** 96:22

**grow** 185:8

**growing** 133:4 192:14

**growth** 33:14 54:11, 15

**guess** 19:5 66:23 81:11 96:1 100:11 104:3 126:12 175:17 191:21

**guy** 127:15

**guys** 191:5 201:18

## H

**had--** 95:9

**hairs** 138:12

**half** 115:10 130:8

**hand** 64:4

**handbook** 67:10,16

**handed** 12:12 198:20

**handful** 14:6,11 58:13

**handl1ing** 117:24

**handle** 19:10 49:25 51:5 57:15 151:12 163:5

**handled** 43:10 118:1

**handles** 76:14

**handling** 59:9 108:13 117:21

**happen** 65:13 174:23 175:2,3,14 176:8 195:17

**happened** 72:5 162:10

**happening** 50:16 77:7 161:24 174:25 190:15

**happy** 201:14

**hard** 62:24,25 65:20 179:8

**hardware** 148:20 149:17

**have--** 110:3

**Haynes** 5:9,15

**head** 20:14

**header** 12:13

**heading** 12:19

**headquarters** 36:16 37:5,9

**headway** 33:25

**health** 19:22 45:19,22 108:20 195:17

**Healy** 78:14,16,22 186:7

**hear** 154:20

**heard** 51:23 132:7 134:17,20,22 135:3

**hearing** 63:7,16 64:17,18 166:12

**hearings** 165:23

**heart** 119:5,7

**height** 38:17 61:22

**heights** 38:15

**held** 121:7

**helped** 52:24 66:10 68:2

**helpful** 201:17

**helping** 77:16 114:21 161:5

**high** 179:17

**higher** 93:16

**highest** 54:2

**highly** 191:4

**hindsight** 183:4

**Hinge** 199:21,25

**Hinge/bumble/the** 200:12

**HIPAA** 108:7,13 165:19 166:1

**Hipaaline** 9:23 10:7,22 13:8 59:16 68:13 69:8 79:1 89:13 111:15,23 112:21 114:14 115:3,6,19 116:22 117:13 119:16 120:11 121:3 124:17 129:18 135:20,23 136:7,10,20 137:21,23 138:1,16,17 142:20 145:19 154:6 155:20 165:15,21,25 166:6,17,23 167:7,15 168:2,3,7,14 169:13,25 171:15,20,24 172:12 173:21 174:1,9 175:20 176:11 177:3,18 178:1,8,13,14,18,22 180:5,10 182:17 185:9 187:17 189:11,14 190:1,2,18 192:15

**Hipaaline's** 166:20 167:1 168:20 169:2,19,22 172:18,24 173:1,9,19

**HIPPA** 114:13 172:22

**hire** 182:11

**hired** 58:14

**history** 37:3 79:9 82:23 83:12 84:11,23 85:17 87:23 89:4 151:24 199:2

**hit** 176:14

**hold** 45:12,13 97:15 193:4

**Holdings** 127:24

**home** 79:18,19,20 80:2 125:19

**hoping** 60:16 174:12

**hosted** 166:2,17

**hosting** 167:14

**hour** 62:18 178:15

**hours** 8:19 64:21 65:15 150:22 169:5

**house** 98:13 122:19 181:14

**huge** 33:14

**human** 40:21 45:9 87:25 88:2,3 89:3

**hundred** 46:24

**hustlers** 33:25

**hypothetical** 33:24 192:10

**hypotheticals** 107:9,14

## I

**ID** 12:12

**idea** 10:1,5,13,20 13:7,15,21,24 26:23 45:2,5 52:13 134:24 135:12,18 141:9,17 146:6,12,20,24 180:4 183:5 185:5 186:14,18 189:4,6 190:16 192:11 196:15 198:19

**Identification** 11:11,23 20:20 23:9 63:22 100:13 103:5 111:7 115:25 119:20 123:20 128:13 147:17 187:2

**identified** 121:17 124:20,25 158:16 169:11 195:18

**identify** 5:13

**identifying** 151:23 159:22

**IDFPR** 23:14,20

**ignore** 70:8

**illegality** 33:21

**Illinois** 5:7,10 21:2 34:5 36:22 38:20 41:13,15 48:24 49:2 61:13 63:8 74:11 80:12 118:14,22 124:2 130:25 165:2,5,6

**illnesses** 186:17

**illustrates** 158:25 159:21

**imagine** 63:13 151:19 155:17

**immediately** 62:3

**impeach** 32:7,9

**implement** 69:21

**implemented** 69:12,13 70:4

**implications** 158:10

**important** 30:18 81:13 91:6

**impossible** 189:7

**impressions** 132:24

**improve** 137:23 138:2

**improved** 68:19

**in-house** 19:25

**inability** 192:20

**incessantly** 138:8

**incident** 160:14

**include** 76:7

**included** 59:1

**includes** 105:15 151:23

**including** 50:19 61:13 105:17,21

**inclusion** 114:4

**incomplete** 12:3,10 192:10

**incompletely** 87:10

**Incorporated** 52:4,6,8 127:24

**incorrect** 144:12 180:22

**increased** 97:20 139:20

**increasing** 74:13

**independent** 41:6, 8,18 50:1 58:5,9,10 67:21 68:1 73:9,16 74:5 75:5,8 77:16,20 89:22 90:16 91:3,7,14 92:16 97:12 99:7,14,16,17,21 107:7,8 109:3,4,18,24 110:14 148:6 149:1,21 177:23

**independently** 16:3 140:11

**individual** 47:21 136:24 175:19 176:10 177:2

**individual's** 68:21

**individuals** 40:22

**influence** 8:13

**information** 9:1 23:19 27:14 82:23 83:2, 14 84:11,16,19,21,22, 25 85:17,18 87:23 89:4 105:15,16,19 106:1,3,9, 12,13,15,17,25 107:23 108:14 132:9 133:19 150:5,10,16 151:23 152:1 154:11 155:19 157:5,6,18,19,21,22 158:8,9,15 159:2,5,6, 20,22,24 160:4 192:21, 22 196:21

**initial** 132:24

**initially** 112:9,20 134:9 178:17

**initiated** 180:11 182:1

**injunction** 59:15 90:5

**input** 68:12 69:7 137:23 138:1

**inputted** 85:9

**inputting** 82:22

**inquiries** 126:25

**inquiring** 67:4

**inquiry** 144:3

**insight** 57:1

**insistence** 70:9

**insolvency** 180:11, 17 181:5,7,12,19 182:1, 4,15,23 183:5

**instance** 28:23 65:7 89:11 93:1,3 107:17 126:23 127:20 159:21

**instances** 107:12 125:18 126:23 127:3 153:4,8

**instrument** 104:21

**instruments** 175:14

**insurance** 24:2

**intake** 79:9,23 80:14, 17,18 82:7,13,14,22 87:10 88:5 89:7,15

**intended** 46:8

**intent** 81:17 155:1 156:17,20,24 157:1

**intention** 154:23

**interact** 55:4

**interacted** 89:2,9

**interacting** 87:24 88:1 134:16

**interchangeably** 168:13

**interest** 62:19 128:22

**interested** 16:15 29:13 202:11

**interests** 81:19

**interface** 149:25

**internet** 79:11 80:3 134:6 141:7 199:2

**interpret** 100:9 104:11,12,18 105:4 154:15,17 156:12 175:13

**interpretation** 47:25 104:21

**interpreted** 106:6,7, 8

**intervention** 139:15

**interview** 28:21,24 77:19

**interviewed** 28:4,7 55:9

**interviewing** 55:10

**interviews** 29:17

**intoxicant** 8:24

**introduced** 139:11, 19 146:5

**introduction** 112:17 152:10

**introductions** 139:13

**invested** 44:19 190:16

**investigated** 133:10,13,21

**invited** 6:15 7:5

**involved** 19:10,22 26:7,8 44:5 114:15,20 127:25 143:10 153:21 164:16 185:21 187:5 189:10 196:16

**involvement** 85:2 110:17,19 129:1 132:11

**iphone** 140:15

**irrelevance** 182:24

**irrelevant** 59:20 80:20 182:9 199:1

**is--** 84:25

**issue** 72:12 80:25 84:19 102:16 136:8 143:20 145:25 150:10 155:4,6 168:6 177:16 193:15

**issued** 104:10

**issues** 7:4 55:11 96:17 119:9 145:2,10 169:12 175:22 176:1, 19,22 177:6,8,12 196:2

**items** 150:5

## J

**January** 129:10

**Jassey** 194:5,7,12

**Jenna** 41:10,13,20 44:13,23 48:17,18,19 52:22 53:6 55:14 57:23 58:5,11 68:10 69:4 70:15,19 72:21 74:13, 15 77:14,19,21 93:12, 14 95:21 96:8,13,15,16, 20,23 122:5 125:23 153:15 164:17 165:9

**Jenna's** 53:14

**Jesus** 169:21

**job** 44:10 81:18

**jobs** 121:8

**jog** 196:22

**join** 33:9 90:24

**joined** 14:20 18:4 22:1,3 31:22 39:14 45:24 46:20 53:16 57:25 58:4,10 72:20 94:25 196:14 197:2,3

**joining** 18:9 29:22,24 30:13

**Jonathan** 5:4,16,21 6:8 150:20 199:20 202:2

**Judge** 87:18 105:4 119:11 200:20

**judges** 177:7

**judgment** 161:12,13 162:15 168:18

**July** 15:5 18:5 73:3 74:4,6 75:3,15,20 76:9 111:2 112:1 117:16 135:25 136:10

**jump** 55:16 174:13

**jumping** 11:18

**June** 14:15,16 32:2,4, 17 39:9 40:13 41:2,20 42:4,7,16 43:5 44:7,25 46:20 47:16 49:10 50:24 65:18 75:1 90:4

93:25 94:1 97:1 112:25 117:18 122:2 136:10 173:18,21 186:20,22

**jurisdictions** 133:10

**jury** 144:1

K

**keeping** 24:22 170:24

**ketamine** 61:7,9,16 62:1 78:8,9,10 110:24 129:9,17,20,24 130:5 186:9,15 195:23

**Khorshid** 14:13

**kicked** 161:22

**kicking** 59:16

**kind** 14:3 30:18 69:14 70:8 83:11 172:15 195:7 197:19

**kinds** 110:1

**Kingdom** 180:12 182:8

**Kioussis** 41:10

**knew** 25:18 26:20 172:9 179:13,16,17,19, 22 196:8 198:19

**knowing** 131:9

**knowledge** 34:4 37:4,12 43:15,19,22,23 51:6 57:10,17,19 62:7 64:25 65:7,10 79:21 84:10,14 87:20,21 92:4, 15 98:12 110:15 113:13 118:4,20 123:10,12 130:24 131:13 132:12, 15 138:22,23 140:13 141:2 154:10 159:9 170:23 177:25 178:21 179:24 180:23 181:25

L

**la** 184:21

**laid** 142:1

**language** 101:25 102:5,10 142:23 159:17 160:10 171:17

**laptop** 140:22

**laptops** 140:14

**large** 52:24 145:20

**larger** 52:23 53:8 193:4

**Las** 131:5,9,15

**Lasalle** 5:9

**laser** 174:12

**late** 31:18

**law** 13:25 14:8,13 15:10 16:16 18:2,9,10, 20 19:5,14,18,20,22 32:20 33:3 35:4,8,14,20 36:3 45:13,19,22 118:7, 14,22 153:13 157:16 191:8 198:20

**laws** 108:7

**lawsuit** 9:15,18 15:11 114:5,10 128:22 141:21 157:7 158:10,13 196:13 200:21

**lawsuits** 9:20 113:25 196:5,8,20,24,25

**lawyer** 18:17 114:21 127:15 174:25

**lawyers** 198:22

**lawyers's** 19:7

**leaf** 56:25 57:6

**Leafwell** 56:21 59:8, 20,25 66:11 67:23 68:8, 14 69:19 78:18 79:2,24 83:5 84:9,15 85:2,4 87:8 88:3 99:18 101:20 108:17 128:23 142:21 146:17 148:20,25 149:15,16,23 151:15, 18,19 160:22 161:15, 16,18,20 162:9,11 164:9 165:12 168:13 170:22 171:22 172:19 173:10,20 174:6 186:6 189:1,2,6 190:14 191:12,18,25 194:4

195:1

**Leafwell's** 148:16 149:17 191:16

**Leafwell.co** 79:16 80:2 166:11

**Leafwell.co.** 79:15

**League** 199:21 200:6

**League/chelsey** 200:12

**learn** 16:18 20:3 24:10,12,14 51:1 180:10

**learned** 20:15 131:12

**lease** 37:17

**leased** 37:15 38:4 74:7

**leases** 37:23 39:4

**leave** 32:19 33:2,5 194:18,21

**led** 118:18

**left** 17:16 35:12 73:20

**legal** 5:10 16:19 18:20 65:22 66:1 85:21 86:1, 9,14 87:11,16 91:16 94:18,24 95:18,20 96:17 97:2,5,8,10 98:5, 7,10,13 102:19,21 104:14,21 106:5,19 111:18 117:5 119:9,13 120:21 121:5 123:11 126:21 127:16,22 143:21 144:5 149:7 150:13 153:1,12 154:16 156:5 157:8 168:8,17, 23 169:1,2,4,17,24 171:11 172:8 173:12 174:8 175:14,21,25 176:1,6,19,22 177:8,12 178:16 184:2 193:12,15

**length** 162:5

**letter** 31:3,8,11 36:4 119:16,22 120:15 186:20,22 187:7,14 188:1,2,9

**level** 93:16 133:3

**Lewis** 194:5

**liability** 121:18 122:14 124:2 126:15,16 183:10 191:8

**liable** 169:17

**library** 67:18

**license** 23:20 83:11

**licensed** 14:5 91:12 92:7,9 144:14 162:16

**licenses** 24:6 171:4

**licensure** 89:22 90:8 91:7,19

**life** 24:2

**likelihood** 101:7

**limited** 105:15,21 121:18 122:13 124:2 126:15,16 151:24 169:25

**limits** 171:24 172:14

**Line's** 172:22

**link** 184:13

**linked** 166:11

**Linkedin** 131:11,14 132:6

**list** 144:13 150:4,9,22 159:1,18

**listed** 27:8,10 106:18 126:2,4,5,6 150:5

**litigation** 7:5 54:3 61:24 101:19

**live** 155:6

**LLC** 5:5 15:6,9 24:25 25:3,7 26:16,22 27:4,6, 11,22 29:5 37:13 121:19,22 122:1,4,10, 23 124:3,22 125:23 126:3,14 174:1 202:2

**locations** 37:24

**locator** 140:8

**log** 57:3 151:14,21

**log-in** 151:20 161:17

**log-ins** 55:12 148:11

**logs** 151:19

**long** 18:1 87:17 111:22 112:3 145:10 174:16 182:4

**longer** 59:19,24 71:11,16 152:9 186:6 187:25

**looked** 24:2 90:9 100:16

**lose** 75:7

**losing** 193:5,6

**lost** 18:8

**lot** 70:5,10 79:20 82:10 96:7 110:4 116:20 139:3 158:3 188:20 201:21

**loved** 165:19

**lumps** 158:7

**lunch** 63:2

**lunchtime** 181:23

M

**M.D.** 177:3

**MAC** 140:15

**made** 7:6 50:13 99:7 103:25 111:20 116:18 117:6 126:24 139:13,18 140:11 141:19,24 169:4 175:10 183:13 189:18 198:21

**maintain** 60:12

**maintaining** 174:5

**make** 6:2 21:15,19,21 49:19 50:9 119:12 144:2 148:5 150:23 154:14 161:23 162:2,16 176:6 188:16 198:25

**makes** 7:25

**making** 33:24 43:24 44:1 137:19 139:4 163:12 165:8

**managed** 42:10 70:10 160:22

**management** 40:22 75:22,23 106:16

**manager** 77:18 124:21 125:15,16 126:6,9 135:14

**managerial** 77:15

**managers** 125:1 135:14

**managing** 174:6

**maniac** 137:11,15

**manner** 82:6 120:8, 20 121:3 157:19 190:13

**manual** 67:24

**Maps** 140:5,8

**March** 14:15 18:15 38:19 147:5

**marijuana** 16:8,12, 16 17:4 19:10,18 60:23 61:6,17 62:9 65:3 78:20 82:19 92:18,22 93:6 99:24 134:18 140:2,4,9 146:19,24 161:2 164:23 186:11

**Marinhas** 68:21

**Mark** 114:23 115:15 116:10

**marked** 11:10,13,22 12:17 20:18,19,22 23:8 63:19,21 100:12 103:4 111:6 113:3 115:25 119:19 123:19 128:12, 14 147:16 187:1

**market** 39:15,19 40:1 129:18,21

**marketing** 40:21 45:9 59:2,9,23 60:5,17, 19 61:24 62:1 105:21, 23 111:1 138:11 139:1, 2 178:5 189:2

**Martin** 181:16

**Maryland** 38:23

**material** 139:2,3 200:24

**materiality** 120:16

**matter** 5:4 15:16,18 24:24 25:2 44:14 47:25 57:11 62:13 82:16 90:11 117:21 118:18 141:12 172:3,4 175:4 183:16 199:8,11,18

**matters** 107:15 133:22 177:9 180:24

**matured** 135:19

**Mccree** 5:12

**MD** 5:5 23:2 128:24 130:3 142:20,21 143:4, 11,18 169:13 175:20 176:11 189:25 190:3 191:1,4,7,11,25 202:2

**MD's** 193:20

**mean--** 110:6

**meaning** 154:17

**means** 7:2 22:16 31:11 48:1,3 60:16 100:6,8 109:11 112:17 151:16,17 183:18

**meant** 75:6 96:19 105:1 151:14 167:9

**mechanism** 51:13 97:23

**media** 190:23

**medical** 8:10 16:8, 11,16 17:4 24:5 29:7 30:3 33:20 37:22,25 38:2,7,9 42:9,25 43:3 45:16 46:10,11,12 48:11 49:3,6 50:18,20 51:19,22,24 52:2,3,4,5, 8 57:13 61:6,17,23 62:9 65:1,3,7 73:17,18 74:4 75:4,7,17,25 76:10 78:20 79:9 80:11,21 81:24 82:5,9,13,19,23 84:11,23 85:17,18 87:23 89:4,5,23 91:10, 11,17 92:20,22,24 93:3, 6 99:22,24 105:16 106:24 107:23 108:6 109:24 123:8,11 124:20,21 134:8,18 140:2 144:14 145:21,23 146:19,24 148:14,16 149:22 151:4,5,8,10,24 152:23 153:5 160:25 161:2 164:13,14,20,23 170:24 186:8,10,11,13 191:18 193:6,19,25 194:24 195:4,9

**medical--** 149:3

**medication** 8:14

**medicinal** 19:10,18 26:8 30:4 92:18

**medicine** 91:18 107:24 146:13 163:19

**meet** 21:23 25:16 27:1 130:17 140:25

**meeting** 25:18

**meetings** 68:17 69:3,9 189:11

**member** 121:18,21, 24,25 122:10,13,15,20, 21,24 124:21 126:3,8,9

**members** 21:14 122:4 126:4

**membership** 122:23 123:4,6 125:23

**memorable** 197:7

**memorialize** 111:20

**memories** 8:11 114:5

**memory** 13:4 17:6 24:23 64:20 70:23 85:9 100:20 101:9 102:16 109:2 112:7 114:2 180:7,9 196:22

**Men** 175:1

**mentioned** 39:20 51:14 58:25 165:22 172:17 187:13

**met** 21:14 24:9 26:5 29:12 130:21 134:4

**method** 50:21

**methods** 105:20

**metropolitan** 145:21

**micro** 70:10

**micromanaging** 138:4

**Miguel** 68:21 69:3,5, 16,21 84:2 178:10

**mind** 78:7 88:18 116:1 128:8 129:23 140:6
**Mind.clinic** 78:21, 23
**Mind.clinic.** 78:7,12
**mine** 43:11
**minion** 69:6
**minute** 71:3 138:13
**minutes** 62:18 63:4 138:9 150:25 170:19 172:17
**Misdemeanor** 9:9
**misrepresentation** 167:18
**missing** 12:11,21
**misunderstood** 82:16
**mitigation** 59:18
**mixed** 181:9
**model** 29:23 45:25 46:4 188:6
**modifying** 119:3
**moment** 55:14 77:18 89:17 143:16 175:1 182:20
**money** 42:6,12,15 43:6,16,24 44:2,12,22 45:3,6,10,21 50:21 51:2 62:8 65:8 75:17 137:18 151:5 179:20,23 188:18,20,24 191:24
**monitoring** 162:2
**month** 96:10 113:1 136:14
**months** 14:6,12 26:17 117:17
**morning** 5:1 6:1
**mortar** 29:8 30:3 74:7 76:20 92:13 134:13 152:9
**motion** 119:6,10,11 167:24 168:17 201:8,11
**move** 7:7 129:20 149:9,12 170:7
**Mraunac** 5:4,16,21 6:1,3,8 11:12 15:4,9,17, 23 16:4 17:18 18:1 19:2 34:13,16,19,22 35:1,12 81:16 157:11 199:20 202:2
**Mraunac's** 150:20
**multiple** 145:4 196:20
**municipal** 126:24
**mystery** 137:19

## N

**nader** 61:22
**nail** 30:20
**name--** 129:8
**named** 15:10 196:19 197:2,6 198:6
**names** 34:7 85:17 105:15 106:24 107:22 127:7,10,17 128:1,4
**narcotic** 8:14
**nature** 38:6 49:8
**nauseam** 176:1
**nearing** 93:10
**necessarily** 188:11
**necessitated** 123:5
**necessity** 111:18
**needed** 113:16 162:17
**negotiation** 118:17
**No--** 201:2
**nomenclature** 153:23
**non-responsive** 113:20
**nonetheless** 91:19 145:11
**North** 5:9 36:21 125:22
**northern** 5:7 63:8 125:19 197:12,18
**Nos** 115:24
**note** 7:4
**noted** 27:20 201:16
**notes** 164:14
**notice** 11:14 102:25 151:2
**notification** 83:20
**noting** 82:4
**November** 14:5,10 17:22,23 59:7,11,13 110:12 115:19 116:11 117:15
**Nufix** 130:1
**number** 5:8 24:3 53:24,25 88:9 101:22 103:2,10,11,15 151:22 166:4,8,14 179:8 185:6
**Numeral** 151:3
**nurse** 93:4 99:23
**nurses** 55:20 57:12

## O

**o'clock--** 174:19
**oath** 5:22
**object** 113:19 118:9 133:1 139:14,15 182:8 183:5 199:6
**objected** 33:7 182:23
**objection** 10:2,3,6, 14,23 13:9 21:9 22:21, 23 25:11 27:13,18,20 28:1,6 29:6,21 30:10 32:21,22,24 39:16 46:2 47:19,23 49:12 50:11, 23 52:9 54:12,21 58:6 59:5 60:25 61:18 67:6 71:15,21 73:19 74:21 78:1 80:20 81:23 85:21, 22 86:1,5,9,23 87:9,13 88:1 89:24 91:16 92:24 93:13 94:5,13 95:3 96:3 97:4,18,22 98:9 102:6, 12 104:14 106:5 109:20 111:17 118:15 119:7 120:21 121:4,23 122:9 124:16 126:4,21 127:9 135:15,16 138:18 141:15,22 143:21 144:24 150:17 153:1, 11,17 154:14,24 156:4 157:8,23 163:14 168:8 169:24 171:11 172:20 173:1,11 174:8 175:21, 25 176:12 178:16 182:24 183:7 184:2 189:15 190:9 191:15 192:10 193:12 198:25 199:9 200:1,4,7,10,13 201:16
**objectionable** 170:13
**objections** 7:3,13 154:20 175:10 200:21 201:14
**obligation** 168:20, 21 169:3 173:2
**obtain** 97:23
**obvious** 18:6,7 65:5
**occasion** 55:4 96:16
**occasionally** 55:11,13
**occasions** 28:22 29:2,3
**occur** 77:24
**occurred** 110:5 188:22
**occurrence** 158:1
**October** 17:22,23 24:18 25:3 63:9 66:1,2 90:5 110:5,12 112:5 119:15,22 135:24 136:3,4,5 142:1 145:17
**offer** 11:20 23:7 100:10 103:2 128:3 186:25 188:13
**offered** 77:20 84:7
**offering** 69:8
**office** 37:10,23 48:11 76:25 187:18,21
**officer** 32:16 40:6,7, 11,12 44:8 45:2,5,25

46:3 50:9 53:6,18,22 54:1,6,13,14,20,24,25 55:3,19 56:1,5 57:21,22 58:2,12,23 59:1,4,22 61:2,16,20 62:8 65:15 66:5,21 67:4 71:11,14, 25 72:6 73:22 74:20,25 76:23 77:10,12 89:19, 20 91:25 93:10,12 101:3,16 103:19 106:2 109:16,23 121:6 189:10

**offices** 37:18,20 38:12 48:24,25 49:2

**offices/clinics** 39:10

**official** 74:19

**officially** 30:13 34:11

**Ogletree** 14:19 16:13 17:9,14,16 35:12,21,22 36:12

**Ohio** 38:23

**one-one-one** 96:16

**ongoing** 163:22 164:5

**online** 5:5 51:14 135:18 139:22 140:1,25 142:20,21 143:4,10,18 146:6,13 169:13 175:20 176:11 177:3 189:25 190:3 191:1,4,7,11,18, 25 193:20 198:8 202:2

**onto--** 149:23

**opaque** 190:17

**operate** 54:23 68:13 70:10 190:12

**operated** 83:19 87:8 127:8 189:13,17

**operates** 82:6 84:8 164:1

**operating** 29:7 30:3 32:16 40:6,11,12 44:8 45:2,5,24 46:3 50:9 53:6,17,22 54:1,5,13, 14,20 55:3,19 56:1,5 57:21,22 58:2,12,23 59:1,4,22 61:2,16,20 62:8 65:14 66:4,21 67:4 71:11,14,25 72:6 73:22 74:19,25 76:23 77:10, 12 89:19,20 91:25 93:10,12 101:3,15 103:19 106:2 109:16,22 121:6 152:9 189:10 191:1,12,24

**operation** 40:16 42:11 76:5 190:1

**operational** 55:11 72:15

**operations** 30:3 40:19,22 46:9 50:10,14 52:23 65:22,25 71:16 72:19,25 73:6 74:2,3, 14,16 93:16 153:22 185:21 191:11 192:4

**opinion** 157:2 173:13

**opinions** 108:7

**opportunistic** 141:16

**opportunity** 33:14 100:14 109:4 182:19 183:14

**opposed** 77:18

**opt-ins** 198:8

**oral** 50:5

**order** 46:8 53:4 79:23 82:18 143:25 158:12

**organi** 24:25

**organization** 21:1 75:22 126:14

**organizations** 33:15

**outline** 122:21

**outsmart** 170:9

**overlap** 34:21

**overly** 133:2

**overrule** 200:21

**overruled** 135:14

**oversaw** 59:23

**owned** 37:13 66:14 76:14 87:5 106:4,17 167:18 171:9 183:25

**owner** 174:9

**ownership** 86:19 87:11 106:8 119:2

**owns** 85:20 86:12 190:16

## P

**p.m.** 202:16

**pages** 88:19 124:9,11 160:8,9

**paid** 42:17 57:3 65:8 95:24 197:5

**Palandech** 14:17

**pandemic** 17:13 54:17

**Paradise** 133:9

**paragraph** 12:23 13:1,15,22 64:7,11 88:21 142:19 143:17 145:14 150:2,3,12 152:4 158:19,20,21,23 159:16 160:3 190:25 198:10

**paragraphs** 13:5 88:17 114:4 146:2,4 147:21 160:9,16 181:1

**Park** 14:9

**parse** 60:20 107:19

**part** 12:16,20 43:11 44:3 58:25 59:6 64:2 86:21,23 91:14 98:18, 24 113:18,24 123:6 142:25 148:23 149:25 159:14 163:5,25 164:8, 22 165:7,24 170:20 172:1 173:6 177:10 185:21 194:20,23 196:1

**part-time** 15:4 41:4, 19 44:5

**partaken** 8:19

**partially** 133:2 187:8

**participate** 142:4

**participation** 80:11

**parties** 10:14,17 86:11 116:21,24 118:11 137:7,10 155:1 156:17, 20,24 157:1

**partner** 18:23

**partnered** 191:19

**partners** 5:5,17 6:19 14:20 15:4,25 16:1 18:12 19:24 20:3,11 21:5 24:4,10,12 25:3,6 26:13 27:22,25 28:5 29:5,20 37:23,25 38:4 40:4 41:22 42:3,6,10,16 43:6,16,23 44:1,9,17, 20,22 45:6 46:7,9 47:17 48:6,13 49:10 50:5 52:21 57:23 58:1 59:3, 17 60:22 67:20 74:7 75:4,7,15,19 76:9,19 77:3 93:7 98:11 99:12 110:10 116:22 121:19, 22 122:13 124:3,22 126:3,10,15,19 143:19 151:4 159:1,19 160:4 178:1 182:7 188:24 200:17 202:2

**partnership** 139:9

**partnerships** 138:11 139:4,7,18

**parts** 12:16 87:3 113:9 165:8 171:22 172:12

**party** 108:21 112:17 171:1 196:9 197:1,2,3,6

**passed** 53:13

**past** 7:17 19:20 123:16 132:4

**patient** 55:12 64:25 65:2 76:6,24 77:23 79:3,8,24,25 80:8,9,15 82:21,24 83:1,2,20,22 84:3,4,10,16 89:2,9 107:5,18 133:17 134:11 138:9 148:24 151:14, 17,22 153:12 159:22 160:19,21 163:1 164:5, 22,23 165:10 184:18, 19,20,21 185:8,12,20 192:21 195:18

**patient's** 151:20

**patients** 42:8,12 46:12,15 47:18,22 48:7, 9,14 57:3,5 60:7,10,12 76:10,13 77:4 85:9 87:7,20,21,22 91:17 92:10 107:3,13,23 108:1 139:5 151:18 153:10,16 154:3 161:3 162:7,16,24 163:23 164:15 166:3 189:3,5 192:22 193:7 194:25

**pay** 44:22 160:22 190:21

**paying** 42:6,12,15,18, 20,22 43:6 44:8,13,16 49:10,23 57:4,5 151:5,8 178:17,22

**payment** 57:1 180:1

**payments** 51:13 76:10,13 151:3 160:18, 20

**PC** 140:15

**pending** 201:7

**penned** 119:22

**Pennsylvania** 38:25

**people** 24:3 34:1 45:21 48:14 57:25 58:4, 10 62:8 72:2,3 73:18 75:24,25 90:2,15,16 110:3 133:9 140:9 153:9,14,16 177:17 178:7 186:16

**people's** 176:7

**percent** 61:15,25 179:3,4

**perception** 133:5

**perform** 104:8 126:20

**performed** 37:20,22

**performing** 36:17 72:15,18 73:4,5,21 109:18 178:7

**performs** 152:25

**period** 17:15 18:20 53:21 54:20 61:1 90:7 96:1,7 110:2 138:16 188:24 192:14

**permitted** 109:12 172:7 199:24 200:2,5

**permitting** 183:9

**person** 27:2 28:15 49:1 67:19 77:6 82:18 98:10 130:22 133:11

**personal** 32:11,12 65:6,10 81:21 82:23 131:13 132:11,14 140:13 144:7 145:11 166:3 170:23,25

**personalized** 8:6

**personally** 8:7 11:7 69:8 138:16,18 150:14, 18

**perspective** 122:12 189:21

**ph** 140:19

**pharmaceutical** 22:13

**pharmacist** 30:8 145:20

**Pharmd** 22:9,12,14, 16 23:2

**phone** 112:17 130:20 140:20,21,25 141:1 166:3 198:18

**physical** 39:10

**physician** 22:20,25 23:3 25:15 30:7 55:20 57:12 76:14 82:21 83:16 84:5 90:24 92:8,9 93:3,4 99:11,17 107:8 113:16 124:20,21 150:1 151:13 161:10 162:25 163:22 164:17 184:18 190:21

**physician's** 163:20

**physicians** 33:19 34:7 39:20,23 42:9,17, 18,20,21 46:16,17 49:9, 23 50:6,22 51:3 55:5, 15,18 57:11 58:20 83:18 84:2 90:10 91:9 99:8,22,23 110:15 144:14 149:19,20,21 161:8 162:2,13,14,21 163:3,7,12 164:5,13,18, 20 165:8 171:3 194:18

**pick** 84:6

**piece** 16:8,11 122:20 154:21

**pieces** 16:19

**pitch** 32:18 113:15

**pitched** 113:14 134:25

**pivoted** 186:9

**place** 5:9 38:3 78:21 94:18 110:14,21 125:18 153:2 161:6 181:19 183:6 188:16

**places** 131:7

**Plaintiff** 6:19 9:17 15:15,18 144:22 196:7, 9,19 197:17 198:6 199:8 200:17,18

**platform** 56:21,25 57:6 59:17 68:14 69:19 77:23,25 78:2 79:2,4,8, 10 81:25 83:6 84:9,15 85:2,10 88:3 89:3 134:19 139:23 142:21 149:15,23 151:15,18 160:22 161:15,18,21 162:11 165:12 166:1 170:22 171:1,23 172:19 173:10 174:7 186:5,6,7 190:14 191:13 194:4 195:1

**Platform--** 85:5

**platforms** 76:22 78:3

**play** 119:10 170:9

**played** 174:5

**pleading** 81:9

**pled** 150:12

**PLLC** 126:16,19

**point** 26:4 29:22 49:22 50:16 51:1 52:20, 22 55:23 59:24 61:12 62:2,5 69:16 77:11 78:16 83:13 88:12 92:8 101:5 104:4 108:17 113:5 115:3 119:12 121:17 124:16 129:18 131:11,17 137:14 151:1 153:2 158:25 163:8,21 164:19 166:15 169:5 176:18,23 179:13 182:7 184:6 191:23

**pointer** 174:12

**points** 168:16

**policies** 66:5,20 67:5,6 104:10 105:6,23

**polite** 133:2

**Ponzi** 14:17

**portal** 134:6 191:18

**portion** 155:23,25 192:1 193:4

**position** 14:11 19:6 27:25 28:4 40:5 52:21 53:5 54:22 74:24,25 77:10,20 81:5 86:2 93:22 95:1,14 101:2 104:22 120:22 142:10 144:8,17,18,19 150:20, 21 151:5,25 167:25 168:19 188:14 195:3 200:25

**posted** 131:11,15

**potential** 7:4 80:8,14 83:1,2 84:10,15 85:15 87:7,21,22 89:2,9 129:9 160:11,19,21 164:22 193:6,11

**power** 62:22

**practice** 7:20 15:3 19:2,16 29:7 32:20 33:3 34:6 46:10,11,12 55:20 61:7 91:18 145:23 152:23 153:6 163:19 201:8

**practices** 38:7 66:6 67:19 127:1 143:5

**practicing** 33:3 57:12 93:4 99:23

**pre-dated** 77:21

**precedes** 118:5

**preceding** 26:17 125:3

**precluded** 18:9
**preferable** 63:1
**preliminary** 8:4
**prelude** 20:2
**premise** 40:17
**preparing** 120:5
**prescribed** 8:14,25
**prescription** 61:5 83:12
**prescriptions** 33:20 60:24
**present** 19:21 62:12 63:11,14 96:15 98:17 123:14 199:24 200:2,5
**presently** 119:6 121:21
**pressuring** 70:18
**presume** 24:21 48:3
**presumes** 32:23
**presumption** 137:18
**prevent** 8:15
**preventing** 162:25
**previous** 113:25
**previously** 31:16 49:8 72:22 113:6 162:19
**price** 56:16,19 58:19 105:17
**pricing** 55:24 56:3,6, 8,21 105:23 151:3
**primarily** 59:8
**principal** 125:18
**principle** 37:10
**printout** 116:2
**prior** 19:9 25:23 29:22,24 45:18 55:10 75:10 87:24 94:3,8,22 95:17 96:25 97:1 99:19 100:17 108:22 110:12 125:24 134:16 145:17 182:1 192:22
**private** 15:3 36:25 37:2
**privilege** 10:3,24 13:11,18 30:10,19 31:13,14 33:1,10 85:22 95:2,4,15 96:13,19 111:17 141:23
**privileged** 13:9 95:23
**privileges** 7:14
**privy** 65:4
**pro** 198:24 200:16 201:1
**Proactive** 98:6
**problem** 155:24
**problematic** 183:10
**problems** 68:18
**procedure** 182:23
**procedures** 66:8,20 67:5,7,19 104:10 105:6, 20 175:8
**proceeding** 180:11 181:8,12 182:1,15,20 183:5
**process** 8:16 66:13 79:24 87:10 88:5 89:7, 15 160:11 163:21,25 164:19,22 182:4 200:21
**processes** 105:21
**product** 10:3 13:10 82:3 85:23 137:24
**profession** 22:4 25:14 91:12,13
**professional** 38:1,2 42:24 43:3 45:19,20 65:2,8 75:5,8 80:21 81:17,24 82:5 91:10,11 92:21,25 104:7 108:6 122:18 126:16 149:3 161:12,13 164:21 193:25
**professionals** 57:13 73:17 74:5 75:17 76:11 89:23 99:22 161:1 164:13 170:24 193:6,20
**program** 80:11
**programmed** 84:2
**programs** 105:22,23 200:9
**project** 26:7
**promise** 201:20
**promised** 137:10
**prompt** 62:16 139:12
**pronouncing** 6:2
**proper** 175:9
**properly** 82:17 158:21 176:23
**property** 106:1
**proposed** 112:20,22
**proprietary** 154:11 155:19 157:5,19,21 158:8,15 159:5,7 195:7
**protected** 108:13
**protection** 197:10
**protocol** 161:11
**protocols** 147:24
**prove** 143:25
**provide** 46:8 47:17, 21 68:12 84:11,16 87:20,22 92:16 137:8
**provided** 76:19 92:5 93:5 97:3,6,9 124:7 155:14,15,16 192:18
**provider** 83:14 141:10
**providers** 144:14 149:2,3 151:4,6,9
**providing** 75:19 76:21 92:1 95:18,21 98:13 99:24 109:24 137:23 138:1,6 140:1 151:11 166:1 167:8
**provision** 31:2 118:8,22 136:12
**provisions** 154:15
**proximate** 160:8
**public** 17:24 23:19 80:4 127:18 166:11 182:20
**publicly** 166:2 181:15 199:9
**published** 16:19
**pull** 90:21 149:14
**pulling** 181:13
**purchase** 182:17
**purely** 145:5
**purported** 115:2 116:23
**purports** 150:3
**purpose** 23:24 25:6 42:7,16 94:15,16
**purposes** 40:9 141:11 144:4 181:22 200:3,6
**pursuant** 181:4
**purveyors** 171:20
**pushing** 31:9
**put** 7:3 12:19 68:7 81:12,13 84:3,12 87:13 109:8 116:17 127:22 149:23 150:24 156:18 183:11 188:3 196:3 199:5
**putting** 120:16 122:22 169:20

## Q

**qualified** 161:6
**qualifies** 159:1,18
**question** 7:9,24 10:19 11:6 13:18,20 22:23,24 33:2,11 42:2 48:3 49:14 51:9 54:25 64:10 66:23 74:17 76:16 82:10,16 86:7,12 87:18 92:19 94:14 104:23,25 106:22 108:25 118:3,19 120:24 132:14 139:14 144:6 152:14,15,18 153:13 154:22 156:14,15 157:9 164:10,17 167:12,13

Case: 1:20-cv-06401 Document #: 253-1 Filed: 08/25/26 Page 228 of 233 PageID #:4841



168:22,23 170:1 175:9 176:3,5 177:14 178:19 180:14 181:2 182:25 183:2 184:8 188:5 193:17 202:11

**questioning** 81:23

**questionnaire** 89:5

**questionnaires** 85:19 87:24

**questions** 7:23 8:4,5 40:9 71:22 72:10 82:1 93:10 104:17 107:20 119:13 121:5 127:4 142:14 155:3 157:15 158:6 170:5,11 176:21 177:8 182:21 199:4,5 202:7

**questions--** 95:5

**quick** 202:7

**quickest** 196:1

**quickly** 169:8 186:9 198:1

**quo** 60:13

## R

**Ramin** 15:21

**ran** 15:3,7 46:9 55:14

**randomly** 83:16

**rate** 178:15 185:20 192:13

**rates** 57:14 58:16,18

**rattle** 128:10

**re-certified** 162:24

**re-sign** 109:4,6

**reach** 193:10 198:4,5

**reactive** 98:6

**read** 11:3 49:20 64:2,11 88:11,21,25 100:24 101:4 102:7,9,13,15 106:18 113:2,24 152:19 160:16 184:9

**reading** 13:4 88:18 101:9 102:11 105:14 116:13 142:24

**reads** 104:6 158:21,25

**real** 37:13,15,17 38:3 39:3

**reason** 7:22 18:8 64:22 88:13 127:5 156:3,6 184:3,5

**reasons** 18:6,7 65:5

**recall** 31:14 50:13 63:6,11,14 64:17 66:9,16,19,24,25 69:8 70:3,17,21 96:23 109:3 113:11 115:7,15 116:13,18 119:15 120:2 128:7 129:13 130:10 165:24 198:12

**receive** 64:14 84:3 97:13

**received** 77:4 188:18 198:18

**recent** 132:3

**recently** 131:6 132:3 183:11

**recess** 147:13

**recite** 9:1

**recognize** 72:6,7 103:9 119:5 123:24

**recognized** 71:24

**recollection** 20:17 30:17 52:17 56:11 62:15 64:1,12 67:3 71:12 75:12 83:17 85:12 89:1 96:25 102:23 103:23 104:1 112:11,13,16 117:10 118:13,21 119:3 124:23 128:4,19 132:19 135:5

**recommend** 13:23

**recommendation** 13:22

**recommended** 10:25 13:15

**record** 5:2 6:7 7:4,7 17:24 21:16 22:23 23:14 24:20 27:20 32:24 49:18,20 62:13 71:6,9 80:25 81:1,4,11,12,13,15 86:5 87:14 116:17 133:12 147:12,15 152:19 156:18 161:14,19 175:23,24 176:12 177:10 184:9 196:3 199:5 201:25 202:3,10

**recordkeeping** 164:17

**records** 48:12 49:4,6 50:15,18,19,20 75:25 148:14,16,24 149:10,18,22 151:24 161:21 164:14 165:10 181:8,10,12 194:24 195:4

**red** 198:20

**reduce** 164:2

**refer** 126:12 153:16 190:11

**reference** 99:7 117:6 155:25

**referenced** 67:23 105:7

**referral** 140:1

**referrals** 60:8,9,10 78:21 146:20 161:2

**referring** 120:14

**refers** 152:23

**reflected** 186:19 188:1

**refresh** 20:17 30:17 70:25 75:12 85:12 102:22 117:10 132:18

**refreshed** 13:4 89:1

**refreshes** 64:1,12 102:16 128:19

**refused** 177:13 194:18,21

**regard** 23:22

**regular** 202:14

**regulations** 66:14

**regulatory** 126:23 127:4 163:13,15,16,18

**relate** 60:19 86:18 158:11 166:16

**related** 24:5 55:12 63:7 71:13 92:17 98:5 110:24 126:25 130:2 143:5 192:20 193:19

**relates** 154:22 157:6

**relating** 105:19

**relation** 164:6

**relations** 105:18

**relationship** 21:10,13 30:12,20,24 31:1 32:15 34:23 35:15 36:7,11 94:3,5,10,17 95:11,13 96:19,20,24 114:25 123:11 135:19 136:6 137:8 138:17 145:18 163:23 164:6 173:10,17,19

**relaxed** 7:2

**relevance** 27:18 29:6 32:21 59:5 71:21 86:23 97:18 102:12 118:9,15,17 124:16 133:1 135:16 141:15,22 150:17 153:11 154:24 156:4 173:1 183:7 200:1,4,7,10,13

**relevant** 59:6,10,14,18 110:6 115:12 128:16 197:14 198:13

**relinquished** 52:23 53:5 71:17 74:19 76:22 77:9

**remain** 18:2 171:6

**remainder** 200:23

**remained** 17:14 71:15

**remains** 125:6 145:11

**remediation** 72:9

**remember** 8:11 9:1 16:10,11 20:7 24:25 25:2,3 26:19,20,21,22,25 27:3,5 34:7 37:18 42:23 43:21 51:17 53:5 56:9 69:10 70:5,6 71:18 72:23 77:14 87:2 88:4

91:5,21 100:1,2,4,6 101:7 108:24 112:10 115:20 116:8,9,10 117:8 120:4 128:20 130:6,19 131:10 135:7 153:25 172:15 178:4, 12,24 179:1,10,12,15 181:13 194:19 196:18 197:19,23,24 198:7

**remove** 149:22

**renegotiate** 109:13

**renewals** 91:2

**repercussions** 33:24

**rephrase** 92:19 160:20

**rephrased** 49:17

**replete** 176:13

**report** 98:25 99:2 123:17

**reported** 40:16 98:23 99:5

**reporter** 5:11,18 23:6 41:11 49:21 56:22 68:22 69:1 152:17,20 184:10

**reports** 124:14

**represent** 5:13 81:19 115:3 116:6 174:18 177:4 188:11

**representation** 35:2 193:24

**representative** 6:18 89:10

**representatives** 171:16,25

**represented** 199:15

**representing** 36:1 121:2 153:15 191:5 198:22 199:12 202:10

**request** 31:2 170:12

**requested** 68:7

**requests** 69:11,14

**require** 164:25

**required** 27:14 91:19 108:7 162:24 164:4,9 165:6 174:10

**requirements** 148:7 163:13,15,16,18

**requires--** 82:6

**researcher** 178:10

**reserve** 31:10 72:12 85:16 155:4 196:2 202:5

**reserves** 144:13 168:24 170:4 177:16

**reserving** 201:4

**residence** 36:25 37:2

**resolve** 201:9

**resources** 40:21 45:9

**respect** 106:20 107:4,10,15 113:7

**response** 119:11

**responsibilities** 98:4 121:11,12,13 122:18 176:7

**responsibility** 37:8 40:15 60:5 89:21 93:14, 17 163:20

**responsible** 90:7, 15,17 123:13 163:11 167:4

**rest** 198:7

**restroom** 71:2

**result** 183:24

**resulted** 193:10

**resume** 28:3,8

**resumed** 60:5

**resuming** 71:10 110:11

**retain** 141:19,24

**retention** 185:20

**retroactive** 136:12

**returning** 184:13,17 187:9,10 188:6

**revenue** 41:23,25 42:3 46:8 139:21 179:5

**revenues** 179:16

**review** 53:4

**reviewing** 187:24

**revision** 69:15

**revisions** 70:7

**rightfully** 85:19

**riot** 32:4

**risk** 49:16

**Robert** 5:10

**robin** 84:1

**role** 14:8 43:12 52:23 53:8,14 55:16 74:14 77:15 89:18 98:15 123:7 172:19,22,25 173:1 174:4

**roles** 72:3 176:7

**Roman** 151:2

**room** 80:16 83:21 84:12 138:9 170:15

**round** 84:1

**Rudloff** 14:17

**rules** 6:12,14 7:2,3 8:2 67:19 170:9 175:7

**ruling** 119:12

**run** 52:24

**running** 18:10 25:9 189:25 190:1,6,7 191:16 192:4

**RX** 130:3

## S

**safe** 45:16 130:13

**sale** 182:19

**sales** 105:20,22

**Salzman** 25:9,10,13, 21 27:2,12 36:2,12 69:5 122:6,10 126:2,9

**sat** 28:20 68:17

**save** 154:19

**scam** 113:17

**scammed** 183:12

**scenes** 190:15

**scheduled** 28:23 48:13

**scheduling** 48:10 75:24

**school** 14:1 179:17

**scope** 170:1

**screen** 138:12

**script** 11:19

**secret** 144:15 159:23

**Secretary** 21:2 24:20

**secrets** 143:19,20,22 144:2,3,11 150:4,9,15, 21 159:2,4,19

**section** 79:21,22 101:22 102:1 104:5,6 105:7,10 118:25 155:10 156:1 166:14 195:25

**sections** 88:16

**security** 196:10 197:11

**seek** 104:18

**seeking** 156:14,15

**seeps** 132:9 133:20

**select** 83:22

**self-defining** 154:25

**sell** 195:10

**sending** 116:10 119:16 120:5

**Senior** 18:25 19:1

**sense** 7:25 20:14 22:17

**sentence** 104:6 105:13

**sentences** 106:18

**separate** 145:10 164:10 165:18

**separately** 71:19 72:6,8 158:11
**September** 136:17 145:16
**serve** 18:11
**served** 15:25
**servers** 148:17 171:9,18,23
**service** 15:23,25 38:1 42:17 83:19 135:18 148:10,12 167:15 191:18
**services** 38:3 42:24 43:3 46:7 47:17 55:25 56:4 60:2,16 75:19,22, 23 76:19,21 92:1 95:18, 20 97:2,5,8,9,10 98:13 104:8 105:18 107:24 109:24 111:2 113:14 138:2 140:1 141:6 143:5 151:11 153:9,16 167:8 178:18,22
**session** 201:13
**set** 55:24 57:13 58:15, 18
**sets** 86:19 122:17
**setting** 96:22
**settle** 188:13
**settled** 197:19 198:1
**settlement** 188:9
**share** 115:18
**shift** 89:25 180:1
**shifted** 188:6
**short** 18:20 71:7 81:2 147:13
**show** 128:10 181:10
**showed** 24:16 118:2
**sick** 55:16
**side** 69:6 114:19
**signature** 202:5
**signed** 85:10 103:1 109:9 111:2,25 113:1 115:14 118:2,4 136:1 167:19
**significance** 59:13
**significant** 50:9,11
**similar** 34:5,9 124:14 159:16
**similarly** 159:14
**sincere** 175:4
**single** 28:23 75:4 89:11 107:17 188:16
**sit** 17:7 28:12 70:24 101:3,8 104:11
**site** 68:19
**sites** 172:14
**Sitter** 128:8
**sitting** 21:19 94:2 102:11 103:24 120:18 126:22 157:4
**situation** 17:12 72:5 96:23 120:17
**skip** 154:20 160:3
**Skipping** 89:16
**slightly** 121:1
**slow** 80:17
**smart** 166:3
**Smith** 199:22 200:12
**so--** 94:18 137:3 182:10 200:25
**social** 190:23
**Socrates** 47:24
**software** 105:22 172:13 178:10
**sold** 181:4 191:7 195:18
**sole** 106:1 139:22
**solely** 155:1
**solicitation** 193:19
**soliciting** 198:7
**solo** 15:3,7 19:1,21 34:6
**somebody's** 36:25
**sooner** 107:21 163:1
**sort** 8:13,24 19:18 26:6,7 50:1,4 58:4,6 67:18 72:18 73:17,21 75:16 132:23 137:13 138:5 144:23 162:1 165:21
**sought** 112:12
**sound** 88:7 134:24
**sounds** 52:1 114:24 150:13
**sour** 137:5
**sources** 199:10
**space** 34:2 195:23
**speak** 28:12,25 95:25 96:3,6,16
**speaking** 31:20 141:1
**special** 33:14,18
**specialty** 134:7
**specific** 48:4 51:25 64:19 70:17 72:5 88:16 90:20 142:13 153:2 155:14,16 163:17,18 186:1
**specifically** 23:14 70:2,6,21 155:12,13,15 165:4
**specifics** 89:15
**spell** 6:6 21:17 56:22 68:22
**spend** 118:10 180:24
**spent** 19:24 65:22 110:4
**spirit** 141:14,16
**split** 65:23
**splitting** 138:12
**spoke** 28:22 29:1,2 96:24
**Spread** 39:12
**spring** 14:12 178:7
**squarely** 82:9
**stack** 129:5
**staff** 140:18
**stamp** 12:13
**stand** 144:10 192:8
**standardized** 56:12
**standing** 6:23
**standpoint** 191:17
**stands** 118:19
**start** 26:12 32:20 33:3 39:3 40:5 90:6 142:15 147:10 196:10
**started** 17:20,25 31:19 39:8 40:25 54:4 73:1,12,14 75:1 93:24 97:21 98:3,16,22 112:25 117:14 137:2
**starting** 128:21
**starts** 155:13
**state** 5:13 6:5 21:2 38:20 56:18,19 66:10, 12,13,16,17 80:12 92:1 124:2 126:24 133:14 163:13 164:8
**State's** 24:20
**stated** 13:18 86:2
**statement** 11:1 64:23 160:13 168:15
**states** 5:6 38:22 39:12,22,24 53:18,25 54:19 56:12,14,16 61:9 91:17,20 124:15 131:1, 4 132:12,15 143:6 162:8 164:25
**statistical** 186:2
**status** 60:12 90:8 91:7,15 177:24
**stayed** 189:1,13 190:2
**steal** 194:2
**Steno** 5:11,12
**steps** 145:22
**Steven** 25:13 29:1,18 30:8 32:19 35:15,24 36:2,11,17 69:4 90:9,22 95:21 96:8 135:6

**stipulating** 116:3
**stole** 185:17
**stolen** 184:21
**stop** 62:24,25 63:2 136:15
**stopped** 18:3 74:1,3
**storage** 172:13
**stored** 49:6 171:17
**straight** 160:19,20 171:7
**strategies** 189:20,24
**strategizing** 120:4
**Street** 5:9
**strictly** 31:20
**strike** 59:22 92:18 99:20 145:24
**structure** 55:25 57:1 58:19 82:11 151:3 180:1,5
**structures** 56:4
**stuff** 65:16 70:8 122:22 134:1 148:19 168:1 201:5
**stylistic** 127:23
**submit** 28:3,8
**submitted** 12:7 119:11 170:11
**subsequent** 133:6 189:5
**succeed** 137:8
**successful** 145:23
**successor** 183:9 191:8
**sudden** 188:8
**suffered** 198:11
**suffering** 8:9
**sufficient** 152:6
**suffix** 127:23
**suggesting** 82:5
**suggestions** 68:12 69:7,25 70:1,3 138:5
**suitability** 80:10 82:19
**suits** 196:17
**summary** 168:18
**summer** 73:2 139:25 178:3,23 179:7
**support** 12:7 135:8, 12,17
**supported** 50:22 51:2 55:5 135:17
**supporting** 34:9 55:20
**suppose** 53:12 91:4 116:16 118:3 130:21
**supposed** 157:12 178:14
**sure--** 49:19
**surpassed** 77:12
**suspect** 190:3
**suspends** 201:7
**swear** 5:19
**Swibel** 181:24
**switch** 154:5 185:11, 12 188:15,21 189:5 194:10
**switched** 188:8
**sworn** 5:20,22 175:24 176:17
**sympathy** 174:17,20
**system** 84:1 160:13 164:4 166:19,20,22 167:7 168:16 171:19,21 183:9 185:15
**systems** 140:12 167:18

**T**

**tablet** 166:3
**tablets** 140:14
**taking** 5:8 18:3 38:3 55:15 62:19 77:15 78:21 94:18 104:22 116:1 128:17 134:17 142:10 146:4,6 181:19 188:2
**talk** 88:17 90:4 108:8 138:14,25 199:2
**talked** 49:9 139:3 178:9 196:4 202:7
**talking** 12:16 31:19 35:9 38:8 40:5 51:21 57:20 58:22,24 73:24 85:4,7 91:9 106:13 109:20 110:5 134:17 140:14 147:7 174:2 193:25 199:23 201:3,5
**talks** 53:13 113:25
**target** 59:2 60:1,6,7, 11
**task** 76:5
**team** 90:25 120:4 178:10 189:11
**technical** 22:17 80:25
**teleconference** 132:23
**telehealth** 29:10 76:21,25 77:6,23,24 78:3 79:2 107:24 134:18 143:5 146:16, 18,24 166:1
**telemedicine** 54:16
**telephone** 53:10
**ten** 38:16
**Tennessee** 131:6 132:2
**tenure** 54:1
**term** 22:12,18 48:1 104:12 143:22 157:21
**termed** 35:18 54:6 188:15
**terms** 61:23 104:9 105:17 139:20 169:3 173:7,8
**terrible** 133:11
**test** 175:11
**testifies** 5:23
**testify** 7:12 197:21 199:18
**testifying** 144:23
**testimony** 144:5 175:24 176:17
**texting** 70:11
**thankfully** 130:23
**that--** 152:16 201:1
**theoretically** 176:24
**therapy** 61:7,9 110:24 186:9
**thereabouts** 137:3
**thereof** 133:15 154:4
**thereto** 115:23
**thing** 59:10 68:6 86:13 88:11 154:1 156:19 174:24 178:24 196:22
**things** 13:16 45:8 60:22 70:18 76:2,3 79:20 84:18 89:16 95:23 109:2 110:5,7 135:13 136:13,15,24 137:2 148:3 150:15 152:6 201:9
**thinking** 155:23
**thinks** 174:25
**thought** 10:10 132:22 170:2
**thoughts** 8:16
**threw** 107:16
**throw** 66:8
**thrown** 80:15
**Thursday** 5:3
**tiff** 193:16
**tiff's** 193:18
**time** 5:2 7:5,21 9:3,6 11:17 17:15 19:25 22:3 26:20 27:1 28:20 29:11, 12 30:6,8,11 31:9 32:16 33:13,19 34:2,17,22

35:5,6,8,9,14 36:3,15 37:1,3 39:24 40:25 41:15,23 43:15 44:7 47:16,17 53:1,21 55:19, 25 56:4 57:21,22 58:1, 11,22 59:3,19 60:2 61:1,15,19 62:7,21 65:21 66:4,20 69:11 71:8 72:3 73:6,9,20,21, 25 74:23 76:22 77:9 79:13,14 80:22,23 81:3, 16 82:2,3 84:7 87:17 89:8,25 90:7,12 91:14, 24 92:4,15,20 93:15 95:8 96:21 97:10 98:16, 18,24 99:4 100:7 101:18 104:10,11 108:2 111:20,22 118:10 128:25 133:11 134:12 135:3,14 136:9,11,20 139:24 141:20 143:14 145:10,19 147:14 149:10 152:8 154:19 160:13 161:20 170:2 174:16 177:20 179:7, 19,22 180:24 195:13 201:7 202:3,4,9,12

**times** 73:23 94:23 131:6 138:13 145:4 154:16 174:13

**tinkering** 69:18

**title** 43:13 52:24 71:17 72:24 74:19 76:23 89:21 155:11,13

**titles** 121:7

**to--** 70:12

**today** 5:2 7:12 8:10 11:16 23:25 38:8 59:12 100:18 101:4,8 102:11 103:24 104:12 126:22 144:8,23 170:12 174:3 185:1 198:14 201:20

**told** 17:8 31:22 44:17 75:3 102:2 132:24 146:8

**top** 20:14 101:11 120:7

**topic** 16:21,22 130:21 159:15

**touch** 163:9

**tout** 165:20

**track** 69:11 180:14

**tracker** 69:22

**trade** 143:19,20,22 144:1,3,11,15 150:4,9, 15,21 159:1,4,19,23

**trading** 115:7

**transaction** 11:8 77:23 78:1

**transactions** 57:2

**transcript** 64:21 202:13

**transfer** 155:11

**transferring** 155:12

**transforms** 170:15

**transition** 53:11

**transitioned** 137:14

**transitioning** 93:21

**transposed** 181:21

**traveled** 131:5

**treat** 105:25

**treatment** 61:16 77:5 164:14 186:16

**treats** 105:24

**trigger** 137:13

**Trip** 128:8

**true** 41:24 125:15 143:15 162:5

**trust** 7:16

**turning** 137:15

**type** 66:9 67:24 69:7 79:9 84:1 95:17,20

**typical** 77:22 79:3 89:12

**typically** 8:8 100:6

## U

**U.K.** 181:8,12 182:12, 14 183:9 191:9

**U.S.** 63:7

**Uber** 83:19

**ultimate** 57:18

**ultimately** 182:5

**underlying** 192:11

**understand** 7:10,23 8:1,2,4,8 11:6 22:4 23:18 45:25 46:4 69:12 106:16,22 114:25 128:15 134:5 155:8 157:23 158:13 169:10 173:9

**understanding** 7:8 22:10 29:19,23 30:2 170:17 173:16 175:7

**understood** 106:3

**undertake** 40:21

**undertook** 145:22

**United** 5:6 39:24 130:25 131:4 132:12,15 143:6 180:11 182:8

**update** 37:8

**updating** 174:6

**upheld** 173:4

**upload** 83:8

**uploaded** 148:19,25

**ups** 161:14,24

**usage** 108:12

**UTC** 196:10,12,22 198:11

## V

**vague** 10:2,6,14,19 21:9 22:21 25:11 28:1,6 29:6,21 46:2 47:19,23 50:11,23 52:9 54:12,21 58:6 59:5 60:25 61:18 67:6 71:15 73:19 78:1 88:1 89:24 92:24 94:5, 13 95:3 96:3 98:9 102:6,12 109:2,20 119:7 127:9 138:18 141:15 144:24 153:17 163:14 172:20 189:15, 22 191:15

**vaguely** 66:15 100:19

**valid** 175:11

**variant** 173:23

**varied** 162:6

**Vegas** 131:5,9,15

**venture** 129:9,24

**ventures** 127:25

**venue** 158:21

**venued** 5:6

**verify** 91:6

**Verizon** 197:5

**Vernetta** 5:11

**version** 116:13,19

**versus** 51:19 61:17 65:22 140:14,15 153:10 167:15 175:19 177:2 199:21

**victim** 133:8

**video** 130:20 132:23 140:17 202:8,12,13

**view** 57:2

**virtual** 63:16 64:18

**virtually** 39:21 140:25

**virtue** 122:24 140:24 141:1

**vis-a-vis** 71:20

**vision** 29:4,19

**visit** 79:8,10,16 80:1 89:12 151:20 165:10

**visited** 175:18

**visits** 65:5 79:24 84:3

## W

**wait** 84:12 138:13

**waiting** 83:21 138:9

**waived** 65:1

**walk** 14:3 79:6

**walked** 18:19 48:19, 22

**Walker** 5:14,15,25 81:15 113:19 147:18 168:24

**wanted** 11:7 60:12 93:14 156:25 187:25 189:3 197:10

**wanting** 129:13

**was--** 197:13

**waste** 80:22 82:2,3 150:22

**wasting** 80:23 81:16

**watching** 138:12

**ways** 68:19 86:17 201:9

**web** 68:17,20 69:9 171:9,18,23

**website** 69:15 70:7 79:14 80:5,9 82:6 83:3 87:7 89:13 151:20 165:19,21 166:10 167:14,15 168:20,21

**websites** 170:18 172:13

**Weed** 140:8

**week** 26:23 65:15 77:17

**weekly** 68:17 69:2,9 189:11

**weeks** 69:24 112:2 115:13

**Well--** 148:18 175:6

**Wellness** 130:3

**whatsoever** 120:8, 20 121:3

**Who--** 105:10

**wisdom** 117:12 170:8

**wise** 118:23

**wished** 183:3

**with--** 172:25 188:19

**word** 101:9 135:21

**words** 63:24 158:3 171:7

**work** 10:2 13:9 17:12 35:11,22,23,25 36:16 38:11 40:22 66:13 79:3 82:1 85:22 88:5 94:18 98:10 122:12 140:13 141:11 143:24 188:19 191:11

**worked** 14:6,14,19 19:6 22:6 35:5,7 49:1 61:7 74:15 83:23 160:13,24 165:14

**working** 14:12,16 15:5 16:18 18:16 23:18 24:3 25:25 26:2,6 32:20 35:13 36:12 39:6 40:23 57:23 59:8,19,25 65:15 67:20 75:5 92:23 93:7 111:23 112:3 121:2 137:22 138:8 145:19 177:18 184:18 192:5,14 194:3,7,9

**workplace** 16:8,12

**works** 81:25 82:3

**would--** 170:3

**write** 33:20 68:9 86:25 199:13,16

**writing** 16:11 66:16 68:6 86:21 120:3 142:4 144:9 150:24

**written** 10:4,21 11:7 13:7 31:7 32:2 50:5 66:5,19 90:20 98:1 105:2 111:15 112:20,23 122:25 152:4 165:15 201:18

**wrong** 175:18

**wrote** 16:7 68:10 143:14 178:10 199:17

**www.leafwell.co** 166:2

## Y

**year** 14:1 16:7 17:9,18 18:17 22:2 63:9 74:13, 18 75:10 85:8 98:20 99:19,21 105:8 110:2 111:2 125:2 130:8 131:21 132:4 147:5 162:8,9 164:3 165:11 182:2 185:3,15,23 188:24 189:14

**years** 52:11,15,18 53:2 61:8 75:1 85:3,6, 10 87:2 98:24 101:3 113:11 120:19 124:12 125:3,11 128:1,5 131:23,25 133:6 159:12 162:7 164:12 166:25 176:2 182:6,11 183:6 185:15 187:15 188:17, 21 189:8 190:9,19 194:13 196:14 197:4

**you--** 73:25 116:6

## Z

**Zimay** 5:10